```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF TEXAS

 3                       DALLAS DIVISION

 4   HARRISON COMPANY LLC,        §
                                  §
 5            Plaintiff,          §
                                  §
 6   v.                          § Civil Action No.
                                  § 3:19-CV-1057-B
 7   A-Z WHOLESALERS, INC. and    §
     BARKAT G. ALI,               §
 8                                §
              Defendants.         §
 9

10

11

12

13

14

15

16

17             REMOTE VIDEOCONFERENCE

18        ORAL AND VIDEOTAPED DEPOSITION OF

19                    AMAR ALI,

20   INDIVIDUALLY AND AS CORPORATE REPRESENTATIVE OF

21               A-Z WHOLESALERS, INC.

22               JANUARY 7, 2021

23

24

25
```

1          ORAL AND VIDEOTAPED DEPOSITION of AMAR ALI,

2    produced as a witness at the instance of the

3    Plaintiff, and duly sworn, was taken in the

4    above-styled and numbered cause on the 7th day of

5    January, 2021, from 10:14 a.m. to 7:03 p.m., before

6    Kim M. Dickman, CSR in and for the State of Texas,

7    reported by machine shorthand, at 616 Clariden Ranch

8    Road, in the City of Southlake, County of Tarrant,

9    State of Texas, pursuant to the Federal Rules of Civil

10   Procedure, current Court orders related to the

11   COVID-19 State of Disaster, and the provisions stated

12   on the record.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  A P P E A R A N C E S

 2       FOR THE PLAINTIFF:

 3            Mr. David L. Swanson
              Mr. Joseph Anthony Unis, Jr.
 4            Ms. Anna K. Finger
              LOCKE LORD LLP
 5            2200 Ross Avenue
              Suite 2800
 6            Dallas, Texas 75201
              214.740.8000
 7            junis@lockelord.com
              dswanson@lockelord.com
 8            anna.k.finger@lockelord.com

 9

10       FOR DEFENDANTS:

11            Mr. Guy Harvey Holman
              JOYCE W. LINDAUER ATTORNEY, PLLC
12            1412 Main Street
              Suite 500
13            Dallas, Texas 75202
              972.503.4033
14            guy@joycelindauer.com

15

        ALSO PRESENT:
16
              Mr. Wayne Rennke, Videographer
17

18

19

20

21

22

23

24

25
```

1                           I N D E X

2       WITNESS                                        PAGE

3       AMAR ALI

4       EXAMINATION BY MS. FINGER

5       CORRECTIONS MADE BY WITNESS
        SIGNATURE OF WITNESS
6       REPORTER'S CERTIFICATION

7       EXHIBITS                                  IDENTIFIED

8       Exhibit   1 - Notice of 30(b)(6) Deposition
                       of A-Z Wholesalers Inc.
9
        Exhibit   2 - Credit Application
10
        Exhibit   3 - Harrison Company, L.L.C., Terms
11                     or Conditions

12      Exhibit   4 - Imperial Invoice to A-Z Wholesale
                       Dallas
13
        Exhibit   6 - Defendant A-Z Wholesalers, Inc.'s
14                     Responses and Objections To
                       Plaintiff's First Set of Discovery
15                     Requests

16      Exhibit   8 - Defendant A-Z Wholesalers, Inc
                       Response to Plaintiff's Second Set
17                     of Discovery Requests

18      Exhibit  10 - 9-10-18 Imperial/Baquet letter to
                       A-Z Wholesalers, Inc., Barkat G.
19                     Ali, Amar B. Ali

20      Exhibit  11 - E-mail string top e-mail being
                       1-12-19 Amar Ali e-mail to Zazulak
21
        Exhibit  12 - Wayne Baquet text messages
22
        Exhibit  13 - 4-10-14 Wayne Baquet e-mail to
23                     Wayne Baquet

24      Exhibit  14 - Declaration of Amar B. Ali

25

1

<u>I N D E X</u>

2   Exhibit   18 - E-mail string top e-mail being
                         12-22-14 Barkat e-mail to Thomas,
3                        Amar Ali

4   Exhibit   29 - 10-30-15 bradp e-mail to Amar Ali,
                        barkat1950
5
   Exhibit   31 - 6-15-18 Imperial/Prendergast e-mail
6                        to A-Z Wholesalers, Inc.

7   Exhibit   32 - 5-31-18 A/R Aged Trial Balance by
                        Chain Number
8
   Exhibit   33 - 3-15-19 Zazulak e-mail to Amar Ali
9
   Exhibit   34 - Declaration of Sandy Zazulak
10
   Exhibit   38 - Defendants' First Amended Answer
11                     To Plaintiff's Original Complaint

12  Exhibit   39 - Subpoena to Testify at a Deposition
                     in a Civil Action To:  Amar Ali
13
   Exhibit   40 - Plaintiff's First Set of Discovery
14                    Requests to Defendant A-Z
                     Wholesalers, Inc.
15

16

17

18

19

20

21

22

23

24

25

|    |    |
|----|----|
|    | 1  | P R O C E E D I N G S |
| 10:11:47 | 2  | THE VIDEOGRAPHER:  Going on the record; |
|    | 3  | the time is 10:14 a.m.  Today is Thursday, January |
|    | 4  | 7th, 2021.  This is the beginning of the |
|    | 5  | videoconference deposition of Amar Ali, individually |
| 10:14:53 | 6  | and as corporate rep of A-Z Wholesalers, Incorporated |
|    | 7  | in the case styled Harrison Company LLC versus A-Z |
|    | 8  | Wholesalers, Incorporated, et al. |
|    | 9  | This deposition is taking at 616 Clariden |
|    | 10 | Ranch Road, Southlake, Texas, 76092.  The court |
|    | 11 | reporter is Kim Dickman.  We're with Dickman |
|    | 12 | Davenport, 4228 North Central Expressway, Suite 101, |
|    | 13 | in Dallas, Texas. |
|    | 14 | The reporter will now make a brief |
|    | 15 | statement for the record and ask that all parties make |
| 10:15:30 | 16 | their appearances with their agreements, after which |
|    | 17 | she may swear in the witness. |
|    | 18 | THE REPORTER:  My name is Kim Dickman, |
|    | 19 | Texas Certified Shorthand Reporter Number 2181.  This |
|    | 20 | deposition is being held via videoconferencing |
|    | 21 | equipment.  The witness and the reporter are not in |
|    | 22 | the same room.  The witness has been sworn in remotely |
|    | 23 | pursuant to agreement of all parties. |
|    | 24 | The parties stipulate that the testimony |
|    | 25 | is being given as if the witness was sworn in person. |

|            |    |                                                         |
|------------|----|---------------------------------------------------------|
|            | 1  | All parties please state their agreement                |
|            | 2  | on the record at this time.                             |
| 10:15:59   | 3  | MS. FINGER:  My name is Anna Finger, at                 |
|            | 4  | Locke Lord, and I represent the plaintiff, Harrison,    |
|            | 5  | in this law -- in this deposition.                      |
|            | 6  | MR. HOLMAN:  Good morning.  My name is                  |
|            | 7  | Guy Holman with the law firm of Joyce Lindauer.  I      |
|            | 8  | represent the defendant *CKTP an Amar Ali, in his       |
|            | 9  | individual capacity and corporate capacity.             |
|            | 10 | MR. UNIS:  Joe Unis is also on the line                 |
|            | 11 | for plaintiff, Harrison.                                |
|            | 12 | THE REPORTER:  I think we lost Mr. Ali.                 |
|            | 13 | *CKSPEAKER:  There you go.                              |
|            | 14 | THE REPORTER:  Can you hear me, Mr. Ali?                |
|            | 15 | THE WITNESS:  Yes, ma'am.                               |
|            | 16 | AMAR ALI,                                               |
|            | 17 | having been first duly sworn, testified as follows:     |
|            | 18 | EXAMINATION                                             |
| 10:16:23   | 19 | BY MS. FINGER:                                          |
|            | 20 | Q.  Mr. Ali, can you please state your full name        |
|            | 21 | for the record?                                         |
|            | 22 | A.  My name is Amar Barkat Ali.                         |
|            | 23 | Q.  Mr. Ali, my name is Anna Finger and I               |
|            | 24 | represent Harrison in this lawsuit and in this          |
|            | 25 | deposition today, and moving forward, if I refer to     |

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|            | 1  | Harrison, will you understand that I'm referring to |
| 10:17:27   | 2  | the plaintiff in this case, Harrison Company, LLC? |
|            | 3  | A.  Yes. |
|            | 4  | Q.  You are here to testify today on behalf of |
|            | 5  | yourself individually as well as the defendant in this |
|            | 6  | case, A-Z Wholesalers, Incorporated; is that right? |
|            | 7  | A.  Yes. |
|            | 8  | Q.  So moving forward, if I say A-Z in my |
|            | 9  | questions, will you understand that I'm referring to |
|            | 10 | the defendant A-Z Wholesalers, Incorporated? |
|            | 11 | A.  Yes. |
| 10:17:57   | 12 | Q.  Your lawyer is here, Mr. Ali; is that right? |
|            | 13 | A.  Correct. |
|            | 14 | Q.  Have you ever been deposed before? |
|            | 15 | A.  Yes, I have. |
|            | 16 | Q.  How many times? |
|            | 17 | A.  It's hard to remember if I was being deposed |
|            | 18 | or if I attended a deposition, but probably a couple |
|            | 19 | of times as a person being deposed. |
|            | 20 | Q.  And in those depositions that you were being |
|            | 21 | deposed, were you a fact witness or a party to those |
|            | 22 | lawsuits? |
| 10:18:28   | 23 | A.  I believe I was in one of them a corporate |
|            | 24 | representative for a party in the lawsuit and in the |
|            | 25 | other I was a fact witness as an attorney for one of |

1  the parties -- the parties, the plaintiffs in the

2  lawsuit.

3      Q.   And the first deposition that you mentioned,

4  who was the party in the lawsuit that you were a

5  corporate representative for?

10:18:59  6      A.   I believe the party was Altona, Inc., that's

7  A-L-T-O-N-A comma, Inc.

8      Q.   What was your role with that company?

9      A.   I'm the president and owner of that company.

10     Q.   When did that deposition take place?

11     A.   Whew, testing my memory here.  So I want to

10:19:28 12  say maybe four years ago, maybe a little less.

13     Q.   What was the nature of the lawsuit?

14     A.   It was an insurance claim that was filed by

15  Altona, Inc. for some damage that had occurred on a

16  property owned by Altona, Inc.

17     Q.   And were they the plaintiff or the defendant

18  in that case?

19     A.   Altona, Inc. is the plaintiff in that case.

10:19:59 20     Q.   Has the case since been resolved?

21     A.   It went to trial and we got a jury verdict in

22  favor of Altona, Inc.

23     Q.   Are you still the president of Altona, Inc.?

24     A.   Yes, ma'am.

25     Q.   Are you also still the owner?

```
 1          A.   Yes, ma'am.

 2          Q.   Are you the sole owner?

 3          A.   Yes, ma'am.

 4          Q.   What does that company do?

 5          A.   It just owns real estate.

 6          Q.   Is all of the real estate that it owns in

 7    Texas?

 8          A.   Yes, ma'am.

 9          Q.   What kind of real estate does it own?

10          A.   Commercial real estate.

11          Q.   Can you be more specific?

12          A.   It owns a shopping center in Sherman, Texas.

13          Q.   Is that its only property?

14          A.   I'm sorry?

15          Q.   Is that its only property that it owns?

16          A.   Yes.  It -- it's actually, I think three or

17    four properties that are adjacent to each other that

18    makes up the entire shopping center.

19          Q.   You mentioned another deposition that you

20    gave as a fact witness as the attorney for the

21    plaintiff in a lawsuit; is that correct?

22          A.   That's correct.

23          Q.   Who was the plaintiff that you represented?

24          A.   It was Barkat Ali and Neil Johnston, both

25    acting in their derivative capacity for River Bend
```

10:20:26   (line 5)
10:20:58   (line 17)
10:21:26   (line 25)

```
 1   Financial Corporation.
 2        Q.   You mentioned Mr. Barkat Ali, that's your
 3   father, correct?
 4        A.   Yes.
 5                  THE VIDEOGRAPHER:  Anna --
 6                  MS. FINGER:  It's me?
 7                  THE VIDEOGRAPHER:  No, I'm so sorry.  I
 8   think, Kim, that's something, there was some -- a
 9   chair going off on Guy's feed.  I'm so sorry to do
10   this on your record, but, Guy, if -- if we could maybe
11   go on mute unless you anticipate an objection to one
12   of these questions, I think it would really help Kim
13   out.
14                  MR. HOLMAN:  That's fine.
15                  THE VIDEOGRAPHER:  Thank you.
16                  Kim, you're still on mute.
17                  THE REPORTER:  Mr. Ali, you had said they
18   were both acting in a derivative capacity?
19                  THE WITNESS:  That's correct.
20                  THE REPORTER:  Okay.  That was the word I
21   didn't hear.  Thank you.
22        Q.   (By Ms. Finger)  My last question, Mr. Ali,
23   was you mentioned Barkat Ali as a party in that case.
24   He's your father; is that right?
25        A.   That's correct.
```

10:21:59 (beside line 11)
10:22:30 (beside line 15)

```
 1      Q.   And he's also a defendant in this lawsuit?

 2      A.   Yes.

 3      Q.   You were present for his deposition in this

 4  case on Tuesday, correct?

 5      A.   I was.

 6      Q.   In this other lawsuit in which you were

 7  deposed, who was the defendant?

 8      A.   Shair Hakemy, that's spelled S-H-A-I-R; last

 9  name, Hakemy, H-A-K-E-M-Y.

10      Q.   And the other party that you represented was

11  Neil; is that right?

12      A.   It's Neil Johnston, S-T-O-N, and Neil

13  Johnston is the trustee of the trust that owns the

14  shares in the River Bend Financial Corporation.

15      Q.   Who else is a shareholder of that

16  corporation?

17      A.   In addition to Barkat Ali and the Johnston

18  trust, the other shareholders are Mike Farhat, last

19  name is spelled F-A-R-H-A-T, Sam Farhat, who is

20  represented by I believe the executor of the estate,

21  Layla Farhat, same spelling on the last name.  Layla's

22  first name is spelled L-A-Y-L-A.

23              There is Sam Srianant, last name is

24  spelled S-R-I-A-N-A-N-T.  There's Allen Miller,

25  A-L-L-E-N, Miller, if you need the spelling, let me
```

10:22:59 — line 8

10:23:29 — line 13

10:23:54 — line 19

10:24:25 — line 23

|    |    |
|----|----|
|    | 1  | know later, Shair Hakemy and Sabreena Hakemy, and her |
| 10:24:56 | 2  | name is spelled S-A-B-R-E-E-N-A, Hakemy, same last |
|    | 3  | name as Shair Hakemy. |

        1    know later, Shair Hakemy and Sabreena Hakemy, and her
10:24:56 2    name is spelled S-A-B-R-E-E-N-A, Hakemy, same last
        3    name as Shair Hakemy.
        4         Q.   And what does River Bend do?
        5         A.   River Bend Financial Corporation is the
        6    holding company for a financial institution, a bank, a
        7    local community bank.
        8         Q.   You just listed all the shareholders for us.
        9    You don't have any interest in that corporation, do
10:25:30 10   you?
        11        A.   I do not.
        12        Q.   What was the nature of that lawsuit?
        13        A.   It's a derivative lawsuit versus a minority
        14   shareholder regarding some conduct -- bad conduct by
        15   that minority shareholder.
        16        Q.   When was that lawsuit?
        17        A.   I believe the lawsuit was originally filed
        18   sometime in June of 2019.
10:25:59 19        Q.   Where was it filed?
        20        A.   In Dallas County.
        21        Q.   Has it been resolved since?
        22        A.   No, but the plaintiffs in the case, Barkat
        23   Ali, Neil Johnston, were granted a temporary
        24   injunction by the 101st Judicial Court in Dallas.
        25        Q.   What is the injunction for?

|  |  |
|---|---|
| | 1 |
| 10:26:28 | 2 |
| | 3 |
| | 4 |
| | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| | 10 |
| | 11 |
| | 12 |
| 10:26:59 | 13 |

        A.   To prevent the minority shareholder from
continuing to conduct rogue and bad acts.
        Q.   We just talked about these two cases that you
were deposed in.  Are there any others that you
remember where you've given a deposition?
        A.   Not that I recall.  There may have been a car
accident when I was, you know, in high school that I
may have been deposed on, but I don't really recall if
I was or wasn't.
        Q.   Okay.  Have you ever taken a deposition
before?
        A.   I have not personally taken a deposition, but
I've sat in as, you know, an associate during
depositions.  I've also sat in on depositions where,
you know, parties were being -- parties that I
represented were being deposed.
        Q.   So you're rather familiar with the process,
right?
        A.   Yes.
        Q.   I'm just going to go over a few rules even
though you do have some experience and we've been
doing a really good job so far.  As you know, the
court reporter is going to take down everything that
you and I say, and especially with some of the
feedback issues we've been having, it will be really

```
            1        A.   To prevent the minority shareholder from
10:26:28    2   continuing to conduct rogue and bad acts.
            3        Q.   We just talked about these two cases that you
            4   were deposed in.  Are there any others that you
            5   remember where you've given a deposition?
            6        A.   Not that I recall.  There may have been a car
            7   accident when I was, you know, in high school that I
            8   may have been deposed on, but I don't really recall if
            9   I was or wasn't.
           10        Q.   Okay.  Have you ever taken a deposition
           11   before?
           12        A.   I have not personally taken a deposition, but
10:26:59   13   I've sat in as, you know, an associate during
           14   depositions.  I've also sat in on depositions where,
           15   you know, parties were being -- parties that I
           16   represented were being deposed.
           17        Q.   So you're rather familiar with the process,
           18   right?
           19        A.   Yes.
           20        Q.   I'm just going to go over a few rules even
           21   though you do have some experience and we've been
10:27:28   22   doing a really good job so far.  As you know, the
           23   court reporter is going to take down everything that
           24   you and I say, and especially with some of the
           25   feedback issues we've been having, it will be really
```

1   important that you and I let each other finish

2   speaking before we start responding.  So I ask that

3   you let me finish my question before you start

4   answering, and I'll also do my best to let you finish

5   your answer before I ask my next question; is that

6   fair?

7        A.   That's fair.

10:27:54   8        Q.   Also, we have Guy representing you today, is

9   that correct, Mr. Holman?

10       A.   That's correct.

11       Q.   And he may unmute himself if he needs to

12  object to any of my questions or to advise you on any

13  privilege issues, and so all I ask is if you hear your

14  lawyer start to object, you let him do so before you

15  give your answer.  Is that okay?

16       A.   Yeah, my plan is since he's on mute to maybe

17  give a few seconds for him to object if I feel like

18  the question may be objectionable.  So if I'm stalling

10:28:28   19  on my answer, it's because I'm thinking maybe there

20  will be an objection coming.

21       Q.   Sure.

22            And you understand that even if --

23  ifMr. Holman objects, unless he instructs you not to

24  answer on a privilege issue, you do still have to

25  answer the question after the objection.  Do you

1    understand that?

2         A.   I do understand that.

3         Q.   And so also to help the court reporter, it's

4    important that you give audible answers, so clear yes

5    or no to yes or no questions and we need to avoid any

6    head nods or head shakes and things like that.  Do you

10:28:59   7    understand that?

8         A.   (Witness nodding head.)

9         Q.   Is that yes, sir?

10        A.   Yeah.  Yes.

11        Q.   Thank you.

12             I tend to talk a little fast, and so I

13   will say if I ask a question too quickly or unclearly,

14   please do let me know.  If I ask a question and you

15   answer it, I'm going to assume that you understood

16   what I say; is that fair?

17        A.   That's fair enough.

10:29:29   18        Q.   Do you understand that you're under oath

19   today, Mr. Ali?

20        A.   I do.

21        Q.   And the oath that you're under in this

22   deposition today is the same that you would be under

23   as if you were testifying in a court, do you

24   understand that?

25        A.   Yes.

1    Q.   Are you currently on any medication that

2    might affect your ability to give true and accurate

3    testimony today?

4    A.   No.

5    Q.   Are you under the influence of any other

6    drugs that might affect your ability to give accurate

7    testimony today?

8    A.   No.

9    Q.   Is there any other reason that you would not

10:29:59   10   be able to give true and accurate testimony as you sit

11   here today?

12   A.   No, aside from the fact that there are lots

13   of exhibits or production documents that have been

14   produced, so I may be off on some dates or exact

15   numbers, but I'll try to do my best to be as accurate

16   as possible.

17   Q.   And if you're not sure of an answer, please

18   do tell me that you don't know, but in any event, you

19   would be able to truly and accurately tell me that you

10:30:29   20   don't recall or you don't remember an answer to my

21   question, right?

22   A.   Sure, and I'll -- I'll try to preface my

23   responses by telling you either approximately or on or

24   about and maybe try to direct you with some documents

25   that might help refresh my memory.

1    Q.   Sounds good.

2         If at any time throughout today's

3    deposition you feel as though you misspoke previously

4    in an answer or that you need to correct something

5    that you said earlier, will you let me know?

6    A.   I will.

10:31:02    7    Q.   Have you personally ever filed a lawsuit

8    before?

9    A.   Can you clarify your question?  So personally

10   as in a party, like a party?

11   Q.   Yes.  In your individual capacity, so not

12   necessarily on behalf of an entity, but in your

13   individual capacity, have you ever filed a lawsuit as

14   a plaintiff against a defendant?

10:31:29   15   A.   I don't think I filed one, but I think I may

16   have been a party to a lawsuit in my individual

17   capacity.

18   Q.   When you say you've been a party, do you mean

19   you were a co-plaintiff or that you were a defendant?

20   A.   I believe originally I was a defendant and

21   then I became a counterplaintiff?

22   Q.   Okay.  So the lawsuit was originally filed

23   against you, though; is that correct?

24   A.   That is correct.

10:31:57   25        Can we just go on hold just for a second?

```
          1   I need to plug in my laptop before we lose connection.

          2   Just a sec.  We can stay on the record.  I'm sorry, I

          3   should have done that when I first got here, but I

          4   didn't.

10:32:41  5              THE REPORTER:  Mr. Holman, could I just

          6   ask, sir, if you're on mute?

          7              MR. HOLMAN:  I was on mute, yes.

          8              THE REPORTER:  Okay.  All right.  I

          9   thought -- I thought I heard something, but just

         10   wanted to take the chance to ask you while Mr. Ali is

         11   getting set up.

         12        A.   Okay, Ms. Finger, I'm good to go, I believe.

         13        Q.   (By Ms. Finger)  Okay.

         14        A.   Yeah, it's plugged.  Sorry about that.

10:32:58 15        Q.   So we were just discussing a lawsuit in which

         16   you were personally named as a defendant; is that

         17   right?

         18        A.   Originally, yes.

         19        Q.   Who filed that lawsuit?

         20        A.   I believe it was an individual by the name of

         21   Moses Musallam and maybe Fanci Candy, Inc.

         22        Q.   Were you the only defendant?

         23        A.   Yes.

10:33:29 24        Q.   When was that lawsuit filed?

         25        A.   Whew, I'd say probably seven years ago,
```

1    maybe.

2         Q.   What were the allegations against you?

3         A.   I really don't recall.  I think it may have

4    been like a breach of contract or something is -- is

5    what they alleged.

10:33:59   6         Q.   Has the case since been resolved?

7         A.   Yes.

8         Q.   How so?

9         A.   It went to trial and I was awarded a -- a

10   verdict by a jury in Tarrant County.  The case was

11   appealed, the case was upheld at the appellate court,

12   it was then appealed to the Texas Supreme Court, and

13   it actually got a hearing in front of the Texas

10:34:29   14   Supreme Court.  It was then remanded back down to the

15   appellate court on an issue, ultimately got a final

16   judgment on that probably three years ago ish, again,

17   in -- in my favor.

18        Q.   What were your counterclaims?

19        A.   Breach of contract and I guess -- I think

10:34:57   20   breach of contract was our major counterclaim.

21        Q.   Were you awarded a monetary judgment?

22        A.   Yes.

23        Q.   How much?

24        A.   I don't recall exactly how much that was.

25        Q.   Is that the only lawsuit in which you were

1   named personally as a defendant?

10:35:28   2       A.   I think so.

3       Q.   There are no other lawsuits that you can

4   remember in which you in your individual capacity were

5   named as a defendant; is that right?

6       A.   Not really, but I'm not sure.

7       Q.   You don't recall any other lawsuits in which

8   you were personally named as a defendant as you sit

9   here today; is that right?

10      A.   Yeah, I don't recall any that I'm personally

10:36:01   11   named, but I'm not -- again, I'm not sure.

12      Q.   Have you ever been part of litigation

13   involving a company that you have an ownership

14   interest in?

10:36:15   15            Other than the Altona lawsuit, there may

16   have been one -- there may have been a -- a couple for

17   a company called A-Z Wholesalers -- or A-Z Wholesale

18   Wine & Spirits, LLC.

19      Q.   You mentioned there were a couple lawsuits on

20   behalf of A-Z Wholesale Wine & Spirits; is that right?

10:36:59   21      A.   Correct.

22      Q.   Do you recall when those lawsuits took place?

23      A.   They probably took place sometime between

24   2015 and 2018 or '19ish.

25      Q.   You have an ownership interest in A-Z

```
 1  Wholesale Wine & Spirits?
 2       A.   Yes, ma'am.
 3       Q.   Are you the sole owner?
 4       A.   Yes, ma'am.
 5       Q.   Is that entity at all affiliated, other than
 6  sharing common ownership with the defendant in this
 7  lawsuit?
 8       A.   No.
 9       Q.   A-Z Wholesale Wine & Spirits does not do any
10  business with A-Z Wholesalers that is a party to this
11  lawsuit; is that right?
12       A.   No.  A-Z Wholesalers -- A-Z Wholesale Wine &
13  Spirits isn't an operat -- isn't a company that
14  operates today, so it does not do any business with
15  A-Z Wholesalers, Inc.
16       Q.   When did it cease doing business?
17       A.   I believe in October of 2018 and I think sort
18  of the winding down probably another six months after
19  that.
20       Q.   Prior to October of 2018, did A-Z Wholesale
21  Wine & Spirits do any business with A-Z Wholesalers,
22  Inc.?
23       A.   If they did, it was very nominal.
24       Q.   What kind of nominal business would that have
25  been?
```

10:37:30 (line 4)
10:37:55 (line 12)
10:38:27 (line 18)

1  A. Maybe bought some nonalcoholic beverages,

10:38:56 2 like some sodas and waters.

3  Q. Going back to the lawsuit that A-Z Wholesale

4 Wine & Spirits was involved in in approximately 2015,

5 were they the plaintiff or the defendant?

6  A. So I want to make sure that I didn't misspeak

7 or you didn't misunderstand.  What I said was there

8 were probably a couple of lawsuits, so more than one,

10:39:27 9 from sometime between 2015 and 2018 or '19.  I don't

10 know if the lawsuits were filed in '15 and '16, '17,

11 '18, or '19, but primarily the lawsuits that I recall

12 that occurred in that company were breach of contract

13 lawsuits that A-Z Wholesale would have filed against

14 certain suppliers who we had distribution contracts

15 with and breached those contracts, exclusive

10:39:57 16 distribution contracts with.

17  Q. Do you remember the names of any of those

18 suppliers that A-Z Wholesale Wine & Spirits filed

19 lawsuits against?

20  A. I -- I wish I did, but I don't.  Let me see

21 if I can think of any.  I can't really think of any.

10:40:27 22  Q. So you know for sure that A-Z Wholesale Wine

23 & Spirits did file a few lawsuits between 2015 and

24 2019 against suppliers, but you don't recall the names

25 of those defendants; is that right?

```
 1          A.   Correct, and -- and just to -- just so that
 2   my testimony is accurate, I don't know if the lawsuit
 3   was filed by A-Z Wine & Spirits or there was a lawsuit
 4   filed against the company and then we filed
 5   counterclaims.  All I know is that they were involved
 6   in some lawsuits primarily related to breach of
 7   contract on exclusive distribution agreements.
 8          Q.   Do you recall A-Z Wholesale Wine & Spirits
 9   definitely being a plaintiff in at least one lawsuit?
10          A.   Sure, yeah.
11          Q.   And you also recall A-Z Wholesale Wine &
12   Spirits definitely being a defendant in at least one
13   lawsuit; is that right?
14          A.   Sure.
15          Q.   But you don't recall how many lawsuits the
16   entity was a plaintiff or a defendant?
17          A.   No.  I mean, we -- we had dozens of suppliers
18   over the years, so -- but it was a small number, you
19   know, like I said, at least one, though probably not
20   more than three or four.
21          Q.   Approximately how many suppliers did A-Z
22   Wholesale Wine & Spirits have?
23          A.   I don't recall exactly over the years, but I
24   would say couple dozen.
25          Q.   And of those approximately couple dozen
```

10:40:59  5

10:41:28  11

10:41:56  21

1  suppliers, A-Z Wholesale Wine & Spirits would have had

2  distribution contracts with each of them?

3      A.   That was sort of the standard operating

4  procedure.  There may have been an exception here or

10:42:29  5  there, but primarily we didn't distribute products for

6  a supplier without having a distribution agreement in

7  place.

8      Q.   You mentioned there might be a few

9  exceptions.  What would an exception be?

10      A.   If we picked up a particular brand that --

11  and to test it out in a market potentially to see how

12  viable it would be before we entered into a more

10:42:59  13  formal, long-term agreement.

14      Q.   When you say "picked up a particular brand,"

15  do you mean a particular product that you would have

16  received from a supplier with whom you already had a

17  contract?

18      A.   No, not generally.  I mean, if we -- if we

19  had an agreement with a supplier and they introduced a

10:43:27  20  new brand or wanted to introduce a new brand in the

21  market, that brand would have been added onto the

22  existing agreement as an additional brand, right?

23           I'm talking more about a -- a supplier

24  that perhaps we don't have an exclusive distribution

25  agreement with and they were either self-distributing

10:43:56  1  in the market and that's not really their cup of tea

2  and so they asked us to help out with the

3  distribution.  We said we would, but we wanted to see

4  if we could grow the brand before we got into a

5  long-term arrangement with them.  That's generally how

6  that would work.

7      Q.  So in that scenario where you would try to

8  grow the brand first, you wouldn't enter into a formal

9  distribution contract with that supplier?

10      A.  Again, it was -- it -- it's such a small

10:44:28  11  exception that I can't even think of a brand where we

12  actually did something like that, and -- and we may

13  have done it for a few weeks while everybody was kind

14  of getting their ducks in a row.

15          And then the only other instance I can

16  imagine where we distributed product for a supplier

17  where we didn't have an exclusive distribution

18  agreement is if the supplier had already sort of made

19  the sale, right, and just needed the logistics to

10:44:58  20  deliver the product.  It's standard in that industry

21  when you are dealing with alcoholic beverages, to --

22  you have to have a distributor *CKTP to go through

23  your system, you have to have a distributor, and in

24  order to sell the product, we would buy it from the

25  supplier, deliver it to their customer, and have a

10:45:29

1    fixed, you know, a dollar, $2, $3 per case kind of

2    profit, but there wasn't any sales effort or anything

3    like that on -- on our part.

4        Q.   So, generally speaking, you always had a

5    written contract with your suppliers for A-Z Wholesale

6    Wine & Spirits; is that right?

7        A.   Generally speaking, because that industry is

8    highly regulated.  It's a three-tier system.  You

9    can't be licensed in more than one tier, right, so

10   you're either a supplier, a distributor, or a

11   retailer, and you deal with TABC.

10:45:59   12        And so there's a requirement to have an

13   exclusive distribution agreement when it comes to like

14   beer because it's county by county and with wine and

15   spirits, we just felt like that was the right thing to

16   do was to have an exclusive distribution agreement.

17   Again, it's the alcohol distribution business, very

18   different from obviously A-Z Wholesalers, Inc.

19        Q.   How is it different?

20        A.   Because it's -- A-Z Wholesalers, Inc. doesn't

21   deal with alcohol and there's not a three-tiered

10:46:30   22   system when it comes to convenience channel

23   distribution.

24        MR. HOLMAN:  Anna, I'm going to -- I'm

25   going to have to object to this line of questioning.

1   We -- we're on A-Z Wine distribut -- distributor --

2   distribution, which is only related to the defendant

3   and Mr. Amar is here in his individual capacity and

4   corporate capacity for A-Z Wholesalers.  So can we get

5   back on tract?

10:46:58   6          MS. FINGER:  Correct, Mr. Holman, he is

7   also here on his individual capacity, though, and I am

8   asking about his ownership interest in this company,

9   which was back and forth with lawsuits against breach

10  of contract with similar distribution agreements to

11  the one at issue here.

12      Q.   (By Ms. Finger)  So, Mr. Ali, I believe my

13  last question was, how the industry is different

10:47:27   14  between A-Z Wholesale Wine & Spirits and the defendant

15  in this case?

16      A.   Well, it's very different, and based on your

17  response to Mr. Holman's objection, I think you -- you

18  feel like there's some similarities, so let me help

19  you kind of clarify that a little bit.

20          So in A-Z Wholesalers, Inc., there are no

21  exclusive distribution agreements that we have with

22  suppliers and we're not exclusive to buy from any

10:47:59   23  particular supplier.  We're also in the nonalcoholic

24  space, A-Z Wholesalers, Inc.  There is no requirement

25  by law that we have an exclusive distribution

1   agreement, and we have the ability to buy from lots of

2   different suppliers.

3            We deal primarily with candy, snacks,

4   beverages, nonalcoholic, tobacco, those types of

5   products, and so those companies are very, very

10:48:27   6   distinct from each other.

7        Q.   Although you don't have exclusive

8   distribution agreements at A-Z Wholesalers, Inc., do

9   you have other distribution agreements with suppliers?

10       A.   What do you mean by other agreements?

11       Q.   So, in general, if you're -- if A-Z

12   Wholesalers, Inc. is working with a supplier, do they

10:48:59   13   have a written distribution agreement even though it

14   may not be an exclusive distribution agreement?

15       A.   Generally, no.

16       Q.   Why not?

17       A.   Because it's not a requirement in the

18   industry.

19       Q.   If you don't have a written distribution

20   agreement with a supplier, how do you know what the

10:49:27   21   terms are of your informal distribution agreement with

22   that supplier?

23       A.   What terms are you talking about?

24       Q.   Let me back up.  What sort of terms might you

25   need to agree with with a supplier for distribution of

```
 1   their product; in other words, how do you know how
 2   much to pay or how to place an order or how orders
 3   will be delivered and so forth?
 4       A.   Those are all done by communication with the
 5   supplier.
 6       Q.   Does it change every time you communicate
 7   with a supplier?
 8       A.   Does what change?
 9       Q.   Any of those terms.  So if you were to place
10   an order today and then place another order next week,
11   would you have some sort of expectation of how much a
12   product would be or when it would be delivered, or did
13   that change from one order to the next?
14       A.   Well, it just depends on the supplier.
15       Q.   Okay.  Now, I want to circle back to that,
16   but first I want to go back to the litigation that we
17   were discussing.
18            Is there any other entity in which you
19   have an ownership interest that was a plaintiff or a
20   defendant in a lawsuit?
21       A.   I can't really think of any off the top of my
22   head.
23       Q.   Where did you go to high school, Mr. Ali?
24       A.   At Euless Trinity.  It's a public school in
25   the City of Euless in HEB ISD.
```

10:49:57 (line 4)
10:50:26 (line 14)
10:50:57 (line 21)

```
 1          Q.   When did you graduate?
10:51:27  2          A.   1996.
 3          Q.   What did you do after high school?
 4          A.   I went to college.
 5          Q.   Where did you go to college?
 6          A.   I went to Southern Methodist University in
 7    Dallas.
 8          Q.   When did you first enroll at SMU?
 9          A.   In 1996, the fall semester.
10          Q.   When did you graduate?
10:51:57 11          A.   In 2000.
12          Q.   What degree or degrees did you receive from
13    SMU when you graduated?
14          A.   I believe I received a BA in sociology and I
15    believe I also received a BA in philosophy, but I got
16    to double-check that because I think I may have -- I
17    may have been three hours short.  I don't know if I
18    took summer school to get it or not.
10:52:31 19          Q.   Did you take any accounting courses while at
20    SMU?
21          A.   Not that I recall.
22          Q.   Did you take any business courses while you
23    were at SMU?
24          A.   I'm sure I did.
25          Q.   Do you remember what those courses were?
```

|  |  |  |
|---|---|---|
| | 1 | A. No. |
| 10:52:58 | 2 | Q. What did you do after college? |
| | 3 | A. I went to law school. I took a little bit of |
| | 4 | time off and then I went to law school. |
| | 5 | Q. How much time off did you take? |
| | 6 | A. About a year, year and a half. |
| | 7 | Q. And what did you do during that time? |
| | 8 | A. I don't know. I just tried to figure out, I |
| | 9 | guess, what I wanted to do, really. |
| | 10 | Q. Were you working at all? |
| 10:53:29 | 11 | A. I don't recall, but I'm sure I kept myself |
| | 12 | busy somehow. |
| | 13 | Q. Where did you attend law school? |
| | 14 | A. St. Mary's, San Antonio. |
| | 15 | Q. And when did you first enroll? |
| | 16 | A. Oh, I want to say it was 2002. |
| | 17 | Q. When did you graduate from law school? |
| 10:53:55 | 18 | A. In 2005. |
| | 19 | Q. And graduating from law school means that you |
| | 20 | have your juris doctorate degree; is that right? |
| | 21 | A. That's correct. |
| | 22 | Q. Am I right to assume that you took the bar |
| | 23 | exam after law school? |
| | 24 | A. I did. |
| | 25 | Q. When did you take it? |

|   |   |
|---|---|
| | 1 |
| | 2 |
| 10:54:28 | 3 |
| | 4 |
| | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 10:54:59 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| | 20 |
| 10:55:29 | 21 |
| | 22 |
| | 23 |
| | 24 |
| | 25 |

A.   I think I took it a couple of times.  I didn't take it immediately after graduating that summer.  I want to say the first time I took it was either the following summer or maybe the February bar in between the two summer bars.

Q.   Why did you wait to take it?

A.   I was -- I wasn't feeling well, number one. I had injured myself working out while studying for the bar that summer and I had to take medication that really prohibited me from being able to -- to study or sit, so I thought it was just a good idea not to force myself to do something when I wasn't feeling well.

Q.   You weren't working during that time, were you?

A.   No.

Q.   Are you currently a member of the Texas State Bar?

A.   I am.

Q.   Are you in good standing with the Texas State Bar?

A.   Yes.

Q.   Are you a member of any other state's bar?

A.   No.

Q.   You talked about high school, college, and law school.  Do you have any other education or

1   training?

2       A.   Not formal, no.

3       Q.   Do you have informal education or training?

10:55:59  4       A.   School of hard knocks.

5       Q.   Do you hold any other degrees or

6   certificates?

7       A.   Not that I recall.

8       Q.   And other than your law license, do you hold

9   any other professional licenses?

10       A.   No.

11       Q.   Were you working while you attended college

12   at SMU?

10:56:32  13       A.   Not that I recall.

14       Q.   When was your first job?

15       A.   My first job was, I think, in high school in

16   between my junior and senior year.  I was interning at

10:56:56  17   a law office in Dallas, and then I believe the summer

18   of my senior year I may have worked probably without

19   pay at a convenience store to kind of learn the

20   convenience store business.

21          And then I think after that, my first job

22   really probably was coming out of law school, I worked

23   at a firm in Fort Worth.

10:57:26  24       Q.   What law firm was that?

25       A.   Brown Pruitt.

```
 1         Q.   Were you an associate there?
 2         A.   Yes.
 3         Q.   What year did you start?
 4         A.   I think I started, whew, probably in 2006 and
 5    worked there not as an associate but someone who had
10:57:59  6   graduated from law school, waiting to take the bar, so
 7    I worked there in that capacity and then -- and then
 8    stayed there for a while.
 9         Q.   How long did you work there?
10         A.   Two years maybe, two or three years.  It
11    was probably about --
12         Q.   What type of -- oop, go ahead.
10:58:26 13        A.   I said probably about three years or so.
14         Q.   What type of law did you practice while you
15    were at the firm?
16         A.   I primarily dealt with business transactions
17    and some litigation work.  I think as you probably
18    know -- I don't know how your firm worked or -- or
19    where you went to -- to work after law school, but it
20    was a smaller firm and so I got an experience on some
21    family law cases and, you know, just a -- a number of
22    random areas of law, right, but primarily it was
10:59:00 23   business transactions and litigation.
24         Q.   Why did you leave the firm?
25         A.   Because I went to go work at A-Z Wholesalers,
```

```
 1  Inc.
 2       Q.   When was that?
 3       A.   It probably started sometime in late 2008 and
 4  at that time, I think I was still doing a little bit
 5  of both, right, so working at the firm half of the
 6  time and working at the distribution company half of
 7  the time, and then I think I formally transitioned
 8  full-time to A-Z Wholesalers, Inc. sometime very early
 9  in probably 2009.
10       Q.   While you were working at the firm, did you
11  ever represent a corporate client in forming a legal
12  entity, such as a corporation or an LLC?
13       A.   Yes.
14       Q.   How many times would you say?
15       A.   While working as a lawyer at the firm?
16       Q.   Yes.
17       A.   Whew, maybe three or four times.
18       Q.   Do you have experience forming such legal
19  entities not while working as a lawyer at that firm?
20       A.   Yes, I mean, subsequent to -- to leaving the
21  firm, I've been involved in various capacities in
22  forming legal entities.
23       Q.   And what do you mean by various capacities?
24       A.   Either as an owner of a new entity that's
25  being formed or, you know, perhaps assisting a -- a
```

10:59:27   (line 3)
10:59:55   (line 9)
11:00:26   (line 15)
11:00:59   (line 23)

|      |    |                                                          |
|------|----|----------------------------------------------------------|
|      | 1  | friend or a family member put one together.              |
|      | 2  | Q.   And how many times would you say you've done        |
|      | 3  | it in that capacity as opposed to while working at the   |
|      | 4  | firm?                                                     |
| 11:01:25 | 5 | A.   Maybe a dozen or so.                            |
|      | 6  | Q.   While working at the firm, did you ever             |
|      | 7  | represent a client in a merger or an acquisition?        |
|      | 8  | A.   I don't recall if I did.                            |
|      | 9  | Q.   Have you ever participated either formally as       |
| 11:01:55 | 10 | a lawyer or informally based on your ownership       |
|      | 11 | interests with other entities in a merger or            |
|      | 12 | acquisition?                                              |
|      | 13 | A.   Yes.                                                |
|      | 14 | Q.   How many times would you say?                       |
|      | 15 | A.   Maybe half a dozen.                                 |
|      | 16 | Q.   Do you recall any of the companies that were       |
|      | 17 | involved?                                                 |
| 11:02:18 | 18 | A.   Not offhand.                                    |
|      | 19 | Q.   When you started working for A-Z, what was          |
|      | 20 | your first title?                                        |
|      | 21 | A.   General counsel for sure because I earned it.       |
|      | 22 | I think that was probably my first title, but given     |
| 11:02:59 | 23 | that I started at the company probably full-time     |
|      | 24 | sometime early 2009, I think by then I was probably     |
|      | 25 | vice president and general counsel.                      |

1    Q.   And what were your general responsibilities

2  as the general counsel when you first started at A-Z?

3    A.   I mean, just kind of handling some of the

11:03:30  4  legal affairs, regulatory affairs if there were any,

5  with the company, dealing with customers, you know,

6  just making sure that invoices have the appropriate

7  disclaimers, disclosures, just kind of really trying

8  to make sure that the company's operating with a clear

11:03:57  9  understanding of what the rights and expectations are

10  of both the company, its customers, and its suppliers.

11    Q.   Can you tell me a little bit more about what

12  A-Z is?

13    A.   A-Z Wholesalers, Inc. is what I refer to as a

14  convenience channel distributor.  We sell Cokes and

11:04:29  15  smokes, and so if you can imagine a convenience store,

16  which I think everybody's had an opportunity to go

17  into at some point, you know, you see a lot of

18  packaged goods, right, candy, snacks, salty snacks,

19  nonalcoholic beverages.  Behind the counter there's

20  generally some cigarettes and tobacco, some cigars,

11:04:57  21  not premium cigars, but just your typical -- typical

22  cigars.  And so A-Z Wholesalers, Inc. is a convenience

23  channel distributor where we buy those products from

24  various suppliers and then deliver them to our

25  customer, who is generally convenience store

```
 1    operators.
 2         Q.   How many customers does A-Z have?
 3         A.   It's hard to tell.  You know, you meet
 4    customers probably, you know, in a given year,
 5    probably around a thousand sort of unique customers,
 6    customers that shop with us at least once during
 7    that -- that year.
 8         Q.   Is a unique customer somehow different from
 9    another type of customer that A-Z would have?
10         A.   No.  I -- I refer to it as a unique customer
11    because it -- it's a particular customer with a
12    particular account number, particular, you know,
13    tobacco permit, and so I classify each one of those as
14    a unique customer.
15         Q.   Does A-Z have written agreements with its
16    customers?
17         A.   Define what you mean by written agreement.
18         Q.   Any kind of written agreement between A-Z and
19    its customers, does A-Z enter any kind of written
20    contract with its convenience store customers?
21         A.   Generally what we have is we have a customer
22    application, so if we're going to service a customer,
23    we're going to have a customer application and then we
24    usually get a copy of their driver's license, a copy
25    of their tobacco permit, and that's generally about
```

```
              1   it.
11:07:27      2       Q.   And I know earlier we talked about A-Z Wine &
              3   Spirits, so now shifting to the defendant in this
              4   case, A-Z Wholesalers, I'm going to ask a similar
              5   question:  Does A-Z Wholesalers have written
              6   agreements with its suppliers who it gets its product
              7   from?
              8       A.   Okay.  I'm confused by the question.
              9       Q.   Sure, I'm sorry, I tried to give a preface to
             10   clarify, but I think it just made it more confusing.
             11       A.   Yeah, it did.
             12       Q.   So -- I'm sorry.
             13            So does A-Z Wholesalers, the defendant in
11:07:57     14   this lawsuit, have written agreements with its
             15   suppliers?
             16       A.   Generally, no.
             17       Q.   Does it have any sort of written application
             18   similar to with its customers?
             19       A.   Yes.  So you'll have a -- you'll have an
11:08:26     20   application in -- in many cases and with certain
             21   suppliers there may be certain agreements, but they're
             22   sort of annual agreements, sort of, hey, this is how
             23   much you bought last year, if you buy this much next
             24   year, you'll get a extra, you know, rebate or
             25   percentage, that sort of stuff, right, *cktp pro
```

1   incentive, that sort of stuff, but that's about it.

11:09:00   2          Generally -- generally what governs the

3   supplier-distributor relationship is the invoice,

4   right?  So you'll get a particular invoice from a

5   particular supplier and it will state the terms

6   associated with that transaction and that is the

7   contract, right?

11:09:30   8          So, for example, if -- if you were a

9   supplier and you invoiced me for this pen and you

10   charged me 10 cents, you'd send me an invoice for 10

11   cents and you would let me know when I have to pay you

12   the 10 cents, and then I would turn around and sell

11:09:48   13   this for 12 cents to my customer.

14          So to answer your question, I think the

15   invoice is the contract.

16      Q.   How does A-Z know how much the supplier will

17   charge for a product before it receives the invoice?

18      A.   Generally that's negotiated on the front end

11:10:25   19   before the order is placed.  With some suppliers, the

20   pricing, once it's negotiated, stays static, doesn't

21   change from order to order, and generally the only

22   time that price will change is if the manufacturer,

23   right, the actual producer of the product has a price

24   increase and then that sort of just trickles

25   downstream, and then everybody takes a price increase,

1  right?

11:10:58  2          Manufacturer goes up on their price, so

3  if you bought this for 8 cents and you sold it to me

4  for 10 and then I turn around and sold it -- sold it

5  for 12, but then the next time I try to order Bic or

6  Paper Mate let you -- they told you that, hey, they're

7  going to charge you 10 cents for this, but now you

8  can't sell it to me for 10 cents, so you'll charge me

9  12.  You'll let me know, say, hey, we're taking a

11:11:28  10  price increase on the pens, we're going up to 12

11  cents, but then when we place our order, we're

12  expecting 12 cents on our invoice and then we change

13  our price in our system to our customer and that goes

14  up to 14 cents, for example.

15          Q.  Would you receive the invoice before or after

16  you had received -- received delivery of the product?

17          A.  Best practices are to receive the invoice no

18  later than at the time you receive the product, so in

11:11:59  19  some cases, we would get the invoices in advance via

20  e-mail.  Worst case scenario when the product is being

21  delivered, there should be a hard copy of an invoice

22  that the driver would bring with them.

23          Q.  And you said earlier that that invoice that

24  A-Z receives at the time of delivery is what would

25  govern the relationship with the supplier on that

```
         1   order; is that right?

         2        A.   Yes.

11:12:26 3        Q.   So A-Z wouldn't know by what date it had to

         4   pay for that invoice until it received the invoice

         5   which stated the due date on it; is that right?

         6        A.   No, not really.  So if we're buying from a

         7   particular supplier and we know that their terms are

         8   30 days, right, then if you sold this to me for 10

         9   cents and I know when I buy from your company, I get

11:12:58 10  30 days, then it's anticipated that the invoice will

         11  also state 30 days, right, the terms, it will state 30

         12  days, but what I've noticed in the industry is you

         13  might have an agreement to, say, for example, you

         14  might have an agreement or an arrangement with a

         15  particular supplier where they tell you they're going

         16  to give you 30 days, but then someone in their

         17  accounting office didn't change it in their system and

11:13:29 18  so every time you get the invoice, it says, you know,

         19  COD or 7 days or 14 days or 15 days, when in reality

         20  you have 30 days.

         21       Q.   So in that instance, the agreement that you

         22  made with the supplier prior to receiving the invoice

         23  is what would govern your due date for payment at A-Z;

         24  is that right?

11:13:56 25       A.   What would govern is the due date that we had
```

1  agreed to, and if that due date is anything different

2  than what's on the invoice, there's obviously a

3  conversation about that at some point just to make

4  sure that everybody's on the same page.

5     Q.   So other than negotiating a price and also

6  agreeing to the deadline on which an invoice is

7  supposed to be paid, what other terms does A-Z agree

11:14:27  8  to with its supplier before delivery?

9     A.   Let's see.  What other -- price, terms,

10  payment terms.  Sometimes you -- sometimes you deal

11:14:55  11  with credit limits, right, so you might have a credit

12  limit with a particular supplier.  So, for example,

13  with you, your credit limit might be a buck, at $1

14  which basically means I can buy 10 of these at a time,

15  and even though you're giving me 30 days, right, if I

16  want to buy 10 more of these and I sold them in a

17  week, I'd either have to get you to up my credit limit

11:15:25  18  or I'd have to do -- pay you in advance of the payment

19  term, right, because I've exceeded my credit limit on

20  my next order or I would exceed my credit limit, so

21  that -- that might be something that we discuss.

22        And, again, it depends on each supplier.

23  Every supplier is different, but that might be -- that

24  might also be something that you negotiate with a

25  particular supplier.

1       Q.   And when you're negotiating these terms with

2   the supplier before you receive the invoice, none of

3   that is put in writing?

11:16:01   4       A.   Generally, no.  I mean, you know, some

5   supplier put it in writing, some suppliers don't, and

6   the relationship can ebb and flow, right, and so I

7   don't know if everything is always memorialized in

11:16:27   8   writing, right, oral agreements.

9            You know, even like the price, for

10  example, some suppliers, the price changes because

11  they buy from different people and so if they get it

12  at a higher price, they sell to you at a higher price.

13  And so if you order the product and you send a PO for

14  a certain price, the supplier may call you and say,

15  hey, my price has gone up or I bought it more

16  expensive this time so I'm going to have to charge you

11:16:57   17  50 cents more for it, and so that's never really

18  memorialized, right, it just shows up on an invoice,

19  it's 50 cents higher, the buyer gets a call from

20  somebody at the office and says, hey, we got this for

21  50 cents more, is that correct?

22            The buyer may be like, yeah, he told me

23  it's coming more expensive, let's go ahead and raise

24  our price by 55 cents so we can still make the kind of

25  margin *CkTP at the expense.

1    Q.   Whose job is it at A-Z to remember and keep

11:17:29   2    track of these unwritten terms for each supplier?

3    A.   It depends on what department and what

4    supplier.

5    Q.   Let's stick to paying the invoices.  So when

6    an invoice comes in to A-Z, whose job is it to

7    remember and keep track of the unwritten agreements

8    beforehand in order to be able to determine whether,

9    for instance, the deadline on the due -- on the

11:17:59   10   invoice is accurate or not?

11   A.   So there's -- there's folks in the accounting

12   department, right, that sort of handle payables.  They

13   would know of what the due dates are for certain

14   suppliers if they're different from what's on the

15   invoice.

16   Q.   How do they know?

17   A.   Based on communication from either the buyer,

11:18:27   18   right, the person actually negotiating that deal, or

19   in talking directly with the accounts receivable

20   department at the supplier's office, and in many

21   cases, it can also be based off of instructions that

22   they've received from myself.  There are suppliers

23   that I'm dealing with directly.  So there's a number

24   of ways that that's communicated.

11:18:59   25   Q.   So there's no written record anywhere of

```
 1   these agreed to terms for each supplier, all of the
 2   folks at A-Z sort of just keep it memorized; is that
 3   right?
 4        A.   No, I -- I didn't say that they all keep it
 5   memorized.  I said that the accounts payable folks
 6   would be aware of what the payment terms are for a
 7   particular supplier.  In most cases, it's what the
 8   invoice says, right?  In those few instances -- or
 9   instances where a supplier has extended longer payment
10   terms to A-Z based on the relationship, the volume,
11   the history, the payment history, then, you know,
12   those payment terms may have never changed in their
13   system, but the accounts payable folks would know
14   that, hey, the payment terms are not 15 days, it's 45
15   days.
16        Q.   How many warehouses does A-Z have?
17        A.   A-Z Wholesalers, Inc. has two locations --
18        Q.   What --
19        A.   -- Dallas and Waco.
20        Q.   How many employees are at each warehouse?
21        A.   Yeah, I -- I would probably say about a
22   handful, maybe five or so in Dallas and probably less
23   than that in Waco.
24        Q.   Does A-Z have a separate corporate office?
25        A.   No.
```

11:19:26   8

11:19:57   13

11:20:26   17

11:20:56   24

1    Q.   So all of the employees for A-Z work either

2  in the Dallas or Waco warehouses; is that right?

3    A.   Yes.

11:21:29  4    Q.   What is your current title at A-Z?

5    A.   President and I guess general counsel still,

6  but president.

7    Q.   Why did you phrase it as "I guess general

8  counsel still"?  Do you still do legal work for the

9  entity, or no?

10    A.   Sure.

11    Q.   Frequently?

12    A.   Define frequently.

11:21:57  13    Q.   How often are you acting in your capacity as

14  general counsel for the company?

15    A.   You know, I think it's -- it's hard to

16  distinguish, right?  I feel like my role as president

17  and my legal background lend me to -- to act in a

18  general counsel capacity from time to time, but, you

19  know, I think you being a trained lawyer, I think you

20  understand that once you go to law school and you

11:22:29  21  start practicing law, it just changes how you think,

22  right?  And even going and picking up groceries from

23  Central Market, you can look at it as a legal

24  transaction, right, and you can -- and you can look at

25  the aisles and see advertising for, you know, certain

1    products and consider that a legal contract or a

2    representation.  So I think law school and practicing

11:22:55    3    law really screws you up.

4        Q.    I can appreciate that.

5                When -- there are some instances though

6    where there might be a clear distinction, for

7    instance, if you were going to sign a contract on

8    behalf of the company, are you more likely to be doing

9    so as the president and an officer on behalf of the

10   company or as the general counsel with authorization

11   from another officer?

12       A.    Both.  So I think the answer is both.  I

13   think I would review the documents, right, the

11:23:28    14   contract as general counsel, right, and then hand it

15   to myself as president to execute it, right, after

16   reviewing it as general counsel.

17       Q.    When did you become the president?

18       A.    Oh, gosh, I want to say 2000 -- end of 2016,

19   2017ish.

20       Q.    Who was president before you?

11:23:56    21       A.    My father, Barkat Ali.

22       Q.    He was the first president of the company; is

23   that right?

24       A.    No.  The company had formed prior to my dad's

25   acquisition of the company.

|  |  |  |
|---|---|---|
|  | 1 | Q.   When was the company formed? |
|  | 2 | A.   I think it was legally formed in 1999.  It |
|  | 3 | had been operating, I think, prior to that under |
| 11:24:25 | 4 | either a sole proprietorship or something.  Again, we |
|  | 5 | weren't involved. |
|  | 6 | And then in 2002, it was acquired by my |
|  | 7 | father and a couple of partners, and then in 2008, my |
|  | 8 | father, I believe, bought out his -- his partners. |
|  | 9 | Q.   When your father bought out his partners, he |
|  | 10 | became the sole shareholder in the company; is that |
|  | 11 | right? |
| 11:24:59 | 12 | A.   Yeah.  He was the sole shareholder of the |
|  | 13 | company from, I think, November of 2008 until probably |
|  | 14 | the end of 2016. |
|  | 15 | Q.   And in 2016, you purchased your father's |
|  | 16 | shareholders; is that right? |
| 11:25:28 | 17 | A.   In 2017, I believe I acquired a -- an |
|  | 18 | interest in the company, and I want to say either by |
|  | 19 | the end of that year or the first day of 2018, I |
|  | 20 | acquired whatever remaining interest he still owned. |
|  | 21 | Q.   How much of an interest did you first |
|  | 22 | acquire? |
| 11:25:56 | 23 | A.   You're testing my memory.  I want to say |
|  | 24 | probably about 50 percent.  Knowing that it was my |
|  | 25 | father, I don't think I tried to get a majority |

1   interest, I thought he would deal with me fairly, so

2   probably 50 percent, but soon after that I think I'd

3   acquired the remaining 50 percent.

4       Q.   And you purchased that interest from him; is

5   that right?

6       A.   I'd have to double-check the records and see

11:26:26   7   how that interest was acquired.  I don't want to speak

8   to that because I didn't -- I didn't do any research

9   on that before the deposition.

10      Q.   You didn't -- you don't recall whether you

11  paid any certain amount of money to your father --

12      A.   I --

13      Q.   -- for his 50 percent interest?

14      A.   I do not recall.

15      Q.   What about when you bought the remaining

16  interest from your father, when did you acquire that?

17      A.   I want to say that was either late 2017 or

18  2018.

11:27:01   19      Q.   Do you recall whether you paid your father

20  any certain amount for the remaining interest?

21      A.   Same answer:  I don't recall how that

22  remaining interest was acquired, but I do know that it

23  happened around 2017, 2018.

24      Q.   Do you at least recall whether you paid any

25  amount of money or whether your father just gave you

1  his shares?

11:27:29  2      A.   I do not recall.

3      Q.   As general counsel, is it part of your

4  responsibilities to review contracts that A-Z enters?

5      A.   Yes.

6      Q.   And are you authorized to enter into

7  contracts on behalf of A-Z?

8      A.   Yes.

9      Q.   Who else would be authorized at A-Z to enter

11:28:00  10  into a contract on its behalf?

11      A.   When?  Excuse me.

12      Q.   Let's start with currently.  At this time,

13  you are the president and general counsel, correct?

14      A.   Yes.

15      Q.   So who else besides you right now at A-Z has

16  the authority to enter into a contract on behalf of

17  the entity?

18      A.   So if we're talking about a formal written

11:28:29  19  agreement, other than an invoice that acts as the

20  contract, no one else.  And I'll -- I'll caveat that,

21  unless a team member has received explicit instruction

11:29:01  22  and authorization from me where I've granted them

23  authority to execute an agreement that I've reviewed

24  or approved and their authority would be limited to

25  that particular agreement only.  It wouldn't extend

1    beyond that.

2        Q.   How often does that happen?

3        A.   Not very often.  I mean, it's one of those

4    things where, for example, if I'm in the -- if I'm not

5    in the office and they need a signature on something

11:29:29   6    and I've reviewed it and I left it on my desk and

7    didn't sign it, I may authorize somebody to execute it

8    or just tell them to wait until I get there, you know.

9        Q.   How about in 2011, you were vice president

10    and general counsel at that time; is that right?

11        A.   That's correct.

12        Q.   Were you authorized to enter contracts on

13    behalf of the entity at that time?

14        A.   Yes.

15        Q.   Who else would have had that authority at

11:30:00   16    that time?

17        A.   Barkat Ali as president of A-Z Wholesalers,

18    Inc.

19        Q.   Anyone else?

20        A.   Whew, not that I can recall.

21        Q.   And how about in 2015, at that time, you were

22    still vice president and general counsel at A-Z; is

23    that right?

24        A.   Yes.

25        Q.   So would anyone else besides Barkat have had

```
            1   authority to enter contracts on behalf of A-Z?
11:30:27    2        A.   Other than myself and Barkat?
            3        Q.   Right.  Would anyone else have authority to
            4   enter into contracts on behalf of A-Z?
            5        A.   No, ma'am.
            6        Q.   Prior to becoming the president at A-Z, did
            7   you ever enter into a contract without first
            8   consulting Barkat?
11:31:03    9        A.   Whew, prior to when?
           10        Q.   Prior to becoming the president.  So, in
           11   other words, generally speaking, before you or any
           12   other representative at A-Z would enter into a
           13   contract, would Barkat review it first?
           14        A.   No.
           15        Q.   Why not?
           16        A.   Because I was authorized to enter into
           17   agreements as vice president and also serving as
11:31:30   18   general coun -- counsel, it would be my job to review
           19   the contract.  And so I would take a look at those
           20   documents and if I saw that those were good, then I
           21   had the capacity to enter into that agreement without
           22   seeking formal approval from them.
           23        Q.   So even though at that time you only had a 50
11:31:58   24   percent interest, your father had given you express
           25   authority to enter into agreements on behalf of the
```

1    company without his approval?

2                 MR. HOLMAN:   Objection, form.

3         A.   *CKTP Yes.

4         Q.   (By Ms. Finger)   You can answer.

5         A.   Yeah, so I -- good objection.   Express

6    authority, are you talking about what that -- as far

7    as like the legal definition of express authority or

11:32:26    8    did I have authority to execute contracts on behalf of

9    A-Z Wholesalers?

10                And you'll have to define express

11   authority for me if you mean it in a legal context

12   because it's been a while since I think both of us

13   have taken the bar.

14        Q.   Sure.

15                By express authority, I meant essentially

16   that Barkat told you that you could enter into

17   contracts on behalf of A-Z without first receiving his

18   approval; is that right?

11:32:59    19        A.   Yes.

20        Q.   When did he tell you that?

21        A.   I don't recall exactly when I was told, but

22   I'm -- I'm fairly certain that that would have been

23   the case even prior to my acquisition of 50 percent

24   interest because I believe your question was about

11:33:28    25   when I acquired 50 percent interest, and I think my

1   testimony earlier was that I had the authority to

2   execute documents on behalf of my corporate capacity

3   as vice president and general counsel, which included

4   the time that predated my acquisition of any interest

5   in the company.

6       Q.   So sometime even before you acquired an

11:33:54   7   interest, so sometime between -- before, rather, 2017,

8   Barkat told you that you could enter into contracts

9   without his authority or his approval as the

10  vice president and general counsel of A-Z; is that

11  right?

12              MR. HOLMAN:   Objection, form.

13      A.   Correct.

14      Q.   (By Ms. Finger)  But you don't recall

15  precisely when Barkat told you that; is that right?

16      A.   No.

17      Q.   How were you compensated for your work as the

11:34:29   18  president of A-Z?

19      A.   A good pat on the back and an attaboy and I

20  was also paid a salary.

21      Q.   What was your salary when you first started

22  as vice president of A-Z?

23      A.   I don't really recall.

24      Q.   Did it change when you became the president?

25      A.   I don't recall.

|          | 1  | Q.   How are you compensated for your work as the |
|----------|----|---|
| 11:34:58 | 2  | general counsel of A-Z? |
|          | 3  | A.   Salary. |
|          | 4  | Q.   Is that salary distinguished in any way from |
|          | 5  | your salary as president? |
|          | 6  | A.   No. |
|          | 7  | Q.   So what is the total salary that you receive |
|          | 8  | as president and general counsel of A-Z? |
|          | 9  | A.   I don't know.  Today, you're talking today? |
|          | 10 | Q.   Yes. |
| 11:35:27 | 11 | A.   I think it's probably 120,000 annually. |
|          | 12 | Q.   Do you receive any other form of compensation |
|          | 13 | for your responsibilities at A-Z? |
|          | 14 | A.   It depends year to year. |
|          | 15 | Q.   What other types of compensation might you |
|          | 16 | receive? |
|          | 17 | A.   I might receive a bonus, I might receive a -- |
| 11:35:55 | 18 | I guess a distribution or a dividend. |
|          | 19 | Q.   Who determines whether or not you get a |
|          | 20 | bonus? |
|          | 21 | A.   Today? |
|          | 22 | Q.   Yes. |
|          | 23 | A.   I get the privilege of determining whether or |
|          | 24 | not I get a bonus. |
|          | 25 | Q.   And what factors go into that decision? |

1    A.   I guess how I'm feeling that day, but, no,

2    more -- more generally on whether or not, you know,

3    the staff has gotten bonuses, whether it was a

4    productive year, financially beneficial year, whether

11:36:29   5    there was reinvestment in the company.  There's a lot

6    of things that go into that -- that consideration.

7    Q.   The staff of A-Z may or may not be entitled

8    to a bonus at the end of the year as well; is that

9    right?

10    A.   Sure.

11:36:55   11    Q.   Has that always been true at A-Z?

12    A.   Yeah.  I mean, I don't think we have a -- a

13    fixed sort of bonus, you know, program where, you

14    know, everybody expects a bonus.  It really just -- it

15    depends year to year.

16    Q.   Do you recall if there was a year since 2011

11:37:28   17    that the staff at A-Z was not paid any bonuses?

18    A.   Sure.

19    Q.   Do you recall what years those were?

20    A.   No.

21    Q.   Do you recall approximately how many times

22    that happened since 2011?

23    A.   No.

24    Q.   And I phrased my question with the word

25    staff, but by that I intended to include you as well.

| | | |
|---|---|---|
| 11:37:58 | 1 | So is there any year since 2011 in which you did not |
| | 2 | receive a bonus? |
| | 3 | A.   Yes. |
| | 4 | Q.   Do you recall how many times? |
| | 5 | A.   No. |
| | 6 | Q.   You don't recall what year or years that may |
| | 7 | have been, do you? |
| | 8 | A.   No, ma'am. |
| | 9 | Q.   Do you currently work anywhere else besides |
| | 10 | A-Z? |
| | 11 | A.   As a salaried employee, no. |
| 11:38:29 | 12 | Q.   Do you work anywhere else besides A-Z as some |
| | 13 | other type of employee besides salaried? |
| | 14 | A.   No.  I mean, I do some work for my real |
| | 15 | estate company, so I've got to, you know, drive back |
| | 16 | and forth to Sherman from time to time, so I consider |
| | 17 | that work, but as of -- I don't -- I don't believe I |
| 11:38:54 | 18 | get compensated for that work or didn't.  Things may |
| | 19 | change. |
| | 20 | Q.   The real estate -- I'm sorry, go ahead. |
| | 21 | A.   I said things may change. |
| | 22 | Q.   The real estate company you just mentioned, |
| | 23 | you have an ownership interest in that entity; is that |
| | 24 | right? |
| | 25 | A.   Yeah, that's the one we discussed earlier in |

|          | 1  | my deposition, Altona, Inc. owns that property in |
|----------|----|---|
|          | 2  | Sherman, Texas and I own that company 100 percent. |
|          | 3  | Q.   Do you currently have an ownership interest |
|          | 4  | in any other legal entities besides your real estate |
| 11:39:26 | 5  | company and A-Z? |
|          | 6  | A.   Not that I can think of.  Oh, I have |
|          | 7  | ownership interest in A-Z Wholesalers Wine -- Wine & |
|          | 8  | Spirits, LLC. |
|          | 9  | Q.   You told us about that one earlier, too, |
|          | 10 | right? |
|          | 11 | A.   That's right.  That's really it, I think, |
|          | 12 | that I can think of. |
| 11:40:06 | 13 | Q.   What is Diamond Wholesale? |
|          | 14 | A.   Diamond Wholesale is a company very similar |
|          | 15 | to the defendant A-Z Wholesaler, Inc., convenience |
|          | 16 | channel distributor, that's about it. |
|          | 17 | Q.   Is that company still in operation today? |
|          | 18 | A.   No. |
| 11:40:30 | 19 | Q.   Did you have an ownership interest in it? |
|          | 20 | A.   Yes. |
|          | 21 | Q.   When did you acquire that interest? |
|          | 22 | A.   In 2016. |
|          | 23 | Q.   And when did the company cease operation? |
| 11:40:58 | 24 | A.   I want to say sometime last year maybe.  I -- |
|          | 25 | yeah, last year.  I'd have to double-check. |

```
 1         Q.   Did you hold any other role at Diamond

 2    Wholesale, other than being an owner?

 3         A.   President of the company.

 4         Q.   What is Top 20 Distribution?

 5         A.   Same thing.  Convenience channel distributor.

 6         Q.   Is that entity still in operation today?

 7         A.   No, ma'am.

 8         Q.   Were you also an owner of that company?

 9         A.   Yes.  Well, technically it was owned by

10    Altona, Inc., the real estate company that I mentioned

11    earlier, and I was and always have been the sole owner

12    of Altona, Inc., so that would be a more accurate

13    description.

14         Q.   When did that company cease doing business?

15         A.   A few years ago.

16         Q.   Why?

17         A.   It was essentially acquired by A-Z

18    Wholesalers, Inc.

19         Q.   All right.  Mr. Ali, we've been going for

20    about an hour and a half.  Are you good to keep going

21    or do you want to take a break?

22         A.   It's up to you.  I could take a quick

23    five-minute break and kind of stretch our legs, get

24    some fresh air and come right back.

25         Q.   Do you want to do that?  I'm at a good
```

11:41:29  7
11:42:01  15
11:42:45  18
11:43:00  25

```
 1    stopping point, so let's take five minutes and then we

 2    can pick back up.

 3                    THE VIDEOGRAPHER:  Off --

 4        A.   Okay.  Sounds good to me.

 5                    THE VIDEOGRAPHER:  Off the record; the

 6    time is 11:43 a.m.

 7                    (Recess 11:43-12:01.)

 8                    THE VIDEOGRAPHER:  Back on the record;

 9    the time is 12:01 p.m.

10        Q.   (By Ms. Finger)  Mr. Ali, we came back from a

11    break.  You understand that you're still under oath,

12    right?

13        A.   Yes.

14                    (Exhibit No. 1 marked.)

15        Q.   (By Ms. Finger)  I'm going to show you what's

16    been marked as Exhibit 1 to your deposition.  Let me

17    know when or if you see it.

18        A.   I see it and I'm going to do something here

19    so I can see it a little better.  Let's see here.

20    Okay.  I am going to...

21        Q.   Once we can see it clearly, please let me

22    know if -- if you've ever seen this document before.

23        A.   Okay.  I can see it.

24        Q.   And have you seen this document before?

25        A.   I don't recall if I have.  Hang on.  I don't
```

11:43:16    7

12:01:59   13

12:02:28   19

12:03:00   23

12:03:28  1  recall if I have, but I've seen, probably like you

2  have, lots of documents and filings in this case, but

3  I can't recall if I have or have not seen it.

4      Q.   Sure.  So it says at the top here, Notice of

5  30(b)(6) Deposition of A-Z Wholesalers Inc.  Did I

6  read that correctly?

7      A.   Yep.

8      Q.   And do you have any reason to believe this is

9  not a true and correct copy of the Notice of

10  Deposition of A-Z Wholesalers, Inc. that was served on

12:04:00  11  counsel for A-Z?

12      A.   I have no reason to believe that it's not a

13  true and accurate copy.

14      Q.   If you could, please turn to the third page

15  of this document which is titled Exhibit A.  It says

16  page 1 at the bottom because it's page 1 of Exhibit A,

17  but it's the third page of this document.

18      A.   I'm there, I'm there.

12:04:29  19      Q.   And do you see at the bottom of this page, it

20  says A-Z Wholesalers, Inc. 30(b)(6) Deposition Topics?

21  Did I read that correctly?

22      A.   Yes, you did.

23      Q.   Did you have a chance to review these

24  deposition topics before your deposition?

25      A.   Unfortunately I did not.  I didn't go through

1  each one of those topics obviously because I don't

2  recall seeing this document and did very little

12:04:58   3  preparation for this deposition.

4      Q.   Do you understand that you've been designated

5  today to testify on behalf of A-Z as to these

6  deposition topics?

7      A.   Yes, I understand that.

8      Q.   And since you are here testifying today, I

9  assume that you are doing so with your consent to A-Z

10  designating you as their corporate representative,

11  right?

12      A.   That is correct.

13      Q.   Would you agree that you're the best person

14  at A-Z to testify to these topics?

12:05:29   15      A.   I'd like to think so.

16           (Exhibit No. 39 marked.)

12:05:59   17      Q.   (By Ms. Finger)  I'm now going to show you

18  what has been marked as Exhibit 39.  Let me know when

19  you see it.

20      A.   I see it.  I see it.  Do you want me to flip

21  through all the pages or is there a certain page you

22  want to direct me to?

23      Q.   You don't have to flip through yet.  We can

24  stay on the first page and we'll go through some of it

12:06:27   25  together.  If you feel you need to review any other

1    portion of it before you answer a question, please

2    just let me know.

3        A.   Okay.

4        Q.   Have you ever seen this document before?

5        A.   Not that I recall.

6        Q.   It says in the kind of top to center here,

7    Subpoena to Testify at a Deposition in a Civil Action

8    and it has your name underneath it, Amar Ali, to the

9    care of your lawyers.  Did I read that correctly?

10       A.   That is correct.

11       Q.   Do you have any reason to believe that this

12   is not a true and accurate copy of the deposition

12:06:59  13   subpoena that was served on your counsel?

14       A.   I do not have any reason to believe that.

15       Q.   And you understand that you're here to

16   testify today pursuant to the Notice of Deposition

17   that we just reviewed as corporate counsel, but also

18   in your individual capacity pursuant to the subpoena?

19       A.   As corporate representative?  You said

20   corporate counsel.

21       Q.   Corporate representative, I apologize, yes.

12:07:29  22       A.   That's all right.  Yeah, I understand that,

23   as corporate representative.

24       Q.   And also in your individual capacity pursuant

25   to this subpoena, correct?

1    A.   Yes.

2    Q.   And if you'll look halfway down the page,

3  there's a little check box and next to it it says

4  Production.  Do you see that?

5    A.   Yes, I see that check box.

6    Q.   And it says, "You, or your representatives,

12:07:58   7  must also bring with you to the deposition the

8  following documents, electronically stored

9  information, or objects, and must permit inspection,

10  copying, testing, or sampling of the material," and

11  next to that, it says, "See Attachment A."

12          Did I read that correctly?

13    A.   You read that correctly.

14    Q.   If you can flip to the fourth page of this

15  document, it will be Attachment A, which again says

12:08:27   16  page 1 at the bottom, but it should be the fourth page

17  in this document.

18    A.   Okay.

19    Q.   Did you have a chance to review Attachment A

20  before this deposition?

21    A.   Specifically, I don't think I did.  I don't

22  recall reviewing it.

12:08:57   23    Q.   If you could please turn to page 5 of

24  Attachment A.  It's the next-to-last page of the

25  document.  It says Documents To Be Produced at the

1   top.

2       A.   On page 5, you said?

3       Q.   Yes, of Attachment A.

4       A.   What page is it in the entire document?

5       Q.   Page 8.

12:09:26   6       A.   8, okay.  Got it.  Okay.  I'm there.

7       Q.   It says Documents To Be Produced at the top.

8   Do you see that?

9       A.   Yes, ma'am.

10      Q.   So do you understand that the subpoena also

11  required you to produce any documents that are on this

12  list to the extent that they were in your possession,

13  custody, or control?

14      A.   Yes.

15      Q.   You didn't bring any documents with you to

12:09:58   16  this deposition today, did you?

17      A.   Did I -- that's a trick question.  So --

18      Q.   Let me rephrase.

19           Did you bring any documents with you to

20  your deposition today to produce in response to the

21  requests in this subpoena?

22           MR. HOLMAN:  Objection.  The documents

23  have already been produced at -- at a prior time to

24  the deposition.

25           MS. FINGER:  I would like to get that

12:10:28   1  clarification from the witness, if that's all right
           2  with you, Mr. Holman, so that we have it on the
           3  record.
           4      Q.   (By Ms. Finger)  So, Mr. Ali, I'll -- I'll
           5  restate my question.
           6           Did you bring any documents with you to
           7  your deposition today to produce in response to these
           8  requests?
           9      A.   No.  My -- my understanding is that there's
          10  been lots of production that's occurred in this case
          11  prior to my deposition and I will also state for the
12:10:59  12  record that if there are any documents that somehow
          13  inadvertently have not been produced, but become, you
          14  know, part of the conversation during this deposition,
          15  then I would be glad to produce it to my counsel so
          16  that they could produce it to you.
          17           I think -- I think you understand that
          18  there's lots of documents in this case because it goes
12:11:24  19  back, you know, years, and so we try -- I tried to do
          20  my best even though I think everybody agrees that
          21  document production and discovery can be a very
          22  painful process, right, looking up e-mails and
          23  searching and all that sort of stuff, but I -- I
          24  really try to do my best to try to produce everything
          25  that we have that relates to these request for

1    production requests.

2        Q.   We did receive a production from A-Z

3    Wholesalers, the defendant in this case, as well as

12:11:58   4    from Barkat Ali.  What I want to clarify from you,

5    Mr. Ali, is that you in your individual capacity do

6    not have in your possession, custody, or control any

7    other documents that have not already been produced by

8    A-Z or Barkat; is that true?

9        A.   I don't think I have any documents really in

10   my individual capacity, right?  I think any documents

11   that I produced were produced in my corporate capacity

12   on behalf of A-Z Wholesalers, Inc. and I've never

12:12:28   13   acted in my individual capacity at A-Z Wholesalers,

14   Inc.  So, you know, I -- I can't -- I -- I'm not going

15   to distinguish between whether I have it personally or

16   have it under my corporate capacity.  You know, I -- I

17   act in my -- *CKTP capacity.

18       Q.   Let me clarify what I mean.  You don't have

19   any communications in a personal e-mail address or on

20   a personal cell phone that relate to this case that

12:12:58   21   you have not already produced on behalf of A-Z, do

22   you?

23       A.   Like I said, I've tried to produce everything

24   that I could find in my corporate capacity, whether it

25   was an e-mail that was sent to my corporate e-mail

1    address or if it was sent to some other e-mail

12:13:25    2    address, which I doubt.  So I -- I've tried to produce

3    everything that I have available that's not only

4    relevant to this case, but is responsive to the

5    request for production.

6              Do I know for certain 100 percent that

7    everything that I -- that I have in my corporate

8    capacity has been produced?  I don't think I could

9    ever say that because there's just a lot and, like I

10   said, in a search function when you're looking up for

11   e-mails and trying to transfer them under a Dropbox so

12:13:58   12   that you guys have the -- you know, the actual e-mail

13   instead of like a -- a hard copy printout, you know,

14   something could have gotten lost in that search

15   function.  Some things were probably produced multiple

16   times.  So I can't -- you know, I don't want to swear

17   to the fact that everything's been produced because I

18   can't -- I could never say that, ever.

19        Q.   But to the best of your knowledge, you don't

20   have -- you personally, not necessarily in your

12:14:28   21   corporate account at A-Z, but because we're talking

22   about the subpoena, to the best of your knowledge, you

23   do not have in your possession, custody, or control

24   any personal e-mails that relate to this case or

25   personal text messages or other communications that

1    may be relevant that you did not already produce

2    through A-Z's production in this case, is that true,

3    to the best of your knowledge?

4        A.   Yeah, I mean, to the best of my knowledge, I

5    didn't act in my personal capacity, so I shouldn't

6    have anything in my personal capacity.  If those

12:14:58   7    things -- if there's like a gray area there, I've

8    tried to produce everything in my corporate capacity,

9    which I would, I guess, also produce things if I had

10   received them somehow in my personal capacity

11   inadvertently in -- in --

12       Q.   You still could have received something to a

13   personal e-mail while acting in your corporate

14   capacity though, right?

15       A.   Sure, yeah, I mean, that's what I'm saying.

16   I -- I wouldn't distinguish from that, right, so --

17       Q.   Sure.

18       A.   -- I tried to do my best to produce

12:15:28   19   everything in my corporate capacity, don't really have

20   anything in my individual capacity.  If I have it in

21   my individual capacity, then I would also have it in

22   my corporate capacity.  Does that kind of make sense?

23       Q.   Yes.

24            So would you agree that everything

25   produced on behalf of A-Z was also produced on behalf

1   of yourself?

2       A.   I don't know if I could agree with that or

12:15:58  3   not because I was producing everything based on my

4   corporate capacity, but I don't think I have anything

5   in my individual capacity, right?

6       Q.   So there is no document that you would

7   produce that would not also be produced by the

8   corporation; is that right?

9       A.   It should, yes.  Like in -- in an ideal

10  world, in theory, if I have something personally that

12:16:26  11  somehow ended up in a personal Inbox and if I did the

12  search function on that and it pulled up something

13  related to any of the production requests, then that

14  should have been produced in our corporate capacity.

15  I don't think there was a -- a production dump of

16  anything in my individual capacity.

17      Q.   And that's because you didn't have anything

18  to produce in your individual capacity; is that right?

19      A.   I should not.

20      Q.   Did you check?

12:16:57  21      A.   Yeah, I mean, it was a painstaking process.

22  I think you know how that goes, but we -- I looked,

23  right, in my e-mails for communication between the

24  various individuals or entities listed in -- in the

25  production requests.

1      Q.  So if I look at a document that has an A-Z

2  Bates label on the bottom, I can also assume that that

3  was produced on your behalf; is that right?

4      A.  You'd have to ask my attorneys that.  I don't

5  know how they produced the -- the stuff.  I just put

12:17:27  6  them into a Dropbox and sent them to *CKTP Lay, so...

7      Q.  I will represent to you that all of the

8  documents produced in this litigation by your

9  attorneys bear a Bates label that begins with A-Z --

10      A.  Okay.

11      Q.  -- and were produced on behalf of the

12  corporation.  So the only clarification that I'm

13  looking for is whether you have any separate documents

14  that would be produced on your behalf, but not

15  necessarily on behalf of the entity, or if there are

16  any documents that were produced on behalf of the

12:17:56  17  entity that not -- would not have also been produced

18  by you.

19      A.  I can't think --

20      Q.  Would you be able to draw the line is what

21  I'm looking for.

22      A.  Sure.  I can't think of anything in

23  particular.

12:18:39  24      Q.  Okay.  Does A-Z own an interest in any other

25  entity?

```
 1        A.   Does A-Z own any interest in any other

 2   entity?  No.

 3        Q.   Does it own the warehouses that it operates

 4   or does it rent those?

 5        A.   It rents those.

 6        Q.   From who?

 7        A.   From the landlords of both of those

 8   properties.

 9        Q.   There are two separate landlords?

10        A.   There are two separate landlords.

11        Q.   Who are they?

12        A.   Oh, boy.  For the Dallas warehouse, it's

13   Nelezer, Inc., that's N-E-L-E-Z-E-R, Inc.; and for the

14   Waco one, gosh, I'd have to look and see exactly who

15   the -- the entity is.

16        Q.   Do you have an ownership interest in either

17   of the landlord entities?

18        A.   No, ma'am.

19        Q.   Does your father?

20        A.   He has ownership interest in the Dallas

21   landlord entity, Nelezer, Inc.

22        Q.   How much of an ownership interest?

23        A.   He has a hundred percent ownership interest

24   in that.

25        Q.   Do you know how much in rent the Dallas
```

12:18:58 (line 4)
12:19:25 (line 13)
12:19:59 (line 20)
12:20:33 (line 25)

1    warehouse pays?

2        A.   I'd have to double-check how much exactly the

3    rent is for Dallas and for Waco, quite honestly.

4        Q.   Do you have an approximation?

12:20:52  5        A.   I do not.

6            (Exhibit No. 2 marked.)

7        Q.   (By Ms. Finger)  Showing you what's been

8    marked as Exhibit 2 to your deposition.  Let me know

9    when you see it.

10        A.   I see it.

11        Q.   Have you seen this document before?

12        A.   I have.

13        Q.   What is it?

12:21:29  14        A.   It is a Credit Application for Harrison,

15    Super Regional Food Distributor.

16        Q.   We can see at the top it's dated March 11th,

17    2011; is that right?

18        A.   That is correct.

19        Q.   And in the Ship To and Bill To boxes also

20    toward the top, it says A-Z Wholesalers, Inc. in both

12:21:58  21    of those; is that right?

22        A.   Yes, ma'am.

23        Q.   If you'll turn to the second page of this

12:22:30  24    exhibit, the top instructions ask to "Complete the

25    following for each individual Proprietor, Partner,

```
         1   Manager, Corporate Officer, and Shareholder," and

         2   Barkat is the only individual listed on this

         3   application; is that right?

12:23:03 4       A.   That is correct.

         5       Q.   And next to his name it says President and

         6   CEO because he was the president and CEO as of March

         7   2011, right?

         8       A.   That is correct.

         9       Q.   And is that Barkat's signature all the way at

        10   the bottom of this page as the president?

12:23:24 11      A.   It is.

        12            MS. FINGER:  Bear with me one second.  I

12:23:56 13  am missing an exhibit.  I'm just waiting for this to

        14   upload.  I was missing an exhibit.

        15       Q.   (By Ms. Finger)  In the meantime, if you

        16   could turn back to page 1, please, Mr. Ali, and you'll

        17   see --

        18       A.   2 or --

        19       Q.   No.

        20            THE VIDEOGRAPHER:  So, Anna, I think

        21   you'll need to share that document again.

        22            MS. FINGER:  Okay.  Hang on.  My new

12:24:54 23  exhibit is ready anyway.  Oh, no, it's not.  Okay.

        24   All right.

        25            (Exhibit No. 3 marked.)
```

1    Q.   (By Ms. Finger)   Showing you what has been

2  marked as Exhibit 3, can you see that?

3    A.   Yes.

4    Q.   Have you seen this document before?

12:25:31  5    A.   Give me a minute.

12:26:02  6             Yeah.

7    Q.   What is it?

8    A.   It is the Terms and Conditions -- Terms Or

9  Conditions, excuse me, for Harrison Company, L.L.C.,

10  which I believe was part of the Credit Application

11  that you showed me on Exhibit 2.

12:26:29  12    Q.   And Exhibits 2 and 3 are -- represent the

13  credit agreement between Harrison and A-Z; is that

14  right?

15    A.   It's the Credit Application.

16    Q.   Do you understand that page 3 lists the terms

17  and conditions which represent the agreement between

18  Harrison and A-Z?

19    A.   It lists the terms and conditions associated

12:26:55  20  with the Credit Application that was executed on March

21  11th, 2011.

22    Q.   Do you understand that Exhibit 3 lists the

23  terms and conditions under which A-Z agreed to operate

24  with Harrison pursuant to the credit that it was

25  issued?

          A.   I don't know if I necessarily agree with

that.

          Q.   Why not?

          A.   Well, it was the terms and conditions entered

into as of March 11th, 2011.

12:27:29   Q.   Correct.  That's what I'm asking.

          A.   So as of -- yes, as of that date, the terms

or conditions governing the -- the relationship are

based on these terms and conditions.

          Q.   In fact, we can see on the bottom signature

block this page is also dated March 11th, 2011, right?

          A.   Correct.

          Q.   And it was signed by Barkat Ali as president

12:27:59   as well, right?

          A.   Correct.

          Q.   It lists as the sales representative in that

signature block Rodney Thomas, do you see that?

          A.   Yes.

          Q.   Who is Rodney Thomas?

          A.   Rodney Thomas was the sales representative

for Harrison Company and he was essentially the

account representative for A-Z Wholesalers, Inc. on

12:28:27   behalf of Harrison Company, LLC.

          Q.   Have you ever met him before?

          A.   I have.

```
 1        Q.   How many times?

 2        A.   I don't know, but I've -- I've met him

 3   several times.

 4        Q.   Do you remember the first time you met with

 5   Rodney?

 6        A.   The first time I met with Rodney was probably
```
12:28:52 `7` prior to the execution of this Credit Application.
```
 8        Q.   And how did this Credit Application and later

 9   terms and conditions agreement come about?

10        A.   Rodney on behalf of Harrison Company, LLC was

11   attempting to court our business, and when I -- when I
```
12:29:28 `12` say our business, he was trying to court A-Z
```
13   Wholesalers, Inc., the defendant, to become a customer

14   of Harrison Company, LLC.

15        Q.   What do you mean by court?

16        A.   He's -- he's a salesman, so he came in to try

17   to sell us product, right, and at the time, we were

18   probably buying -- if fact, I know we were buying
```
12:29:58 `19` product from a competitor of Harrison, and so Rodney
```
20   was trying to come in and convince us to leave the

21   competitor and come to them.

22        Q.   Did you or A-Z have any relationship with

23   Rodney or Harrison prior to when he came into the

24   store or to the warehouses?

25        A.   No, I don't think so.
```

12:30:29    1      Q.    Were you the person that Rodney spoke to when

2   he first came in to A-Z?

3      A.    Yes.

4      Q.    Do you remember what he said?

5      A.    Not exactly, but the gist of it was, hey,

6   where are you buying your product from, you know, your

7   cigarettes from right now, how much are you paying,

8   you know, we'd really like to have your business,

9   we're coming into this market, and if you could tell

12:30:58   10   us what your volume is and how much you're buying and

11   how much you're paying, I'm sure we can offer you a

12   better deal than you're -- who you're buying from

13   right now.

14      Q.    What did you do next after talking to Rodney?

15      A.    I probably provided him with some

16   information, some data that would help him assess how

17   competitive Harrison Company could be if they wanted

12:31:27   18   to earn our business, and more than likely we

19   negotiated the pricing and the terms and what that

20   relationship would look like.

21      Q.    Was Barkat there for this conversation?

22      A.    Nope.   I think Barkat had stopped in at some

12:31:58   23   point during this negotiation that probably took, you

24   know, a couple different meetings, right, and I -- I

25   probably just made an introduction and said, hey, this

1  is Rodney Thomas from Harrison Company, we're thinking

2  about moving some of our business in their direction.

3  So I just said, hi, hello, and that was it.

4      Q.   How many meetings did you have with Rodney

5  before A-Z filled out this Credit Application and

6  signed the terms and conditions?

12:32:30  7      A.   I don't know, but I would say it was

8  definitely more than one.

9      Q.   Do you have an estimate?  Was it around the

10  five or six range or the 20 to 25 range, can you

11  say --

12      A.   Definitely not -- definitely not the 20 to 25

13  range.  If we had to go back and forth 20 or 25 times,

14  I would have *CKTP locked it in.  So it's, you know,

15  maybe half a dozen or less.

16      Q.   Did you meet with anyone else at Harrison or

12:32:57  17  speak to anyone else at Harrison prior to A-Z filling

18  out the Credit Application and signing the terms and

19  conditions?

20      A.   You know, I -- I don't know if I would have

21  talked to anybody else at Harrison prior to, but

22  Rodney may have called in some reinforcements to help

12:33:26  23  get the deal closed, so maybe some of his superiors.

24      Q.   Do you remember who they were?

12:33:48  25      A.   I don't remember their names exactly.  I can

1    tell you who they weren't.

2         Q.   That's okay.

3              If we look all the way at the bottom of

4    Exhibit 3, Barkat also signed these terms and

5    conditions as the guarantor of this agreement; is that

6    right?

7         A.   That's correct, Barkat signed a personal

12:34:25   8    guaranty with Harrison Company, LLC on March 11th,

9    2011.

10        Q.   Was Barkat present at all of these meetings

11   that we just discussed with Rodney?

12        A.   No, ma'am.

13        Q.   Did you have an in-person meeting with Rodney

14   and Barkat when this agreement was signed?

15        A.   I don't think so.

16        Q.   Do you recall how the signature transaction

12:35:00   17   took place?

18        A.   I don't recall exactly, so no.

19        Q.   You had done most of the negotiating for this

20   agreement, though, right?

21        A.   I had done all the negotiation.

22        Q.   And at this time, you were vice president and

23   general counsel for A-Z, right?

24        A.   That's correct.

25        Q.   We talked earlier about how you would have

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
|          | 1  | been authorized to enter into contracts on behalf of     |
| 12:35:29 | 2  | the company yourself, correct?                           |
|          | 3  | A.   That is correct.                                    |
|          | 4  | Q.   Why then did you have Barkat sign this              |
|          | 5  | agreement as opposed to just signing it yourself?        |
|          | 6  | A.   Because Barkat was president at the time, he        |
| 12:35:53 | 7  | was the owner of the company at the time and so the      |
|          | 8  | personal guaranty would be his as owner of the           |
|          | 9  | company, and I believe that's what Harrison Company,     |
|          | 10 | LLC expected, that the president of the company and      |
|          | 11 | the owner of the company would be the one signing the    |
|          | 12 | personal guaranty.                                       |
| 12:36:28 | 13 | Q.   What about just the terms and conditions            |
|          | 14 | themselves, though, you could have agreed to that        |
|          | 15 | yourself, right?                                         |
|          | 16 | A.   Could I have agreed to them?                        |
|          | 17 | Q.   You could have signed this document as to the       |
|          | 18 | terms and conditions even if not to the guaranty,        |
|          | 19 | couldn't you?                                            |
|          | 20 | A.   I -- I don't know.  I -- you know, I don't --       |
|          | 21 | I don't know if that ever came up in our discussions.    |
|          | 22 | I think from the -- from the very get-go, I think they   |
| 12:36:56 | 23 | expected to have Barkat sign the credit agreement and    |
|          | 24 | the personal guaranty.                                   |
|          | 25 | Q.   And they expected him to sign the credit            |

```
 1   agreement even though they were negotiating with you

 2   just because of the personal guaranty?

 3       A.   I don't know why they did that.

 4       Q.   Did someone at Harrison say that they

 5   preferred Barkat to sign the agreement?

 6       A.   I don't recall.  It's such a long time ago

 7   that I don't recall exactly what was said regarding

 8   who's executing the agreement.

 9       Q.   Is this credit agreement still in effect?

10       A.   No, it's not.

11       Q.   Why not?

12       A.   Well, for lots of reasons, but primarily

13   because A-Z Wholesalers, Inc. doesn't do business with

14   Harrison Company, LLC, hasn't for several years, does

15   not owe Harrison Company, LLC any money based on any

16   purchases from Harrison Company, and, you know, I'm

17   not even sure, but I don't even know if Harrison

18   Company even exists anymore, quite honestly.

19       Q.   It's A-Z's position that this credit

20   agreement between A-Z and Harrison was terminated,

21   correct?

22       A.   Yeah.

23       Q.   When was the credit agreement terminated?

24       A.   It terminated -- let me look here on my notes

25   real quick.
```

12:37:28 (line 8)
12:38:00 (line 14)
12:38:26 (line 18)
12:38:57 (line 25)

|          |    |                                                                              |
|----------|----|------------------------------------------------------------------------------|
|          | 1  | It -- it was terminated sometime in 2015.                                    |
|          | 2  | The last -- the last purchase from Harrison was on                           |
| 12:39:20 | 3  | March 31st, 2015 and any *CKTP any money that was owed                        |
|          | 4  | to A-Z Wholesalers, Inc. to Harrison Company, LLC                             |
|          | 5  | should have been paid off somewhere around June of                           |
|          | 6  | 2015.                                                                        |

Q.   You broke up a little bit there when you gave the date.  I heard -- you gave a specific date in March.  Could you just repeat that, please?

12:39:55   A.   Yeah, I believe the last purchase that A-Z Wholesalers, Inc., the defendant, made from Harrison Company, I believe was March 31st, 2015, and any balance that was owed as a result of any purchases 12:40:21 made between March 11th, 2011 and March 31st, 2015 by A-Z Wholesalers, Inc. from Harrison Company, LLC, that balance would have been paid off by A-Z to Harrison Company probably sometime around June of 2015, maybe a little bit after.

Q.   Okay.  I'm going to ask you a line of 12:40:56 questions and I just want to clarify that.  I want to focus specifically on this credit agreement.

So I understand it's -- it's your position that this agreement terminated in March of 2015 and then we're going to talk about Imperial a little later, but for now, I want to focus only on

|   | |
|---|---|
| 1 | Harrison's relationship with A-Z while this credit |
| 2 | agreement was in effect.  Do you understand that? |
| 3 | A.   I do. |
| 4 | Q.   So did A-Z and Harrison ever agree to modify |

12:41:30  5  the credit agreement?

6        A.   I would have to look at the credit agreement

7   specifically, but I imagine if we were doing business

8   with them for, call it four years, that there were --

9   there probably was a modification of that which would

12:41:57  10  have been a oral modification subsequent to us doing

11  business at some point.

12        Q.   Do you recall any specific modification or

13  specific term that was altered between Harrison and

14  A-Z?

15        A.   Sure, I can imagine a few that probably would

16  have been altered or modified.

17        Q.   What are they?

18        A.   I think the -- the first thing probably would

12:42:29  19  have been the payment terms, and I can't recall

20  exactly what we negotiated on March 11th, 2011, but my

21  guess is that as a relationship developed and deepened

22  and our volume went up with them, that our terms, our

23  payment terms were probably extended.

24             I can't recall exactly if there was a

12:42:56  25  credit limit that was set on March 11th, 2011, but my

```
 1    guess is based on the volume and the growth, that that
 2    credit limit would have been increased.  I don't
 3    recall exactly what pricing Rodney gave us for the
 4    various products that we were purchasing from
 5    Harrison, but I can imagine that over time that those
 6    prices were also renegotiated, discount, rebates,
 7    marketing, you know, if we were advertising something
 8    in particular that we were buying from them, you know,
 9    I probably went to them and say, hey, I need 20 cents
10    off per carton for a month for two months on this
11    particular brand.  So there were constant
12    modifications, I'm sure, regarding pricing.
13               I don't -- yeah, I'd have to look at the
14    terms and condition specifically, but this is sort of
15    a standard terms and condition that Harrison had
16    probably mostly for like its convenience store
17    customers, right, and we're a wholesaler, right, so
18    our volume is very different from a convenience store
19    versus the -- the wholesaler that -- that we are.
20               So I can imagine there being, you know,
21    oral agreements and modifications as to our return
22    policy for products that didn't sell or expired.
23    Because we weren't direct with the manufacturer for
24    the products that we were purchasing from Harrison and
25    Harrison was direct with the manufacturer, we'd have
```

```
 1   to return the product back to Harrison and Harrison
 2   would send it back to their manufacturer, and so how
 3   those credits and offsets.
 4              The length of time, right, I -- I can
 5   imagine that A-Z Wholesalers, Inc. had a much longer
 6   leash from Harrison when it came to returning products
 7   versus probably that a convenience store that they do
 8   business with was required.  So I can imagine that
 9   there were probably some -- some modifications to
10   that.
11              So, you know, without going through each
12   one of these line by line, I can imagine that this
13   agreement was modified orally over the last three or
14   four years of doing business with them.
15      Q.   Have you ever seen another agreement between
16   Harrison and any of its other customers?
17      A.   I don't know if I have or not.  I -- yeah --
18   well, let me think here.  I -- you know, I'd have to
19   check, but you mentioned Top 20 Wholesale, I think Top
20   20 Wholesale was at some point a customer of Harrison,
21   and so I don't know if there was another agreement
22   there or not.  But, yeah, I -- I don't recall
23   necessarily.
24      Q.   You don't know, though, whether Harrison used
25   the same terms and conditions with all of its
```

12:44:57  5
12:45:30  13
12:45:55  18
12:46:28  24

 1  customers, do you?

 2      A.   I'm fairly certain that they did.

 3      Q.   Do you --

 4      A.   I -- I don't have any reason to believe -- I

 5  don't have any reason to believe that they used a

 6  different terms and condition with their other

 7  customers, with their -- with their retail customers.

 8      Q.   But you don't know whether they did, do you?

 9      A.   I have -- I have no reason to believe that

12:46:54  10  they did, but I don't know for certain.

11      Q.   No amendment or modification to this

12  agreement was ever put into writing, was it?

13      A.   Well, it depends what you mean by writing.

14  You know, I think an e-mail potentially could be

15  a -- a written modification, right?

16      Q.   I'm referring to an executed agreement

12:47:28  17  between the parties.

18      A.   And -- and you're talking about something

19  that was signed?

20      Q.   Yes.

21      A.   You know, I -- I don't recall if there was an

22  amendment or modification that was executed between

23  the parties.

24      Q.   You're not aware of any separate written

25  contracts that Harrison entered into with A-Z, right?

|   |   |
|---|---|
| | 1 |
| 12:47:59 | 2 |
| | 3 |
| 12:48:40 | 4 |
| | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 12:48:57 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| | 20 |
| | 21 |
| | 22 |
| | 23 |
| 12:49:30 | 24 |
| | 25 |

1     A.   I don't recall any specific written contract

2  that was executed by both parties, Harrison and A-Z

3  Wholesalers, Inc.

4          THE REPORTER:  Mr. Holman, I hate to

5  interrupt, but I think I'm getting some feedback from

6  you.  You keep popping up on my screen not lighting up

7  and it's kind of distorting a little.  I don't know if

8  you're on mute or not, but it might help.

9          MR. HOLMAN:  I'm back on mute.

10          THE REPORTER:  Thank you.

11          MR. HOLMAN:  I felt an objection coming

12  there.

13          THE REPORTER:  Okay.  I -- I understand.

14     Q.   (By Ms. Finger)  When A-Z and Harrison first

15  entered into the credit agreement, Harrison set up two

16  separate account numbers for A-Z; is that right?

17     A.   Yes.

18     Q.   And it was one for the Dallas warehouse and

19  one for the Waco warehouse; is that correct?

20     A.   That is correct.

21     Q.   When A-Z placed orders with Harrison, would

22  separate orders be placed by A-Z Dallas and by A-Z

23  Waco or was one order placed for both warehouses?

24     A.   The general practice was to send two separate

25  orders.

1        Q.   When did A-Z place its first order with

2   Harrison?

12:49:49  3        A.   Hmm, my guess is sometime in March of 2011.

4        Q.   At that time, who was responsible for placing

5   orders with Harrison?

6        A.   At that time, I think I was responsible for

7   placing those orders.

8        Q.   What about in 2015, who was responsible for

9   placing orders then before the credit agreement

12:50:31  10  terminated?

11       A.   I think even then I was responsible for

12  placing the orders, but I did have obviously in 2011

13  and in 2015 assistance from certain staff members to

14  place those orders, right.

15       Q.   Who else in 2015 would have been placing

16  orders with Harrison?

17       A.   So, you know, obviously the buck stopped with

12:51:00  18  me as far as placing the orders, but I may have had

19  one of my warehouse managers in Dallas assist me with

20  that.

21       Q.   What was the name of the warehouse manager in

22  Dallas in early 2015?

12:51:29  23       A.   Hmm, let me -- let me rephrase that.  It may

24  have been some -- it may have been the tobacco manager

25  that had been -- that was placing -- that was

|    |    |
|----|----|
|    | 1 | assisting me in placing the orders.  And if the |
|    | 2 | follow-up question is what is his or her name, I don't |
|    | 3 | recall who would have been the tobacco manager in |
|    | 4 | 2015, or, for that matter, in 2011. |
| 12:51:59 | 5 | Q.   Is that something you'd be able to look up at |
|    | 6 | A-Z? |
|    | 7 | A.   I'm sure if I did some digging, I could |
|    | 8 | probably figure out who was the tobacco manager in '11 |
|    | 9 | versus who was the tobacco manager in '15, and I could |
|    | 10 | also probably figure out who was assisting me in |
|    | 11 | placing the orders in '11 versus who was helping me in |
|    | 12 | '15, and it may be the same person, too. |
|    | 13 | Q.   You were primarily responsible for placing |
| 12:52:29 | 14 | the orders, though, right? |
|    | 15 | A.   Yes. |
|    | 16 | Q.   How would you place an order with Harrison? |
|    | 17 | A.   Generally, gosh, I think -- it's -- it |
|    | 18 | changed how we would place the orders.  I mean, |
|    | 19 | sometimes -- I'd have to go back and really do some |
|    | 20 | digging, but my guess is generally the orders were |
| 12:53:01 | 21 | e-mailed. |
|    | 22 | Q.   Who would you send an e-mail to? |
|    | 23 | A.   My guess is Rodney unless he had requested |
|    | 24 | that someone else be copied on that. |
|    | 25 | Q.   Were orders always placed by e-mailing Rodney |

1   or another contact at Harrison?

12:53:26   2       A.   Yeah, I believe -- I believe the orders were

3   placed by e-mail because, you know, I recall a few

4   times if we hadn't sent our e-mail to Rodney, I'd get

5   a call and be like, hey, the deadline is coming up, we

6   need your order so we can, you know, pull it, pick it,

7   and ship it.

8       Q.   Did you ever place orders over the phone?

12:53:56   9       A.   I'm sure there were probably some times where

10   we needed to add something to our order or the order

11   that was sent was -- had an error on it or something

12   got transcribed wrong and so we had to pick up the

13   phone and be like, oh, wait, we meant 60 cartons

14   instead of 6, right.

15       Q.   Did you ever have a standing order that would

16   be automatically processed after a certain time

17   period, for instance, the same product might be

18   ordered in the same quantity once a month

12:54:29   19   automatically unless you were to modify it?  Did you

20   ever place an order like that?

21       A.   Not that I can recall.

22       Q.   How often did A-Z place orders with Harrison?

23       A.   I think that probably also changed.  I don't

24   know if, you know, when we first got started, we were

25   placing orders once a week and then we went to twice a

```
          1    week, but I can imagine that it was at least once a
12:54:58  2    week, if not twice a week.
          3         Q.   In 2015, early 2015, would you say Harrison
          4    was still placing orders once to twice a week with
          5    Harrison?
          6         A.   A-Z was?
          7         Q.   I'm sorry, yes, A-Z was placing orders with
          8    Harrison?
          9         A.   Yes.
          10        Q.   Approximately how much product would A-Z
          11   order each time?
12:55:27  12        A.   How would you like for me to define the
          13   product quantity?
          14        Q.   I guess in product quantity first, not
          15   necessarily dollar amount.
          16        A.   Sure.
          17        Q.   An approximation.
          18        A.   Yeah, hang on.  Let me -- mind if I whip out
          19   my calculator?
          20        Q.   Sure.
12:55:58  21        A.   And this is an approximation, all right --
          22        Q.   I understand.
          23        A.   -- because we're going back ten years.
12:56:26  24             I would say maybe like 7,000 cartons a
          25   week.  That's not including snuff, which is like
```

```
 1   your -- your -- like Copenhagen, Skoal.  I'm just

 2   talking premium cigarettes -- or cigarettes.  We

 3   bought some generic cigarettes from them as well.

 4        Q.   And what was the approximate dollar amount on

 5   your regular orders with Harrison?

 6        A.   Probably around 3, 350.  You're talking about

 7   back in 2011?

 8        Q.   In 2011, yes.

 9        A.   I would say probably around 300 to 350,000

10   per week.

11        Q.   What about in 2015?

12        A.   Maybe a little bit less.  Maybe 250.

13        Q.   Once A-Z placed an order with Harrison, what

14   happened next?

15        A.   Once A-Z places an order with Harrison, what

16   happened next?  Can you be a little more specific?

17        Q.   How long until you received delivery of the

18   Harrison product?

19        A.   I would say three daysish.

20        Q.   And those products were delivered to the

21   respective A-Z warehouse from which they were ordered;

22   is that right?

23        A.   Can you rephrase that question?

24        Q.   Sure.

25                  So if A-Z Dallas ordered product from
```

12:56:58 (line 3)
12:57:30 (line 10)
12:57:59 (line 17)
12:58:28 (line 23)

1    Harrison, it would be delivered to A-Z's Dallas

2    warehouse; is that right?

3         A.   Yes.

4         Q.   Were you there when the products were

5    delivered?

6         A.   Yes, generally.  I was always there, so...

7         Q.   Is that true only for the Dallas warehouse or

12:58:59  8    have you also been present in the Waco warehouse when

9    Harrison product was delivered?

10        A.   You're assuming that the product for Waco was

11   delivered to Waco, which I didn't say it was.

12        Q.   I did.  I'll go back.

13             So we asked that question already with

14   respect to Dallas.  So if A-Z Waco ordered product

15   from Harrison, would it be delivered to the A-Z Waco

16   warehouse?

17        A.   No.

18        Q.   Where would it be --

19        A.   Generally -- generally no.

20        Q.   Where would it be delivered?

12:59:28  21        A.   It would be delivered to the A-Z Dallas

22   warehouse.

23        Q.   Why?

24        A.   Because the practices that I had put in

25   place, I preferred the premium cigarettes be received

1    in Dallas where I could physically set my eyes on it,

2    get a count on the number of cartons, make sure there

3    wasn't any shortages or any issues, and we would

4    receive it for Waco and then put it on our own truck

12:59:58  5    and send it to Waco.

6         Q.   So you were there when most of the products

7    were delivered for both Dallas and Waco orders; is

8    that right?

9         A.   Yeah, that's fair to say because I think

10   generally the deliveries -- at least one of the

11   deliveries would have been Monday morning.

12        Q.   Who delivered the products?

13:00:23  13        A.   Be a little more specific.

14        Q.   Was the product delivered by Harrison, was it

15   delivered by UPS, who delivered the products to A-Z?

16        A.   From March 2 -- or from March 11th, 2011 to

17   March 31st, 2015, in most cases, the delivery was done

18   by Harrison Company on one of their large 18-wheeler

13:00:59  19   trucks that pulled into the warehouse in Dallas on a

20   Monday generally, but probably another day during the

21   week as well, I can't recall.  And every once in a

22   while, I think if they had shorted us some product or

23   screwed up our order somehow, maybe Rodney brought it

24   by, right, just put it in his car, and whatever was

13:01:24  25   missing, he'd -- he'd bring over really quick.

```
 1      Q.   Do you know any of the truck drivers that
 2  delivered product?
 3      A.   You know, I met several of them because it
 4  would take some while for us to -- to receive the
 5  product and count it, make sure it's accurate, and,
 6  you know, they didn't leave either until we got an
 7  exact count.  I don't recall any specific names.
 8      Q.   Do you know who technically employed those
 9  truck drivers?
13:01:58  10      A.   I believe those truck drivers from 2011 to
11  2015, March to March, is the period that I'm
12  testifying about right now, so I want to be really
13  specific about that.  I believe Harrison Company, LLC
14  employed them.
15      Q.   How do you know that?
16      A.   Well, aside from their shirts that said
17  Harrison Company on them and the truck that said
13:02:28  18  Harrison Company on them and the invoice that they
19  were handing us said Harrison Company on them, and
20  probably just through conversations, right, I always
21  like to kind of pick -- pick people's brain a little
22  bit.  If I could figure out how much they're getting
23  paid, they get paid by the hour, do they get paid
24  salary, you know, all that sort of stuff, I just -- I
25  can learn more about how to operate my own business
```

1    that way.

13:03:00   2        Q.   Do you recall having a conversation like that

3    with a truck driver at Harrison?

4        A.   Oh, I'm sure; not a specific conversation,

5    but I'm sure I had those conversations several times

6    with any driver that I would have seen from -- from

7    Harrison or some of the other companies that I thought

8    were running a -- a good -- good operation.

9        Q.   You don't recall a specific conversation,

10   though, in which you asked a Harrison truck driver who

11   the entity was that technically employed him, do you?

13:03:29  12        A.   I don't -- I don't think I ever asked that

13   question specifically, no, but I had -- I had no

14   reason to believe that it wasn't Harrison Company,

15   right?  You've got Harrison plastered everywhere, on

16   your shirt, on your truck, on the invoice, on the bill

17   of lading, on, you know, business cards or whatever,

18   and so I thought a fair assumption would be is that

19   they were employed by Harrison Company.

20        Q.   You don't know who held the title to the

13:03:58  21   delivery trucks, do you?

22        A.   I did not do a title search on the delivery

23   trucks that were coming to A-Z, no.

24        Q.   You also do not know who the delivery trucks

25   were registered to; is that right?

1     A.   I believe it was Harrison because, you know,

2   when your -- Department of Transportation requires

3   certain information on these types of trucks, right,

4   so you have to have a Department of Transportation

13:04:27   5   number, and those are usually illustrated on the doors

6   of the trucks on both sides of the doors and then

7   sometimes I believe also on the rear of the truck.

8   And I don't recall exactly what it said, but I believe

9   it would say something along the lines of, you know,

10   Harrison Company or Harrison Super Regional

11   Distributor and then underneath that it would have a

13:04:59   12   Department of Transportation number, I believe.

13     Q.   You don't recall specifically seeing Harrison

14   listed on one of those Department of Transportation

15   stickers on any of the delivery trucks, though, do

16   you?

17     A.   I mean, it would say Harrison and then it

18   would say DOT number, but I didn't do a -- I didn't do

19   a DOT search on every truck that came to see if that

13:05:27   20   was registered to the Harrison Company, no, but a fair

21   assumption is what I'm saying, you know, in that

22   situation.

23     Q.   Who else at A-Z was present when you received

24   delivery from Harrison?

25     A.   Everybody that worked there should have been

1    there except for Barkat.

2        Q.   You testified earlier that there were, you

3    know, only five or six employees in the Dallas

13:05:59   4    warehouse.  Was that always true?

5        A.   No, that was not always true.

6        Q.   Were there more or less?

7        A.   More.

8        Q.   When was that?

9        A.   Between 2009 through probably 2000 --

13:06:26  10    probably the early part of 2019.

11        Q.   So how many employees worked at A-Z from 2011

12    to 2015?

13        A.   I don't recall exactly, but it was more than

14    five.

15        Q.   But all of them should have been present when

16    you received delivery from Harrison; is that true?

17        A.   Sure, unless it was a salesperson who is

13:06:58  18    supposed to be out doing sales calls at our customer

19    stores, anybody that worked in the warehouse or worked

20    for the company; other than that and other than

21    Barkat, they would have been present.

22        Q.   Can you tell me the names of the employees

23    who also should have been present when you received

24    product from Harrison?

25        A.   Nah, I couldn't -- I can't recall any exact

1 names or last names or legal names.

2    Q.   Is that something you could look up at A-Z?

13:07:29  3    A.   Sure.

4    Q.   Do you recall the last time you spoke to a

5 Harrison delivery truck driver?

6    A.   No.

7    Q.   And you don't recall any of their names, do

13:08:07  8 you?

9    A.   No.

10    Q.   Have you ever worked for the Department of

11 Transportation?

12    A.   No.

13    Q.   So you mentioned earlier, you never did a

14 title or registration search on any of the delivery

15 trucks, did you?

16    A.   Yeah, I never did that.

13:08:29  17    Q.   Once a delivery was made by Harrison, was A-Z

18 given any documentation by the Harrison delivery

19 driver?

20    A.   Yes.

21    Q.   What were they given?

13:08:48  22    A.   So generally we would get an invoice, right,

23 I believe there would be a -- maybe another document,

24 kind of like a ship list or a bill of lading,

25 something along those lines.  I'm trying to think if

there was anything else that we would get.  If there
was any damaged product or any returns that we were
processing at that time, then we would probably get
13:09:28    a -- another document that would identify the damaged
product for either a future return or an immediate
return right there and then.

And then if we were sending back product
that had either expired or we had received damage that
we didn't see at the time of receiving the product or
there was something wrong with it, it was an old
product or expired product or the wrong product, then,
13:09:57    you know, we would probably schedule a -- a return.
If the driver came and made a drop, we'd have our
return ready to go, probably sent that information
over to Rodney at Harrison saying, hey, we're
returning such and such and then we get a credit memo
later or something along those lines.

Q.   So you received the invoice at the time of
delivery; is that right?

A.   Yes.

Q.   Would you review the invoice as soon as you
received it?

13:10:28    A.   Yeah.  I mean, I think that's -- that's one
of the first things that we would do, right, first
identify the number of cartons or quantity shipped,

1  right, and count the quantity that we have.  Depending

2  on how busy we were or like whether we needed to

3  receive the product, we probably didn't go through

4  each SKU while the driver was waiting, that could be a

13:10:59  5  couple-hour process, right.

6          So we would at least look at the invoice,

7  look at the quantity, make sure that that matched up

8  with -- with what was shipped, and then we could

9  always reassess it later because our relationship with

10  Harrison was such that if they had sent us the wrong

11  SKU, we could just tell them, hey, later, hey, we got

12  the wrong SKU here, we'll just set that aside for the

13  next truck and get us credit back on that one.

14      Q.   From 2011 to 2015, the invoices that you

13:11:30  15  would receive at time of delivery said Harrison on it;

16  is that right?

17      A.   Let's be specific.  So let's say from March

18  11th, 2011 until March 31st, 2015, the invoices stated

13:11:53  19  Harrison Company on them, yes.

20      Q.   You don't know where Harrison's warehouse was

21  located that the product came from, do you?

22      A.   I do.

23      Q.   Where?

24      A.   It's -- I think it was Bossier City, which is

13:12:24  25  just west of Shreveport, if I'm not mistaken.

1     Q.  Do you know the address?

2     A.  I don't have the address memorized, but I

3 have -- I have seen the facility.  I've been there.

4     Q.  When did you go there?

13:12:48  5     A.  Oh, boy.  I probably went there in 2011,

6 probably in 2012, maybe again in '13.

7     Q.  Why did you go there in 2011?

8     A.  I believe that I -- I was invited to tour the

9 facility and the warehouse to kind of see what goes on

13:13:26  10 behind the curtain as they were pulling one of our

11 orders and watch that process a little bit.  Also I

12 believe it was another sort of endeavor to continue to

13 court A-Z Wholesale to remain a loyal customer of

14 Harrison to see if there was ways that we could

15 purchase more product from Harrison because their

13:13:56  16 experience with us had been fairly good, our

17 experience with them was fairly good, and so in any

18 business relationship you're always trying to figure

19 out a way where you can do a little more together,

20 right, deep in the partnership, deep in the

21 relationship.

22     Q.  You didn't receive a tutorial on Harrison's

23 accounting system when you visited the warehouse in

24 2011, did you?

13:14:26  25     A.  Did I receive a tutor -- define what you mean

 1  by tutorial.

 2      Q.   Did anyone in Harrison's accounting

 3  department give you a walk-through of how Harrison's

 4  internal accounting system works while you were there

 5  in 2011?

 6      A.   Not -- no, not to that extent.

 7      Q.   What about in 2012?

 8      A.   Nothing like that to that extent.

 9      Q.   What about in 2013?

10      A.   No, no one -- no one gave me an accounting

11  tutorial on what -- how they handle their accounting.

13:14:59  12      Q.   They've never done that, right?

13      A.   Harrison has never given me a tutorial on

14  their accounting system.

15      Q.   What would you do with the invoice after you

16  received it upon delivery?

13:15:25  17      A.   We check each item line by line, SKU by SKU,

18  make sure that the quantity matches up with what was

19  delivered because the pricing for each SKU can vary,

20  right, so we want to make sure because, let's say, for

21  example, we counted 7,000 cartons, right?

22           THE WITNESS:  You're allowed to be here.

23  You can sit down if you want.

24           MR. BARKAT ALI:  Oh, yeah.

25           THE WITNESS:  That was my dad, by the

```
 1   way, that was Barkat.

 2              MR. BARKAT ALI:  How are you?

 3       A.   And so let's say, for example, the driver

 4   made a delivery of 7,000 cartons, for example.  We

 5   counted 7,000, it says 7,000 on the invoice, we signed

 6   off on it, no damage, no nothing, driver's off.  Then

 7   we go through each invoice line by line, SKU by SKU to

 8   make sure that if we ordered 600 Marlboro Light

 9   cartons, box, that we got 600 cartons of those, right.

10       Q.   (By Ms. Finger)  Let me clarify, Mr. Ali.

11   I -- I don't mean to cut you off, but I believe you --

12   you told us a little bit about how thoroughly you

13   check the invoice when you receive it.

14              What I meant by my question this time

15   more specifically was, once you've done all that and

16   you yourself have reviewed the invoice, where do you

17   take it from there?

18       A.   Where do I take what from there?

19       Q.   The invoice.

20       A.   Like physically where does it go?

21       Q.   Yes.  Do you give to it A-Z's accounting

22   department or what happens next?

23       A.   So once the product is received, right, which

24   is the process we went through line by line, SKU by

25   SKU, all that sort of stuff, and the product is
```

1    received into our system, right, so we -- it goes into

2    our system, our inventory goes up by 7,000 SKUs, at

3    that point, that invoice makes its way to accounts

4    payable.

5         Q.   Who is responsible for importing the

13:17:28  6    information from the invoice into A-Z's system?

7         A.   Various staff members.

8         Q.   Can you tell me any of their names from March

9    2011 to March 2015?

10         A.   No.   It's whoever was available that could

11    just scan the stuff, it goes right into our system, we

12    hit received, boom, done.

13         Q.   Do you remember the names of who was in

13:17:55  14    accounting at A-Z from March 2011 to March 2015?

15         A.   No, not exactly.   I mean, over the years

16    we've had a lot of turnover in employees and stuff.

17         Q.   From March 2012 to March 2015, who was

18    responsible for maintaining the books and records at

19    A-Z?

20         A.   When you say books and records, can you be

21    more specific?

22         Q.   I mean the accounting books.

13:18:30  23         A.   We have lots of sort of traunches for

24    accounting, so we have accounts receivable, we have

25    accounts payable, generally those two people are

1  separate.  We have financials, right, those types of

2  things, that's usually somebody that's separate,

3  sometimes in-house, sometimes outside, and those

4  duties or those -- that personnel has changed a lot

13:18:58   5  over the last 12, 13 years since I've been there.

6      Q.  Between March 2011 to March 2015, was A-Z

7  using outside accountants?

8      A.  For what task?

9      Q.  For any task.  Were they maintaining A-Z's

10  accounting at that time?

11      A.  I don't recall if they were, if we were using

12  outside folks or in-house.

13:19:34  13      Q.  Who was responsible for processing a Harrison

14  invoice in A-Z's accounting system from March 2011 to

15  March 2015?

16      A.  Whoever was doing accounts payable at the

17  time.

18      Q.  Was there more than one person responsible

19  for accounts payable at that time?

20      A.  I don't recall.  There may have been.

21      Q.  You don't recall any of their names; is that

22  right?

23      A.  No.

13:20:09  24      Q.  How did A-Z pay for the product it received

25  from Harrison?

        1       A.    It depends.

        2       Q.    What were -- if there was more than one way,

        3   can you identify all of the ways A-Z may have paid

13:20:28    4   Harrison at any given time?

        5       A.    The preferred payment method would have been

        6   by check.  In the alternative, there may have been --

        7   we may have electronically pushed out funds, right,

13:20:52    8   either by wire or ACH, EFT, whatever -- ETF -- EFT,

        9   but mostly by check.

       10       Q.    Who determined how payment was going to be

       11   made?

       12       A.    As far as?

       13       Q.    Whether it was going to be by wire or check?

       14       A.    That was generally my call, right.

       15       Q.    What would make you choose one or the other

       16   method?

       17       A.    Nothing in particular, really.  Like I said,

13:21:27   18   my preference was always to pay by check.  If somehow

       19   inadvertently a check went for the wrong amount and we

       20   were -- we had shorted an invoice or shorted

       21   something, then I would ask the accounts payable

       22   department to send out an electronic payment so that

       23   we could get it there faster.

13:22:01   24       Q.    Who were the checks made out to?

       25       A.    When?  Are we still talking about the same

 1  time period?

 2      Q.   Yes.  I'll -- I'll --

 3      A.   Stipulate --

 4      Q.   -- let you know when we're going to shift

 5  gears, but we're still under the A-Z Harrison

 6  relationship, so my questions right now are still all

 7  referring to on that March 2011 to 2015 time period.

 8  So during that time, who *CKTP effect --

 9      A.   During the -- during the Harrison

13:22:26  10  relationship from March 11th, 2011 to March 31st,

11  2015, the payments would have gone to Harrison

12  Company, so they would have been made payable to

13  Harrison Company, and I also believe probably

14  subsequently maybe, there have been -- there may have

15  been some payments that went to Harrison Company until

16  the entire balance with Harrison Company was paid off.

13:22:56  17              THE VIDEOGRAPHER:  Kim, were you able to

18  get the full question?

19              I'm sorry, Kim.  You're on mute.  It

20  looked like you were struggling with the question.

21              THE REPORTER:  Yes, I was trying to stop

22  near the end of the question.

23              MS. FINGER:  I'm sorry, Kim.

24              THE REPORTER:  That's all right.

25              (Requested portion read.)

1    A.   *CKTP Sorry.

2    Q.   (By Ms. Finger)   No worries.   Let's just --

3  we'll get that clearly on the record then.

4              So we're still talking about March 2011

5  to 2015, during that time when A-Z paid for Harrison

6  product, who were the checks made out to?

7    A.   Harrison.

8    Q.   Who was signing the checks?

13:24:01   9    A.   Generally those checks were probably being

10  signed by Barkat.

11    Q.   Did you also have authority to sign the

12  checks?

13    A.   You betcha.

14    Q.   Was there any reason a check would be signed

15  by you versus Barkat?

16    A.   Perhaps Barkat didn't make it into the office

13:24:28  17  to sign the check by the time I wanted to have the

18  check sent out, so I may jump in and sign them, but I

19  try to reserve that responsibility for Barkat to give

20  him something to do.

21    Q.   How were the checks sent to Harrison?

22    A.   Usually by, I think regular mail or, you

23  know, by -- by some sort of mail service, FedEx, UPS.

13:24:58  24  I didn't really get involved in that part too much,

25  but I do know that it went by mail.

```
 1        Q.   Who was responsible for sending the mail?

 2        A.   Probably the accounts payable folks that were

 3   there that generally left a file of checks for Barkat

 4   to sign, and if he signed them and then handed the

 5   file right back, then they would just make

 6   arrangements to have it mailed out.

 7        Q.   Do you know the address that the checks were

 8   mailed to?

 9        A.   And we're still in the same time period?

10        Q.   Correct.

11        A.   I -- my -- my guess is, and, again, the --

12   I'm sure -- I'm sure there's some sort of documentary

13   evidence that will be better than my recollection.  My

14   guess is checks were being sent to Harrison Company at

15   their Bossier City address, which would have been the

16   address on the invoice as well.

17        Q.   Do you have any reason to believe that the

18   checks would have been mailed to anybody but Harrison

19   at that time?

20        A.   No.

21        Q.   Once A-Z mailed its payment, you don't know

22   what Harrison did to process that payment in its

23   internal accounting system, do you?

24        A.   Can you rephrase the question?

25        Q.   Sure.
```

13:25:26

13:25:59

13:26:29

1          Once A-Z mailed its payment, you don't

2   have any personal knowledge as to what Harrison's

3   accounting department may or may not have done with

4   that check to process it in its internal accounting

5   system, do you?

6       A.   I have some knowledge.

7       Q.   What knowledge did you have?

8       A.   Even -- even though I didn't get a tutorial

9   when I was there, my understanding is that those

10  payments would be deposited in the Harrison bank

13:26:58  11  account and those payments would be applied in their

12  system against our accounts so that the balance would

13  be reduced and so that the balance would be reflective

14  of the payments.

15      Q.   How do you know how Harrison's internal

16  accounting department applied those payments?

13:27:29  17      A.   Because when we sent a payment to, for

18  example, to Harrison, our balance would go down.  If

19  we bought stuff from Harrison, our balance would go up

20  and so that number was constantly changing, right.

21  Payments were being issued regularly, product was

22  coming regularly, so it's constantly like up and down,

23  up and down.

24      Q.   So you know the payments would have been

25  applied to the total balance, but you don't know what

13:27:58    1  payments were necessarily applied to any given

            2  invoice, do you?

            3      A.   Oh, yeah, no, I do.

            4      Q.   How do you know that?

            5      A.   Because it's -- what do they call it, is it

            6  FIFO?  Are you familiar with FIFO?

            7      Q.   No.

            8      A.   First in first out.

            9      Q.   You understand that -- and, again, I'm not

           10  necessarily asking how it may have supposed to have

13:28:29   11  been done or what your understanding is of generally

           12  how accounting should work, but specifically at

           13  Harrison.

           14      A.   No, I -- I'm familiar with it.  I mean, we

           15  did a -- we did nearly a hundred million dollars'

           16  worth of business.

           17      Q.   So you saw Harrison's internal accounting

           18  system demonstrating that payments were always applied

           19  to --

           20      A.   Yeah, so --

           21      Q.   -- a particular invoice; is that right?

           22      A.   Yeah, so let me -- let me walk you through

           23  this.  So we get a particular invoice, right, let's

13:28:58   24  say it's for 60 grand or something or -- or whatever.

           25  We would send out a check for $60,000 for that

1    particular invoice, right?

2        Q.   Sometimes A-Z paid less than its balance

3    though; isn't that true?

4        A.   So I'll give you an example where I think

5    this might help you.  Let's say, for example, we got a

13:29:27   6    order for $300,000, right?  Then in order to pay that

7    invoice, we might make five separate checks for 60,000

8    apiece, right, one on Monday, one on Tuesday, one on

9    Wednesday, one on Thursday, one on Friday, so when we

10    mailed out the checks to Harrison in Bossier City, we

13:29:58   11    would send them five checks that would be dated

12    Monday, Tuesday, Wednesday, Thursday, Friday, and it

13    would be referencing -- generally should be

14    referencing the invoice that it's paying off, and so

15    we were paying -- we were paying off the oldest

16    invoice first, right, first in first out, right, and

17    that also helped Harrison with their aged receivables,

13:30:29   18    right, so that way the receivables for those oldest

19    invoices didn't find themselves in a bucket that's 120

20    days, 180 days, 190 days out, right, it stayed within

21    the terms that we had agreed to with the Harrison.

22              Does that help?

23        Q.   Is it your testimony, Mr. Ali, though, that

24    A-Z never fell behind on payments that it owed to

25    Harrison?

13:30:59    1        A.   Not really.  I mean, I think as -- as our

            2    relationship with Harrison grew, our volume was also

            3    growing, our credit limit went up, and so we -- you

            4    know, we generally tried to stay on track with them,

            5    and they were -- you know, they were working with us

            6    as well, right, because we were buying a lot of

13:31:25    7    product from them.  I mean, you know.

            8        Q.   But A-Z did fall behind on payment to

            9    Harrison, didn't it?

           10        A.   No.

           11        Q.   What is your basis for that?

           12        A.   Because our last purchase with Harrison was

           13    in March of 2015, at the end of March 2015, and my

           14    guess is within eight to ten weeks, whatever balance

13:31:58   15    remained as of the last delivery was paid off to

           16    Harrison within that eight- to ten-week period, which

           17    is kind of where our terms ended up.

           18        Q.   I understand that it was A-Z's intent that

13:32:24   19    payments were being applied to the oldest invoice;

           20    however, did you personally look into Harrison's

           21    accounting system and see how all of those payments

           22    were being applied?

           23        A.   I didn't look into their accounting system,

           24    but I spoke to people in their accounting department.

           25    I think their former CFO, Brad Albritton, we had

```
           1   talked a lot, and it was always first in first out.
13:32:59   2       Q.   What else did Brad tell you about Harrison's
           3   internal accounting system?
           4       A.   Just the same thing about, you know, we want
           5   to get the oldest invoices taken care of first, that
           6   way the aged receivables doesn't go too far because
           7   they've got a line of credit and they've got to show
           8   the bank what their accounts receivable is.  If you
           9   get something into the 120-, 180-day bucket, they
          10   probably don't get a line of credit on that.
13:33:30  11            I think we had discussions about making
          12   sure that if we're going to split up payments on a
          13   particular invoice, so let's say, for example, the
          14   $300,000 invoi -- let's say it was a 300,001 dollar
          15   invoice, don't make five payments of $60,000 because
          16   it still leaves a $1 balance left.  Make the last
          17   payment $60,001, so that way that invoice is cleared
          18   and it's completely done, right.
13:33:59  19            And I preferred that, too, actually
          20   because we could keep track of the invoices that had
          21   moved out and the new invoices that we've gotten over
          22   the last eight to ten weeks.  We just pick up the
          23   oldest one first, pay those, receive a new delivery,
          24   and ten weeks later, we'll get to that invoice and
          25   we'll pay that one.
```

```
 1              Does that kind of make sense?
 2       Q.    Yes.
 3              A-Z sometimes made payments that were
 4  returned for nonsufficient funds; is that right?
 5       A.    I'm sure over the last, you know, five years
 6  or whatever, the four years that we were doing
 7  business with Harrison, there may have been some
 8  checks that were returned NSF, but I -- if it -- if
 9  that ever occurred, we cured that immediately.
10       Q.    It's your testimony that A-Z paid off its
11  balance with Harrison in full; is that right?
12       A.    Yes, ma'am.
13       Q.    And it's A-Z's and your position that A-Z
14  does not owe any money to Harrison under the terms of
15  this credit agreement, that's right?
16       A.    Zero dollars owed to Harrison under the
17  credit agreement or owed to Harrison Company, LLC.
18              And I think the -- I think the invoices,
19  right, the -- the relevant period, because we haven't
20  discussed it, I'm sure you'll get there, maybe after
21  lunch, but the relevant period is for invoices from
22  October 22nd, 2018 to March 4th, 2019.  Those are all
23  material invoices.
24       Q.    We'll talk about that time period, Mr. Ali.
25       A.    Okay.  I just wanted to make sure we got
```

13:34:35
13:34:56
13:35:17
13:35:57

1   there because I don't know if we got a chance to go

2   over that with -- with my dad's testimony the other

3   day.

4          Q.    Sure.

5                 So it's your position that to any extent

6   any balance is owed, it would be due to Imperial; is

7   that right?

8          A.    That's correct.

9          Q.    When was the credit agreement with Harrison

10  terminated?

11         A.    It would have terminated after the balance

12  was paid, like I said, somewhere between eight to ten

13:36:27  13  weeks after the last delivery on March 31st, 2015, so

14  without giving you an exact date, which I'm sure if we

15  took some time, we could probably do and if we end up

16  at trial, I'll be prepared for this, but I'll probably

17  be able to tell you exactly which day the last invoice

18  with Harrison was paid and the balance was zero with

19  Harrison.

20         Q.    How was the credit agreement terminated?

21         A.    It naturally terminated because we didn't buy

13:36:57  22  any more product from -- from Harrison, right.  It's

23  not a -- it's not a credit agreement in perpetuity,

24  right?  It's a credit agreement as long as we're doing

25  business with you.  If we're not doing business with

1  you, then that credit agreement no longer exists.  And

2  if both parties have performed, which is they

3  delivered and we paid and we paid in full the amount

4  that was owed sometime by June or July of 2015, then

13:37:25  5  that credit agreement and the personal guaranty signed

6  by Barkat to Harrison ceases to exist, it naturally

7  terminates.  It can't be there forever because we're

8  not doing business with them anymore.

9      Q.  So there was no conversation that took place

10  between anyone at A-Z and anyone at Harrison about

11  terminating the credit agreement, right?

12      A.  No, that conversation would have occurred

13  with the folks over at Imperial.

14      Q.  I'm talking only about the credit agreement

15  with Harrison.  So there was no conversation that took

16  place about terminating this agreement, rather A-Z

13:37:59  17  simply ceased placing orders with Harrison; is that

18  right?

19      A.  I mean, there were discussions, there were

20  e-mails, there were all sorts of stuff that we were --

21  we were going to buy from Imperial moving forward, not

22  from Harrison.

23      Q.  You had that conversation with someone at

24  Harrison?

25      A.  No.  I had that conversation -- well, I may

1    have had that conversation with some people at

2    Harrison, but definitely had that conversation with

3    the folks over at Imperial.

4        Q.   Who at Harrison did you speak with about no

13:38:30  5    longer ordering product from them?

6        A.   I -- if Rodney was still working for

7    Imperial -- I mean, for Harrison at the time, then I'm

8    sure I would have talked to Rodney about it --

9        Q.   Do you specifically --

10       A.   -- but I've not --

11       Q.   -- remember talking to him about it?

12       A.   I mean, I don't remember specifically talking

13   to him about it because at this point, I was dealing

13:38:54  14   with, you know, the CEO at Imperial, Wayne Baquet, and

15   so a lot of my dealings or conversations would have

16   occurred with Wayne Baquet or Brad Prende --

17   Prendegrast over at Imperial.

18             But I can assure you that we don't -- A-Z

19   Wholesalers, Inc. doesn't owe a penny to Harrison

20   Company.

13:39:28  21       Q.   I understand that's your position, Mr. Ali.

22       A.   No, I -- I just want to make sure that

23   everybody is clear on that, at least on the record.  I

24   mean, it -- it would be -- you know, you'd be talking

25   about invoices that go back six or seven years and

1    that's just not how it's done.

2         Q.   I appreciate your strategy, Mr. Ali, but I'll

3    have to ask that you stick to answering my questions.

4    We'll have to go through this process my way, if you

5    can --

6         A.   Sure, sure.

7         Q.   *CKTP -- if you can do that.

8         A.   I'll be glad to go through it your way.

9         Q.   I appreciate it.

13:39:59  10           And you just mentioned the conversation

11   with folks at Imperial.  Can you tell me the names

12   again of all who participated in that conversation?

13        A.   Wayne Baquet, Brad Prendegrast.

14        Q.   Anybody else?

15        A.   I can't recall anybody else specifically that

16   we would have talked to about sort of the high level,

17   you know, relationship.

18        Q.   When did you first talk to Wayne?

13:40:28  19        A.   Whew, I don't know.  Probably in that 2015

20   range, right, right around maybe that springtime.

21        Q.   When was the first time you spoke to Brad

22   Prendegrast?

23        A.   Same time.

24        Q.   How did you meet?

13:40:56  25        A.   My guess is that Rodney would have requested

1   a meeting.

2        Q.   Rodney worked for Harrison, though, right?

3        A.   At the time that I met Rodney, he worked for

4   Harrison.   What happened to Rodney's employment around

5   the time of the spring of 2015, I don't know.

13:41:27   6        Q.   So why would Rodney have set up a meeting

7   between you, Wayne, and Brad if he worked at Harrison?

8        A.   Because Imperial was buying out Harrison and

9   they were transitioning everything to Imperial.

10        Q.   In this 2015 conversation you had with Wayne

13:41:57   11   and Brad, what did they say?

12        A.   Pretty much the same thing, that Imperial is

13   acquiring Harrison Company, it's going to be a

14   process, sort of a transition process before

15   everything closes, but they were kind of letting us

16   know, you know, what's going on behind the curtain in

13:42:28   17   advance of making any, I think, formal announcements

18   of a deal closing, but because we were such an

19   important customer of Harrison, they wanted to let us

20   know that there may be some personnel changes because

21   they didn't want to double up their efforts, right,

22   have two salespeople, two accounting, two CFOs, two

23   CEOs, two of everything, right, and that we would

13:42:59   24   still get the same level of service that we were

25   getting with Harrison, and that they would continue to

1    be a strong supplier partner of ours moving forward,

2    and, you know, that was -- that was sort of the gist

3    of it.

4         Q.   That conversation took place in March 2015,

5    right?

6         A.   I don't know exactly when it took place, but

7    I can -- I'm -- I'm fairly confident that it would

13:43:29   8    have happened around that time frame because I think

9    we were -- we were a very valued customer of -- of

10   Harrison and the anticipation was that we would be

11   just as valued of a customer with Imperial moving

12   forward.

13        Q.   Did anyone else from A-Z participate in that

14   conversation or it was just you?

13:43:56   15        A.   I think it was probably just me.

16        Q.   And it was your understanding after that

17   conversation that you would no longer be doing

18   business with Harrison and from now on, you would only

19   do business with Imperial; is that right?

20        A.   My understanding was that there was a

21   transition that was already sort of in place.  There

22   weren't any like exact timings of when things were

23   going to switch over, but based on my understanding

24   that they were trying to do that as quickly as

25   possible, I think they may have even tried to do it

13:44:29    1   sometime in 2014, but it ran over to '15, but that we

2   would be doing business with Imperial.  And when we

3   received our last invoice from Harrison on March 31st,

4   2015, the next subsequent invoice that we got was that

5   first week of April 2015, and that was a Imperial

6   invoice.

7       Q.   And so it's your understanding that when you

13:44:59    8   received that first Imperial invoice, that meant that

9   you were no longer doing business with Harrison and

10   you were only doing business with Imperial; is that

11   right?

12       A.   That is correct.

13       Q.   And is that position based only on the

14   invoice that said Imperial or is there any other

15   factual basis for your belief?

16       A.   No, there -- it's -- it's not just the

17   invoice.  It's, you know, who we were dealing with,

13:45:28   18   you know.  I was dealing with Brad Prendegrast at

19   Imperial, which is the CFO, Wayne Baquet, who is the

20   CEO.

21           It was based off of obviously the

22   invoices that we were getting, the payments that we

23   were going to send in relation to those invoices, you

24   know, who I needed to talk to about any issues in the

25   relationship.  It was based on the announcement or the

13:45:58   1 | e-mail that they had sent that, you know, Imperial was

2 | now the entity.  It's based on a number of -- number

3 | of things, right.  It was no like, hey, just the

4 | invoice changed and all of a sudden it's Imperial and

5 | it's not Harrison.

6 | I mean, you know, that may have happened

7 | with some of their small, you know, convenience store

8 | customers, but, again, we were doing a lot of business

9 | with them and so they wanted to make sure that the

13:46:24  10 | process and the transition was very smooth for us.

13:47:01  11 | Ms. Finger, can I ask you when you're

12 | coming to a good stopping point because I've been

13 | loading up on liquid, but I've got to put something

14 | solid in my tummy.

15 | Q.  Sure.  Now would be good.

16 | A.  You sure?

17 | Q.  Yes.

18 | THE VIDEOGRAPHER:  Off the record; the

19 | time is 1:47 p.m.

13:47:19  20 | (Recess 1:47-2:35.)  *ck ALI3 IS THE SAME

21 | AS ALI2, GOING TO INSYNC

22 | THE VIDEOGRAPHER:  Going back on the

23 | record; the time is 2:35 p.m.

14:35:28  24 | Q.  (By Ms. Finger)  We've just come back from a

25 | break, Mr. Ali.  You understand that you're still

1  under oath, right?

2      A.   Yes, ma'am.

3      Q.   Before the break, we were talking about A-Z's

4  relationship with Harrison and we just started

5  touching on A-Z's relationship with Imperial; is that

6  right?

7      A.   That's correct.

8      Q.   When did A-Z place its first order with

9  Imperial?

10      A.   I want to say it would have been on or about

14:36:00  11  that first week of April 2015.

12      Q.   Did you place that order?

13      A.   I don't recall if I -- you know, I -- I

14  placed it, e-mailed it, or what, exactly.

15      Q.   You were primarily responsible for placing

16  the orders with Imperial still though, right?

17      A.   Yes.

18      Q.   You would have placed that order via e-mail;

19  is that right?

14:36:30  20      A.   I -- I believe so.  It -- it would have been

21  transmitted electronically somehow, either by e-mail

22  or some other method.

23      Q.   What other method would there have been to

24  submit it electronically?

14:36:52  25      A.   Hang on one second.  Sorry about that.

                         There -- I can't recall if there was like

a hand-held device or something that we may have

used.

        Q.   There was a hand-held device that you could

place orders through, wasn't there?

        A.   Generally, yeah, I mean, most suppliers have

various ways of accepting orders, we do, too, right,

14:37:27  we -- by e-mail, by Vap *CKSP, by phone, by hand-held

device, however we can get it.

        Q.   When did you first start using the hand-held

device to place orders?

        A.   I don't know exactly.

        Q.   Do you recall still placing some orders with

Imperial via e-mail, though?

        A.   I -- I think we -- we continued to send our

orders various methods, hand-held device, e-mail, some

electronic form.  What we didn't do is we didn't just

14:37:58  pick up the phone and call, that's for sure, or fax.

        Q.   You still place some orders through Imperial

via e-mail; is that right?

        A.   I believe we probably did.  Again, my

recollection is not so clear as to exactly how those

orders were being transmitted.

        Q.   How do you know, then, that you were placing

an order with Imperial and not with Harrison?  What

1  was the difference?

2      A.   Who we were dealing with, who was fulfilling

14:38:29  3  the orders, who was billing us for the orders, who --

4      Q.   I want to start just at the time that you

5  placed the order though.  So you said that you placed

6  your first order with Imperial around April 2015.  How

7  did you know at that time that you were placing an

8  order with Imperial as opposed to with Harrison?

9      A.   Because I believe we were told that our next

10  order would be with Imperial.

11      Q.   Who told you that?

14:38:59  12      A.   I can't recall exactly who.  Could have been

13  Brad, Wayne, or Rodney or...

14      Q.   But at the time you placed the order, how was

15  it different from how you were placing orders with

16  Harrison?

17      A.   It probably wasn't much different.

18      Q.   You can't say any specific differences, can

19  you?

20      A.   It -- it would -- it would still be by some

14:39:28  21  electronic means, right, e-mail, hand-held device, so

22  some electronic means we were sending those orders.

23      Q.   You weren't, for instance, calling a separate

24  phone number to place an order, were you?

25      A.   I don't -- we weren't placing orders by

1    phone.

2         Q.   So you were only placing orders by e-mail or

3    hand-held device; is that right?

4         A.   Yeah.

5         Q.   You don't recall whether the e-mail address

14:39:56   6    that you sent orders to through Imperial was different

7    from the e-mail address you sent orders to through

8    Harrison, do you?

9         A.   At that time, I'm not sure if it was

10   different or if it changed at some point

11   subsequently -- subsequent to that date.

12        Q.   You remember it changing at some point

13   though?

14        A.   You kind of broke out.

15        Q.   Do you remember the e-mail address changing

16   at some point through which you would place orders

17   with Imperial as opposed to Harrison?

14:40:27   18        A.   I'm sure over time the communication

19   transitioned more and more to Imperior -- Imperial

20   e-mail addresses.  I don't know how they handled that

21   in their transition, whether everybody got new e-mail

22   addresses immediately or transitioned over or they got

23   their e-mails forwarded.  I mean, that's sort of an

24   internal thing again.

25        Q.   You don't remember specifically, though,

|       |                                                           |
|-------|-----------------------------------------------------------|
| 1     | placing an order with an Imperial e-mail address as       |
| 14:40:56  2 | opposed to placing one with a Harrison e-mail address |
| 3     | at any specific time, do you?                             |
| 4     | A.   I don't recall, but I'm -- I'm fairly certain       |
| 5     | that it would have been done at some point.              |
| 6     | Q.   But you don't remember specifically the time       |
| 7     | that that changed, do you?                               |
| 8     | A.   No, I don't remember exactly which dates, you      |
| 9     | know, that changed.                                       |
| 10    | Q.   Was there ever a specific time at which the        |
| 11    | salesperson that you dealt with transitioned from a      |
| 14:41:24  12 | Harrison sales rep to an Imperial sales rep?         |
| 13    | A.   Yeah, I mean, I think at some point Rodney         |
| 14    | Harrison wasn't there anymore.  Our account was large    |
| 15    | enough -- I mean, I'm sorry, Rodney Thomas, who          |
| 16    | originally worked for Harrison, I think at some point    |
| 17    | may have worked for Imperial, but we weren't really      |
| 18    | dealing with sales reps at that point.  My               |
| 14:41:55  19 | communication was directly with Wayne Baquet or Brad |
| 20    | Prendegrast who were both at Imperial.                   |
| 21    | Q.   So you were placing orders directly through        |
| 22    | Wayne and Brad; is that right?                           |
| 23    | A.   No.  When you -- you said if we had a sales        |
| 24    | rep from Imperial.                                        |
| 25    | Q.   Sure.                                               |

1    A.   And -- and I'm sure there was probably one

2    that was assigned to us, but because of the size of

3    our account and the volume of business, I was dealing

14:42:23   4    directly with the CEO at Imperial.

5    Q.   When you placed your first order with

6    Imperial, how did you know that you were placing that

7    order with Imperial as opposed to placing it with

8    Harrison at that time?

9    A.   Because we were told that that transition

10   would be occurring and that our invoices that would be

11   coming now would be coming from Imperial, so we're

12   placing our orders with Imperial, receiving product

14:43:00   13   from Imperial.

14   Q.   But there was otherwise nothing different

15   about how you placed that first order that indicated

16   it was with Imperial as opposed to Harrison, was

17   there?

18   A.   I mean, there's -- I'm sure there's a lot

19   different, right.

20   Q.   What specifically do you remember that was

21   different about that first order you placed with

22   Imperial?

23   A.   Again, the people that we're dealing with,

14:43:23   24   right, dealing with Brad and Wayne and, you know,

25   exactly how the order was sent, whether there was

```
 1   something different or not, but the order that was
 2   received came from Imperial invoice with a new account
 3   number for A-Z Wholesale of --
 4        Q.   *CKTP
 5        A.   -- Waco --
 6        Q.   -- specifically to this point in the time
 7   frame, though --
 8             THE REPORTER:  Wait, wait, Anna.
 9        Q.   (By Ms. Finger)  -- so when you're placing an
10   order --
11             THE REPORTER:  Anna -- Anna --
12        Q.   (By Ms. Finger)  -- before you even receive
13   the product.
14             THE REPORTER:  Anna, Anna --
15        A.   Yeah, so --
16             THE REPORTER:  -- you guys are talking --
17   I -- yeah, I couldn't -- I need you to restate the
18   question again.  You guys were talking at the same
19   time and it cut out.  I apologize.
20             MS. FINGER:  No worries.  I'll start
21   over.
22        Q.   (By Ms. Finger)  *CKEDITEDTOHERE Focusing
23   only on when you first placed an order with Imperial,
24   prior to receiving delivery of that product, what
25   about your placing of that order was different from
```

14:43:42

1  how you previously would place orders with Harrison?

2       A.   Who we were placing the order to?  We're

14:44:29  3  placing it to Imperial as opposed to Harrison.

4       Q.   When you placed your first order with

5  Imperial, what about the process of placing that order

6  was different from when you would place orders with

7  Harrison?

8       A.   I don't recall exactly what was different

9  when that first order was placed from March 31st to

10  the first week of April, whether or not a new device

14:44:57  11  was dropped by, whether it was sent to a different

12  e-mail address, if it was still sent to Rodney but

13  Rodney is now with Imperial, I don't know exactly what

14  was different on that particular first order.

15       Q.   When did the process change?

16       A.   What process?  The order willing process.

17       Q.   Yes.  So when did the process change from how

18  you would place orders with Harrison?

19       A.   The process.

20       Q.   I'm sorry.  At what point did your process

14:45:30  21  for placing orders with Imperial become different from

22  how you used to place orders with Harrison?

23       A.   As far as the process is concerned, they were

24  still sent -- both were sent electronically.

25       Q.   But you didn't know who was receiving the

1    electronic orders on the other end; is that right?

2        A.   Sure, we did.   Imperial was receiving it

3    because Harris -- we weren't doing business with

4    Harrison anymore.

5        Q.   How did you know that when you were placing

6    the order?

14:45:58  7        A.   Again, because we were told that future

8    orders would be going to Imperial, invoices would be

9    coming from Imperial, they would be assigned new

10   account number, A-Z would be assigned new account

11   numbers, the invoices would come from Imperial, the

12   payments need to be made out to Imperial.

13       Q.   Before we get to that point, there was

14   nothing about placing an order with Imperial that

15   indicated it was with Imperial as opposed to Harrison,

16   was there?

17       A.   Sure, yes, we were placing the order to

18   Imperial.

14:46:27  19       Q.   And my question is, how you knew that.   Who

20   were you speaking to at Imperial?

21       A.   We, project, I don't know if Rodney was still

22   there, but Brad and Wayne.   I mean this wasn't

23   something that just happened overnight, right?   This

24   was something that was coming down the pike, right

25   ***CHECK and we knew that there would be a date -- a

```
         1  switchover date, right, and that date happened to be
14:46:55 2  the last purchase from Harrison was on the 31st, of
         3  March 2015 and the subsequent order placed and
         4  received in the first week of April was from Imperial.
         5      Q.   So any order that was placed after March
         6  31st, 2015 were through Imperial; is that right?
         7      A.   You cut out there at the end, sorry.
         8      Q.   Any order that A-Z placed after March 31st,
14:47:29 9  2015 was through Imperial, is that your position?
        10      A.   Yes [SP-LT] **SPL** put me in the **SPL**.
        11      A.   It's.
        12           MS. FINGER:  Sorry, Kim.
        13      A.   It's the extra injuring we have from lunch.
        14  Give it an hour again we'll be slower begun.
        15      Q.   The products thatter A-Z was ordering from
14:48:00 16 Imperial were not different from the products they
        17  were ordering from Harrison, right?
        18      A.   No, the products should have been, I think
        19  should have been the same.
        20      Q.   Who delivered product from Imperial to A-Z?
        21      A.   Imperial.
14:48:28 22     Q.   How do you know that?
        23      A.   I can't recall exactly when, but you know,
        24  the transition, I think for them took a little bit
        25  longer when it's a lot to do, I can imagine and makes
```

```
            1    sense, but the invoices we received were from Imperial

            2    so they were being delivered by Imperial, you know,

14:49:00    3    obviously, I don't know if they changed the insignia

            4    on their trucks immediately, but at some point we

            5    started seeing trucks with Imperial insignia on it.  I

            6    can't recall if I saw the delivery drivers with new

            7    shirts but at some point I started seeing new shirts

            8    with Imperial on it, so again, it's not a switch that

            9    you just turn on, right, where all of a sudden you

           10    waive the magic wand and everything changes overnight

14:49:27   11    and it goes from Harrison to Imperial, but for our

           12    purposes we were buying product from Imperial and

           13    paying Imperial after -- after the Harrison invoices

           14    were paid off and the invoices that we got in April

           15    that started getting paid sometime in July or June of

           16    2015, those payments were going to Imperial, being

           17    made out to Imperial and paid to Imperial.

14:49:59   18         Q.   When did you first -- scratch that.

           19              Do you know what role Brad and Wayne

           20    play, if any, at Imperial?

14:50:22   21         A.   Brad is the CFO and Wayne is the CEO.

           22         Q.   Do you know what role Brad and Wayne play, if

           23    any, at Harrison **SPL** played **SPL**?

           24         A.   Brad did not play any roles at Harrison

           25    because their CFO was Brad Albritton, a different
```

```
         1   Brad, and when they transitioned, I believe Brad
14:50:55 2   Albritton was let go **SPL** and everything was
         3   Imperial after that.
         4       Q.   How do you know that?  How do you know that
         5   Harrison didn't continue to operate after that
         6   transition that you're referring to?
         7       A.   I don't know if Harrison continued to
         8   operate, but they certainly didn't supply A-Z
         9   Wholesalers, Inc.
        10       Q.   The only basis for that statement that
14:51:27 11  Harrison did not continue to supply product to A-Z
        12   [WHAEULS], Inc. is one, a conversation that you had
        13   with Brad and Wayne, and two, invoices that you
        14   received; is that right?
        15               MR. HOLMAN:  Objection, form, objection
        16   compound.
        17       Q.   (By Ms. Finger)  You can answer.
        18       A.   That is not the only evidence.  Multiple
14:51:51 19  conversations, multiple dealings, invoices that went
        20   for four years from March -- from the end of March or
        21   let's call it April of 2015 all the way until March of
        22   2019, multiple conversations, my visit to Imperial in
        23   Louisiana at some point to check out their operations,
        24   you if know, the insignias on the trucks, the drivers,
14:52:28 25  the business cards, the e-mail addresses, the various
```

1    communications, the payments that were being made, the

2    credits that were being requested, how that was being

3    handled, the accounts receivable, the accounts

4    payable, I mean, it's the whole relationship

5    everything.

6         Q.   You saw the Imperial trucks when they

7    delivered product from Imperial, correct?

8         A.   Not every time, but I mean, I tend not to be

9    one of those people that sit in the ivory tower and

14:52:57  10  sit in my office.  I'm a hands on kind of guy on the

11   floor in the warehouse, usually get there early, leave

12   late, I see the trucks in the back, I've got cameras

13   in my office that show.

14        Q.   Delivery before, correct?

15        A.   I'm sorry.

16        Q.   You've seen a delivery truck from Imperial

17   before, correct?

18        A.   Oh, yeah.

19        Q.   Did you ever notice that it said Harrison on

20   the other side or no?

21        A.   Said Harrison on the other side of what?

22        Q.   The truck.

14:53:30  23  A.   You're saying the Imperial truck SAS Imperial

24   on one side and Harrison on the other side.

25        Q.   I'm asking if you ever noticed if that was

1   the case?

2       A.   I can imagine maybe during the transition

3   that was the case.  I don't know what, but I -- I

4   still see Imperial trucks today and it says Imperial

5   on it.  I don't see any Harrison trucks anywhere.

6       Q.   Do you know who owns the title to those

7   delivery trucks once you started receiving deliveries

14:54:00   8   from Imperial?

9       A.   I don't know when the titles were changed,

10   all that sort of stuff, again, didn't do title

11   searches.

12       Q.   So you don't know if the titles were ever

13   changed, right?

14       A.   I don't know if they even own their trucks or

14:54:19   15   they lease them.

16               (Exhibit No. 40 marked.)

17       Q.   (By Ms. Finger)  I'm going to show you what's

18   been marked as Exhibit 40, four zero, to your

14:54:48   19   deposition.  Let me know when you see it?

20       A.   I see it.

21       Q.   Have you ever seen this document before?

22       A.   Hang on, let me try to zoom in without

14:55:14   23   zooming in too much.

14:55:59   24       Q.   We'll focus on this document a lot, Mr. Ali,

25   I just want to ask about a definition that's going to

1    be relevant for our next exhibit, so once you've

2    finished scrolling through, if you can let me know if

3    you've ever seen this before?

4        A.   Yeah, I'm just almost all the way through it.

5    I believe I have seen this document before.

6        Q.   And on the top it says plaintiff's first set

14:56:27    7    of discovery requests to defendant A-Z Wholesalers,

8    right?

9        A.   Yeah, let me get back up there, yes.

10       Q.   Do you have any reason to believe this is not

11   a true and correct copy of plaintiff Harrison

12   companies first set of discovery requests that were

13   served on your counsel?

14       A.   I have no reason to believe that that is not

15   plaintiff Harrison company's first set of discovery

16   requests to defendant A-Z **[WHAEULS]**, Inc.

14:56:58   17       Q.   If I can have you turn to page 4, please and

18   we're going to look at paragraph number 12.  Are you

19   there?

20       A.   Yes.

21       Q.   It says the term relevant period means March

22   11th, 2011 to the present.  Did I read that correctly?

23       A.   You did read that correctly.

24       Q.   Do you understand that throughout plaintiff's

14:57:28   25   requests, to the extent they say relevant period,

1  plaintiff was referring to the period March 11th, 2011

2  to the present?

3      A.   I see that that's the definition that you

4  have there but for some reason I recall that the

5  relevant period or that phrase relevant period was for

6  October 22nd, 2018 to March 4th, 2019.

14:57:58  7      Q.   That may have been?

8      A.   That may have been in like subsequent

9  discovery requests, I don't know, but in my brain,

10  from what I remember, is the relevant period has

11  always been October 22nd, 2018 to March 4th, 2019.

12     Q.   Perhaps that is a relevant period defined in

13  another document, I'm not sure, but for purposes of

14  this document in this discovery request, you

15  understand that reference to the relevant period means

16  March 11th, 2011 to the present, correct?

14:58:29  17     A.   I understand that that's the definition that

14:58:33  18  is being put out on page 4.

19                (Exhibit No. 6 marked.)

20     Q.   I'm now showing you what's been [-RBGDZ] may

21  as Exhibit 6 to your deposition.  It says there at the

22  top defendant A-Z up wholesale, Inc. responses and

23  objections to plaintiff's first set of discovery

24  requests; is that right?

14:59:21  25     A.   Hang on.

1    Q.   I'm going to turn to the last page next so if

2  you can stick with me on the first page, we're going

3  to get there?

4    A.   Yeah, yeah, just, yeah, the title of the

5  document is defendant A-Z Wholesaler, Inc. responses

6  and objections to plaintiff's first set of discovery

7  requests.

8    Q.   And do you have any reason to believe that

9  this is not a true and accurate copy of the responses

14:59:52  10  and objections that your counsel served to plaintiff?

15:00:56  11    A.   I'm looking for verified, yeah, this was the

12  discovery responses submitted by A-Z's prior counsel,

13  being Mark bird ***CHECK.

14    Q.   And you're already at that verification page,

15  right?

16    A.   Actually the certificate of service but I'm a

17  page ahead of you but I can flip back to the

18  verification pretty quick.

19    Q.   You verified these responses as being true

20  and correct; is that right?

21    A.   Yes.

15:01:38  22    Q.   If you can scroll back to page 2 of this

23  document, we're going to look at Request for Admission

15:01:43  24  number 3.  Let me know when you're there, please?

25    A.   Okay.

         1     Q.   RFF number 3 says admit that you ordered

         2    products from Harrison during the relevant period.

         3    Did I read that correctly?

         4     A.   You did.

         5     Q.   And in the response, I want to look at the

         6    second sentence.  It says "Deny that any of the

         7    product forming the basis of Harrison's lawsuit were

15:02:30 8    ordered from Harrison."

         9              What products do you contend form the

        10    basis of Harrison's lawsuit?

        11     A.   That's a -- that's a tricky question for me

        12    to answer.  Can you rephrase it?  I want to make sure

        13    we don't -- I don't misspeak here.

        14     Q.   Well, you verified the response here that

15:02:59 15   says,"deny that any of the products forming the basis

        16    of Harrison's lawsuit were ordered from Harrison."

        17              What products are you referring to in

        18    that sentence?

        19     A.   There are no products.

        20     A.   That form the basis of the.

        21     Q.   So what you're saying?

        22     A.   Of the Harrison -- I guess what's being said

        23    there, again, is that there are no products that form

15:03:25 24   the basis of Harrison's lawsuit were ored from

        25    Harrison.  It's another way of saying that there is no

basis for Harrison's lawsuit because no payment -- no

open invoices and no product was ored from Harrison

for which A-Z still owes money to.

     Q.   That's not what this sentence says though.

This sentence implies that there are products that are

forming the basis of Harrison's lawsuit.  What are

15:03:58   those products that you contend Harrison is suing for?

     A.   I'm not going to speculate on what the

sentence implies or doesn't imply.  The way I read

that sentence is it's basically a denial that there

are any products that form the basis of Harrison's

lawsuit because none of the products that are being

discussed for the invoices from October 22nd, 2018 to

March 4th, 2019 were purchased from Harrison.

15:04:29   Q.   Mr. Ali, have you read the pleading in this

case?

     A.   Probably a long time ago.

     Q.   Do you understand that Harrison is not suing

on the specific invoices that you're referring to?

               MR. HOLMAN:  Objection, form.

     A.   I can't imagine what invoices Harrison would

be suing us on.

     Q.   (By Ms. Finger)  I appreciate how?

     A.   Why don't you tell me what invoices Harrison

15:04:58   is suing us on.

1    Q.   Harrison is suing on the credit agreement

2  which we reviewed earlier in some of the exhibits and

3  I ask that only to try to clarify this specific

4  Request for Admission.

5    A.   I got to write this one down because it seems

6  like a new one to me.  So Harrison.

7              MR. HOLMAN:  Objection, that's a

8  misstatement of the facts.  Harrison also has a breach

9  of contract as well as the breach of the guarantee.

10             MS. FINGER:  Correct.

15:05:28  11             MR. HOLMAN:  So it's not just on the

12  guaranty.

13             MS. FINGER:  I didn't say it was just on

14  the guaranty.  I said it was not on any particular

15  invoice.  We're not suing for breach of a specific

16  invoice.  It's a breach of the credit agreement.

17             MR. HOLMAN:  No, you're not.  There's a

18  breach of the guaranty.

19             MS. FINGER:  Correct.

20             MR. HOLMAN:  You're showing on a breach

21  of -- breach of contract related to the invoices that

22  you specify and those products are related to those

23  invoices.

15:05:59  24             MS. FINGER:  Harrison -- I'm not going to

25  argue with you about Harrison's theory of the case.  I

```
 1    will say this breach of contract suit is not on the

 2    specific invoices as contracts themselves.  Correct,

 3    have you read the pleading Mr. Ali.

 4              MR. HOLMAN:  Yes, I have I read it

 5    several times.

 6              MS. FINGER:  I apologize, I didn't mean

 7    you Mr. Holman, I imagine you have, I meant no respect

 8    there, I meant Mr. Ali.

 9         A.   Again, I've read the pleadings, it's been a
15:06:28 10   while.  I've responded to discovery and your discovery

11    requests if you go down a little bit further specify

12    particular invoices that Harrison is alleging are

13    unpaid to Harrison which is in all practical purposes

14    in the world that I live in, which is I think reality,

15    right, earth A or earth 1, earth 1, Harrison doesn't
15:07:00 16   have those invoices.  Those are not Harrison invoices.

17         Q.   Mr. Ali, I'm going to object as nonresponsive

18    so that we can move forward here.

19              I'll represent to you that Harrison is

20    not suing for payment of any specific product, so my

21    question to you is what specific products you are

22    referring to in this discovery response that you

23    believe form the basis of Harrison's lawsuit?
15:07:28 24        A.   So if Harrison is not suing based on any

25    particular product, then I don't really understand
```

what Harrison is suing us over, but if you're saying

it's over the credit agreement, then there's no money

owed under that credit agreement or the personal

guaranty.  If your question.

Q.   If --

A.   Let me answer so we can move on because I

think we can go -- we can go around and around on this

all day long and we're not going to get anywhere.

15:07:58        If you're asking me what products is

being referenced in this denial to RFA number 3, the

products are any products because what we're saying is

that there are no products that A-Z purchased from

Harrison that A-Z wholesale still owes Harrison any

money, so there are no products that form the basis of

15:08:27   Harrison's lawsuit that were ordered from Harrison

**SPL**.

Q.   That answered my question.  Thank you.

We are going to turn next?

A.   You hit me with lots of questions as far as

your theory of the case, again, I'm sure we'll get

15:08:55   there at trial but ***CHECK beginning of answer

***CHECK.

Q.   I want to turn to page 25 now in these

15:09:16   responses and look at Interrogatory No. 1 and the

response to Interrogatory No. 1 is on page 26 and I

1   want to look at some of the factual statements in

15:09:51   2   A-Z's substantive response.  Please let me know when

3   you're on page 26?

4        A.   I'm on page 26 and I read the response.

5        Q.   Great.  So not the first two paragraphs which

6   are objections but looking to the third paragraph, the

7   first sentence states," the credit agreement and other

8   correspondence makes up the entirety of the agreement

9   between A-Z and Harrison."  Did I read that correctly?

10        A.   You read that correctly.

11        Q.   And the credit agreement are the exhibits we

12   looked at earlier that we've been referring to as the

15:10:29   13   credit agreement, correct?

14        A.   Yes, ma'am.

15        Q.   What other correspondence are you referring

16   to here that is also part of the agreement between A-Z

17   and Harrison?

18        A.   The e-mail communications between A-Z and

19   Harrison during the time that A-Z was doing business

15:10:48   20   with Harrison, s are the oral conversations, and how

21   the parties and the actions of the parties, right, I

22   think all of that sort of makes up the agreement I

23   think we talked about that earlier in my testimony,

24   about the relationship to A-Z and -- and Harrison and

25   how things changed over time and they weren't in that

1    sort of confined box of the terms and conditions of

2    the credit agreement.

15:11:28    3        Q.   What agreements did A-Z reach with Harrison

4    via e-mail?

5        A.   I can't point to any specific ones but I'm

6    sure there's e-mails about pricing, about credits,

7    about rebates, about damaged goods, about discounts,

8    about marketing spend, about other incentives, credit

15:11:54    9    terms, credit limits, payment terms, forceouts,

10   promotional products, a number of e-mails throughout

11   that four-year -- is it four-year?  Yeah, four-year

12   relationship that would have comprised the entire

13   agreement between A-Z wholesale and Harrison.

14       Q.   You can't point to any specific agreement

15   that was reached via e-mail that you contend forms a

15:12:27   16   contract between the parties, can you?

17       A.   I'm sure if you pulled up some e-mails from

18   that time period, I'm sure I could point to several

19   e-mails that probably talk about that.

20       Q.   I want to know what ones you're referring to

21   here that form that agreement.

22       A.   There's way too many documents that have been

23   produced in this case and I haven't looked over every

24   single e-mail since it has been produced to point to a

25   specific e-mail that shows that that correspondence is

15:12:59    1   part of the overall agreement between A-Z and

2   Harrison, but I contend and I will stick to this, that

3   there -- that that that does exist afternoon certainly

4   you can take the time to look at them and if you want

5   to point me to a particular e-mail during that time

6   frame and I can tell you whether or not that was part

7   of the agreement or not part of the agreement.

8           Q.   You're a lawyer, Mr. Ali, correct?

9           A.   I am.

10          Q.   Have you ever drafted discovery responses

11  before?

12          A.   Unfortunately, I have, but it's been a really

15:13:30   13  long time.

14          Q.   So you understand that it's the

15  responsibility of the party responding to discovery

16  responses to answer with specificity, don't you?

17          A.   I think -- I think it's the responsibility of

18  both parties to be as specific as they can whenever

19  they possibly can to narrow the issues for trial,

20  right, so in judicial efficiency purposes, let's not

15:13:59   21  take up the court's time and talk about a bunch of

22  stuff that's not got to do anything with trial.  Get

23  ready for trial and figure out where the actual

24  dispute lies and so, yeah, I think that's -- I think

25  that's good practice ***CHECK, I don't know if that's

1    a rule, like I said, I haven't responded to formal

2    discovery in a really long time and as the client

3    here, I think I would have supplied information or

4    provided the associate or whoever with information

15:14:28   5    that they then put into the appropriate legalese

6    response that you see in front of you today.

7         Q.   But so you understand that it's your

8    responsibility in responding to the discovery to point

9    to the correspondence that you contend makes up a

10   contractual agreement, right?

11        A.   I don't know if that's my responsibility or

12   the lawyer's responsibility, but in producing all the

15:14:59   13   documents, which I don't know if we had gone through

14   production at this point, you know, if there's -- in

15   this discovery request if there is a request for

16   production.

17        Q.   I'm sure there is and documents were produced

18   but even in responding to interrogatories there's a

19   requirement by the rules for specificity, and so other

20   correspondence is not something I can decipher

21   specific e-mails from, so my question to you is if you

22   could point me to any specific e-mails that I could

15:15:29   23   pull from the production in this case that you contend

24   are part of the contractual agreement between A-Z and

25   Harrison?

1      A.   So I am certain that I can but I can't do

2  that right now because I haven't reviewed all of the

3  e-mails from 2011 to March of 2015 to point you to

15:15:55   4  that, but I would be glad to maybe have our attorneys

5  supplement, right, or provide you with more responses

6  to at least give you a couple examples, but like I

7  said, the correspondence covers e-mails,

8  conversations, how the parties conducted business with

9  each other, all the various correspondence includes

10  credit memos, rebates, promotional, marketing spend,

11  forceouts, I mean a number of things that all impacted

15:16:29   12  their relationship and the agreement, and then

13  ultimately we have the -- the what I would -- what I

14  would argue is the controlling contract which is the

15  invoices, which is why I didn't understand you earlier

16  which is Harrison is not suing on specific invoices,

17  then I'm not really sure what Harrison is suing on.

15:16:58   18      Q.   You understand that an invoice isn't a

19  contract, don't you?

20      A.   No, I don't understand that.  I probably

21  wouldn't even agree with that in my legal capacity,

22  but just in my like professional capacity as a

23  business owner.  If I get an invoice, that's a

24  contract, that means goods or services were provided,

25  unless I dispute whether or not those goods or

1    services provided or there's an issue with the goods

15:17:28  2    and services that were provided, there's an obligation

3    then to pay the amount unless I dispute the amount or

4    there's issues with the invoice.  I mean, that's how I

5    believe that works.

6         Q.   If you entered into an agreement with a

7    supplier to pay a dollar for your pen and the

8    supplier?

9         A.   That was before lunch.

10        Q.   We love the pen?

15:17:59  11       A.   I'm saying it was ten cents before lunch so

12   it went up 90 cents after lunch.

13        Q.   That's right, we're increasing.

14        A.   All right.

15        Q.   So if you entered into an agreement with a

16   supplier via e-mail that you were going to purchase a

17   pen for a dollar and the supplier delivers the pen and

18   also hands you an invoice for $5, would you contend

15:18:29  19   that the supplier breaches the previous agreement or

20   does the invoice govern?

21        A.   I wouldn't look at those as two distinct

22   agreements.

23        Q.   You are?

24        A.   R?

25        A.   I would look at the e-mail and the invoice as

1   one agreement and I would state that there is a

2   irregularity in the invoice because the offer to

15:18:59   3   purchase the pen was for a dollar, not for $5 and so I

4   would either in that case reject the invoice, send the

5   product back or have the supplier correct the invoice

6   to a dollar and that way the e-mail and the invoice,

7   the offer and the, I guess acceptance kind of match up

8   ***CHECK get.

9           MS. FINGER:   **SPL**.

10      Q.   That was because the initial agreement you

15:19:27   11   made for one dollar for the the pen is what governs

12   the transaction, isn't it?

13      A.   Not necessarily.

14      Q.   What if the supplier came back and said, no,

15   we had a contract, it's the invoice that's in front of

16   you and that says $10 so now you owe me $10?

17      A.   We would just send the product -- we would

18   just send the product back.

19      Q.   On what basis?

20      A.   On the basis that I'm not paying $10 for a

21   product that's not even worth ten cents before lunch.

22      Q.   Because you agreed to $1 previously, right?

15:19:59   23      A.   No, because I think fair value would be that

24   $1.

25      Q.   Let's put this hypothetical in terms of all

1   fair values.  Let's say that the pen was agreed to for

2   a price of ten cents via e-mail, the supplier delivers

3   the pen with an invoice that says now you'll pay 15

4   cents.  You would send the product back and say, no, I

5   agreed to only pay 10 cents, wouldn't you?

6               MR. HOLMAN:  I'm going to object form.

7        A.   It depends.

15:20:28   8               MR. HOLMAN:  On relevancy.  We're doing

9   hypotheticals at this point.  Let's move on to

10   something substantive.

11        Q.   (By Ms. Finger)  You can still answer the

12   question, Mr. Ali?

13        A.   Yeah, my answer is going to be it depends,

14   right?  It depends on whether or not there was a price

15   increase from the time that we ordered the product at

16   ten cents and then the supplier's price went up by the

17   time we got it, the price went up so then we paid 15

18   cents, whether or not we think 15 cents is fair and we

19   were getting, you know, the offer was incorrect,

15:20:59   20   somebody at that -- at that company made a mistake and

21   gave us the wrong price, I mean, there's so many

22   variables in this height.

23        Q.   I want to ignore all of those and the

24   question solely that I'm getting at is whether your

25   agreement to pay ten cents before receiving the

|   |   |
|---|---|
|  | 1 |

invoice or the invoice itself that says 15 cents,

assuming no mistake was made, which agreement forms

the binding transaction between the parties?  Which

one is a contract?

15:21:26  5     A.   I disagree with the premise of your question.

6     Q.   How -- had?

7     A.   I know what you're trying to get me to say

but I don't -- I disagree with the premise of your

question that those are two distinct agreements.  I --

I believe that the entire agreement is made up of both

of those documents and whatever subsequent

conversations happened when we get that invoice to try

to correct that invoice or to make things right, so I

think there's -- there's just more to it.  It's just

15:21:56  15  not that -- it's just not that clean.  I feel like I'm

back in law school with all those hypotheticals.

Those things drove me nuts then.

18              (Exhibit No. 8 marked.)

19     Q.   (By Ms. Finger)  I'm going to show you what's

15:22:24  20  been marked as Exhibit 8 to your deposition.  Do you

see it?

22     A.   Yes, I do.

15:22:53  23     Q.   And is this defendant A-Z Wholesalers, Inc.,

Inc. response to plaintiff's second set of discovery

requests?

1    A.    That's what it says, yes.

2    Q.    If you turn to the last page, these were

3    verified by Barkat Ali; is that correct?

4    A.    No, they were verified by Amar Ali.

5    Q.    They were verified by you, I may have the

6    wrong printout in front of me.  Yes, I'm sorry, you

7    verified these responses, didn't you?

8    A.    Yes, ma'am.

15:23:29    9    Q.    Okay.  Turning back to the first page, if we

10    can look at paragraph number 1 and the definition says

11    modified oral agreement or MOA refers to the oral

12    modification of a payment terms concerning Imperial's

13    invoices to A-Z.  What were A-Z's initial payment

14    terms with Imperial?

15:24:00    15    A.    I want to say they were probably eight to ten

16    weeks, two months.

17    Q.    Can you be more specific?

18    A.    I can't without looking at the invoices and

19    the prior invoices and determining what the terms

20    were.

21    Q.    How were those payment terms modified as you

22    refer to here in paragraph 1?

15:24:27    23    A.    The payment terms were modified and they were

24    modified by discussion with Wayne and Brad at Imperial

25    that A-Z was to reduce its -- its credit --

15:24:57   1   outstanding credit with Imperial on a weekly basis.

2   So I'll give you an example.  If A-Z wholesale owed

3   Imperial a million dollars and the following week we

4   were going to order $200,000 worth of product, Brad

15:25:27   5   and Wayne wanted to see a payment that following week

6   of more than 200 -- $200,000 so that that credit

7   number would go down, right, that outstanding credit

8   would go down, not up, and generally did that from

9   time to time, it would spike maybe one week and then

10   the next week it would go down a little bit more, but

11   generally that was how the oral -- that was how the

15:25:54   12   modified oral agreement worked.  In exchange for that,

13   Harrison -- I mean, excuse me, that's a Freudian slip.

14   Imperial promised to continue to supply product to A-Z

15   wholesale, so as long as that number on a weekly basis

15:26:13   16   continued to come down, they would supply product.

17       Q.   Why was the outstanding balance for A-Z so

18   high with Imperial?

19       A.   In the grand scheme of things, I don't think

20   it was so high.  You have to understand that over the

21   course of doing business with Imperial, and heck, I'll

22   say in the -- in the course of doing business with

23   Harrison for the first four years and then Imperial

15:26:58   24   for the next four years, A-Z Wholesalers, Inc., and

25   I'm not sure if I'm counting the diamond wholesale or

1    the Top 20 Sherman wholesale, I mean, we did nearly a

2    hundred million dollars worth of business with those

3    two companies over the course of eight years, and so

15:27:26   4    having a balance that Brad and Wayne wanted to see

5    reduced is really something that they wanted to see

6    and we -- we wanted to comply and so, you know, we

7    were willing to reduce the amount on a weekly basis,

8    so order versus payments, payments should be more than

15:28:04   9    orders.

10        Q.   When did that oral modification agreement

11   take place?

12        A.   I don't recall, but I am fairly certain that

13   if I looked through e-mails that have been produced, I

14   could probably pinpoint to a time frame where that

15   happened.

16        Q.   You didn't look at any of those e-mails in

15:28:27   17   preparation for your deposition today?

18        A.   No.  Quite honestly, Ms. Finger, I didn't

19   spend very much time in preparation for the deposition

20   today.  I tried to but there's no way that I could

21   have gone through all of the production, all of the

22   e-mails, all of the various filings in preparation for

23   this deposition and even if I had gone through all

24   that, I probably still wouldn't be able to tell you

15:28:58   25   right now what day that moral or that modified oral

1  agreement took place or what subsequent or, you know,

2  are moral -- modified oral agreements occurred.

3      Q.   So you can't point me to a date certain that

4  this oral modification took place; is that right?

5      A.   Not right now, I cannot but I'm sure that I

6  probably could if we go to trial, I will make a note.

7      Q.   You understand that I'm entitled to know that

15:29:29  8  answer to that question before we go to trial and

9  that's the whole purpose of this deposition, right?

10      A.   I don't know if that's the purpose of this

11  definition -- or the deposition and I do think you're

12  entitled to that answer but if I can't answer that

13  question right now, instead of me giving you a date

14  and saying, oh, it occurred on, you know, August, 2015

15:29:53  15  or it occurred in September of 2018, I don't want to

16  misspeak because then you'll throw my deposition up at

17  trial and be like oh, you said it was this date but

18  it's really this date and you'll try to impeach my

19  credibility but I'd rather just tell you I don't

20  recall exactly when that modified oral agreement

21  occurred.

22      Q.   Those are two very different possibilities

23  that you just gave.  Can you give any approximation as

24  to around when that oral modification took place?

25      A.   No, ma'am, I cannot.

15:30:25    1        Q.   You can't even tell me a year?

            2        A.   No, not -- not right now.  If I gave you a

            3   year and it ended up being like the next year, then

            4   again.

            5        Q.   Let's look at page 3 of this exhibit and I

            6   want to look at interrogatory number 14?

            7        A.   And by the way, you can talk to your clients.

            8   I can't imagine your clients would deny that modified

15:30:59    9   oral agreement.

           10        Q.   I understand, Mr. Ali, but I'm here to ask

           11   you questions today?

           12        A.   Sure.

           13        Q.   I've spoken to my client as well?

           14        A.   Did they tell you?  Did they tell you when we

           15   talked about reducing the debt amount?

           16        Q.   If you can turn to page 3, Mr. Ali, and if

           17   you can look at interrogatory -- interrogatory number

           18   14, please?

15:31:45   19        A.   Okay.

           20        Q.   The second sentence of the response says once

           21   A-Z was notified that Imperial purchased Harrison and

           22   that the relationship with Harrison was terminated,

           23   Imperial and A-Z entered into a modified oral

15:31:59   24   agreement, MOA to extend terms on delinquent

           25   invoices."  Did I read that correctly?

1    A.   Yes, ma'am.

2    Q.   And you testified earlier that the time that

3  Harrison was terminated was approximately March 2015;

4  is that right?

5    A.   The end of March, yes.

6    Q.   So is that the time that the oral agreement

7  was entered with Imperial according to the sentence?

8    A.   This -- I don't know if this sentence is

15:32:29   9  referencing the same modified oral agreement that.

10    Q.   That modified oral agreement is in capital

11  letters according to the definitions set forth

12  earlier, isn't that reright?

13    A.   And so this would be the.

14    A.   It is.

15    Q.   So this would be the same modified oral

16  agreement we were discussing, wouldn't it ***CHECK?

17    A.   I don't know.  I can tell you what this

18  modified oral agreement is referencing if that's what

19  you want to ask me and then you can figure out if it's

15:32:57   20  the same one or a different one since we don't really

21  know which one.

22    Q.   I know that when the words modified oral

23  agreement are capitalized in this document, I'm going

24  to read it according to the definition that was given

25  earlier.  Are you stating now that this is referring

1  to a different modified oral agreement?

2      A.   All I'm stating is I don't recall when that

3  modified oral agreement was entered into that we were

4  discussing in the prior -- I don't know if it was an

15:33:29   5  interrogatory or discovery response.  What this

6  modified oral agreement is referring to is that when

7  we started purchasing product from Imperial and the

8  relationship with Harrison was terminated, A-Z

9  Wholesalers, Inc. still owed money to Harrison, okay?

10  Follow me so far?

11      Q.   Yes.

12      A.   And when A-Z started doing business with

15:34:00   13  Imperial, Imperial started selling product to A-Z

14  wholesale and did not expect to get paid under the

15  terms that they would normally get paid by a new

16  customer, which probably would be about a month,

17  right, because we were running two months with

18  Harrison.  So we spent the first two months while

15:34:27   19  doing business with Imperial paying off the Harrison

20  invoices and the modified oral agreement refers to the

21  terms on delinquent invoices that we then had with

22  Imperial because we were running a month past the

23  terms that I think may have been on the invoices that

24  Imperial was sending us.  If you pull an Imperial

25  invoice, I think it says terms, one month or 30 days,

1  right?  And so we were -- after doing business with

15:34:59  2  Imperial during the month of April and not having paid

3  the -- those April invoices, by the time we got into

4  May we were delinquent, right, on the terms and so the

5  modified oral agreement was, no worries, make sure

6  that Harrison gets paid off, once that's paid off,

7  then you start paying Imperial invoices.

8      Q.   When was that modified oral agreement that

9  you're referring to now, when was that entered?

10     A.   That -- that would have occurred, right,

15:35:30  11  during this period of time.

12     Q.   What period of time?

13     A.   This March, April, May time frame, right,

14  along with the discussion of taking the overall

15  number, once Harrison is paid off, and continuing to

16  reduce Imperial's accounts receivable and trying to

15:35:57  17  bring it closer to the terms that were on the invoice,

18  trying to bring -- trying to go -- trying to go from

19  being two months in terms and go to seven weeks, and

20  then six weeks, slowly reduce that amount, purchasing

21  X versus payments Y, payments should be more than

22  purchasing.

23     Q.   Let me see if I've understood you correctly

15:36:29  24  about this first oral agreement.

25     A.   It's -- no, what you're referring to this

1  modified oral agreement, right?

2      Q.   The one that you are referring to now, an

3  oral agreement that you contend took place in March

4  2015, right, I want to make sure I understand you

5  correctly?

6      A.   I said that that -- that modified oral

7  agreement occurred at some point in that March, April,

8  May time frame, when we started doing business with

15:36:59  9  Imperial, or may have even occurred slightly prior to

10  that, I don't know, in preparation for us doing

11  business with Imperial, right, because it wasn't just

12  a light switch that we just turned on and said whoops,

13  here you go, right.

14      Q.   You testified earlier that the relationship

15  with Harrison was terminated in March of 2015; isn't

16  that right?

17      A.   Correct.

18      Q.   And so it says here that once A-Z was

19  notified that Imperial purchased Harrison and that the

15:37:27  20  relationship with Harrison was terminated, so we're in

21  March 2015 so far, do you agree?

22      A.   We should be, yes.

23      Q.   It says Imperial and A-Z entered into a

24  modified oral agreement to extend terms on delinquent

25  invoices.  Did I read that correctly?

1      A.   Yes.

2      Q.   So at this point, are A-Z had terminated its

3    relationship with Harrison, correct?

4      A.   Yes.

5      Q.   And had not yet placed its orders with

6    Imperial, right, you were still negotiating the

7    initial terms?

8      A.   No.

15:37:59   9      Q.   You had already placed an order with Imperial

10   before agreeing to the payment terms; is that what

11   you're saying?

12     A.   No, what I'm -- what I'm saying is -- if

13   you're asking me on which day did the modified oral

14   agreement take place, right, I can't point you to the

15   exact date without maybe looking at some e-mails that

16   might refresh my memory, but the modified oral

15:38:26   17   agreement took place at a time when Imperial and A-Z

18   were doing business and no longer doing business with

19   Harrison, or at least in preparation of that, because

20   the goal was Imperial would start selling us product,

21   our payments would be made to Harrison for the open

22   invoices that remained.  Once those open invoices were

23   fully paid off to Harrison, probably sometime in June,

15:38:58   24   early July of 2015, then the payments would resume or

25   would start for Imperial.

1          At that point, Imperial's invoices were

2    probably eight, ten weeks out and so we were to pay

3    those invoices last -- first invoice -- the first

4    invoice from April 1st, pay that one first, and them

15:39:26   5    pay the next subsequent invoice so on and so forth,

6    and at the same time continue to reduce the credit

7    amount that had accrued during that first eight to ten

8    weeks of doing business with Imperial and reduce that

9    amount on a weekly basis, and in exchange, Imperial

15:39:58   10   would continue to serve and deliver goods to A-Z

11   wholesale.

12        Q.   Looking again at this specific interrogatory,

13   shall why is this oral agreement not distinguished

14   from the other oral agreement you were referring to

15   earlier with Imperial?

16        A.   It may not be another oral agreement, like

17   you were saying, it's capital, it's capital aislessed,

18   right, so it refers to a specific modified oral

19   agreement.

15:40:28   20        Q.   So in March 2015 or sometime in that time

21   frame, then, is your testimony when the oral agreement

22   took place that we were referring to earlier, where

23   A-Z would pay more than the amount it was purchasing?

24        A.   Again, I can't pinpoint you on whether or not

25   that occurred in March, whether that occurred in

1  April, whether that modified oral agreement occurred

2  in June, but it did occur because Imperial started

15:40:58  3  shipping product, delivering product and A-Z started

4  purchasing product from Imperial in April of 2015,

5  that first week; however, our first payment to

6  Imperial for that -- for those invoices for the

7  product that was purchased and delivered by Imperial

8  to A-Z wholesale probably did not occur until sometime

9  in June or July, and at that point you would have had

10  eight weeks or ten weeks worth of business, let's say

15:41:29  11  even at two million -- at $200,000 a week, you're at

12  $2 million that now A-Z owes Imperial for invoices,

13  you know, minus credits and offsets and rebates and

14  all that other stuff, right, just on invoice, right,

15  you're at $2 million and you're at payment terms that

16  are at two.  So the agreement was let's take that $2

17  million number and just reduce that every week so

15:41:58  18  which means, if you buy X, if you buy $300,000, pay

19  more than $300,000 that following week so that number

20  requests down, buy it hundred thousand dollars, pay

21  more than $200,000 so that number goes down.  Now that

22  occurred and every once in a while if it moved we jump

23  on the phone with Wayne and Brad, I would jump on the

24  phone with Wayne and Brad, it's a short week, it's a

25  holiday, we're only ordering once, we're going to do

|  | 1 | this, so the extra $20,000 that the amount went up |
| 15:42:27 | 2 | with Imperial this week, we'll make that up next week, |
|  | 3 | right, and so we had those agreements also but this |
|  | 4 | modified oral agreement I believe specifically relates |
|  | 5 | to the -- the initial agreement that we had with |
|  | 6 | Imperial and how it was modified so so that Harrison |
|  | 7 | could get completely paid off and we would have the |
|  | 8 | extended terms for the delinquent invoices or the past |
|  | 9 | term invoices that we had with Imperial, because I |
|  | 10 | think if you pull up an Imperial invoice it would say |
| 15:42:59 | 11 | one month but we started off with terms of nearly two |
|  | 12 | months or two and a half months **SPL** months back |
|  | 13 | there **SPL**. |
|  | 14 | Q.   If you could turn back to page 2 to this |
|  | 15 | exhibit, Mr. Ali and look for Request for Admission |
| 15:43:16 | 16 | number 155; do you see that? |
|  | 17 | A.   I mean, this -- this Request for Admission |
|  | 18 | says a little more succinctly what I was trying to say |
|  | 19 | over the last two or three minutes. |
|  | 20 | Q.   And you see -- it's in front of you though, |
|  | 21 | correct? |
|  | 22 | A.   It's in front of me, yes. |
|  | 23 | Q.   So I want to look at specifically number 3 in |
|  | 24 | the response. |
|  | 25 | A.   Yes. |

```
            1      Q.   So this response says that A-Z has an
15:43:57    2   agreement with Imperial that Barkat Ali was excused
            3   from person -- I guess that means personal liability
            4   for payment on Imperial's invoices.  Did I read that
            5   correctly?
            6      A.   That's correct.
            7      Q.   When was that agreement made?
            8      A.   That was -- this was all done at the same
            9   time, right, like this is all -- this is all part of
           10   the same agreement to do business with Imperial.
           11      Q.   Was this agreement made in one conversation?
           12      A.   I don't know if it was all done in one
15:44:29   13   conversation.  It probably -- I think things were
           14   touched on probably in one conversation but we had
           15   subsequent conversations and many conversations to
           16   make sure that everybody's staying on track and that
           17   we're doing exactly what we're supposed to do.
           18      Q.   Who participated in those conversations?
           19      A.   Wayne and Brad and it may have just been one
           20   on one with Wayne and Wayne told Brad and then Brad
           21   communicated with me, it may have been both of them on
           22   the phone.  I mean, we had several conversations, so
15:44:57   23   it's not, you know, again, it's not as clean as you'd
           24   like to say, hey, all of this happened, because I
           25   mean, again, it doesn't talk about in this response it
```

1    doesn't talk about reducing that amount, right,

2    reducing the payment terms with Imperial, that was

3    also discussed, so there's several things in there, it

4    doesn't -- you know, it doesn't discuss promotional

5    product, rebates.

6         Q.   I understand.  Mr. Ali, I want to focus on

7    what it does say for now so we can get through this

8    smoothly and quickly?

15:45:30  9       A.   Okay.

10        Q.   So from those conversations you just

11   mentioned, do you recall which one expressly released

12   Barkat Ali from any personal liability?

13        A.   I'm sure the initial conversations would have

14   done that.

15        Q.   Who was that with?

16        A.   With Brad and Wade.

17        Q.   When did that take place?

18        A.   Around the time that we either started doing

19   business with Imperial, were preparing to do business

15:45:59  20  with Imperial or had started doing business with

21   Imperial, right, again, in that March time frame,

22   April, May, you know, just in that -- in that area.

23        Q.   Number 4 in your response to RFA number 155

24   says "Promissory note executed by Amar ailly on behalf

15:46:29  25  of A-Z."  Did I read that correctly?

```
 1      A.   Yes.

 2      Q.   ?

 3               (Exhibit No. 11 marked.)

 4      Q.   (By Ms. Finger)  I'm going to show you now

 5 what's been marked as Exhibit 11.  Let me know when

 6 you see it.  Do you have it up in front of you,

 7 Mr. Ali?

 8      A.   Hang on.  I'm looking through it real quick.

 9 Bear with me.

10      A.   Yeah, I've got it there.

11      Q.   Have you seen this document before?

12      A.   I have.

13      Q.   And the first page is an e-mail chain between

14 you and sandy, Wade and Brad; is that right?

15      A.   That's actually not the first e-mail.  I

16 think -- is it?  Oh, yeah, it is.  All right.  I see

17 the -- I see the first -- the top e-mail there, yes.

18      Q.   Great.  And this is an e-mail from you to

19 sandy?

20      A.   Sorry, I -- sorry, I didn't mean to cut you

21 off, but it's not the first e-mail.  I received an

22 e-mail from sandy and then however.

23      Q.   Mr. Ali, if we can stick to my question.  I

24 want to walk through it with you so just this e-mail,

25 there are two e-mails here; is that correct?
```

15:46:53 (line 6)
15:47:24 (line 9)
15:47:59 (line 14)
15:48:27 (line 17)

1    A.   Yes on the first page.

2    Q.   Yes, and the first one is at the bottom; is

3    that right?

4    A.   That's correct.

15:48:59   5    Q.   And so sandy first sends an e-mail to you

6    copying Wade and Brad, correct?

7    A.   Correct.

8    Q.   And then you respond to that e-mail, also

9    copying sandy, wane and Brad; is that correct?

10   A.   That's correct.

11   Q.   And attached to your e-mail is a document

12   titled A-Z Wholesalers, Inc. promissory note executed

13   1-11-2019; is that right?

14   A.   That's correct.

15   Q.   And if we turn to the next page, we'll see

16   the promissory note that you attached to your e-mail;

17   is that right?

15:49:27   18   A.   Yes.

19   Q.   And that's dated January 11th, 2019, correct?

20   A.   Yes.

21   Q.   Is this the promise note that you were

22   referring to in RFA number 155 in your discovery

23   responses?

24   A.   Maybe.  I don't -- I got -- I got to go back

25   and look.

1      Q.    Is there another promissory note that you

2  entered with Imperial?

15:49:58  3      A.    Not that I can think of but, again, there's

4  been so many documents in this case that if there --

5  if there isn't another promissory note that -- that I

6  entered into on behalf of A-Z wholesale or in my

7  personal capacity as a commercial guarantor, then that

8  would -- this would be the promissory note that's

15:50:25  9  being referenced in that RFA response.

10     Q.    You only discussed entering into one

11  promissory note with Imperial, right?

12     A.    In the RFA response?

13     Q.    In general?

14     A.    Yeah, I think so.

15     Q.    If you can turn to the last page of this

16  document, you signed on behalf of A-Z; is that right?

17     A.    That is correct.

18     Q.    You also signed as guarantor; is that right?

15:50:58  19     A.    That is correct because at that time I owned

20  the company.

21     Q.    In this deposition -- I'm sorry?

22     A.    I said at that time I owned the company.

23  This was done in 2019 and so I would be signing the

24  guaranty.

25     Q.    Is it your position that this agreement is

```
 1   binding?

 2         A.   What do you mean by binding?

 3         Q.   I mean is this promissory note finalized and

 4   in effect?

 5               MR. HOLMAN:   Objection, that calls for a

 6   legal conclusion.

 7         Q.   (By Ms. Finger)   I asked for his position on

 8   whether or not this agreement is binding and in

 9   effect.

10         A.   I don't believe it is because I think

11   Imperial may have breached terms of this agreement.

12         Q.   But it's your position that at one time this

13   promissory note governed the relationship between

14   Imperial and A-Z; is that true?

15         A.   No, that's not true.  This wasn't -- this

16   wasn't the only document that governed the

17   relationship.  This was a document, an agreement as

18   part of the modified oral agreement and any other

19   correspondence agreement that we had or I had with

20   Imperial, so this isn't -- this isn't the -- this

21   isn't the only exclusive controlling document, it's

22   not -- it's not an integrated document that basically

23   says all other oral conversations, promises,

24   agreements no longer exist and this is the -- this is

25   the only one, so I disagree with your.
```

15:51:30

15:51:58

15:52:30

```
 1          MS. FINGER:  Objection, nonresponsive.

 2     Q.  (By Ms. Finger)  Mr. Ali, I didn't ask

 3  whether it was the only agreement.  I'm asking if it's

 4  your position that this agreement was binding and in

 5  part it governed the relationship between Imperial and

 6  A-Z?

 7     A.  See now your question is different.  First of

 8  all, it's two questions in one but now you're saying

 9  is it in part an agreement that governed as opposed

10  to -- you didn't say in part earlier.

11     Q.  Let me ask you this way:  Did Imperial ever

12  sign this agreement?

13     A.  It's a promissory note so they don't have to.

14     Q.  Is that -- is that your opinion or is that a

15  fact?  What's your basis for that?

16     A.  Promissory notes are usually signed by the

17  maker and don't have to be signed -- I mean, I've seen

18  lots of promissory notes.  I -- most of them that I

19  see are only signed by the person that is promising to

20  pay, not --

21     Q.  Okay.  In any event, Imperial did not sign

22  this agreement, correct?

23     A.  Imperial did not sign this agreement because

24  they didn't have to but they agreed to it because I

25  talked to Wayne about all the changes, sent him a copy
```

15:52:55 (line 9)

15:53:29 (line 18)

1   of the changes.

2        Q.   Mr. Ali, if I can ask you to keep your

3   responses to my actual question.  I did not ask why

15:53:59  4   Imperial may or may not have signed it, only that

5   Imperial did not sign the agreement, and that's true,

6   correct?

7        A.   Imperial -- that's true, yes.

8        Q.   Thank you.

9             (Exhibit No. 12 marked.)

10       Q.   (By Ms. Finger)  I'm going to show you what's

11   he is been [-RBGD] may as Exhibit 12.  Do you have

15:54:24  12   that in front of you?

13       A.   I do.

14       Q.   This is a text message between you and wane

15   about a Kay; is that true?

16       A.   Wayne bat can he tell.

17       Q.   Yes.

18       A.   How does he pronounce it, I think it's Baugh

19   can he tell.

20       Q.   We'll go with that **SPL**?

15:54:54  21       A.   All right.  It appears to be a text message.

22       Q.   Between you and Wayne; is that right?

23       A.   Yes.

24       Q.   I want to look at the text message in the

25   center, it's dated March 13th, 2019; is that right?

1      A.   Yes.

2      Q.   And that text message is from Wayne to you;

3 is that right?

4      A.   That is correct.

5      Q.   He says when you are serious, I, we can

6 discuss.  This agreement has never been finalized.

15:55:28  7 Did I read that correctly?

8      A.   Yes.

9      Q.   Do you know what agreement he was referring

10 to there?

11     A.   I think he was referring to a new agreement

12 that they were attempting to get finalized that we

13 weren't agreeable to.

14     Q.   What agreement was that?

15     A.   I don't recall exactly but I would have to go

16 back to my text messages or my e-mails around that

17 time frame to see what new agreement they sent over,

15:56:01  18 but I'm fairly certain it's a new agreement.  It's not

19 referring to the agreement that we entered into when

15:56:08  20 we first started doing business in 2015.

21     Q.   When was A-Z first notified that Imperial

22 acquired Harrison?

23     A.   I can't remember or recall the exact date but

24 I think there were -- I think we may have received

25 some of their -- the form announcements that they sent

15:56:58  1  to all their customers and then obviously I had more

2  specific questions and discussions with Wayne and Brad

3  but I can't recall when that -- when that occurred.  I

4  do know -- I do know that the -- again, it wasn't like

5  turning on a light switch for them, right, big

6  companies take time to transition in their merger or

7  whatever.

8      Q.   When did you first receive an announcement

9  that Imperial was acquiring Harrison?

15:57:29  10      A.   I don't recall, but I do recall that that was

11  part of the e-mail production that we provided in this

12  case, it's an attachment and then I think I got

13  another e-mail from Wayne or another letter from Wayne

14  that was sent out to all their customers as well that

15  included us.  We had.

16      Q.   How long before A-Z stopped doing business

17  with Harrison was A-Z aware that Imperial had acquired

18  Harrison?

15:57:58  19      A.   Can you ask me that question again?

20      Q.   How long before A-Z stopped doing business

21  with Harrison was A-Z aware that Imperial acquired

22  Harrison?

23      A.   I don't recall.

24      Q.   Did you first learn of the acquisition in

25  approximately March 2015 when you started ordering

|  | 1 | from Imperial? |
| 15:58:24 | 2 | A.   I don't recall.  Again, you know, we had a |
|  | 3 | very good relationship with Harrison, we were |
|  | 4 | endeavoring to have a very good relationship with |
|  | 5 | Imperial, given the size and our account volume, our |
|  | 6 | purchasing volume, our payment volume, I can't recall |
|  | 7 | if Wayne or Brad told me in advance of any formal |
|  | 8 | announcement that they gave to their other customers. |
| 15:58:56 | 9 | I really can't recall.  We weren't -- we weren't |
|  | 10 | blindsided, that's for sure. |
|  | 11 | Q.   ? |
|  | 12 | (Exhibit No. 13 marked.) |
|  | 13 | Q.   (By Ms. Finger)  I'm going to show you what's |
|  | 14 | been marked as Exhibit 13.  Have you seen this |
| 15:59:22 | 15 | document before? |
|  | 16 | A.   I have, yes. |
| 15:59:59 | 17 | Q.   Do you recognize this as an e-mail sent from |
|  | 18 | Wayne, and although it says it's sent to Wayne, the |
|  | 19 | Bates label on this document is labeled with A-Z, so |
|  | 20 | that means you or someone at A-Z received this |
|  | 21 | document, correct? |
|  | 22 | A.   Yes.  I believe I received it and my guess is |
|  | 23 | Wayne didn't just send it to himself, it was sent to |
|  | 24 | him and then blind copied to all of Harrison's |
|  | 25 | customers. |

16:00:27   1        Q.   Wayne sent this from a Harrison e-mail

2    address; is that right?

3        A.   Wayne sent this from a Harrison e-mail

4    address, that is correct.

5        A.   And.

6        A.   That's correct.

7        Q.   And Wayne also signed this as the president,

8    didn't he?

9        A.   Yes.

10       Q.   And it says here in the second paragraph,

11   effective immediately the Harrison distribution center

12   in bossier city, Louisiana will report to the Imperial

13   senior management team in Elmwood, Louisiana.  Did I

16:00:59  14   read that correctly?

15       A.   Yes, you did.  **SPL** that was Bossier

16   **SPL**.

17       Q.   You testified earlier that Wayne did not have

18   any affiliation with Harrison as far as you know.

19   Does this refresh your recollection as to that answer?

20

21       A.   Yeah, somewhat.

16:01:30  22       Q.   When did Wayne begin acting only for Imperial

23   as opposed to Harrison, as far as you know, if ever?

24       A.   As far as I'm concerned or as far as A-Z's

25   concerned?  It -- I mean, I don't know how many

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | e-mails I got from Wayne at Harrison Company.com, but     |
| 16:01:59 | 2 | if not most of the e-mails that I have received from    |
|       | 3  | Wayne come from his Imperial trading -- yeah,            |
|       | 4  | Imperial.com.                                            |
|       | 5  | MS. FINGER:  Objection, nonresponsive.                  |
|       | 6  | Q.   (By Ms. Finger)  At what point did you learn       |
|       | 7  | that Wayne was only working for Imperial and not also   |
|       | 8  | still representing Harrison?                             |
|       | 9  | A.   As far as A-Z is concerned, be March, April        |
| 16:02:31 | 10 | of 2015 when we started doing business with Imperial  |
|       | 11 | and stopped doing business with Harrison.               |
|       | 12 | Q.   Did Wayne tell you that he was no longer           |
|       | 13 | affiliated with Harrison at that time?                  |
|       | 14 | A.   I don't know if he told me at that time, but       |
|       | 15 | I mean, subsequent to that, Harrison doesn't exist and  |
|       | 16 | so he's the CEO of Imperial.                            |
|       | 17 | Q.   How do you know that Harrison no longer            |
|       | 18 | exists?                                                  |
| 16:02:58 | 19 | A.   Because it's Imperial -- the company's           |
|       | 20 | Imperial.                                                |
|       | 21 | Q.   Imperial acquired Harrison, do you understand      |
|       | 22 | that?                                                    |
|       | 23 | A.   I believe so, yes.                                  |
|       | 24 | Q.   That doesn't necessarily mean Harrison, the        |
|       | 25 | company, ceases to exist, right?                         |

1    A.   Well, it depends, but in this situation when

2  Imperial officially acquired Harrison, right, Harrison

16:03:29   3  stopped existing at some point.

4    Q.   What is your basis for that?

5    A.   Hang on, let me finish my answer.  So

6  Harrison stopped existing at some point which was well

7  after we stopped doing business with Harrison, right,

8  and so my basis for that is who we were doing business

9  with, who we were buying from, who were we, you know,

10  who were we paying, who were we communicating with.  I

16:03:58  11  mean we weren't communicating with anybody at Harrison

12  and it doesn't look like anybody at -- anybody at

13  Harrison that existed at the time was reporting to

14  Imperial senior management anyway, and I was dealing

15  with Brad and Wayne with, that's Imperial.

16    Q.   But you don't know whether Harrison still

17  exists, do you?

18    A.   I mean, I don't believe Harrison exists but

19  for my purposes, for A-Z's purposes, Harrison doesn't

20  exist for us because we don't do business with them.

21  We stopped doing business with them, we paid them off,

16:04:29  22  don't owe them any balances, invoices were paid off so

23  as far as I'm concerned, whether Harrison exists or

24  not has got nothing to do with me.  They don't exist

25  in our reality.

        1     Q.   Mr. Ali, I'm sorry, to cut you off, but

        2   please respond only to my question.

        3             Do you know one way or the other whether

        4   Harrison ceases to exist as a business entity today?

16:04:55 5     A.   Could you pull up an affidavit from Wayne or

        6   a declaration from Wayne in this case that has some

        7   information about a merger and how the company was

        8   going to cease to exist which was the company that

        9   Harrison -- that was Harrison?  It was called

       10   something else and then that company's going away.

       11     Q.   It's really a yes or no question, Mr. Ali,

       12   whether you know whether or not Harrison ceases to

       13   exist?

16:05:27 14    A.   I mean, if I could look at that document, I

       15   might be able to tell you right now, if not, no.

       16     Q.   Sitting here today you're not aware of

       17   whether or not that company still exists, are you?

       18     A.   Harrison doesn't exist for our purposes.

       19     Q.   Exist as a business entity, not from A-Z use

       20   Biff or whether A-Z does business as an entity, does

       21   Harrison still exist as a company, do you know yes or

       22   no ***CHECK?

       23     A.   If I could see that meant do, I might be able

       24   to tell you more do you have that document.

16:05:58 25    Q.   Mr. Ali, sitting here today, without hearing

from a sworn statement from the owner of that company,

do you know whether or not that company still exists?

    A.   Well, Wayne's not the owner, first of all so

and I don't -- I don't believe that that company

exists.  If it does, it may just be a shell, right?

    Q.  **[PWHAS]** the basis for that, Mr. Ali, how do

you have personal knowledge of that?

16:06:27    A.   My personal knowledge is as of April, 2015,

we started doing business with Imperial, terminated

doing business with Harrison, paid off Harrison all

open invoices within the two to two and a half month

period and began paying Imperial, only dealing with

**[PHAOPL]** folks, getting invoiced by Imperial, sending

orders to Imperial, getting deliveries from Imperial,

you know, working on our rebates and our credits and

16:06:57  our offsets they still owe us for from Imperial,

everything was Imperial, so whether Harrison

physically existed or not is inconsequential to A-Z

because A-Z did not owe or do any business with

Harrison after the purchase in March of 2015 and the

payments were made by June or July of 2015.  At that

point, that company no longer existed for us.

            MS. FINGER:  Objection.

    A.  .

16:07:29             MS. FINGER:  Objection, nonresponsive.

```
 1              THE REPORTER:  Let's try to go one at a
 2   time, please ***CHECK.
 3       Q.   (By Ms. Finger)  Mr. Ali, I'm showing you
 4   now, can you see what's been [-RBGD] may as Exhibit 14
 5   to your deposition, do you see it?
 6                  (Exhibit No. 14 marked.)
 7       A.   I do.
 8       Q.   And this is your declaration that you signed
 9   in support of summary judgment briefing; is that
10   right?  Is this your [TKHRA*EURS] declaration,
11   Mr. Ali?
12       A.   I'm just reading through it real quick or
13   skimming through it.
14              MR. HOLMAN:  And just for the record, as
15   counsel, I will represent to you that there is a typo
16   in paragraph 3 as to the date, that first date there
17   in paragraph 3.
18              MS. FINGER:  That's rather convenient,
19   Mr. Holman.  You.
20       Q.   (By Ms. Finger)  I would like to direct your
21   attention, Mr. Ali, to paragraph 3, once you've read
22   through, and please allow me to ask my question first.
23       A.   It's fine, I was thinking the same thing
24   anyway because that date looked like it was off,
25   September 1st.
```

16:07:47  (line 9)
16:08:58  (line 16)

```
           1        Q.   Right?

           2        A.   2018.

16:09:29   3        Q.   You had an opportunity to review this

           4   document before you signed it, though, didn't you?

           5        A.   I -- yes, I would have probably reviewed it

           6   and signed it.

           7        Q.   And you understand you signed this document

           8   under penalty of perjury, don't you?

           9        A.   Yes.

          10        Q.   And you understand that this document was

          11   filed with the court, don't you?

          12        A.   I believe so, yes.

          13        Q.   And so in paragraph 3 it states, on September

16:09:58  14   1st, 2018, Imperial trading company, LLC Imperial

          15   acquired Harrison and took over the process of

          16   fulfilling all orders."

          17             Is it your position that September 1st,

          18   2018 is when Imperial took over orders instead of

          19   Harrison with A-Z?

          20        A.   I don't think that that date's correct based

          21   on -- based on the information that I have in front of

          22   me right now.

          23        Q.   Why did you swear to it?

16:10:28  24        A.   Again, I think it may have been just a typo

          25   or a mistake or something.
```

1    Q.   But you had an opportunity to review it

2  before you signed it, didn't you?

3    A.   Sure, yes.

4    Q.   This is wholly inconsistent with your

5  testimony that A-Z stopped doing business with

6  Harrison and started doing business with Imperial in

7  March 2015; isn't that right?

8    A.   I don't know if it's inconsistent or not, you

9  know, because I think, if you look at the e-mail that

16:10:58  10  Wayne sent, I think there was a transition period,

11  right, where maybe Imperial owned Harrison and then it

12  transitioned and closed the deal and took some time to

13  transition, and so whether or not that happened

14  officially on September 1st, 2018, but what I can tell

15  you is that [KHUP] wholesale stopped doing business

16  with Harrison at the end of March 2015 and started

17  doing business with exclusively with Imperial trading

18  **SPL**.

16:11:29  19    Q.   September 1st, 2018, why is that date

20  relevant at all in this lawsuit?

21    A.   September 1st, 2018.

22         MR. HOLMAN:   Counsel, objection, I

23  represented to you that that was a typo.  That date is

24  actually the merger date between the companies, just

25  the year is off but that September 1st is the actual

1   merger date between -- or acquisition date between

2   Imperial and Harrison, but the year -- the year date

16:11:56   3   is off but not the September 1st.  I believe that.

4       Q.   (By Ms. Finger)  Again, Mr. Ali, is there any

5   relevance of the date September 1st, 2018 to this

6   lawsuit?

7       A.   I don't know.

8       Q.   (By Ms. Finger)  To the best of your

9   knowledge, is September 1st, 2018 relevant at all to

10   this lawsuit?

11       A.   I don't know.

12       Q.   Are there any other statements that you swore

13   to under penalty of perjury that were filed with the

16:12:28   14   court in this case that you would like to correct at

15   this time?

16       A.   I would like to -- I'll probably review it

17   and make sure there are no other typos.  I know we

18   were looking at something earlier and there was a

19   discovery response that had a typo in it.  It wasn't a

20   substantive one, in my opinion, but it was a typo so

21   before I tell you if there's any other declarations or

22   affidavits or responses that I've sworn to, to be

16:12:59   23   accurate under the penalty of perjury, I can certainly

24   tell you that if this was a typo, it wasn't

16:13:48   25   intentional.

```
 1              (Exhibit No. 18 marked.)
 2         Q.   (By Ms. Finger)  I'm going to show you now
 3    what's been [-RBLGD] may as Exhibit 18.
 4         A.   Can you go back to that, I just want to make
 5    a note of that affidavit or -- just tell me what
 6    exhibit was it, plaintiff's what?
 7         Q.   It is Exhibit 14?
 8         A.   Plaintiff's 14?
 9         Q.   Correct.
10         A.   Thank you.
11         Q.   Showing you now what's been marked as Exhibit
12    18, do you see this document?
13         A.   Yeah, I see it.
14         Q.   Have you seen this document before?
15         A.   A while back and I think I may have seen it
16    in Barkat's depo the other day.
17         Q.   And this is an e-mail exchange, correct?
18         A.   It is.
19         Q.   And the first e-mail is actually toward the
20    top of the page because the second e-mail is short and
21    the first e-mail is from Rodney Thomas to Barkat and
22    yourself and it copies Brad Hal pert and that the
23    Harrison's as well as 10 the SB global.net, correct
24    ***CHECK?
25         A.   Yes.
```

1    Q.   And the date on that e-mail is Monday,

2    December 22nd, 2014, correct?

3        A.   Yes.

4        Q.   And I want to go down to the fourth paragraph

5    in that e-mail, it starts with "These payments"?

6        A.   Uh-huh.

7        Q.   It says these payments are to be mailed

8    weekly to Imperial-Bossier City office."  Did I read

9    that correctly?

10       A.   It's Bossier City, but...

11       Q.   Forgive me, Bossier City?

12       A.   Close enough.

13       Q.   Originally a New Yorker, forgive me my

14   mispronunciations?

15       A.   I don't blame you.

16       Q.   So it says these payments are to be mailed

17   weekly to Imperial Bossier City office; is that

18   correct?

19       A.   That's correct.

20       Q.   And this e-mail was sent by Rodney Thomas who

21   in his signature block indicates that he is with

22   Harrison Company, correct?

23       A.   That's what his signature block still says,

24   yes.

25       Q.   And his e-mail address is still with Harrison

1   Company as well, correct?

16:17:29   2      A.   Yes, it is.

3      Q.   And the top e-mail is a response from bear

4   cat to that e-mail, correct?

5      A.   Yes.

6      Q.   And he says Rodney, will do.  Thank you and

7   wish you-all happy holidays, correct?

8      A.   Yes.

9      Q.   In December 2014, A-Z had still not placed an

10   order with Imperial, correct?

16:17:59   11      A.   I don't believe so.

12      Q.   You testified earlier that A-Z didn't start

13   placing orders with Imperial until the first week of

14   April 2015; isn't that right?

15      A.   Yeah, or the last week of March for the first

16   week of April's deliveries.

17      Q.   You also testified that any payments that

18   were owed to Harrison were sent to Harrison, right?

19      A.   The no.  I said that they were made payable

20   to Harrison.

21      Q.   But this says that payments were to be mailed

16:18:28   22   to Imperial.  Why would that have been?

23      A.   A couple reasons why I can guess, but the

24   payments weren't made to Imperial.  They were mailed

25   to Imperial's Bossier City office and I suspect that

1   they probably were starting their transition already,

2   right, in 2014, so Harrison was still there in Bossier

3   City but they're calling it their Imperial Bossier

16:18:58   4   City office, so as things were transitioning from

5   Harrison to Imperial, that's what I'm guessing.

6       Q.  Did you ever ask Harrison why payments were

7   to be mailed to Imperial?

8       A.  No, because I think we already knew that

9   there was a transition going on, right?  They were --

10   they were transitioning, they were going to acquire,

11   merger, whatever you want to -- whatever they had up

12   their sleeves, they were going to do, and this is just

16:19:27   13   part of the process, right, because Rodney, I don't

14   know if Rodney ever got an Imperial e-mail address.  I

15   know Brad didn't because Brad alBritten didn't because

16   Brad pen at that grass took over the CFO role, I think

17   Ron hunt, be Wayne's e-mail had retired, was going to

18   retire, it was just a transition ***CHECK.

19            (Exhibit No. 4 marked.)

20       Q.  (By Ms. Finger)  I'm going to show you what's

16:19:59   21   been marked as Exhibit 4.  This is a very long

22   document so I will ask that you, before you scroll

23   through, just take note of the date of the first page,

16:20:18   24   and we can go through to the date of the last page.

16:20:43   25       A.  All right.  What we got here?  Okay, you

1  wanted me to make a note of the date.  ?

2     Q.  Correct.  This should be invoices from May

3  2015 through September 2015, correct?

4     A.  I don't know.  I haven't gone through 213

5  pages of it.

6     Q.  I'll represent to you that the ones in the

7  middle fill in the missing gaps but if you can look at

8  the first page, we're looking at September 28th, 2015

16:21:28  9  and then the last invoice is May 4th, 2015.  Are you

10  with me?

11           MR. HOLMAN:  Excuse me, Counsel, just

12  quickly, have these been produced to counsel.

13           MS. FINGER:  Yes.  Bates label -- there's

14  a Bates label on the bottom of each page, actually,

15  this one begins with Harrison 005055.

16           MR. HOLMAN:  Okay.  I see it now, I had

17  my -- I had mine expanded too much.

18     A.  And tell me again the dates.

16:21:59  19     A.  The first invoice I'm looking at here is

20  9-28-15?

21     Q.  (By Ms. Finger)  Correct.

22     A.  And you're saying they're not in

23  chronological order.

24     Q.  They are.  If you scroll all the way to the

25  bottom, you should see May 4th, 2015?

1    A.   May 2000 what?

16:22:23   2    Q.   '15?

3    A.   Yeah, I -- these obviously are not the actual

4    invoices.   These are electronic copies of these

5    invoices or an electric -- an electronic version of

6    these invoices because they don't look exactly like

7    the invoices that I remember seeing.

8    Q.   These are not the invoices that A-Z received

16:22:56   9    in 2015?

10    A.   Oh, because we're still in '15.   I jumped

11    ahead to -- my bad.   I was already in 2019 because

12    these invoices changed, right, from '15 to '16 by the

13    time we got to '19, they didn't look like this.

14    Q.   Sure.   But in 2015 --

15    A.   Yeah, they were still -- they were still

16    transitioning, yes, yes, this is good, I'm with you.

16:23:27   17    Hold on.   5, 5, 4, 15 so there's still a month's of

18    invoices, the April, you don't have shows April's in

19    this batch.

20    Q.   Not in this exhibit.

21    A.   Okay.   But there should have been April ones

22    also with Imperial, I think.   Am pretty sure.

23    Q.   I can't say either way, I'll just represent

24    to you that for now we're going to look at the May

25    through September ones for 2015.

1      A.   Okay.

16:23:57  2      Q.   When A-Z began doing business with Imperial,

3  it was issued account numbers that were different from

4  its account numbers with Harrison; is that right?

5      A.   Yes.

6      Q.   Do you know why?

7      A.   Because we were doing business with Imperial

8  and Imperial has their own naming convention and we

9  were being set up as a new account for Imperial, so we

10  would just naturally get whatever the next account

11  numbers are.

16:24:29  12      Q.   And if you'll go with me to the first page

13  looking at the September invoices -- well, actually,

14  if you're still at the bottom, you can see there in

15  May 2015 in the center, it says Harrison customer

16  number, right?

17      A.   Yes.   That Harrison customer number reference

18  was on the Imperial invoices for about six, nine, ten,

19  12 months, something like that, and then I think when

16:24:58  20  they completed all their transition stuff, then the

21  Harrison customer number went away.

22      Q.   Okay.

23      A.   So if you look at the 2019 invoices, 2018

24  invoices, '17 invoices and I think part of '16

25  invoices, it no longer references a Harrison customer

1   number.

2       Q.   We'll get there, Mr. Ali, but for now, May

3   2015, there's still a Harrison customer number listed

4   here, right?

5       A.   As a reference, it's not the customer number

6   for the invoice.

7              THE VIDEOGRAPHER:  Ms. Ninger.

16:25:29   8       Q.   Did Imperial ever tell you why it was

9   referencing the Harrison customer number on its

10  invoices?

11      A.   Because they were just -- they were still

12  transitioning, right, they were transitioning.

13      Q.   What about in September 2015 when A-Z,

14  according to your testimony, had fully paid off its

15  Harrison balance, did Imperial represent to you why

16  the Harrison customer number was still listed on the

17  invoices?

18      A.   Because.

19              MR. HOLMAN:  Objection, the date is

20  wrong, you mentioned September 2015.

21      Q.   (By Ms. Finger)  Correct, September 2015 is

16:25:58   22  the first page of this exhibit.  Let's scroll up

23  there, Mr. Ali.  Are you there?

24      A.   You're talking.

25      Q.   Correct?

1    A.   I understand your question and Harrison was

2  completely paid off by then already, , well before

3  then and the reason the Harrison customer number it

4  was explained to me was still on there is because they

5  were still transitioning.

6    Q.   Who explained that to you?

7    A.   Their transition -- their transition was

8  taking a long time, and I can appreciate that, I mean,

16:26:26  9  it's -- it's a giant company.  I mean, Imperial is a

10  bow [HAOEPL] he tell of a company, they do billions of

11  dollars' worth of business, right, and for them to

12  transition a company that they acquired or merged and

13  then were getting rid of, there's a lot of moving

14  parts and I think this is just one of them **SPL** bee

15  [HAOEPL] he tell **SPL**.

16    Q.   Who told you why the Harrison customer number

17  was still listed on the invoices?

18    A.   Wayne Baugh can he tell.

19    Q.   When did he tell you that?

20    A.   Probably at some point when I asked him why

16:26:59  21  that number was still on there or looked at the

22  invoice for the first time.

23    Q.   You don't specifically remember asking him

24  that though, do you?

25    A.   I'm pretty sure we talked about that because

1  it was sort of unusual at first, right, and then it

2  dropped off at a later date just like he said it

3  would.

4              THE VIDEOGRAPHER:  Ms. Finger.

5              MS. FINGER:  Yes.

6              THE VIDEOGRAPHER:  I wanted to give you a

7  heads-up, we've got about 8 minutes left before we

8  need to make an immediate change.

16:27:29  9          MS. FINGER:  Okay, great, thank you.

10      A.  But we were talking about the customer

11  number, do you want to finish that conversation

12  because there's a customer number that A-Z has with

13  Imperial, the Dallas warehouse was assigned the 95750

14  number, and that's the customer number for A-Z

15  wholesale Dallas with Imperial.

16      Q.  (By Ms. Finger)  Was it your understanding

16:27:56  17  when you received a customer number from Imperial that

18  this new account had a zero balance from the

19  beginning?

20      A.  The yes, it had a zero balance from the

21  beginning.  We didn't owe Imperial any money as of

22  March 31st, 2015.  When we got our first invoice in

23  April, that's when we accrued our first balance with

16:28:46  24  Imperial.

25              MS. FINGER:  We can take a break now, if

| | |
|---|---|
| 1 | that's okay with you, Mr. Ali, so we can swap out the |
| 2 | video before I put up the next exhibit.  Is that all |
| 3 | right with you. |
| 4 | A.   I would like to keep going I'm having way too |
| 5 | much fun to stop now. |
| 16:28:59   6 | Q.   We can keep going, I I'm just asking for the |
| 7 | video to? |
| 8 | A.   Yeah if it's a great place and let them make |
| 9 | their switch, . |
| 10 | MS. FINGER:  We'll take five minutes and |
| 11 | come back. |
| 12 | THE VIDEOGRAPHER:  Off the record; the |
| 13 | time is 4:29 p.m. |
| 16:29:17  14 | (Recess 4:29-4:44.) |
| 15 | THE VIDEOGRAPHER:  *ck ALI 4 STARTS ON |
| 16 | 201 Back on the record; the time is 4:45 p.m. |
| 17 | Q.   (By Ms. Finger)  We just came back from a |
| 18 | break, Mr. Ali.  You understand that you're still |
| 19 | under oath, correct? |
| 20 | A.   Yes.  And if it's okay with you when we were |
| 16:45:30  21 | off the record I mentioned that I wanted to clarify |
| 22 | something about my testimony on the record. |
| 23 | Q.   Yes, please do? |
| 24 | A.   Just real quick, when we were talking about |
| 25 | the modified oral agreement and what that refers to, |

1    it certainly refers to the modified oral agreement

2    that we had with with Imperial when we first started

3    doing business with them, but we also had a series of

4    modified oral agreements throughout our four-year

5    relationship, so I believe that that modified oral

16:45:57   6    agreement, in response to those discovery questions,

7    should refer to the series of modified oral

8    agreements, not just that sort of one snapshot of the

9    modified oral agreement.

10        Q.   Sorry, we had some feedback.  I don't hear it

11   anymore.

12             When you refer to it as a modified oral

13   agreement, that initial agreement with Imperial, it

14   wasn't modified, so to speak, right, it was just your

16:46:30   15   initial agreement with Imperial; is that fair to say?

16        A.   No, because I think -- I think we had -- we

17   had an agreement that we would buy product from them

18   and that they would give us certain amount of terms

19   but that wasn't modified right away.  It wasn't the

20   ***CHECK the standard agreement that Imperial enters

21   into with a new customer.

22        Q.   So what were the initial terms that you

23   entered into with Imperial before any modifications

24   were made?

16:46:57   25        A.   I believe the terms that we entered into was,

1    I think it was one month was the payment terms but we

2    knew we weren't going to be there right out of the

3    gate, right, so we were able to modify that so that we

4    could get closer and closer.  I think also the -- the

5    credit limit, I can't remember, you know, if we had

6    started off with like a $3 million or two and a half

7    million dollar credit limit but the goal was to try to

16:47:27   8    reduce that amount, so, again, those series of

9    changes, those modified oral agreements throughout the

10    four years, five years we did business with Imperial

11    is -- is what that -- I think that term refers to.

12         Q.   Okay.  My subsequent question though was what

13    the terms were that A-Z agreed to with Imperial in

14    their initial conversation before any modifications

15    were made.  So you mentioned that it was going to be

16    one month payment?

16:47:59   17         A.   Yeah.

18         Q.   Right?

19         A.   Yeah, one month payment, the credit limit

20    ***CHECK would be set at whatever the sort of the

21    number was that we were going to come out of at the

22    gate of, you know, eight to ten weeks worth of orders

23    before the first payment was going to be made, that

24    Barkat would no longer have a personal guaranty;

16:48:27   25    that -- I think there were some pricing discussions or

1  agreements that we had, some discounts and rebates

2  that we would be getting that were different from what

3  we were getting with Harrison but I would have to go

4  back and look at my e-mails or some notes that I would

5  have in reference to what those were.

6      Q.   When did you first modify the payment term,

7  the one ***CHECK?

8      A.   Probably when we got to a month, right when

9  we got to the first month and we had a general idea of

10 what our volume was, we were able to kind of predict

16:48:59 11 out that in another month we'll be here and that we

12 would probably be somewhere between eight to ten weeks

13 is what I recall, that's why that number eight to ten

14 weeks keeps coming up in my head.

15     Q.   How many times would you say that you

16 modified that term with Imperial?

17     A.   I think we modified that a couple of times

18 because the goal was to go from like ten weeks to nine

19 weeks to eight weeks, right, to continue to try to

16:49:30 20 reduce the -- the credit terms and try to bring it

21 into about a month or six weeks, that was the goal.

22     Q.   You don't recall a specific number of times

23 you entered into an agreement to change that term?

24     A.   Yeah, I would say at least -- we probably --

25 we discussed it several times and as we got within a

1   certain, you know, payment term and the goal was to

2   try to keep it there, right, so modified, let's say

16:49:58   3   let's keep it at ten weeks now or if we were at 12

4   weeks when we started, let's keep it at 11 weeks, now

5   let's keep it at ten weeks and continue to reduce it.

6       Q.   But you can't point to a specific number of

7   times that A-Z?

8       A.   No.

9       Q.   And Imperial reached a new agreement on how

10   that term would be modified, can you?

11      A.   No, not -- not specifically on how many times

12   we modified the -- the term, the payment term of the

13   agreement, no.

14      Q.   And it was always you discussing that term

15   with either Wayne or Brad when you entered into those

16:50:30   16   agreements; is that right?

17      A.   Yes, they're the only ones that had the

18   authority at Imperial and I was the only one that had

19   the authority at A-Z to really be handling that.

20      Q.   You also mentioned that A-Z had an initial

21   credit limit during the first agreement with Imperial.

22   How many times was that term modified?

23      A.   That was probably modified more regularly

24   because the credit limit was -- the goal was to

16:50:55   25   continue to reduce that credit limit, right, so as we

1  reduced the credit -- the balance, right, and if we

2  were ever to have ordered more than the payments were

3  the subsequent week, we'd have to go back and modify

4  and say, okay, how are we going to handle the extra

5  $20,000 in purchases that we did last week versus the

6  payments that were already sent for $20,000 less --

7  less than what we expected to order.

8      Q.   You can't --

16:51:28   9      A.   Or if we got like a -- like if we got a

10  forceout, right, promotional product, those would

11  get -- those would get forced out from Imperial to us

12  to send to our customers, those are items that weren't

13  ordered by us specifically, but were forced out to us

14  because our customers had ordered them and Imperial

15  was our [#134R50EUR], so we would get that forceout

16  automatically.  So if I sent $200,000 worth of

16:51:58   17  payments and I ordered 190 thousand dollars' worth of

18  product, that balance would have reduced by $10,000

19  but if somehow that week there were promotions that we

20  were getting that were getting forced out, and that

21  was $20,000 worth of promotions, then it looked like

22  on its face that the balance had gone up by 10,000,

23  right, so then we'd have to talk and we'd say, oh,

24  those are promotions, that's fine, that wasn't

25  something we ordered, and then that would be fine.

1          If it was something that we had ordered,

16:52:27   2   then we would try to figure out how hey how do we

3   bring that number down by 10,000 or whatever it was.

4       Q.   My question was approximately how many times

5   was that credit limit modified?  You can't tell me a

6   specific number, can you?

7       A.   No, I can't tell you an exact number.

8       Q.   And those agreements always took place via

9   conversation between you and either Wayne or Brad; is

10   that right?

11       A.   Primarily, why he.  Yes.

16:52:57   12       Q.   You say primarily, how else would those

13   agreements have occurred?

14       A.   You know, if for whatever reason it was like

15   a holiday and Brad was already out of the office, he

16   may have asked sandy to call me or e-mail me about

17   that and sandy would say, hey, your balance went up

18   this week and I can say, organizations it was related

19   to promotions and he'd be like all right, or he calls

20   me and says hey Brad says your balance went up by

21   10,000, please send an extra $10,000 for next week,

16:53:28   22   okay, got it.  So more like relaying the message as

23   opposed to being a decision maker.  I think sandy --

24   sandy did a little bit of that.  I can't remember if

25   there was anybody else.  Again that was for whatever

1   reason, Brad was out of town, it was a holiday or he

2   couldn't get ahold of me, he asked somebody in his

3   office to give me a call.

4       Q.   Other than the e-mails and the invoices, did

5   you ever put any of these modifications into a

16:54:00  6  writing?

7       A.   I don't recall.  Again, I could probably look

8   through the production to see if there is anything,

9   but every time there was an oral modification, was

10  that oral modification memorialized in writing?  No.

11  That just wasn't standard operating procedure on

12  either side.

13      Q.   You say on either side.  Do you mean that

14  Imperial never put any of its agreement modifications

15  with any customer in writing?

16:54:29  16     A.   I'm saying with us.  I don't know how they

17  dealt with their other customers, but between --

18  between Imperial and A-Z Wholesale, every oral

19  modification to our agreement wasn't memorialized in

20  writing.

21      Q.   Did you ever ask to put any of those

22  modifications in writing?

23      A.   No.

24      Q.   You weren't at all concerned that none of

25  those payment terms were put into a writing?

16:54:59   1      A.   No, I mean, again, we had a very good,

2   healthy relationship with Imperial until things went

3   sideways there in 2019, I mean, you know, in any

4   business relationship when when you're dealing with

5   money and you're dealing with product, there's ups and

6   downs, there's good days and bad days but we always

7   found a way to work through them, right?  You

8   testified earlier.

9      A.   Until you lawyers get involved and then it

16:55:28  10   gets tricky.

11      Q.   You testified earlier that as of March 31st,

12   2015, A-Z did not yet owe Imperial any money; is that

13   right?

14      A.   That's correct.  We hadn't -- we hadn't

15   bought any product from Imperial as of March 31st, I

16   think it was, 2015, so we didn't owe Imperial any --

16:55:55  17   any money in relation to the invoices.

18      Q.   I'm going to show you now what's been [-RBGD]

19   may as Exhibit 29 to your deposition.  I'll give you

20   an opportunity to review, but did the document pop up

21   in front of you?

22      A.   Yes.

16:56:27  23      Q.   Okay.  Have you seen this document before?

24      A.   I'm sure I have at some point.

25      Q.   And this is an e-mail sent by Brad P. at

1  Imperial trading.com; is that right?

2       A.   Yes.

3       Q.   Do you understand Brad P. to be Brad

4  Prendegrast that we've been discussing **SPL**?

5       A.   Yes.

16:56:58  6       Q.   And this e-mail was sent to you and Barkat,

7  CCing others at Imperial and Harrison; is that right?

8       A.   It was CCed to people with -- people from

9  Imperial and people that still had Harrison e-mail

10  addresses but I don't know if they were, at that time

11  with Harrison or they were with Imperial, that, again,

16:57:30  12  is.

13       Q.   Rodney Thomas?

14       A.   It's gotten, Rodney -- rod any was still, I

15  guess, our sales rep with Imperial, I guess, at that

16  time.

17       Q.   And this e-mail is dated October 30th, 2015;

18  is that right?

19       A.   That's correct.

20       Q.   And this says, balance decreased by

16:57:48  21  $134,522.08 to $3,003,712.43, correct?

22       A.   Yes.

23       Q.   If I can read numbers correctly.

24       A.   Okay ***CHECK.

25       Q.   And so it's your understanding that this

1    e-mail was sent from Imperial, correct?

2         A.   Yes, and that's an Imperial balance there.

3         Q.   It says here that there's an Attachment A-Z

4    which you'll see if you turn to the remaining pages of

5    this document.  Do you see that?

16:58:30   6         A.   Yes, I do.

7         Q.   And if you'll turn to the very last page,

8    you'll see October 30th, 2015, which is the date that

9    e-mail was sent, correct **[STKPWHREUT]** and?

10        A.   Yes.

11        Q.   And all the way at the bottom we see the

12   total of approximately $3 million that Brad indicated

16:58:56   13  in his e-mail, correct?

14        A.   Hang on.  Yep.

15        Q.   If you'll turn to the third page of this

16   document, actually, let me -- it's missing some

17   columns so let's start with the second page of the

18   document, if you see all the way on the left-hand side

19   there's a column that says A-Z wholesale.  Do you see

20   that?

21        A.   Uh-huh, yes.

16:59:30   22        Q.   And it's purchases, payments applied and the

23   last one in that category is total balance.  Do you

24   see that?

25        A.   Yes.

```
 1        Q.   And so do you understand that those columns
 2   apply respectively to the following pages, even though
 3   it doesn't appear?
 4        A.   Yes, the headings.
 5        Q.   Correct.
 6        A.   Yeah.
 7        Q.   So turning now to the second page, these are
 8   columns dated February 27th, 2015 for intervals
 9   through May 8th, 2015; is that right?
10        A.   That's correct.
11        Q.   And if we look at April 3rd, 2015, right in
12   the center there, the past due balance listed is
13   approximately one and a half million dollars; do you
14   see that?
15        A.   I have to go back and check your headings.
16        Q.   It should be?
17        A.   Yes **SPL** one of those dates was wrong
18   **SPL**.
19        A.   I see that.
20        Q.   How did A-Z have a past due balance of a
21   million and a half dollars to Imperial on April 3rd,
22   2015 if it had not started doing business with
23   Imperial until after March 31st, 2015?
24        A.    That's a very good question and it's just a
25   sloppy spreadsheet.   That balance there of 1.563 --
```

16:59:59 (line 8)

17:00:29 (line 15)

17:00:59 (line 25)

1  actually, I would rather go to the one before it, but

2  let's just say the 1.481, 1.25, right, on March 27th,

17:01:23  3  2015, that is a Harrison balance and so when you look

4  at April 3rd, 2015, I don't know if we had received

5  our first delivery by then by -- from Imperial but I

6  think so, and so the ending balance, according to this

17:01:58  7  spreadsheet, and again, this is a spreadsheet that was

8  done by Imperial's folks, the ending balance with --

9  with Harrison was $2.194,440 at the end of March, and

17:02:27  10  so that amount was paid off, let's see where the

11  payment is applied is the second one, so I'm just on

12  the average, if you take $300,000 payment in about

13  seven weeks, Harrison was paid off.

14      Q.   Why is the Harrison balance reflected

15  together with your Imperial balance?

17:02:59  16      A.   I don't -- again, I think it's just a -- it's

17  a sloppy spreadsheet.  There should have just been two

18  spreadsheets.  There should have been one with

19  Harrison, right, that showed the payments being

20  applied, balance Turk to zero, the new purchases with

21  Imperial, that balance growing **SPL** turning **SPL**

22  right, and then eventually have gotten to the point

23  where no more payments are being applied to Harrison,

24  payments -- everything's done, and the payments are

17:03:29  25  then being applied to Imperial so it should have been

1    two separate spreadsheets but not very difficult to

2    take the data and convert it into two separate ones.

3         Q.   You didn't ask Brad at Imperial to do that

4    and create two separate spreadsheets though, did you?

5         A.   No, I didn't.  It wasn't necessary because I

6    can tell what's going on here.

7         Q.   But you didn't ever ask him to clarify what

8    balance was owed to Harrison and what amount was owed

9    to Imperial at any given time?

10        A.   Again, the balance to Harrison was paid off,

17:03:59  11  looks like based on these payments, probably around

12   seven weeks, maybe eight weeks, which is kind of the

13   same eight to ten week terms that I've been talking to

14   you about and then.

15        Q.   If we turn to the next page, we'll be in the

16   June, July 2015 range which is when you testified

17   earlier that you believed Harrison was paid off?

18        A.   Yes.

19        Q.   Looking at this?

20        A.   Definitely by then because you're looking at,

17:04:27  21  you know, payments of 341000, 36 5,000, on the page

22   above it, everything's in the pretty much $300,000.

23        Q.   All of those payments are not significantly

24   higher though than the purchases made in those months,

25   are they?

1    A.   Yes.

2    Q.   Let's look at May 22nd, 2015?

3    A.   Oh, no, because, let me before you go there,

17:04:58   4   let's in the interest of time, if you look at look at

5   the -- look at the last one.

6    Q.   What's the date?

7    A.   No, no, I'm saying look at the last block, so

8   you're just looking at A-Z wholesale.

9    Q.   Correct?

10    A.   Right, but they were treating A-Z wholesale

11   and diamond, Top 20, all sort of one company for

12   their -- for our agreement purposes.

13    Q.   Okay.

14    A.   So if you look at the last batch, right,

17:05:27   15   generally you'll see payments are higher than the

16   purchases, there's obviously some differences in

17   certain places and again, that just kind of ebbed and

18   flowed and we modified as we went along, but generally

19   you would see, like I'll take you up to **SPL**

20   eastbounded **SPL** ebbed **SPL** where can I take you

21   here, yeah, generally.

22    Q.   Let's -- let's go through some of these dates

17:05:56   23   together.  So on April 3rd, 2015, [-BS] [PR-FPLS] were

24   a little over 350,000, correct, but the payments were

25   only 340,000 and change; is that right?

1      A.    Ee -- that's what this says.

2      Q.    And then on April 10th also we have $380

3 thousand and change in purchases but less than 350 in

4 payments; is that right?

5      A.    Yeah, and you -- and again, you make a very

17:06:28   6 good point.  I think it also was when this report was

7 coming out and when the payments were coming in and

8 when the orders were being invoiced, Brad and I talked

9 about this a few times because it would seem like

10 sometimes that the -- that the balance was going up

11 when it really wasn't.  They were already -- they had

12 already invoiced us for purchases and hadn't applied,

13 say, for example, one payment that they still had,

17:06:57   14 right, so if the report came out on Friday morning and

15 they hadn't deposited the check from Friday yet, it

16 wasn't reflected in that balance so there's a few

17 sometimes, especially when we were doing this early,

18 that we were going through this and I would get a call

19 and say hey your balance went up, I was like there's

20 no way the balance went out up, we sent five checks

21 for $450,000 and we only bought $300,000 there's no

22 way that it could have gone up, and he's like yeah, we

23 didn't reflect that in the spreadsheet.

24      Q.    Well, this report goes all the way through

17:07:30   25 October 2015 and we're looking all the way back in

1  this same spreadsheet to March and April and in fact

2  we're not necessarily looking at the total balance and

3  whether that went up, we're looking at purchases made

4  and payments applied and in fact, for several months

5  through the end of at least May 2015 A-Z was making

6  payments that were less than the purchases they were

7  making; is that true?

8       A.   Yeah, but the overall balance was going down,

17:08:02  9  you have.

10       Q.   ***CHECK?

11       A.   You've got to look at diamond and Top 20 as

12  well.

13       Q.   But how much of these payments were being

14  paid towards the balance that originally owed to

15  Harrison?

16       A.   So the payments that were being made were

17  being applied to Harrison first.

18       Q.   How do you know that?

19       A.   All -- because that's how -- that's how

20  the -- that's how we stay within our terms.

21       Q.   But the Harrison balance is reflected in this

17:08:30  22  spreadsheet, isn't it?

23       A.   That's what I'm saying, this is a very, very

24  sloppy spreadsheet.  There should be two [SPHRAEUT] --

25  we can actually take this, we can actually take the

1   data in this spreadsheet and split it up into two and

2   show you very clearly when the balance was zero with

3   Harrison and what the balance would have been on that

4   day with Imperial for all three of those warehouses or

5   whatever they are.

6        Q.   Do you have a better spreadsheet prepared

7   that reflects the accounting of the difference between

17:08:59   8   your accounts with Harrison and Imperial?

9        A.   I do believe that somebody in our office

10  probably does because we kind of kept a track of it as

11  well, we don't just rely on other people's

12  information.

13       Q.   And was that produced in this litigation?

14       A.   I don't know if it was.  I'd have to go back

15  and look to see if it was produced.

16       Q.   How did you keep track internally of what

17  amounts were being paid to Harrison and what amounts

18  were being paid to Imperial?

17:09:29   19       A.   Based on who we were writing the payments to.

20       Q.   Did you have separate accounts in A-Z's

21  internal accounting system that reflected how

22  Harrison's balance was being paid down versus

23  Imperial's?

24       A.   Are we had, from what I recall, ing we

25  generally have spreadsheets on all of our suppliers or

1  at least the major suppliers, right, the larger

17:09:58  2  suppliers, and where we are with them on their

3  balances, what checks were paid, you know, what was --

4  what was reduced, what purchases were made.  I mean we

5  generally try to keep a decent track of that stuff.

6      Q.   Was it your understanding that your account

7  balance from Harrison was going to transfer over to

8  your account with Imperial?

9      A.   Our account balance from Harrison

10  transferring over to Imperial, no.

11      Q.   Correct?

12      A.   No.

17:10:28  13      Q.   But did you ask Brad why these balance

14  reports were reflecting the Harrison balance if it was

15  unrelated to Imperial?

16      A.   Well, because if you look, this started

17  before we even started doing business with Imperial.

18  It goes back to 2014.

19      Q.   Yeah, why is that?

20      A.   Because those are Harrison's balances.

21      Q.   But this spreadsheet came from Imperial,

22  didn't it?

23      A.   Not originally, it came from Harrison

24  originally.

25      Q.   How do you know that?

17:10:57    1         A.    Because I believe Brad Albritton used to send

            2    these **SPL**.

            3         Q.    He used to send them to you weekly, right?

            4         A.    I think so, yeah.

            5         Q.    And so you never asked Brad at Imperial to

            6    send you new spreadsheets on behalf of Imperial,

            7    right?

            8         A.    No because he was -- he -- no, not at all.  I

            9    knew exactly where these numbers are coming from.

           10    It's no -- it's not rocket science.

           11         Q.    And this was just a continuation of the

17:11:30   12    Harrison spreadsheet that you used to receive, right?

           13         A.    This is -- so you've got Harrison's balances

           14    all the way up until 3-27-15 so the overall balance

           15    for A-Z was 2.19 4 million, right, and if you look at

17:11:53   16    the payments made by A-Z to Harrison during the

           17    subsequent eight-week period, my guess is that will

           18    probably add up pretty close to 2.19 4 million, and

           19    again, these are rounds -- these numbers are rounded,

           20    they're not to the penny but I'm guessing the last

           21    check that was paid towards the Harrison balance will

           22    be an exact amount to clear that last balance.

           23              MS. FINGER:   Objection, nonresponsive.

           24         Q.    (By Ms. Finger)  Was this spreadsheet a

           25    continuation of the spreadsheet that you received from

17:12:32  1   Harrison?

17:12:33  2       A.   It should be, it should be.

          3       Q.   I'm showing you now what's been marked as --

          4   actually, we're not going to go through that one.   Is

17:13:27  5   it A-Z's position that to the extent any outstanding

          6   balance is owed, it's owed to Imperial, not to

          7   Harrison; is that right?

          8       A.   Yeah, if there are any balances owed, they

          9   would be to Imperial, not to Harrison.

         10       Q.   A-Z does not contest the amount that Harrison

         11   claims is owed, right?

         12       A.   Sure we do.

         13       Q.   How so?

         14       A.   Because we don't owe Harrison anything so

         15   we're contesting that amount.

         16       Q.   And what is your basis for that allegation?

17:13:59 17       A.   Because the products purchased and the

         18   invoices that are outstanding are due to Imperial

         19   minus any offsets, credits, **[-BS]** returns, expired

         20   goods that we still have and any other counterclaims

         21   for them breaching the contract with Imperial breached

         22   with us, but that exists within Imperial not Harrison.

17:14:29 23       Q.   I'm talking only to the dollar amount.   Do

         24   you dispute Harrison's accounting of the balance that

         25   remains regardless of whether it was owed to Harrison

1  or Imperial?

2      A.   I can't answer that question because it's not

3  owed to Harrison so I am disputing that amount, yes.

4      Q.   If Imperial filed this lawsuit, would you

5  contest the dollar amount that Harrison calculated as

6  outstanding from A-Z?

7      A.   Absolutely.

8      Q.   Why?

9      A.   Because it doesn't count the offsets, the

17:14:58  10  rebates, the credits, the returns and any

11  counterclaims that we have against Imperial so I would

12  certainly contest that amount.

13      Q.   Is it your position that A-Z owes any amount

14  to Imperial?

15      A.   I don't know.  Until there's a proper

16  accounting done, I couldn't tell you who owes who, but

17  we've got significant damages at this point that have

18  accrued against Imperial.

19          MR. HOLMAN:   I believe Imperial has

17:15:30  20  repudiated the debt and said the debt is owed to

21  Harrison in an affidavit.

22          MS. FINGER:   Objection, Mr. Holman, I

17:15:38  23  haven't asked a question to the witness.  ***CHECK one

24  of the two guys said something and I didn't hear.

25      A.   I just sustained your objection, by the way.

```
 1      Q.   (By Ms. Finger)  Appreciate it.

 2      A.   You're welcome.

 3      Q.   (By Ms. Finger)  Okay.  I'm going to show you
```
17:16:25  4  what's been marked as Exhibit 32.
```
 5            (Exhibit No. 32 marked.)
```
17:16:58  6      Q.   (By Ms. Finger)  Do you see Exhibit 32 in
```
 7  front of you, Mr. Ali?

 8      A.   I do.  I just rotated it and trying to blow
```
17:17:08  9  it up so I can see it.  Okay.
```
10      Q.   I want to look at the individual totals for

11  each Dallas and Waco.  Let me back up.  Have you ever

12  seen this document before, Mr. Ali?

13      A.   I don't know if I recall seeing it or not.

14      Q.   Did you from time to time receive trial
```
17:17:56  15  balances from Harrison or Imperial?
```
16      A.   I don't recall if I did or did not.

17      Q.   If we can take a look at the first total for

18  A-Z wholesale Dallas, it says $1,363?

19      A.   Sore ex-us [SKAO] me, sorry, I want to

20  correct my testimony.

21      Q.   Sure.

22      A.   I do recall receiving balances from Imperial.
```
17:18:28  23  I don't know if they were these trial balances but
```
24  they're balances that I would receive on a weekly

25  basis that wasn't that sloppy spreadsheet **SPL** that
```

1    was 1 million 3 **SPL** that we were talking about

2    earlier.

3         Q.   This one is dated May 31st, 2018.  Do you see

4    that?

5         A.   Yes, ma'am.

6         Q.   And the total for A-Z Dallas of May 31st,

7    2018 here says 1,368,925.67.  Do you see that?

8         A.   Yes, ma'am.

17:18:59  9    Q.   And for Waco it says 1,038,500.42.  Do you

10   see that?

11        A.   Yes, ma'am.

12        Q.   ?

13                  (Exhibit No. 31 marked.)

14        Q.   (By Ms. Finger)  I'm going to show you now

15   what's been marked as Exhibit 31.  Do you see Exhibit

16   31 in front of you?

17        A.   Yes, I do.

17:19:28  18   Q.   And have you ever seen this document before?

19        A.   Yes, I have.

20        Q.   And this is a letter that A-Z received dated

21   June 15th, 2018; is that right?

22        A.   Yes, ma'am.

23        Q.   This was signed by Brad Prendegrast at

24   Imperial; is that right?

17:19:59  25   A.   Yes, ma'am.

1    Q.   And it says the balance due of $1,368,925.67

2  as of May 31st, 2018 is correct without the following

3  exceptions."  Did I read that correctly?

4    A.   Yes, you did.

5    Q.   And there are no exceptions written below,

6  right?

7    A.   There are no exceptions written below, no.

8    Q.   And that's your signature at the bottom of

9  this page, correct?

17:20:28  10    A.   Yes.

11    Q.   And by signing this you agreed that the

12  balance owed as of May 31st, 2018 was $1,368,925.67;

13  is that right?

14    A.   Well, not technically right.  So the balance

15  due on the invoices that they have totaled up to that,

16  but that, again, wasn't reflective of any rebates,

17  credits, damaged goods, returns, that sort of stuff,

18  and the purpose of this was, this was actually an

17:20:59  19  audit that their, I guess their accountant does or

20  their financial -- their lender does and it's just to

21  verify, hey, does this company owe this amount of

22  money.

23    Q.   You understand that by signing below you

24  agreed that the balance due as to A-Z Dallas was

25  $1,368,925.67 as of May 31st, 2018, that's what this

1    page says, correct?

2        A.   Yes, per the invoices and the credits that

17:21:29   3    they already had on file because I've seen they've got

4    some credits as well.

5        Q.   That is language is not in this document

6    though, correct ***CHECK?

7        A.   It's actually in the attachment.   There's

8    already some credits in there.

9        Q.   This does not say the balance due per

10   invoices, correct, it says the balance due is

11   1,368,925.67 as of May 31st, 2018 and you signed

12   below, correct?

13       A.   It is per invoices because if you go to the

14   second page it's got the actual invoices there.

17:21:58   15       Q.   I understand but that language is not in this

16   sentence, correct?

17       A.   That language is not in that sentence, no.

18       Q.   If you can you turn to the third page, we'll

19   see a similar letter with respect to A-Z as well; is

20   that right?

21       A.   Yes.

22       Q.   And is it has the same statement below this

23   time with respect to A-Z Waco that the balance due of

17:22:23   24   1,038,500.42 as of May 31st, 2018 is correct.   Did I

25   read that correctly?

1          A.   You did read that correctly.

2          Q.   Is that your signature below?

3          A.   It is.

4          Q.   So as of May 31st, 2018, you agreed in August

5     of 2018 that the balance as reflected on these

6     documents were correct; is that right?

17:22:59   7      A.   Per the invoices that are associated with the

8     second page of each one of those letters and the

9     credits that they had on file at that point, yes.

10         Q.   In August of 2018, you agreed that the

11    balance that A-Z owed as of May 31st, 2018 are the two

12    amounts listed in Exhibit 31; is that right?

13         A.   Based on the statement that's on the second

14    page of the letter, yes.

17:23:34   15     Q.   Does this?

16         A.   And we were not contesting that those

17    invoices and those amounts are correct.  Those are the

18    invoices and the amounts associated with those

17:23:46   19  particular invoices from Imperial to A-Z Wholesalers,

20    Inc.

21         Q.   ?

22                   (Exhibit No. 33 marked.)

23         Q.   (By Ms. Finger)  I'm going to show you what's

17:24:11   24  been marked as Exhibit 33.  Let me know when you see

25    it.

1      A.   I see it.

2      Q.   And this is one of the balance reports you

3  mentioned that you would receive from time to time

4  from Imperial, correct?

5      A.   No.  This is the spreadsheet that we would

6  receive from Imperial.  It's not the -- it's not the

7  balance report that I was talking to earlier that I

8  got by e-mail.

17:24:59  9      Q.   Did the balance report look like the one we

10  looked at before with the trial balance?

11      A.   Nope.  It looked more like the statement that

12  was associated with the -- the letter for their

13  auditors.

14      Q.   These spreadsheets are what you would receive

15  almost weekly, though?

16      A.   Yeah, we would.

17      Q.   In?

17:25:29  18      A.   Yeah, we would receive this weekly and we

19  would also receive the statement weekly as well.

20      Q.   How did the statements that you're referring

21  to differ from the spreadsheets that you would receive

22  weekly?

23      A.   The statements were more detailed, they

24  referenced specific invoices that were still open and

25  they gave us a total.

17:25:59   1       Q.   Did those ever differ from the spreadsheet?

           2       A.   I don't know.  I'd have to look but I'm sure

           3  they probably did because the spreadsheet, again, was

           4  kind of -- it was sloppy and it's the -- it's also

           5  what time was the spreadsheet done, did they count the

           6  Friday payment or the Monday payment, did they include

           7  the Monday's order or not.  The statement itself is --

           8  is better because it's got the actual invoices

17:26:29   9  numbers, the amount for that invoice number and then

          10  it's got any credit memos that had already been

          11  processed for returned or damaged goods, so, yeah, and

          12  they differ because the statements state clearly

          13  Imperial, it has our account numbers, it's got a

          14  lot -- it's got a lot more information.

17:26:59  15       Q.   How would you receive those, also via e-mail?

          16       A.   Yes, ma'am.

          17       Q.   From who?

          18       A.   It depends, but I think it was like in -- it

          19  was -- I don't know who -- I don't know who sent it.

          20  I think maybe Sandy sent it in the beginning and then

          21  somebody by the name of Kay Kerr anticompetitive

          22  behavior sent it.  I mean I still get those today,

          23  Ms. Finger.  I mean, I got one on Friday or Saturday

17:27:28  24  still showing what balance that Imperial shows that we

          25  owe them **SPL** Kay Kerr anticompetitive behavior

1   **SPL**.

2       Q.   Have you ever --

3       A.   But we don't get -- but we don't get any of

4   those obviously from Harrison because we don't any of

5   anything to Harrison.

6       Q.   Have you produced any of those you're

7   referring to in this litigation?

8       A.   I believe one of those were produced or a

9   couple were produced, but they come in every week.

10      Q.   Why not all of them?

11      A.   Be glad -- I don't think anything's changed

17:27:57  12  on them though so the one that -- the one or two that

13  are produced are going to look pretty much the same as

14  the one I got this Saturday or Friday.

17:28:27  15      Q.   What does the most recent statement look like

16  that you received?

17      A.   Hang on.

18      Q.   I can't -- Mr. Ali if you have something that

19  you're going to look at to refresh your recollection,

20  I'll need to have seen it at least now or beforehand,

21  I don't know if you have the ability to do that so

22  I'll ask that you answer my question based on your

23  recollection before consulting?

24      A.   Okay, trying to help.

25      Q.   I understand.

```
          1      A.   It looks -- it looks very similar to the
17:28:59  2  statement that was attached to the letter that
          3  verified whether or not these invoices were correct
          4  and that's the balance in the audit letter, so it's
          5  page 2 and page 4 of exhibit, whatever we had up just
          6  a second ago.
          7      Q.   31, Exhibit 31, right, that was attached to
          8  the audit letter?
          9      A.   Yes so the statement that I receive weekly in
17:29:28  10  Imperial, have for the longest time and still receive
          11  up until this day, which was produced at least one or
          12  twice in this lawsuit looked more like that.
          13      Q.   Is it possible, Mr. Ali, that Imperial acts
          14  on Harrison's behalf?
          15      A.   Imperial acts on Harrison's behalf?
          16      Q.   Correct.
17:30:01  17      A.   Not when they deal -- not when they were
          18  dealing with us.
          19      Q.   How do you know that?
          20      A.   Because we were dealing Imperial and we were
          21  buying from Imperial, we were returning to Imperial,
          22  we were paying Imperial, we were doing business with
          23  Imperial, we were talking to Imperial, modifying our
          24  agreement with Imperial, extending or reducing our
17:30:22  25  credit terms, so there's no way on earth 1 that
```

1  Imperial was acting for Harrison with us, and

2  certainly not for the -- for the invoices that are

3  potentially still open that we -- that we have

4  problems with at this point.

5      Q.   It's possible that Harrison and Imperial

6  shared management though, right?

7      A.   I think based on Wayne's letter back in 2014

17:31:00  8  they did share management in the very beginning while

9  they were still transitioning, but again, I think

10  that's again the transitioning woes but there's no

11  shared management as far as who we were dealing with.

12  We were dealing with weighed Baugh can he tell **SPL**

13  at Imperial, Brad Prendegrast at Imperial, Sandy at

17:31:30  14  Imperial.

15      Q.   But you have no personal knowledge a as to

16  whether Brad, Wayne, sandy or any other Imperial

17  representative that you were dealing with also worked

18  for Harrison, do you?

19      A.   I don't believe they ever worked for

20  Harrison.

21      Q.   We saw an e-mail earlier where Wayne had a

22  signature block as the president from a Harrison

23  e-mail address, didn't he?

24      A.   Sure, he may have been an officer during the

25  transition period when they acquired or were doing

17:31:59    1   whatever they were doing.

            2       Q.   You're speculating though, Mr. Ali, right,

            3   you don't have any personal knowledge for sure whether

            4   any of those individuals worked for or have ever

            5   worked for Harrison, do you?

            6       A.   I -- I am confident that from the time I met

            7   Wayne Baugh can he tell, Wayne held himself out to be

            8   the CEO of Imperial trading, that Brad Prendegrast

            9   held himself out to be the CEO of Imperial trading and

17:32:27   10   that people we were doing business with come April

           11   2015 was Teel trading.

           12       Q.   You're the president of more than one of

           13   company Mr. Ali, aren't you?

           14       A.   I am.

           15       Q.   If you were doing business as the president

           16   of one company that you were no longer the president

           17   of another company?

           18       A.   Well, I mean, if -- am I getting paid at both

           19   companies?

           20       Q.   Sure.

           21       A.   I mean.

           22       Q.   Does that matter?

           23       A.   I'm sorry?

           24       Q.   Does that matter?

           25       A.   Well, I mean, no, I can be an officer in

1  multiple companies.

17:32:58  2    Q.  So you have no personal knowledge as to

3  whether Brad, Wayne and sandy, although they may have

4  been working for Imperial were also employed by

5  Harrison, do you?

6           MR. HOLMAN:  Objection, asked and

7  answered.

8           MS. FINGER:  He has not responded to the

9  question, Mr. Holman.

10    Q.  (By Ms. Finger)  Could you have any personal

11  knowledge for sure as to whether Wayne, Brad and Sandy

12  also work for Harrison?

13           MR. HOLMAN:  Objection.

14    A.  Based on my --

15           MR. HOLMAN:  Pardon me, he's represented

16  that those individuals held themselves out as Imperial

17:33:30  17  representatives.

18           MS. FINGER:  That's not what I asked.

19  That's not what I asked.

20    Q.  (By Ms. Finger)  I asked whether yes or no if

21  you have any personal knowledge of whether Sandy,

22  Wayne and Brad also worked for Harrison?

23    A.  I -- I don't have any personal knowledge that

24  Brad Prendegrast ever worked for Harrison.  Aside from

25  that one e-mail that you showed me where Wayne sent

1    out an e-mail and said that he was the president and

2    he was announcing that Imperial was taking over

17:33:58   3    Harrison, where Wayne ever held himself out to be

4    anything other than the CEO of Imperial trading.

5    Sandy SARS lock never held himself out or herself out

6    as as Harrison trading employee or representative.

7              MS. FINGER:  Objection as nonresponsive.

8         Q.   Mr. Ali, I did not ask how any of these

9    individuals held themselves out to be.  I asked

10   whether you have any personal knowledge as to whether

17:34:29   11   sandy, Wayne or Brad worked for or have ever worked

12   for Harrison, yes or no?

13        A.   Based on my personal knowledge and my

14   personal experience with Wayne, Brad, sandy, they are

15   employees or they [-RBGD] would for Imperial trading.

16        Q.   So Wayne told you that he works for Imperial

17   trading and he does not work for and has never worked

18   for Harrison; is that true?

19             MR. HOLMAN:  Objection, form.

20        A.   Wayne told me that he was the CEO of Imperial

17:34:59   21   trading from the first day that I met him.

22        Q.   You told me earlier in your deposition today

23   that you are the president of A-Z; is that right?

24        A.   Yes.

25        Q.   You also told me that you're the president of

1  another company; is that right?

2      A.   Yes.

3      Q.   If you were only to say that you were the

4  president of A-Z, does that eliminate the fact that

5  you're also the president of that other company?

6      A.   Well, no, so here's where you're making your

7  mistake, if you're going to do a hypothetical, let's

17:35:27  8  do it the right way.  I've got A-Z wholesale, I've got

9  diamond wholesale and if I'm doing business with a

10  customer, I'm either doing business with a customer as

11  A-Z wholesale or I'm doing business with them as

12  diamond wholesale.

13      Q.   Correct?

14      A.   I'm not doing business with that customer

15  both, so if it was a diamond customer and then diamond

16  merged into A-Z Waco, we started invoicing our

17  customers in Austin with A-Z wholesale invoices,

17:35:59  18  diamond went away, we got new Credit Applications with

19  our customers that were formerly diamond's customers

20  at A-Z Waco, that means I'm doing business with them

21  as A-Z wholesale, not diamond wholesale.

22           MS. FINGER:  Objection, nonresponsive.

23      A.   So.

24      Q.   Mr. Ali, I'm not asking what you're doing

25  business as or how anybody is holding themselves out

1   as.  I am asking whether Wayne, Brad and Sandy,

2   although representatives of Imperial, could also have

17:36:28   3   been employed by Harrison; is that possible or do you

4   know for sure that it is not true?

5        A.   I think anything is possible.  I don't know

6   what they were doing during their transition phase so

17:36:40   7   it absolute -- absolutely, it's possible.

8        Q.   Looking back At Exhibit 33 that we still have

9   up, sandy sent this e-mail on March 15th, 2019; is

10   that right?

11        A.   Yeah.

12        Q.   This was the last time that Imperial sent one

13   of these spreadsheets to A-Z, isn't it?

14        A.   I'd have to check.  I don't know if there was

17:37:29   15   another **[SPAOELT]** that was sent after this **SPL**

16   spreadsheet **SPL**.

17        Q.   Sandy says in her e-mail that the balance

18   increased to $2,574,930.73; is that right?

19        A.   That's correct.

20        Q.   Did you ever contact anyone at Imperial or

21   Harrison to dispute this balance that sandy sent on

22   March 15th, 2019?

17:37:56   23        A.   I don't know if I did or not because I think

24   your firm was probably engaged soon after and they

25   were represented by attorneys, it's probably not the

best thing to be talking to the client without your

permission, so I don't know if I did or didn't.  Also

I know that I was traveling, I was oversees during

this time period.

Q.   You don't recall ever reaching out to sandy

and asking why she sent you an incorrect balance, do

you?

17:38:29   A.   I don't recall reaching out to sandy around

this time frame and talking about this balance, but

I'm sure I've reached out to sandy or Wayne or Brad at

other points to talk about the balance being

incorrect.

Q.   I'm talking about this balance specifically,

you also did not respond to either Wayne or Brad

asking why this balance is incorrect, did you?

A.   Did they ask me if the balance was incorrect?

17:38:58   Q.   I want to know if you ever disputed this

balance to Wayne or Brad when you received this

e-mail?

A.   Rephrase your question because I'm a little

confused.  Again, just I just want to make sure.

Aren't March 15th, 2019 I was oversees or I was -- I

was on vacation so did I respond back to sandy saying

this balance is incorrect at that time?  I don't know,

17:39:26   I'd have to go back and look.  If you're asking me do

1    icon test that balance today that A-Z owes Imperial

2    $2.574930.37, so yes.

3         Q.   Do you agree that that was the outstanding

4    balance on March 15th, 2019?

5         A.   No, I don't agree.

6         Q.   Why?

7         A.   Because it project does not include all the

8    rebates, the credits, the offsets, the returned

17:39:59  9  products, expired products, the discounts, that stuff.

10        Q.   You said probably.  How do you know that?

11        A.   I'm sorry?

12        Q.   You said probably does not include?  How do

13   you know whether or not it includes those?

14        A.   Because the balance -- because the balance

15   they sent every week doesn't -- didn't always include

16   all that stuff.

17        Q.   Have you done the accounting to figure out

18   what the accurate balance was that was owed to

19   Imperial before this lawsuit?

20        A.   Did I do that before this lawsuit?

17:40:28  21       Q.   The outstanding balance owed to Imperial,

22   we'll say as of today, have you calculated that

23   number?

24        A.   I have not.

25        Q.   So how do you know that this number is

1   incorrect?

2       A.   Because I know because I was doing business

3   with them and I know that that number is incorrect.

4       Q.   How?

5       A.   Well, **[TPOER]** several reasons:  Number one,

6   it doesn't include all of the offsets and credits and

7   damaged products and expired products that we have

8   that they're responsible for crediting us.

17:40:57  9       Q.   But how do you know that how do you know that

10   this number didn't include it?

11       A.   Because they haven't picked up the product

12   yet.  It's still sitting in my warehouse in shrink

13   wrap on pallets, you know, black shrink wrap and

14   they're responsible for picking that up and that's

15   hundreds of thousands of dollars of stuff not to

16   mention the fact that they breached the contract and

17   stopped shipping us that caused damage to our company,

18   not to mention they didn't give me the discount per

19   carton I was promised to get so if you take all of

17:41:28  20   that, yeah, I do contest that amount with Imperial.

21       Q.   How much do you claim A-Z is entitled to in

22   offsets?

23       A.   I don't know.  I can't give you that number

24   right now.

25       Q.   You understand that that number should have

1   been already included in discovery responses as well

2   as in your answer and should definitely be testified

3   to at this time?

17:41:59  4        A.   No, because Harrison is the plaintiff in this

5   case and we -- I can tell you for sure Harrison is

6   owed zero dollars.  If Imperial was the plaintiff, I

7   certainly believe we would have done the accounting by

8   now and this case would have probably already settled

9   a long time ago.

10       Q.   What evidence do you have?

11       A.   Because we.

12       A.   We would have just sat down and done the

13   accounting and talked to the principals over there and

17:42:26  14  said hey, this is what we believe is owed by you guys,

15   this is what we believe is owed by us, let's settle

16   this thing and walk our separate ways.

17       Q.   Objection, nonresponsive.

18       Q.   Mr. Ali, what evidence do you have to support

19   that this number calculated as of March 2019 is

20   inaccurate?

21            MR. HOLMAN:   Objection, asked and

22   answered.

23       Q.   (By Ms. Finger)  I haven't asked that

24   question yet, Mr. Holman.  Mr. Ali what he would do

25   you have in that you can present to me in this lawsuit

17:42:56   1   that this number is incorrect, evidence, not

  2   allegations that offsets have not been credited?

  3      A.    Because.

  4      Q.    What evidence do you have?

  5      A.    I've got pallets of product that is -- that

  6   Imperial has to take back.

  7      Q.    Why?

  8      A.    That's entire product.

  9      Q.    Why?

 10      A.    Because that was our agreement.

 11      Q.    Why when you make that agreement?

 12      A.    That was our agreement from the very

 13   beginning if we have any expired product, either

 14   snuff, cigarettes don't sell, they executed credit us

 15   back 100 percent, we bought $50 million from of stuff

17:43:29  16   from Imperial and $50 million from Harrison after

 17   doing $100 million of business they're going to give

 18   me credit for my 203 hundred thousand dollars stuff

 19   that's [EPBGS] [SPAOEURD], that's what they do, they

 20   get 100 percent credit back to the manufacturer.  They

 21   go to Phillip Morris they say these are old

 22   cigarettes, that he them back, they get their

 23   assessing Rhett money back, Phillips Morris takes it

17:43:54  24   back a and it's done so it doesn't cost A-Z or

 25   Imperial any money.

1     Q.   What amount do you contend A-Z is owed in

2  offsets ***CHECK?

3     A.   I don't know that number because Imperial

4  trading isn't the one suing me or A-Z.

5     Q.   What amount do you contend A-Z is owed by

6  Imperial for offsets?

7     A.   I don't have that exact number.

8     Q.   How much do you contend A-Z is owed in

9  credits?

10    A.   I don't have that exact number.

11    Q.   What other credits are you referring to that

17:44:28  12  A-Z is supposedly owed?

13    A.   Credits for.

14             MR. HOLMAN:   Objection, form, asked and

15  answered.

16    A.   Credits for discount.

17    Q.   I haven't asked my question yet, Mr. Holman.

18  You can answer, Mr. Ali?

19    A.   Credits for the expired products?

20    Q.   How are those different from offsets?

21    A.   Offsets are something that is like we get

22  damaged goods right away, right so that should be

23  offset off our invoice, that's are those smaller ones

17:44:57  24  you see in the statement, 50 bucks here,the ten bucks

25  here whatever that is, those are the smaller ones.

The credits are for expired goods and then the credits
are also for the discounts on the price that Imperial
was charging us that was a higher rate, right, which
some people referred to as rebate, some people refer
to as credit, but either way, it's -- if they're
charging me 60 bucks but they should be charging my
59.50, that credit is acrucial, right, and I'm
supposed to get that credit at some point you.

17:45:27    Q.   You can't tell me any of the amounts you
contend A-Z is owed in offsets or credits, can you?

    A.   Not sitting here right now, no.

    Q.   ?

            (Exhibit No. 34 marked.)

    Q.   (By Ms. Finger)  Let me show you what's been
17:45:44  marked as Exhibit 34.  I'll represent to you that this
was a declaration of Sandy SAS lack filed in support
of summary judgment briefing by Harrison.  Do you see
thisment do?

    A.   I do.

    Q.   Do you have any reason to believe that this
is not a true and accurate copy of the document that
Harrison filed with the court?

    A.   I have no reason to believe that that's not a
true and accurate copy of what was filed with the
17:46:30  court.

1    Q.   If you could please turn to paragraph 6 on

2  page 2?

3    A.   Yep.

4    Q.   Actually, we're going to skip ahead to?

17:46:58  5    A.   We should talk about paragraph 6 because it's

6  inaccurate but.

7    Q.   How so?

8    A.   Product Harrison sold and delivered to A-Z

9  [WHAEURLS], Inc. are identified by customer number

10  95750 and for those sold and delivered to Waco it's --

11  it's Waco warehouse by can you say [TKPHER] number

12  95751, those are not the customer numbers from

13  Harrison.

14    Q.   That's because you believe those are the

17:47:28  15  customer numbers for Imperial; is that right?

16    A.   It's not that I believe.  Facts are a

17  stubborn thing and the invoices are the best evidence.

18  Pull up a Harrison invoice, pull up an Imperial

19  invoice and you will see that there are two separate

20  customer numbers for each respective warehouse;

21  further, the reason why I agree -- disagree is because

22  it says that product -- for products that were sold

23  and delivered to its Waco wears house.  Well, neither

24  Harrison nor Imperial actually ever delivered anything

17:47:57  25  to the Waco warehouse so that is also inaccurate.  It

1  was all delivered to Dallas.  The Harrison customer

2  number, that Dallas had is 173501; the Harrison

3  customer number that A-Z Waco had was 17502, the

4  customer number that A-Z had with Imperial was 95750

5  and the Waco warehouse with Imperial at 95751, so

17:48:28  6  when Mr. -- so when when Sandy testifies in an

7  affidavit that Harrison sold this product and

8  delivered it by customer number 957350 that should say

9  product sold by Imperial, not by Harrison.

10      Q.  And your statement just now is based on the

11  invoices you received, correct?

12      A.  Oh, it's wasted on more than just invoices

13  but the invoices are just the best evidence.  You

14  could throw those up and anybody could see that that's

15  completely false.

17:48:57  16      Q.  Mr. Ali, you never worked for Harrison, did

17  you?

18      A.  No.

19      Q.  How long did you work for Harrison's

20  accounting department?

21      A.  I never worked for Harrison's accounting

22  department.

23      Q.  If you can turn to Exhibit D of this exhibit,

24  of this exhibit, please, so Exhibit D of Sandy's

25  declaration which is on [PHAEUPBLG] the label page is

| | | |
|---|---|---|
| 17:49:28 | 1 | 11 and the exhibit page is the first page? |
| | 2 | A.   I am there. |
| | 3 | Q.   Have you reviewed this document before? |
| | 4 | A.   The only time I've looked at this document |
| | 5 | from what I recall was just a few days ago or couple |
| | 6 | days ago when my father was being deposed. |
| | 7 | Q.   Okay.  You'll see at the top? |
| | 8 | A.   **[STPOP]**.  You can ask me questions about this |
| | 9 | all day long.  This is an in-house made spreadsheet. |
| | 10 | It's not a report and so when it says warehouse, they |
| | 11 | could write Bossier City, they could write Imperial |
| 17:49:58 | 12 | Bossier City, they could write **[HARS]**. |
| | 13 | Q.   Mr. Ali, I have not asked a question, |
| | 14 | objection, nonresponsive, there's no question pending? |
| | 15 | Q.   Mr. Ali, ? |
| | 16 | A.   Get it I get it it's getting late in the day. |
| | 17 | Q.   I understand if you want to wrap this up |
| | 18 | quickly, Mr. Ali if you want to wrap this up quickly, |
| | 19 | I need you to answer my questions and not to testify |
| | 20 | to a Monday log that is nonresponsive to any question |
| | 21 | I have pending? |
| | 22 | A.   Absolutely. |
| | 23 | Q.   At trial, your lawyer can ask you whatever |
| 17:50:29 | 24 | questions you want so you can give whatever testimony |
| | 25 | you want but right now it's my turn to ask the |

1  questions I need to answers to, okay?

2      A.   I get it on-I'm sure you have lots of

3  questions about this document because it's very

4  unusual ***CHECK all that ***CHECK.

5      Q.   As you stayed, this is an internal document

6  produced by Harrison or Imperial; is that correct?

7      A.   Yeah this is -- I wouldn't -- I wouldn't even

17:50:58   8  classify it as an internal document 138 scratch the

9  yes **SPL** I would classify this as a document to

10  prepared to fit the conclusion that they're looking

11  for in this case.

12      Q.   Is it your allegation that this document was

13  fabricated, Mr. Ali?

14      A.   I would probably argue it is because I

15  guaranty you the other thousands of customers that

16  they have, they don't have warehouse Harrison written

17  in there.

18      Q.   What is the basis for your allegation that

19  this document is in any way inaccurate or a

20  misrepresentation of any amounts owed, all of the

17:51:29  21  other evidence with us doing business with with

22  Imperial like even on the -- even on the Imperial

23  invoices, right, on the Imperial invoices, it doesn't

24  say warehouse Harrison?

25      Q.   Why C are you only focusing on the wears

```
 1    house Mr. Ali other than the definition of the

 2    warehouse, what is your factual basis for your

 3    allegation that somebody at Harrison or Imperial

 4    fabricated this document to be inaccurate?  What

 5    actual evidence do you have of that he's?

 6        A.   Based on what I'm looking at, this is

 7    completely made up.  This is just -- they made -- they

 8    made this up because you've got a customer number

 9    that's an Imperial customer number and then you write

10    down warehouse Harrison so the judge is like oh, it

11    says Harrison and like they're going to fall for that.

12    I mean, this is -- this is fraud.

13        Q.   Mr. Ali, Harrison?

14        A.   This is fraud.

15        Q.   Where is Harrison located?

16        A.   Harrison is not located anywhere.

17        Q.   Where was Harrison's distribution center

18    located?

19        A.   I believe one of their distribution centers

20    was located in Bossier City that I went and visited in

21    2011 and 2012.

22        Q.   And you understand that Imperial was also

23    shipping product from a distribution center in Bossier

24    City, Louisiana?

25        A.   Imperial was shipping product from a Bossier
```

1  City.

2      Q.   You understand that that's actually reflected

17:52:57  3  on the invoices you received from Imperial, don't you?

4      A.   After Harrison went away, yes, that was

5  Imperial, that's what I'm saying.  This -- this should

6  say Bossier, if you want this to be accurate, it

7  should say Bossier City, it shouldn't say Harrison.

8      Q.   Let's pretend, let's pretend this says

9  Bossier City instead of Harrison.  Do you have any

10  reason to contest that the amounts listed in this

11  document are fabricated as you've accused?

12      A.   I didn't say the amounts were fabricated.

13      Q.   Well, let's focus on that.  If your issue is

17:53:27  14  with Harrison listed as the I warehouse, that's

15  irrelevant to my question.  The amounts?

16      A.   .

17      Q.   Mr. Althat the amounts are accurate?

18      A.   ***CHECK.

19      A.   I can't testify to that right now because I

20  need--in need to see the invoice numbers.  You see how

21  there's no invoice numbers, if there's a reference

22  number I have to look at all that, so I -- this

23  spreadsheet doesn't help me or the court or anybody,

24  all it does is service your client's interests in

25  trying to show that Harrison owed the money when

17:54:00    1   Harrison is owed nothing.

            2       Q.   **[PHR*L]**?

            3       A.   Zero dollars are owed to Harrison.

            4       Q.   We are talking about the dollar amounts

            5   calculated here, whether or not you contest that

            6   amount is owed to Harrison or Imperial is not my

            7   question.  My question is this dollar?

            8       A.   I answered your question.

            9       Q.   Mr. Ali, let me finish.  The dollar amount,

           10   whether you contests owed to Harrison or Imperial is

           11   what we are focusing on right now.  What is your basis

           12   to say that the amounts listed in this spreadsheet

17:54:30   13   generated by Harrison's accounting system are

           14   inaccurate?  What evidence do you have of that?

           15       A.   I can't tell you because I don't know what

           16   those amounts are for.  I'd have to look at the

           17   invoices myself, compare them to the actual invoices,

           18   which is the best evidence, not some spreadsheet that

           19   someone punched the data into.

           20       Q.   You haven't calculated the amount, have you?

           21       A.   No, I told you earlier, I have not calculated

17:54:57   22   the amount.  I get -- I get a statement, right, and I

           23   haven't calculated the offsets, the rebates, the

           24   credits any of that sort of stuff, not to mention the

           25   damages that we've -- we've incurred as of.

1    Q.   I'm not talking about your damages, Mr. Ali.

2    Let's look at the top of this document.  It's dated

3    June 1st, 2018.  Do you see that in the center of the

4    first line?

5        A.   No, I don't see that.

6        Q.   The very top line of the first page of

7    exhibit D, it says month, day, century and year and

17:55:28  8    it's dated June 1st, 2018.  Do you agree with that?

9        A.   No, I don't.

10        Q.   What are you looking at?  We're on page 12 of

11    this exhibit which is page 1 of Exhibit D to Exhibit

12    34.  We're still looking at the same spreadsheet and

17:56:00  13    in the center it says month, day, century and year,

14    and beneath it says 6-1-20 and 18.  Do you see that?

15        A.   I see that.

16        Q.   Do you understand that that means the month

17    is 6, which is June, the day is one, which is the 1st,

18    the century is 20, meaning the 2000s and the year is

19    18, meaning June 1st, 2018.  Do you understand that?

20        A.   I understand that that's what this

21    spreadsheet says.

17:56:28  22        Q.   That's what I asked.  That's what it says,

23    correct?

24        A.   That's what this spreadsheet says.

25        Q.   And that's the date immediately after May

1   31st, 2018, which is the date you signed the audit

2   letter agreeing to the balance at that time, correct?

3        A.   Again, that's not what I testified to.  I

4   agree -- I agreed that those invoices were accurate

5   and if you total up those invoices and you total up

6   the credits on those invoices that they were showing

7   in that statement, that that total is accurate.

17:56:59   8        Q.   You didn't do that and total up those amounts

9   before you signed the document that said you agreed to

10   the balance?

11        A.   I didn't have to because it was on the

12   statement.

13        Q.   So you just signed the letter and agreed to

14   the outstanding balance as of May 31st, 2018; isn't

15   that right?

16        A.   No.  What we do is we go back and make sure

17   that those invoices are the actual invoices.

18        Q.   And you did that, right?

19        A.   Yeah, we checked actual every invoice and

20   say, okay, did we get this invoice, yes, did we get

17:57:27   21   this invoice, yes, yes yes yes, are these the credits

22   that have already been processed, yes yes yes, does

23   that end up being the total amount that's according to

24   this statement, yes, that's what I'm signing off on.

25        Q.   So in that date when you signed off on the

1    balance that you reviewed the invoices for and

2    confirmed with accuracy, this spreadsheet now goes

3    from the next day, June 2018 all the way through to

17:57:54    4    April 1st, 2019, and as you're scrolling through to

5    confirm my dates, I'll ask that you look in the column

6    on the right-hand side and see that generally

7    speaking, this spreadsheet incorporates payments,

8    sales invoices, credit memos, nonsufficient fund

9    checks, et cetera.  Do you see all that?

10       A.   I see all that.

11       Q.   Do you have any reason to dispute the line

12    items that are included in this spreadsheet?

13       A.   Yes.

14       Q.   Why?

17:58:29    15       A.   Because these are -- these are not reflective

16    of all the credits and offsets.

17       Q.   How do you know that those aren't in here?

18       A.   Because I'm still sitting on a hundred or

19    $200,000 worth of product that still needs to be

20    credited.

21       Q.   And you don't see any of that in here and you

22    claim that you're entitled to it?

23       A.   No, I'm still sitting on it.  The only stuff

24    that's reflected in here is the ones that they

25    physically picked up.

1    Q.   But you can't tell me approximately how much

2    that offset would change these numbers, can you?

17:58:58  3    A.   I can tell you it would probably be a couple

4    hundred thousand dollars just the expired goods.

5    Q.   , And that's not including the rebates and

6    the discounts, I mean?

7    Q.   In your?

8    Q.   In your counterclaims?

17:59:28  9    A.   Ma'am, hang on.  Can you tell me what exhibit

10   this is again?

11   Q.   34?

12   A.   Plaintiff's 34?

13   Q.   Correct.

14   A.   Okay.  Thanks.

15   Q.   In A-Z's answer and counterclaims filed in

16   this case, to the extent there are any, how much do

17   you claim A-Z is owed in offsets?

18   A.   [-FLTS] against Harrison, zero.  Harrison

17:59:58  19  doesn't owe us any credits, offsets, anything.

20   Imperial does.

21   Q.   So you any amount of the amount Harrison

22   claims other than to say it's not owed to Harrison,

23   only to Imperial in your pleadings; is that true

24   ***CHECK?

25   A.   We don't have any counterclaims against

|          |    |                                                                 |
|----------|----|-----------------------------------------------------------------|
|          | 1  | Harrison because we don't owe Harrison any money in             |
|          | 2  | counterclaims.  We don't owe them and they don't owe            |
|          | 3  | us.  Harrison doesn't owe us anything, we don't owe             |
| 18:00:27 | 4  | Harrison anything.  Like Harrison and A-Z are zero              |
|          | 5  | zero.  It's Imperial and A-Z.  Imperial owes us money           |
|          | 6  | and we potentially owe them money but if you count the          |
| 18:00:40 | 7  | damages, I don't know where we go.                              |
|          | 8  | Q.  If a jury disagrees with you, Mr. Ali, and                  |
|          | 9  | finds that the balance is owed to Harrison, what                |
|          | 10 | amount do you claim is owed?                                     |
|          | 11 | MR. HOLMAN:  Objection, calls for a                             |
|          | 12 | hypothetical.                                                   |
| 18:01:29 | 13 | Q.  (By Ms. Finger)  You can answer, Mr. Ali.                   |
|          | 14 | A.  Zero dollars.                                               |
|          | 15 | Q.  How so?                                                     |
|          | 16 | A.  Because we don't owe Harrison any money.                   |
|          | 17 | Q.  If a jury disagrees with you and finds that                |
|          | 18 | the outstanding balance that A-Z was left with as of           |
|          | 19 | March 2019 or later and finds that the balance was             |
|          | 20 | owed to Harrison, what dollar amount do you contest            |
|          | 21 | A-Z owes?                                                       |
| 18:01:58 | 22 | A.  To Harrison?  The entire amount.                           |
|          | 23 | Q.  Which would be what?                                        |
|          | 24 | A.  Whatever the jury found was owed by A-Z to               |
|          | 25 | Harrison.  I would -- with all due respect to the             |

```
         1   jury, I have to say that the jury verdict is
         2   completely wrong because A-Z Wholesalers, Inc. and
         3   I'll die -- I'll go to my grave knowing this, ing
         4   doesn't owe Harrison a penny, and Harrison doesn't owe
18:02:30 5   A-Z wholesale a penny.  The fight, the dispute is
         6   between Imperial and A-Z wholesale.
         7        Q.   And how much does A-Z owe Imperial?
         8        A.   I can't tell you sitting here right now what
         9   that amount is.
        10        Q.   Can you guess?
        11        A.   No, I don't want to guess.
        12             MR. HOLMAN:  Objection, asked and
        13   answered about 20 different ways.  We need to move on.
        14             MS. FINGER:  Mr. Holman, respectfully, I
        15   would ask you to keep your objections according to the
18:02:58 16  rules and Mr. Ali, I will ask you how much you contend
        17   A-Z owes to Imperial.
        18        A.   I can't give you that amount.
        19        Q.   Is it more than $1 million?
        20        A.   I can't answer that and I wouldn't try to
        21   answer that until we calculate all the offsets,
        22   credits, expired goods, send it all back, get all that
        23   stuff done and then the damages that A-Z [WHAEURLS]
        24   has incurred as a result of Imperial's breach of
18:03:29 25  contract with A-Z Wholesalers which is substantial.
```

1    Q.   And the only reason you haven't tried to

2    calculate that amount is because you think Imperial

3    should be a party to this lawsuit; is that right?

4              MR. HOLMAN:  Objection, form.

5    Q.   (By Ms. Finger)  You can answer?

6    A.   Imperial -- Imperial should be the only

7    plaintiff in this case.

8    Q.   And because they're not a plaintiff, is that

9    why you haven't made any effort to calculate the

10   amount that A-Z is owed or that Imperial is owed?

18:04:00  11   A.   It's not that I haven't made any effort, it's

12   that hasn't been something that we've been asked to

13   do.

14   Q.   Who would ask you to do that?

15   A.   The plaintiff in this case and the plaintiff

16   is Imperial.

17   Q.   You don't have any internal accounting at A-Z

18   that reflects how much you owe to another company?

19   A.   I'm fairly certain that we could very quickly

20   put together a spreadsheet that would account for all

18:04:26  21   the payment, credits, offsets, rebates, discounts, and

22   then I could give you a ballpark number on the damages

23   that we've incurred as a result of Imperial's breach

18:04:37  24   of contract with A-Z Wholesalers, Inc.

25   Q.   You haven't produced any documents in this

1  case that reflect any calculation by A-Z of the

2  amounts owed, right?

3      A.   I don't know if I have or have not.   If it

4  wasn't a production request which it couldn't have

5  been because Imperial hasn't asked for any but I can

6  tell you with Harrison, since they're the plaintiff,

7  it's zero, doesn't take much to calculate that.   It's

8  zero dollars.

9           MS. FINGER:   Objection, nonresponsive.

10     Q.   (By Ms. Finger)   Have you produced any

18:05:29  11  document in this litigation that reflects an

12  accounting of the amount that A-Z owes to Harrison or

13  Imperial?

14     A.   Yes.   Well, to Harrison, yes, it's zero.

15     Q.   What document have you produced that shows

16  that?

17     A.   I mean, just the -- just the payment

18  documents that you have up here show that.   I don't

19  know -- I don't know exactly what we've produced.   I

20  think we've produced all our checks and everything

21  that we made, payments that we've made, those show

22  that.

18:05:59  23     Q.   It's your position that the spreadsheet in

24  front of you reflects that A-Z doesn't owe Harrison

25  anything even though it reflects an outstanding

1    balance?

2         A.   Okay.  So the spreadsheet in front of me

3    definitely says that I don't owe Harrison anything

4    because this is not a Harrison spreadsheet.  This is

5    Imperial.  This money is owed to Imperial is what this

6    spreadsheet says.  I don't I don't agree with that

7    amount but that's Imperial spreadsheet, not a Harrison

8    spreadsheet.  The Harrison spreadsheet should say zero

18:06:27  9    because Harrison was paid off in 2015 around June or

10   July, whatever that $2.1 million balance was that was

11   started on March 2015 was paid off seven or eight

12   weeks later.  But it doesn't take a spreadsheet to

13   figure that one out, it's zero dollars.

14        Q.   I'm going to show you what's been marked as

18:07:05  15   Exhibit 38:  Can you confirm that this is a copy of

16   the defendants first amended answer to plaintiff's

17   original complaint filed in this case?

18        A.   Yeah it looks like a file marked copy so I'm

19   assuming this is defendants answer.

18:07:28  20        Q.   If you can turn to page 4, I want to look at

21   paragraph 27 that runs into page 5?

22        A.   Okay.

23        Q.   And on page 5, this paragraph states Harrison

24   was not a party to any transaction involving any of

25   the claims it has asserted."  Did I read that

                      1  correctly?

                      2       A.   Yes, you did.

                      3       Q.   Do you understand Harrison is filing for

18:07:59    4  breach of the credit agreement between Harrison and

                      5  A-Z, correct?

                      6       A.   No, I don't agree with that.

                      7       Q.   What is your personal knowledge of Harrison's

                      8  theory of this case?  Do you represent Harrison,

                      9  Mr. Ali?

                     10       A.   No, I don't.

                     11       Q.   Do you work for Harrison, Mr. Ali?

                     12       A.   No, ma'am.

                     13       Q.   Do you agree that Harrison is a party to the

18:08:28   14  credit agreement dated March 11th, 2011?

                     15       A.   Yes.

                     16       Q.   I want to go down now to paragraph 32.  It

                     17  says plaintiff's claims are barred in whole or in part

                     18  due to a cord and satisfaction because the parties

                     19  modified their payment terms as to arrearages and

                     20  defendant A-Z was performing in satisfaction of the

                     21  modified terms" do you see that?

                     22       A.   I do.

18:09:02   23       Q.   Who were the parties that the defendants

                     24  refer to in this sentence?

                     25       A.   Of the I don't know but I'm assuming it would

1    be plaintiff and defendant.

2        Q.   When did Harrison and A-Z modify their

18:09:27   3   payment terms as to arrearages?

4        A.   At several points during the four-year

5    relationship that we had with Harrison beginning in

6    March of 2011 to March of 2015.

7        Q.   How many times were those payment terms

8    modified?

9        A.   I don't know.

10       Q.   How were they modified?

18:10:02  11       A.   Same way that we've modified other terms of

12   our agreement through conversation, through e-mails,

13   through other means of communication and

14   correspondence, through our actions.

15       Q.   Mr. Ali, as a lawyer, isn't it your

16   understanding that best practice would be to put any

17   agreement into writing?

18:10:29  18       A.   Not really when you're -- not, I mean, in

19   this situation, that's not a best practice.

20       Q.   You're a lawyer though, right?

21       A.   Yeah, sure, but it's not a best practice

22   because every time, I mean, every time -- every time a

23   price changes, we don't put it in writing and say,

24   hey, this is going to be the price change, we're going

25   to buy for this much, we're going to do that, I this

```
            1   is a relationship and so it's like any other

            2   relationship where, you know, if I tell my wife, hey,

18:10:59    3   we're going to go have Chinese food for dinner and I

            4   say we're going to change Chicago in Richardson, I

            5   don't put that in writing with my wife.

            6       Q.   That is not hundreds of thousands of dollars'

            7   worth of an agreement, right?

            8       A.   No, we're talking millions of dollars and

            9   that's why the relationship here was like a marriage,

           10   right?  It was such a close relationship that we could

           11   pick up the phone and say hey I need 20 [KREPBS] off

           12   [PHARL] borrows for the next six weeks because I'm

18:11:29   13   going to be selling it in my marketing flier for 20

           14   cents less so I need you to pick up a little bit of

           15   that action so I can sell more volume which helps

           16   their business because then they get more rebate money

           17   so that's the kind of relationship it is, right?  So

           18   that might be done by phone, that might be done by

           19   text message, it might be done by e-mail, it may be

           20   done and then later I'm like oops I forgot to call

           21   Harrison or Imperial whoever we were dealing with at

           22   the time when we wanted the discount, so I for got to

18:11:59   23   tell them we wanted that much discount and I go look

           24   at the cartons we want that Monday and they give me

           25   the credit for that, that's the kind of relationship
```

1    that we had.

2         Q.    Why then were you going to put the promissory

3    note in writing that we looked at in Exhibit 10?

4         A.    Which promissory note.

5         Q.    There was only one promissory note that we

6    reviewed, it was Exhibit 10 to your deposition.  Why

7    were you going to put that in writing if not any of

8    the other modifications?

9         A.    Because that was a specific dollar amount

10   that they wanted a promissory note for and our

18:12:29  11   intention was to get that paid within a certain amount

12   of time, and so we documented that one because it was

13   a promissory note, right?  You couldn't have a

14   promissory note without it being in writing ***CHECK

15   last page check heck.

16        Q.    I apologize I misspoke as to the exhibit

17   number?

18        A.    I know which one you're talking about, the P

19   note.

20        Q.    Right, the promissory note we reviewed

21   earlier.

22        A.    Yeah.  January 11th, 2019.

18:12:59  23   Q.    Right, to clarify, that was Exhibit 11, not

24   Exhibit 10.

25        A.    So, yeah, there were some -- there were some

       1   agreements that were not modified orally, many of
       2   them -- many of the agreements were modified orally,
       3   one particular one like the promissory note was done
       4   in writing.
       5        Q.   Now that I've mentioned it, I want to show
18:13:27   6   you Exhibit 10, which is dated September 10th, 2018.
       7   Have you seen this document before?
       8        A.   I may have.
       9        Q.   And you'll see that the subject line here
      10   says debt restructuring term sheet; is that right?
      11        A.   That's what this said but it was never signed
18:13:57  12   by Barkat Ali, by Amar Ali, by A-Z **[WHAEURLS]**, Inc. or
      13   diamond wholesale.
      14        Q.   Why not?
      15        A.   Because it wasn't agreed and accepted.
      16        Q.   Why was this agreement going to be put into
      17   writing even though it wasn't standard practice?
      18        A.   Because this actually has significant terms
      19   and changes to our relationship that wasn't agreeable.
      20   It's talking about fully executed financial statements
      21   for each guarantors, it's talking about guarantors,
18:14:29  22   there weren't any guarantors so we weren't agreeable
      23   to that.
      24        Q.   What other terms would you have requested be
      25   in writing with any given modification to your

```
 1   agreement with Harrison or Imperial?
 2        A.   I mean, I think personal guaranties would
 3   have been in writing, I think, you know, like the
 4   promissory note, $250,000, that would have been in
 5   writing, you know, significant changes to the -- to
 6   the relationship would be in writing.
 7        Q.   If a personal guaranty was required to be in
 8   writing, wouldn't you require the release of that
 9   personal guaranty to be in writing?
10        A.   You don't need a release of a personal
11   guaranty when there's no amount owed.
12        Q.   What about formation of a credit agreement,
13   you wouldn't put that in writing?
14        A.   Do what.
15        Q.   With what about termination of a credit
16   agreement, you wouldn't put that in writing?
17        A.   No **SPL** I'm going to slap this chick in a
18   minute **SPL**.
19        Q.   I want to go back to Exhibit 38 that we were
20   looking at.  Let's take a look at paragraph 33 on page
21   5.  Let me know when you're there?
22        A.   Hang on.  I'm just making a quick note for
23   myself.
24             MR. HOLMAN:  Repeat the page number.
25             MS. FINGER:  Page 5, paragraph 33.
```

```
 1              MR. HOLMAN:  Can we get a time check.
 2              THE VIDEOGRAPHER:  I can give you a rough
 3    estimate, if that's fair.
 4              MR. HOLMAN:  That's fine.
 5              MS. FINGER:  Okay.
 6              THE VIDEOGRAPHER:  I show approximately
 7    15 minutes remaining before we hit that 7 hours mark.
 8              MR. HOLMAN:  Okay.
 9              MS. FINGER:  Perfect, thank you.
10         A.   Where do you want me to go.
11         Q.   Paragraph 33 on page 5, Mr. Ali?
12         A.   Paragraph 33 on page 5.
13         Q.   Are you there?
14         A.   Almost.  I soon passed it, sorry.
15         Q.   Do you see it now?
16         A.   I'm there.
17         Q.   It says plaintiff's original complaint is
18    barred in whole or in part by the doctrine of unclean
19    hands because plaintiff failed to fulfill their own
20    side of the modified agreement and thus breached and
21    therefore excused defendants are from
22    performance."  Did I read that correctly?
23         A.   Sorry, I was on the wrong one so I can't tell
24    you, hang on.  You said page 5.
25         Q.   Page 5, paragraph 33.  I'm sorry, it's page 5
```

18:16:29 (line 7)
18:16:58 (line 13)
18:17:29 (line 21)

1    of the document, yeah, it's the same, the last

2    paragraph on page 5.

3        A.   Yes.  Let's try that again.

4        Q.   It says plaintiff's original complaint is

5    barred, in whole or in part, by the doctrine of

18:17:59  6    unclean hands because plaintiff failed to fulfill

7    their own side of the modified agreement and thus

8    breached and therefore excused defendants from

9    performance."  Did I read that correctly?

10        A.   Yes, you read that correctly.

11        Q.   The plaintiff in this lawsuit is Harrison,

12    correct?

13        A.   That is correct.

14        Q.   And what obligation under the agreement with

15    A-Z did Harrison fail to fulfill?

18:18:26  16        A.   If Harrison is suing us for an amount that's

17    owed, that's not owned, ing that's certainly a failure

18    on their side.

19        Q.   That's not what I asked, Mr. Ali.

20             Is it a term of Harrison's contract with

21    A-Z that they cannot file lawsuits for any particular

22    subject matter?

23        A.   I mean they can file privilege us lawsuits if

24    they want to.

25        Q.   Sure.  So this says plaintiff failed to

1   fulfill their own side of the modified agreement.

18:18:59   2   What obligation did Harrison fail to fulfill with A-Z

3   by the terms of their agreement ***CHECK frivolous,

4   not sure he said that ***CHECK?

5       A.   They failed to, I mean, I think they -- they

6   failed to release Barkat of his personal guaranty

7   after all payments owed to Harrison were paid off in

18:19:26   8   2015 in the summer of 2015.  They famed to release A-Z

9   wholesale of the amount owed after all payments were

10  made, so I mean, those are two failures that I can

11  think of right now, but again, I'd have to sits down

12  with my lawyers to figure out exactly what specific

13  acts were being alleged here that aren't named here

14  specifically that fit this description.

15      Q.   By failing to release Barkat and A-Z, you

18:19:56   16  just mean that Harrison filed a lawsuit against them,

17  don't you?

18      A.   No.  If Harrison's contending that we still

19  owe them money, then it's not just about filing a

20  lawsuit.

21      Q.   It's your allegation that seeking payment

22  from Barkat and A-Z under the credit agreement is a

23  breach of the agreement by Harrison; is that right?

24      A.   Sure, because the money -- there's no money

25  owed.

1    Q.   Is there any other obligation you can think

2    of that you contend Harrison failed to fulfill under

18:20:29   3    its agreement with A-Z?

4    A.   I mean, I can't think of anything right now,

5    but it's getting late in the day and I know these are

6    affirmative defenses.  I do **[-PBL]** the court's asked

7    us to specify these affirmative defenses by Monday.

8    Q.   You intend to produce evidence in response to

9    that court order, corrects?

10   A.   Yeah, I think that's due on Monday, so I'm

11   sure the lawyers will be working over the weekend,

12   right, Mr. Holloway man to make sure that's get

18:20:58   13   submitted on time.

14   Q.   If we can turn to paragraph 34 on the next

15   page?

16   A.   Yep, I see it.

17   Q.   It says plaintiff's original complaint is

18   barred in whole or in part by the doctrine of

19   unconscionability given the parties had agreed to new

20   terms which have not been breached.  Who are the

18:21:29   21   parties that you're referring to in paragraph 34?

22            MR. HOLMAN:  Objection, the court has

23   asked us to brief these and the answer is more

24   extensive that what the -- the deponent can even

25   respond to at this time.  It requires a briefing that

1    the court has specifically requested.

2                MS. FINGER:  Mr. Holman, I will ask that

3    you keep your objections to the rules and although the

4    court has ordered defendants to respond to its order,

5    I am still entitled to ask the witness about the

18:21:58  6    discovery.  I'm sorry, about the pleading that was

7    filed in this case.

8                My question does not require an extensive

9    answer.  I'm asking at the time that this answer was

10    filed, who are the parties referred to in this

11    answer.

12                MR. HOLMAN:  Plaintiff will not know

13    because it hasn't been briefed.

14                MS. FINGER:  Mr. Holman, I will ask the

15    witness to please answer my question.

16        A.   Yeah, so I'm going to, look, it's getting

17    late, I know everybody's tired, you're an hour ahead

18    of us he so you're probably a little more tired than

18:22:29  19    we are, but, again, I don't know exactly.  I can't

20    remember the last time I reamy thought through the

21    doctrine of unconscionability but I'm sure we can have

22    the elements for that doctrine and what acts are

23    related to that, and we can specify in our response

24    who we mean by parties.

25        Q.   And so in your response to the court order

```
              1   that you'll file on Monday, you'll clarify [KWHO] the
18:22:57      2   parties are that are referred to in each of these
              3   affirmative defenses; is that right?
              4        A.   If that's something that the lawyers feel is
              5   appropriate, then certainly and if not, then you
              6   should file a Motion to Compel to figure out who the
              7   parties are that we're referencing.
              8        Q.   I don't need to file a Motion to Compel
              9   because I'm entitled to this deposition and only right
             10   here, and at the time this was filed you reviewed this
             11   before it was filed, didn't you?
             12        A.   I may have.  I don't -- I don't recall
             13   necessarily.
             14        Q.   And you -- you can't tell me even from the
18:23:29     15   context of reading this sentence here who the parties
             16   are relevant to this lawsuit that agreed to new terms
             17   which have not been breached, you can't tell me which
             18   parties you're referring to in that paragraph?
             19        A.   Well, .
             20             MR. HOLMAN:   Counsel, objection, the
             21   deponent did not draft the answer and so it
             22   encompasses both Imperial being imputed where Harrison
             23   could be imputed to have standing through Imperial and
18:23:58     24   so it references actually both parties but that will
             25   be briefed to the court.  The deponent [K-FRPBT]
```

1  answer that question, that technicality.

2      A.   I really can't Ms. Finger, you know, I've

3  tried to cooperate with you.  If I could answer that

4  question right now, I would give you a straight answer

5  and tell you like it is.  What I can.

6      Q.   Mr. Ali?

7      A.   What I can tell you right now that the only

8  word that sticks out to me is unconscionable and

18:24:28  9  what's unconscionable to me right now is Harrison sued

10  A-Z wholesale.

11      Q.   Mr. Ali?

12      A.   For money that's not owed.

13      Q.   Objection?

14      A.   All right, so.

15      Q.   Objection, nonresponsive.  We're running out

16  of time and I will ask that you ask my question so I

17  don't have to file a motion with the court requesting

18  more time to get answers to my questions.

19          Paragraph 34 states the parties agreed to

20  new terms which have not been breached.  Although your

21  lawyer may have drafted this document, you had to give

22  your lawyer the underlying facts in order to assert

18:25:00  23  these defenses, isn't that true?

24      A.   Sure, but my lawyers had those underlying

25  facts since we first engaged with them right.

```
 1      Q.   So?

 2      A.   If they -- if they felt like this is an

 3  affirmative defense that they can legitimately argue

 4  in front of the court, they put that affirmative

 5  defense in there, we'll certainly know on Monday

 6  whether or not they have the facts and the evidence to

 7  maybe -- for this affirmative defense to hold water.

 8  The now do I --

 9      Q.   Mr. Ali?

10      A.   Hang on.  I want to answer your question.

11      Q.   You're not answering my question?

12      A.   I cannot answer your question at this time

13  because I don't know the doctrine of

14  unconscionability.

15      Q.   I didn't ask -- Mr. Ali I did not ask about

16  the doctrine of uncon Shen ability, I'm asking about

17  the factual statement that says the parties agreed to

18  new terms which have not been breached.

19           What facts did you give your lawyer under

20  which parties agreed to new terms question have not

21  been breached?  Who are the parties that you told your

22  lawyer entered those -- that agreement with new

23  terms?

24      A.   Well, so, there's parties, so there could be

25  A-Z [WHAEURLS], Inc., there could be Harrison Company,
```

1  there could be Imperial, there could be Barkat Ali, I

2  mean, there's -- you could have certain parties, if

3  that's what it said.  Specifically as to the doctrine

4  of unconscionability, which parties are being

5  referenced, I'm not really sure, but I can tell you

18:26:29  6  it's certainly unconscionable what Harrison is doing

7  by suing in this lawsuit as far as I'm concerned.

8       Q.   Mr. Ali, are objection, nonresponsive?

9       A.   Imperial is also being unconscionable if

10  they're trying to use Harrison to keep that -- that

11  personal guaranty in place and that's the reason why

12  Harrison is suing is because there's a personal

13  guaranty with Harrison but there's knee money owed

14  with Harrison.

15       Q.   Objection, nonresponsive.

18:26:56  16       Q.   (By Ms. Finger)  Mr. Ali?

17       A.   Mr. Did a personal guaranty because we

18  refused to give a personal guaranty to Imperial, they

19  tried several times including the last document that

20  you drew up there which.

21       Q.   Mr. Ali?

22       A.   And we refused to do that, and so the end

23  around -- the end around is hey let's just use

24  Harrison and say this is Harrison's debt but it's not.

25  We all know that, you even know that, you're a good

1   lawyer, you get it.

18:27:27   2      Q.   Mr. Ali, objection, nonresponsive.  The court

3   reporter cannot take down what we're all saying when

4   we talk over each other.  I will ask that you keep

5   your testimony in response to my question so that I do

6   not have to file a motion with this court requesting

7   more time to further this deposition to remedy the

8   obstruction that you're causing to my deposition.

9      A.   I -- look, I'm.

10      Q.   I have not asked a question.

11      A.   I know but I'm just saying you can't say, you

12   can't go to the court be and be like I'm obstruct

18:27:58   13   being I'm answering all your questions throughout the

14   seven hours.

15      Q.   Mr. Ali, nonresponsive and I have not gotten

16   my full seven hours because I cannot get answers to my

17   questions this way?

18      A.   In the last 15 minutes I disagreed with your

19   question over here because I can't tell you who the

20   parties are and I don't know the doctrine of uncon

21   Shenabilities by heart but by Monday we'll all have

22   the answers so let's wait by Monday.

23      Q.   I understand you intend to file a motion,

24   file your response with the court on Monday.  Sitting

25   here today in your affirmative defenses you cannot

```
         1   tell me who the parties are that you are referring to
18:28:29 2   to in each of these; is that true?
         3       A.   I can't answer that question right now,
         4   that's correct.
         5       Q.   That's correct?
         6           MS. FINGER:  Let's go off the record
         7   right now.  Wayne, I don't know if I have any time
         8   left but to the extent I do, let me just make sure I
         9   don't have anything else to throw on the record to the
        10   extent I can before we wrap up.  The.
        11           THE VIDEOGRAPHER:  Sure, Mr. Holman you
        12   agree.
        13           MR. HOLMAN:  I do agree, I have a brief
        14   redirect.
        15           THE VIDEOGRAPHER:  Do you agree to go off
        16   the record.
18:28:59 17           MR. HOLMAN:  Yes.
        18           THE VIDEOGRAPHER:  Off the record at 6:28
        19   p.m.
18:29:04 20           (Recess 6:28-6:39.)
        21           THE VIDEOGRAPHER:  Back on the record;
        22   the time is 6:39 p.m.
        23           MS. FINGER:  I will pass the witness.
        24       A.   I know I'm still under oath.
        25           MR. HOLMAN:  I'm sorry, Anna, did you
```

```
         1    pass.
18:39:29 2                    MS. FINGER:  Yes, sir.
         3                    MR. HOLMAN:  Okay.  Thank you.
         4    EXAMINATION
         5    BY MR. *:
         6                    MR. HOLMAN:
         7        Q.   Mr. Ali, you were asked earlier about your
         8    understanding of Harrison's theory of the case, do you
         9    recall that?
        10        A.   Yes.
        11        Q.   And it was brought up that there were two
        12    cause of actions of one for breach of contract and the
18:39:58 13   other one you as suit on guaranty against Ali, do you
        14    recall that ***CHECK?
        15        A.   Yes.
        16        Q.   I want to represent, this is the actual
        17    language from the complaint filed where it says that
        18    the credit agreement is a valid and enforceable
        19    contract.  Harrison has performed all conditions
        20    precedent, covenants and promises required of it
        21    pursuant to the credit agreement.  Then it goes on to
18:40:30 22   state in paragraph 18 that A-Z breached a credit
        23    agreement by failing to pay the amounts due and owing.
        24    Is it your understanding that when we mentioned that
        25    there was no invoices that were due, that there was no
```

```
          1   breach of contract, that those relate to the actual

          2   invoices that they are referencing in paragraph 18?

18:40:59  3              MS. FINGER:  Objection, form.

          4        A.   That is.

          5        Q.   Would you agree that when it says A-Z

          6   breached the credit agreement by failing to pay the

          7   amounts due and owing, if any, what amounts would be

          8   due and owing?

          9        A.   Zero dollars.

         10        Q.   And if there were any, they would be

         11   represented by invoices; is that correct?

         12              MS. FINGER:  Objection, form.

         13        A.   That is correct.

18:41:31 14        Q.   All right.  Let's go on to and Anna, I'm

         15   going to ask your help with this, this was in you

         16   pulled up RFA number 3?  I don't have the exhibit

         17   number but it was the response to RFA number 3?

18:42:00 18              MS. FINGER:  Exhibit 6.

         19        A.   Hey can you guys hang on I think I just got a

         20   family emergency I got a text message from my cousin

         21   and it said 911, we have to stop for a second, please.

         22              MR. HOLMAN:  Okay.

         23              THE VIDEOGRAPHER:  Off the record; the

18:42:16 24   time is approximately 6:42 p.m. 6:44.

18:44:57 25              (Recess 6:42-6:44.)
```

1          THE VIDEOGRAPHER:  Back on the record;

2   the time is 6:45 p.m.

3       Q.   (By STPHAO)  Mr. Ali, we have pulled up what

4   was Plaintiff's Exhibit Number 6.  This was your RFA

5   response to question number 3, and there was some

6   discussion regarding the second sentence where it says

7   that deny that any of the products forge the basis of

18:45:28  8   Harrison's lawsuit were ordered from Harrison, and

9   then you went on to say it was contested that there

10   were no products that are being sued on, but is it

11   your understanding that there are certain invoices

12   that would relate back to any products that would have

13   been sold by Harrison or Imperial; is that correct?

14          MS. FINGER:  Objection, leading.

15       A.   .

16       Q.   (By STPHAO)  Let me restate.

18:45:59  17          Where it says here products, are there

18   any associated invoices that if there were products,

19   there would be invoices associated with that?

20          MS. FINGER:  Objection, form.

21       Q.   (By STPHAO)  You can answer?

22       A.   Yes, there would be invoices.

23       Q.   Is it your understanding that there are no

24   Harrison invoices for the relevant period that are the

25   basis of this suit?

18:46:26    1        A.   That's correct.

            2        Q.   Okay?

            3             MR. HOLMAN:  Anna can you pull up your

            4   Exhibit 14, I believe that was the affidavit of

            5   Mr. Ali.

            6        A.   He's putting you to work, huh, Ms. Finger.

            7        Q.   (By STPHAO)  Thank you.  And let's go down to

            8   paragraph 3.

            9        A.   Yes.

           10        Q.   And you previously testified that that was a

18:46:59   11   typo where it says September 1, 2008?

           12        A.   That's correct.

           13             MS. FINGER:  Objection.

           14        Q.   (By STPHAO)  ; Is that correct?

           15        A.   That's correct.

           16             MS. FINGER:  Objection, mischaracterizes

           17   prior testimony.

           18        Q.   (By STPHAO)  Okay.  Mr. Ali, does September

           19   1, 2018 have any relevance to you?

           20        A.   No.

           21        Q.   Does September 1, 2014 have any relevance?

           22        A.   Yes.

18:47:30   23        Q.   And what would that date be?

           24        A.   That date would be the date that Imperial

           25   acquired Harrison.

```
 1        A.    Okay.

 2        Q.    Thank you.

 3               MR. HOLMAN:   Anna, can you bring up

 4   your -- I have the Bates number, it's Harrison 005748.

 5               MS. FINGER:   It's plaintiff's Exhibit 18.

 6               MR. HOLMAN:   I believe there was a

 7   subsequent attachment.

 8               MS. FINGER:   Not to this exhibit.

 9               MR. HOLMAN:   Just one second.  Here we

10   go.  I see it.

11        Q.    (By STPHAO)   If you look down at the one,

12   two, three, four, five, six, the sixth paragraph where

13   it says I think, do you see that?

14        A.    Yes.

15        Q.    Can you read that sentence?

16        A.    It says I think this system will help the

17   accounting method A-Z needs per Barkat and will

18   suffice the needs of Imperial to continue supplying

19   our customer.

20        Q.    And so from that who -- from your perspective

21   who was supplying you?

22        A.    Imperial.

23        Q.    Okay?

24               MR. HOLMAN:   Can you bring up Exhibit 31,

25   please?
```

1    Q.   (By STPHAO)   This was the audit letter and

2   whose letterhead is the audit letter on?

3    A.    Imperial.

4    Q.   And who signed the audit letter?

18:49:59    5    A.   Brad pen at that grass as -- for -- on behalf

6   of Imperial trading company, LLC.

7    Q.   So when you signed that, was it your

8   understanding that you were acknowledging invoices

9   owed to Imperial?

10    A.   Yes.

11    Q.   At that time when you acknowledged the -- the

18:50:27   12   audit letter, had you contemplated any offsets,

18:50:32   13   setoffs, rebates, is that included in that figure?

14    A.   No.

15    Q.   Mr. Ali, your prior testimony was that also

16   that none of the modifications were in writing; is

17   that correct, [-RG] that many of the modifications

18   were not in writing?

19    A.   That's correct, but what I -- what I meant

20   with that and I'm glad you bring that up and I think

18:51:29   21   Ms. Finger and I talked about that early in my

22   deposition, when she was stating writing -- I was

23   trying to clarify if it was writing and executed,

24   right, where it was actually physically signed or in

25   writing, i.e., like an e-mail or some other

1    correspondence.

2        Q.    So are you aware of any e-mails that would

3    constitute a writing that would form the basis of a

4    modification that had been discussed?

18:52:00   5        A.    Sure, there's several of those.

6        Q.    Okay.    So when we say modification by a

7    writing, it not only references promissory notes that

8    have an execution but also e-mail and text message

9    correspondence; is that correct?

10        A.    That's correct.

11                MS. FINGER:    Objection, form.

12        A.    That's correct.

13                MR. HOLMAN:    I'll pass **SPL** 6:52 p.m.

14    (6:52 p.m.)

15    EXAMINATION

16    BY MR. *:

18:52:31   17                MS. FINGER:    I just want to take one more

18    look, Mr. Ali, at your declaration which was Exhibit

19    14, again we're talking about paragraph 3 on page 2.

20    Do you see that.

21        A.    Yes, ma'am.

22        Q.    And is it your testimony that this first

18:52:55   23    sentence should say on September 1st, 2014 instead of

24    2018?

25        A.    Yes.

                1    Q.   In September 2014, A-Z was still receiving
                2   invoices from Harrison; is that right?
                3    A.   Yes.
                4    Q.   A-Z was also still placing orders with
    18:53:30    5   Harrison at that time, right?
                6    A.   Yes you just.
                7    Q.   You just testified in response to Mr. Holman
                8   oops questioning there are e-mails and text messages
                9   that comprise an agreement between A-Z and Imperial;
               10   is that right ***CHECK?
    18:53:59   11    A.   That's not exactly what I testified to.
               12    Q.   Can you clarify?
               13    A.   I said that there would be e-mails and text
               14   messages, other correspondence that's in writing that
               15   would make up, you know, a modification of our
               16   agreement.
               17    Q.   If you had to tell a stranger what your
    18:54:26   18   agreement was with Imperial, how would you do that?
               19    A.   With Imperial?
               20    Q.   Yes.
               21    A.   I would say that our agreement with Imperial
               22   was that we continue to buy product from them, they
               23   continue to ship product to us, they continue to
    18:54:54   24   accept all returns, expired goods, give us credits and
               25   offsets.  We continue to pay and reduce our overall

1  balance with Imperial, no personal guaranties, either

2  from Barkat or from amiles an hour as long as they

3  continue to ship and we continue to pay **SPL**, the

4  relationship would continue and that we would to be

18:55:29  5  good, strong partners.  That's sort of the -- that's

6  sort of the summary after seven hours of doing this.

7  I'm sure I could be more succinct when I'm bright I'd

8  and bushy tailed in the morning.

9      Q.   What documents would you show **SPL** eyed

10  **SPL**, just for a description of A-Z's agreement

11  with Imperial?

12      A.   I would probably show e-mails, text messages,

18:55:56  13  the invoices from Imperial, the statements that we

14  received on a weekly basis, not that spreadsheet, but

15  the actual statements from Imperial, other

16  correspondence, and then I would probably also show

17  other documents that were not executed intentionally

18  like that agreement that Mr. Bar can he tell said in

18:56:25  19  September of 2018 that we refused to sign or a credit

20  agreement that Imperial tried to get us to sign that

21  we refused to sign **SPL** Baugh can he tell **SPL**.

22      Q.   So just to describe the terms that govern the

23  relationship between A-Z and Imperial, how many

24  documents would you show?

25      A.   I mean, it depends on how many invoices we

```
 1   have because each one of those is a contract in my
 2   opinion because we're -- we're buying and they
 3   deliver, then we pay, but there would be other
 4   documents and again, it's a very good question.  I
 5   would probably need to give it some more thought and
 6   get my head around it and jot down all the points of
 7   what I believe the agreement was with Imperial, but
 8   those are just some of the highlights.
 9       Q.   You didn't prepare any of that in preparation
10   for your deposition testimony today on the topics that
11   were listed in your Notice of Deposition as the
12   corporate representative; is that right?
13       A.   Did I prepare any what?
14       Q.   Did you pull together any of these e-mails or
15   text messages or other written documents that you just
16   said you would show to prove the agreement between A-Z
17   and Imperial?
18            MR. HOLMAN:   Objection, they've been
19   produced.
20            MS. FINGER:   That's not what my question
21   was.
22       A.   Yeah, did I.   -- did I revisit the items
23   that are produced and kind of put them together in a
24   succinct and chronological manner to potentially
25   respond to a question that may come up in seven hours
```

18:57:00 (line 4)
18:57:28 (line 13)
18:57:56 (line 25)

|   |   |
|---|---|
|   | 1 |
with all the production, no.  I did, you know, I did,

2  like I said, I made some preparation, I did a little

3  bit of preparation.  I know the case well enough to

4  where I felt I could accurately respond but, you know,

5  in any -- in any context, there were some questions

6  that you raised that I would like to revisit and look

7  at and make sure that I've got a very succinct answer

8  so that we could get beyond that and narrow the issues

18:58:27  9  for trial even better.

10       Q.   (By Ms. Finger)  When will you get these

11  succinct answers?

12       A.   Certainly before trial.

13       Q.   You understand that the purpose of this

14  deposition is so that we don't have any surprises at

15  trial as to the questions that I'm asking, right?

18:59:00  16       A.   I mean, I don't think there's going to be any

17  surprises from our side.  We produced everything we

18  could possibly produce.  I think -- I think you have a

19  very clear understanding of what our legal position

20  is, I've tried to make it clear.

21            MS. FINGER:  Objection, nonresponsive.

22       Q.   (By Ms. Finger)  You haven't told me though

23  which e-mails and exhibits you contest comprise the

24  agreement between A-Z and Imperial, right?  You can't

18:59:29  25  connect them for me sitting here today, can you?

1    A.   I can't tell you that right now.  I can tell

2  you what, I mean, I can -- I can tell you that my

3  focus obviously in preparation for this deposition is

4  to -- to look at Harrison and so I spent a little more

5  time with Harrison than I did with Imperial since

6  Harrison is the plaintiff in this case.

18:59:59  7    Q.   You also haven't pointed me today to any

8  document, e-mail or text that shows in writing how any

9  terms were modified or terminated with Harrison; is

10  that true?

11    A.   I have not pointed you to any specific

12  e-mails but you have all my e-mails that I was able to

13  produce and I am confident that those e-mails are

14  reflective of the written modifications or some of the

19:00:27  15  written modifications in relation to the plaintiff or

16  in relation to Imperial for that matter.

17    Q.   At trial, do you plan to connect those dots

18  and testify as to which e-mails and texts comprise any

19  modification to the agreement between A-Z and

20  Harrison?

21    A.   I anticipate I will be more prepared for

22  trial than I was for the deposition, and since you've

23  asked me these questions, I actually kind of took some

24  notes so my job would be to specifically look into

19:00:59  25  those and get more succinct answers that I think a

1   jury or a judge, fact finder could understand.

2         MS. FINGER:  I have no further questions.

3   (7:01 p.m.) **SPL** 7:01 p.m.)

4         MS. FINGER:  Mr. Holman are we good to go

5   off the record.

19:01:28   6      A.   We're good to go.

7         THE VIDEOGRAPHER:  Counsel pursuant to

8   the federal rules are there any other agreements

9   pertaining to the exhibits transcript and other

10  pertinent matters.

11        MS. FINGER:  Also while we're on the

12  record, I would like to request that any notes that

13  Mr. Ali has taken during this deposition be produced

14  in this litigation.

15        MR. HOLMAN:  We would object.

16        MS. FINGER:  On what grounds.

17        MR. HOLMAN:  They're his private notes.

18  We haven't had a chance to review it, potentially

19:01:59  19  there might be some privileged note taking.  It's his

20  personal recollection -- his personal notes, it might

21  be privileged.

22        MS. FINGER:  Were any of the notes

23  derived from communications with his attorney.

24        MR. HOLMAN:  Maybe, I don't know, I

25  haven't been able to review his notes.

1                    MS. FINGER:  Let me clarify that we are

2     asking for unprivileged notes that Mr. Ali has taken

3     during his deposition which he just mentioned in

19:02:27    4     response to his last question that relate to succinct

5     answers he will be able to provide in response to the

6     questions that I ask today that he could not answer.

7                    MR. HOLMAN:  We'll take that under

8     advisement.

9                    THE VIDEOGRAPHER:  This marks the

10     conclusion of the videoconference deposition.  We're

11     going off the record at 7:02 p.m.

19:03:22    12                    (Deposition concluded at 7:02 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25