# EXHIBIT A

**Amar Ali - January 7, 2021**

---

**1**

```
 1              UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF TEXAS
 3                    DALLAS DIVISION
 4  HARRISON COMPANY LLC,        §
                                 §
 5          Plaintiff,           §
                                 §
 6  v.                           § Civil Action No.
                                 § 3:19-CV-1057-B
 7  A-Z WHOLESALERS INC. and     §
    BARKAT G. ALI,               §
 8                               §
            Defendants.          §
 9
10
11
12
13
14
15
16
17      ORAL AND VIDEOTAPED DEPOSITION OF
18                  AMAR ALI,
19  INDIVIDUALLY AND AS CORPORATE REPRESENTATIVE OF
20             A-Z WHOLESALERS, INC.
21               JANUARY 7, 2021
22              (REPORTED REMOTELY)
23
24
25
```

---

**2**

```
 1        ORAL AND VIDEOTAPED DEPOSITION of AMAR ALI,
 2  produced as a witness at the instance of the
 3  Plaintiff, and duly sworn, was taken in the
 4  above-styled and numbered cause on the 7th day of
 5  January, 2021, from 10:14 a.m. to 7:03 p.m., before
 6  Kim M. Dickman, CSR in and for the State of Texas,
 7  reported by machine shorthand, at 616 Clariden Ranch
 8  Road, in the City of Southlake, County of Tarrant,
 9  State of Texas, pursuant to the Federal Rules of Civil
10  Procedure, Notice, and the provisions stated on the
11  record.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**3**

```
 1              A P P E A R A N C E S
 2  FOR THE PLAINTIFF:
 3      Mr. David L. Swanson
        Mr. Joseph Anthony Unis, Jr.
 4      Ms. Anna K. Finger
        LOCKE LORD LLP
 5      2200 Ross Avenue
        Suite 2800
 6      Dallas, Texas 75201
        214.740.8000
 7      dswanson@lockelord.com
        junis@lockelord.com
 8      anna.k.finger@lockelord.com
 9
10  FOR DEFENDANTS:
11      Mr. Guy Harvey Holman
        JOYCE W. LINDAUER ATTORNEY, PLLC
12      1412 Main Street
        Suite 500
13      Dallas, Texas 75202
        972.503.4033
14      guy@joycelindauer.com
15
    ALSO PRESENT:
16
        Mr. Wayne Rennke, Videographer
17
18
19
20
21
22
23
24
25
```

---

**4**

```
 1                    I N D E X
 2  WITNESS                              PAGE
 3  AMAR ALI
 4  EXAMINATION BY MS. FINGER              7
    EXAMINATION BY MR. HOLMAN            284
 5  EXAMINATION BY MS. FINGER            291
 6  CORRECTIONS MADE BY WITNESS          299
    SIGNATURE OF WITNESS                 300
 7  REPORTER'S CERTIFICATION             301
 8  EXHIBITS                       IDENTIFIED
 9  Exhibit  1 - Notice of 30(b)(6) Deposition
               of A-Z Wholesalers Inc.     63
10
    Exhibit  2 - Credit Application        75
11
    Exhibit  3 - Harrison Company, L.L.C., Terms
12             or Conditions               77
13  Exhibit  4 - Imperial Invoice to A-Z Wholesale
               Dallas                     197
14
    Exhibit  6 - Defendant A-Z Wholesalers, Inc.'s
15             Responses and Objections To
               Plaintiff's First Set of Discovery
16             Requests                   144
17  Exhibit  8 - Defendant A-Z Wholesalers, Inc
               Response to Plaintiff's Second Set
18             of Discovery Requests      159
    Exhibit 10 - 9-10-18 Imperial/Baquet letter to
19             A-Z Wholesalers, Inc., Barkat G.
               Ali, Amar B. Ali           270
20
    Exhibit 11 - E-mail string top e-mail being
21             1-12-19 Amar Ali e-mail to Zazulak 175
22  Exhibit 12 - Wayne Baquet text messages  181
23  Exhibit 13 - 4-10-14 Wayne Baquet e-mail to
               Wayne Baquet               184
24
    Exhibit 14 - Declaration of Amar B. Ali  189
25
```

---

Amar Ali - January 7, 2021

5

INDEX

Exhibit 18 - E-mail string top e-mail being
          12-22-14 Barkat e-mail to Thomas,
          Amar Ali                          194
Exhibit 29 - 10-30-15 bradp e-mail to Amar Ali,
          barkat1950                        213

Exhibit 31 - 6-15-18 Imperial/Prendergast e-mail
          to A-Z Wholesalers, Inc.          228
Exhibit 32 - 5-31-18 A/R Aged Trial Balance by
          Chain Number                      227

Exhibit 33 - 3-15-19 Zazulak e-mail to Amar Ali 231

Exhibit 34 - Declaration of Sandy Zazulak        248

Exhibit 38 - Defendants' First Amended Answer
          To Plaintiff's Original Complaint  266
Exhibit 39 - Subpoena to Testify at a Deposition
          in a Civil Action To: Amar Ali     65

Exhibit 40 - Plaintiffs' First Set of Discovery
          Requests to Defendant A-Z          142
          Wholesalers, Inc.

6

1       P R O C E E D I N G S
2           THE VIDEOGRAPHER:  Going on the record;
3   the time is 10:14 a.m.  Today is Thursday, January
4   7th, 2021.  This is the beginning of the
5   videoconference deposition of Amar Ali, individually
6   and as corporate rep of A-Z Wholesalers, Incorporated
7   in the case styled Harrison Company, LLC versus A-Z
8   Wholesalers, Incorporated, et al.
9           This deposition is taking place at 616
10  Clariden Ranch Road, Southlake, Texas, 76092.
11          The court reporter is Kim Dickman.  We're
12  with Dickman Davenport, 4228 North Central Expressway,
13  Suite 101, in Dallas, Texas.
14          The reporter will now make a brief
15  statement for the record and ask that all parties make
16  their appearances with their agreements, after which
17  she may swear in the witness.
18          THE REPORTER:  My name is Kim Dickman,
19  Texas Certified Shorthand Reporter Number 2181.  This
20  deposition is being held via videoconferencing
21  equipment.  The witness and the reporter are not in
22  the same room.  The witness has been sworn in remotely
23  pursuant to agreement of all parties.
24          The parties stipulate that the testimony
25  is being given as if the witness was sworn in person.

7

1           All parties please state their agreement
2   on the record at this time.
3           MS. FINGER:  My name is Anna Finger, at
4   Locke Lord, and I represent the plaintiff, Harrison,
5   in this law -- in this deposition.
6           MR. HOLMAN:  Good morning.  My name is
7   Guy Holman with the law firm of Joyce Lindauer.  I
8   represent the defendant and Amar Ali, in his
9   individual capacity and corporate capacity.
10          MR. UNIS:  Joe Unis is also on the line
11  for plaintiff, Harrison.
12          THE REPORTER:  I think we lost the
13  witness.
14          Can you hear me, Mr. Ali?
15          THE WITNESS:  Yes, ma'am.
16               AMAR ALI,
17  having been first duly sworn, testified as follows:
18               EXAMINATION
19  BY MS. FINGER:
20      Q.  Mr. Ali, can you please state your full name
21  for the record?
22      A.  My name is Amar Barkat Ali.
23      Q.  Mr. Ali, my name is Anna Finger and I
24  represent Harrison in this lawsuit and in this
25  deposition today, and moving forward, if I refer to

8

1   Harrison, will you understand that I'm referring to
2   the plaintiff in this case, Harrison Company, LLC?
3       A.  Yes.
4       Q.  You are here to testify today on behalf of
5   yourself individually as well as the defendant in this
6   case, A-Z Wholesalers, Incorporated; is that right?
7       A.  Yes.
8       Q.  So moving forward, if I say A-Z in my
9   questions, will you understand that I'm referring to
10  the defendant A-Z Wholesalers, Incorporated?
11      A.  Yes.
12      Q.  Your lawyer is here, Mr. Ali; is that right?
13      A.  Correct.
14      Q.  Have you ever been deposed before?
15      A.  Yes, I have.
16      Q.  How many times?
17      A.  It's hard to remember if I was being deposed
18  or if I attended a deposition, but probably a couple
19  of times as a person being deposed.
20      Q.  And in those depositions that you were being
21  deposed, were you a fact witness or a party to those
22  lawsuits?
23      A.  I believe I was in one of them a corporate
24  representative for a party in the lawsuit and in the
25  other I was a fact witness as an attorney for one of

Amar Ali - January 7, 2021

---

**85**

1    A. It terminated -- let me look here on my notes
2 real quick.
3         It -- it was terminated sometime in 2015.
4 The last -- the last purchase from Harrison was on
5 March 31st, 2015 and any balance that was owed by A-Z
6 Wholesalers, Inc. to Harrison Company, LLC should have
7 been paid off somewhere around June of 2015.
8    Q. You broke up a little bit there when you gave
9 the date. I heard -- you gave a specific date in
10 March. Could you just repeat that, please?
11    A. Yeah, I believe the last purchase that A-Z
12 Wholesalers, Inc., the defendant, made from Harrison
13 Company, I believe was March 31st, 2015, and any
14 balance that was owed as a result of any purchases
15 made between March 11th, 2011 and March 31st, 2015 by
16 A-Z Wholesalers, Inc. from Harrison Company, LLC, that
17 balance would have been paid off by A-Z to Harrison
18 Company probably sometime around June of 2015, maybe a
19 little bit after.
20    Q. Okay. I'm going to ask you a line of
21 questions and I just want to clarify that. I want to
22 focus specifically on this credit agreement.
23         So I understand it's -- it's your
24 position that this agreement terminated in March of
25 2015 and then we're going to talk about Imperial a

---

**86**

1 little later, but for now, I want to focus only on
2 Harrison's relationship with A-Z while this credit
3 agreement was in effect. Do you understand that?
4    A. I do.
5    Q. So did A-Z and Harrison ever agree to modify
6 the credit agreement?
7    A. I would have to look at the credit agreement
8 specifically, but I imagine if we were doing business
9 with them for, call it four years, that there were --
10 there probably was a modification of that which would
11 have been a oral modification subsequent to us doing
12 business at some point.
13    Q. Do you recall any specific modification or
14 specific term that was altered between Harrison and
15 A-Z?
16    A. Sure, I can imagine a few that probably would
17 have been altered or modified.
18    Q. What are they?
19    A. I think the -- the first thing probably would
20 have been the payment terms, and I can't recall
21 exactly what we negotiated on March 11th, 2011, but my
22 guess is that as a relationship developed and deepened
23 and our volume went up with them, that our terms, our
24 payment terms were probably extended.
25         I can't recall exactly if there was a

---

**87**

1 credit limit that was set on March 11th, 2011, but my
2 guess is based on the volume and the growth, that that
3 credit limit would have been increased. I don't
4 recall exactly what pricing Rodney gave us for the
5 various products that we were purchasing from
6 Harrison, but I can imagine that over time that those
7 prices were also renegotiated, discount, rebates,
8 marketing, you know, if we were advertising something
9 in particular that we were buying from them, you know,
10 I probably went to them and say, hey, I need 20 cents
11 off per carton for a month, for two months, on this
12 particular brand. So there were constant
13 modifications, I'm sure, regarding pricing.
14         I don't -- yeah, I'd have to look at the
15 terms and condition specifically, but this is sort of
16 a standard terms and condition that Harrison had
17 probably mostly for like its convenience store
18 customers, right, and we're a wholesaler, right, so
19 our volume is very different from a convenience store
20 versus the -- the wholesaler that -- that we are.
21         So I can imagine there being, you know,
22 oral agreements and modifications as to our return
23 policy for products that didn't sell or expired.
24 Because we weren't direct with the manufacturer for
25 the products that we were purchasing from Harrison and

---

**88**

1 Harrison was direct with the manufacturer, we'd have
2 to return the product back to Harrison and Harrison
3 would send it back to their manufacturer, and so how
4 those credits and offsets -- the length of time,
5 right, I -- I can imagine that A-Z Wholesalers, Inc.
6 had a much longer leash from Harrison when it came to
7 returning products versus probably that a convenience
8 store that they do business with was required. So I
9 can imagine that there were probably some -- some
10 modifications to that.
11         So, you know, without going through each
12 one of these line by line, I can imagine that this
13 agreement was modified orally over the last three or
14 four years of doing business with them.
15    Q. Have you ever seen another agreement between
16 Harrison and any of its other customers?
17    A. I don't know if I have or not. I -- yeah --
18 well, let me think here. I -- you know, I'd have to
19 check, but you mentioned Top 20 Wholesale, I think Top
20 20 Wholesale was at some point a customer of Harrison,
21 and so I don't know if there was another agreement
22 there or not. But, yeah, I -- I don't recall
23 necessarily.
24    Q. You don't know, though, whether Harrison used
25 the same terms and conditions with all of its

---

Amar Ali - January 7, 2021

---

**105**

1    Q. Do you know the address?
2    A. I don't have the address memorized, but I
3 have -- I have seen the facility.  I've been there.
4    Q. When did you go there?
5    A. Oh, boy.  I probably went there in 2011,
6 probably in 2012, maybe again in '13.
7    Q. Why did you go there in 2011?
8    A. I believe that I -- I was invited to tour the
9 facility and the warehouse to kind of see what goes on
10 behind the curtain as they were pulling one of our
11 orders and watch that process a little bit.  Also I
12 believe it was another sort of endeavor to continue to
13 court A-Z Wholesale to remain a loyal customer of
14 Harrison to see if there was ways that we could
15 purchase more product from Harrison because their
16 experience with us had been fairly good, our
17 experience with them was fairly good, and so in any
18 business relationship you're always trying to figure
19 out a way where you can do a little more together,
20 right, deep in the partnership, deep in the
21 relationship.
22    Q. You didn't receive a tutorial on Harrison's
23 accounting system when you visited the warehouse in
24 2011, did you?
25    A. Did I receive a tutor -- define what you mean

---

**106**

1 by tutorial.
2    Q. Did anyone in Harrison's accounting
3 department give you a walk-through of how Harrison's
4 internal accounting system works while you were there
5 in 2011?
6    A. Not -- no, not to that extent.
7    Q. What about in 2012?
8    A. Nothing like that to that extent.
9    Q. What about in 2013?
10    A. No, no one -- no one gave me an accounting
11 tutorial on what -- how they handle their accounting.
12    Q. They've never done that, right?
13    A. Harrison has never given me a tutorial on
14 their accounting system.
15    Q. What would you do with the invoice after you
16 received it upon delivery?
17    A. We check each item line by line, SKU by SKU,
18 make sure that the quantity matches up with what was
19 delivered because the pricing for each SKU can vary,
20 right, so we want to make sure because, let's say, for
21 example, we counted 7,000 cartons, right?
22    THE WITNESS:  You're allowed to be here.
23 You can sit down if you want.
24    MR. BARKAT ALI:  Oh, yeah.
25    THE WITNESS:  That was my dad, by the

---

**107**

1 way, that was Barkat.
2    MR. BARKAT ALI:  How are you?
3    A. And so let's say, for example, the driver
4 made a delivery of 7,000 cartons, for example.  We
5 counted 7,000, it says 7,000 on the invoice, we signed
6 off on it, no damage, no nothing, driver's off.  Then
7 we go through each invoice line by line, SKU by SKU to
8 make sure that if we ordered 600 Marlboro Light
9 cartons, box, that we got 600 cartons of those, right.
10    Q. (By Ms. Finger)  Let me clarify, Mr. Ali.
11 I -- I don't mean to cut you off, but I believe you --
12 you told us a little bit about how thoroughly you
13 check the invoice when you receive it.
14    What I meant by my question this time
15 more specifically was, once you've done all that and
16 you yourself have reviewed the invoice, where do you
17 take it from there?
18    A. Where do I take what from there?
19    Q. The invoice.
20    A. Like physically where does it go?
21    Q. Yes.  Do you give it to A-Z's accounting
22 department or what happens next?
23    A. So once the product is received, right, which
24 is the process we went through line by line, SKU by
25 SKU, all that sort of stuff, and the product is

---

**108**

1 received into our system, right, so we -- it goes into
2 our system, our inventory goes up by 7,000 SKUs, at
3 that point, that invoice makes its way to accounts
4 payable.
5    Q. Who is responsible for importing the
6 information from the invoice into A-Z's system?
7    A. Various staff members.
8    Q. Can you tell me any of their names from March
9 2011 to March 2015?
10    A. No.  It's whoever was available that could
11 just scan the stuff, it goes right into our system, we
12 hit received, boom, done.
13    Q. Do you remember the names of who was in
14 accounting at A-Z from March 2011 to March 2015?
15    A. No, not exactly.  I mean, over the years
16 we've had a lot of turnover in employees and stuff.
17    Q. From March 2012 to March 2015, who was
18 responsible for maintaining the books and records at
19 A-Z?
20    A. When you say books and records, can you be
21 more specific?
22    Q. I mean the accounting books.
23    A. We have lots of sort of traunches for
24 accounting, so we have accounts receivable, we have
25 accounts payable, generally those two people are

---

Amar Ali - January 7, 2021

121

1  you, then that credit agreement no longer exists.  And
2  if both parties have performed, which is they
3  delivered and we paid and we paid in full the amount
4  that was owed sometime by June or July of 2015, then
5  that credit agreement and the personal guaranty signed
6  by Barkat to Harrison ceases to exist, it naturally
7  terminates.  It can't be there forever because we're
8  not doing business with them anymore.
9      Q.  So there was no conversation that took place
10  between anyone at A-Z and anyone at Harrison about
11  terminating the credit agreement, right?
12      A.  No, that conversation would have occurred
13  with the folks over at Imperial.
14      Q.  I'm talking only about the credit agreement
15  with Harrison.  So there was no conversation that took
16  place about terminating this agreement, rather A-Z
17  simply ceased placing orders with Harrison; is that
18  right?
19      A.  I mean, there were discussions, there were
20  e-mails, there were all sorts of stuff that we were --
21  we were going to buy from Imperial moving forward, not
22  from Harrison.
23      Q.  You had that conversation with someone at
24  Harrison?
25      A.  No.  I had that conversation -- well, I may

122

1  have had that conversation with some people at
2  Harrison, but definitely had that conversation with
3  the folks over at Imperial.
4      Q.  Who at Harrison did you speak with about no
5  longer ordering product from them?
6      A.  I -- if Rodney was still working for
7  Imperial -- I mean, for Harrison at the time, then I'm
8  sure I would have talked to Rodney about it --
9      Q.  Do you specifically --
10      A.  -- but I've not --
11      Q.  -- remember talking to him about it?
12      A.  I mean, I don't remember specifically talking
13  to him about it because at this point, I was dealing
14  with, you know, the CEO at Imperial, Wayne Baquet, and
15  so a lot of my dealings or conversations would have
16  occurred with Wayne Baquet or Brad Prende --
17  Prendergast over at Imperial.
18          But I can assure you that we don't -- A-Z
19  Wholesalers, Inc. doesn't owe a penny to Harrison
20  Company.
21      Q.  I understand that's your position, Mr. Ali.
22      A.  No, I -- I just want to make sure that
23  everybody is clear on that, at least on the record.  I
24  mean, it -- it would be -- you know, you'd be talking
25  about invoices that go back six or seven years and

123

1  that's just not how it's done.
2      Q.  I appreciate your strategy, Mr. Ali, but I'll
3  have to ask that you stick to answering my questions.
4  We'll have to go through this process my way, if you
5  can --
6      A.  Sure, sure.
7      Q.  -- if you can do all that.
8      A.  I'll be glad to go through it your way.
9      Q.  I appreciate it.
10          And you just mentioned the conversation
11  with folks at Imperial.  Can you tell me the names
12  again of all who participated in that conversation?
13      A.  Wayne Baquet, Brad Prendergast.
14      Q.  Anybody else?
15      A.  I can't recall anybody else specifically that
16  we would have talked to about sort of the high level,
17  you know, relationship.
18      Q.  When did you first talk to Wayne?
19      A.  Whew, I don't know.  Probably in that 2015
20  range, right, right around maybe that springtime.
21      Q.  When was the first time you spoke to Brad
22  Prendergast?
23      A.  Same time.
24      Q.  How did you meet?
25      A.  My guess is that Rodney would have requested

124

1  a meeting.
2      Q.  Rodney worked for Harrison, though, right?
3      A.  At the time that I met Rodney, he worked for
4  Harrison.  What happened to Rodney's employment around
5  the time of the spring of 2015, I don't know.
6      Q.  So why would Rodney have set up a meeting
7  between you, Wayne, and Brad if he worked at Harrison?
8      A.  Because Imperial was buying out Harrison and
9  they were transitioning everything to Imperial.
10      Q.  In this 2015 conversation you had with Wayne
11  and Brad, what did they say?
12      A.  Pretty much the same thing, that Imperial is
13  acquiring Harrison Company, it's going to be a
14  process, sort of a transition process before
15  everything closes, but they were kind of letting us
16  know, you know, what's going on behind the curtain in
17  advance of making any, I think, formal announcements
18  of a deal closing, but because we were such an
19  important customer of Harrison, they wanted to let us
20  know that there may be some personnel changes because
21  they didn't want to double up their efforts, right,
22  have two salespeople, two accounting, two CFOs, two
23  CEOs, two of everything, right, and that we would
24  still get the same level of service that we were
25  getting with Harrison, and that they would continue to

Amar Ali - January 7, 2021

149

1  1, Harrison doesn't have those invoices.  Those are
2  not Harrison invoices.
3        MS. FINGER:  Mr. Ali, I'm going to object
4  as nonresponsive so that we can move forward here.
5     Q. (By Ms. Finger)  I'll represent to you that
6  Harrison is not suing for payment of any specific
7  product, so my question to you is, what specific
8  products you are referring to in this discovery
9  response that you believe form the basis of Harrison's
10 lawsuit?
11    A. So if Harrison is not suing based on any
12 particular product, then I don't really understand
13 what Harrison is suing us over, but if you're saying
14 it's over the credit agreement, then there's no money
15 owed under that credit agreement or the personal
16 guaranty.  If your question --
17    Q. If --
18    A. Let me -- let me finish, let me answer so we
19 can move on because I think we can go -- we can go
20 around and around on this all day long and we're not
21 going to get anywhere.
22        If you're asking me what products is
23 being referenced in this denial to RFA No. 3, the
24 products are any products because what we're saying is
25 that there are no products that A-Z purchased from

150

1  Harrison that A-Z Wholesale still owes Harrison any
2  money.  So there are no products that form the basis
3  of Harrison's lawsuit that were ordered from Harrison.
4     Q. That answered my question.  Thank you.
5        We are going to turn next to --
6     A. You've left me with lots of questions as far
7  as your theory of the case, but, again, I'm sure we'll
8  get there at trial, but...
9     Q. I want to turn to page 25 now in these
10 responses and look at Interrogatory No. 1 and the
11 response to Interrogatory No. 1 is on page 26, and I
12 want to look at some of the factual statements in
13 A-Z's substantive -- substantive response.  Please let
14 me know when you're on page 26.
15    A. I'm on page 26 and I read the response.
16    Q. Great.  So not the first two paragraphs which
17 are objections, but looking to the third paragraph,
18 the first sentence states, "The Credit Agreement and
19 other correspondence makes up the entirety of the
20 agreement between A-Z and Harrison."
21        Did I read that correctly?
22    A. You read that correctly.
23    Q. And the credit agreement are the exhibits
24 that we looked at earlier that we've been referring to
25 as the credit agreement, correct?

151

1     A. Yes, ma'am.
2     Q. What other correspondence are you referring
3  to here that is also part of the agreement between A-Z
4  and Harrison?
5     A. The e-mail communications between A-Z and
6  Harrison during the time that A-Z was doing business
7  with Harrison, the oral conversations, and how the
8  parties and the actions of the parties, right, I think
9  all of that sort of makes up the agreement, I think we
10 talked about that earlier in my testimony, about the
11 relationship between A-Z and -- and Harrison and how
12 things changed over time and they weren't in that sort
13 of confined box of the terms and conditions of the
14 credit agreement.
15    Q. What agreements did A-Z reach with Harrison
16 via e-mail?
17    A. I can't point to any specific ones, but I'm
18 sure there's e-mails about pricing, about credits,
19 about rebates, about damaged goods, about discounts,
20 about marketing spend, about other incentives, credit
21 terms, credit limits, payment terms, force-outs,
22 promotional products, a number of e-mails throughout
23 that four-year -- is it four-year?  Yeah, four-year
24 relationship that would have comprised the entire
25 agreement between A-Z Wholesale and Harrison.

152

1     Q. You can't point to any specific agreement
2  that was reached via e-mail that you contend forms a
3  contract between the parties, can you?
4     A. I'm sure if you pulled up some e-mails from
5  that time period, I'm sure I could point to several
6  e-mails that probably talk about that.
7     Q. I want to know what ones you're referring to
8  here that form that agreement.
9     A. There's -- there's way too many documents
10 that have been produced in this case and I haven't
11 looked over every single e-mail since it has been
12 produced to point to a specific e-mail that shows that
13 that correspondence is part of the overall agreement
14 between A-Z and Harrison, but I contend, and I will
15 stick to this, that there -- that does exist, and
16 certainly you can take the time to look at them and if
17 you want to point me to a particular e-mail during
18 that time frame, I can tell you whether or not that
19 was part of the agreement or not part of the
20 agreement.
21    Q. You're a lawyer, Mr. Ali, correct?
22    A. I am.
23    Q. Have you ever drafted discovery responses
24 before?
25    A. Unfortunately, I have, but it's been a really

Amar Ali - January 7, 2021

153

1  long time.
2      Q.  So you understand that it's the
3  responsibility of the party responding to discovery
4  responses to answer with specificity, don't you?
5      A.  I think -- I think it's the responsibility of
6  both parties to be as specific as they can whenever
7  they possibly can to narrow the issues for trial,
8  right.  So in judicial efficiency purposes, let's not
9  take up the court's time and talk about a bunch of
10  stuff that's got nothing to do with anything and you
11  to narrow the issues for trial, figure out where the
12  actual dispute lies, right?
13          And so -- so, yeah, I think that's -- I
14  think that's good practice.  I don't know if that's a
15  rule.  Like I said, I haven't responded to formal
16  discovery in a really long time, and -- and as the
17  client here, I think I would have supplied information
18  or provided the associate or whoever with information
19  that they then put into the appropriate legalese
20  response that you see in front of you today.
21      Q.  But so you understand that it's your
22  responsibility in responding to the discovery to point
23  to the correspondence that you contend makes up a
24  contractual agreement, right?
25      A.  I -- I don't know if that's my responsibility

154

1  or the lawyer's responsibility, but in producing all
2  the documents, which I don't know if we had gone
3  through production at this point, you know, if
4  there's -- in this discovery request if there is a
5  request for production.
6      Q.  I'm sure there is and documents were
7  produced, but even in responding to interrogatories,
8  there's a requirement by the rules for specificity,
9  and so other correspondence is not something I can
10  decipher specific e-mails from.
11          So my question to you is if you could
12  point me to any specific e-mails that I could pull
13  from the production in this case that you contend are
14  part of the contractual agreement between A-Z and
15  Harrison.
16      A.  So I am certain that I can, but I can't do
17  that right now because I haven't reviewed all of the
18  e-mails from 2011 to March of 2015 to point you to
19  that, but I would be glad to maybe have our attorneys
20  supplement, right, or provide you with more responses
21  to at least give you a couple examples, but like I
22  said, the correspondence covers e-mails,
23  conversations, how the parties conducted business with
24  each other.  All the various correspondence includes
25  credit memos, rebates, promotional, marketing spend,

155

1  force-outs, I mean, a number of things that all
2  impacted their relationship and the agreement, and
3  then ultimately we have the -- the what I -- what I
4  would argue is the controlling contract, which is the
5  invoices, which is why I didn't understand what you
6  said earlier about Harrison is not suing on specific
7  invoices, because then I'm not really sure what
8  Harrison is suing on.
9      Q.  You understand that an invoice isn't a
10  contract, don't you?
11      A.  No, I don't understand that.  I probably
12  wouldn't even agree with that, not in my legal
13  capacity, but just in my like professional capacity as
14  a business owner, if I get an invoice, that's a
15  contract, that means goods or services were provided.
16  Unless I dispute whether or not those goods or
17  services provided or there's an issue with the goods
18  and services that were provided, there's an obligation
19  then to pay the amount unless I dispute the amount or
20  there's issues with the invoice.  I mean, that's how I
21  believe that works.
22      Q.  If you entered into an agreement with a
23  supplier to pay a dollar for your pen and the
24  supplier --
25      A.  That was before lunch.

156

1      Q.  We love the pen.
2      A.  I'm saying it was 10 cents before lunch, so
3  it went up 90 cents after lunch?
4      Q.  That's right, we're increasing.
5      A.  All right.
6      Q.  So if you entered into an agreement with a
7  supplier via e-mail that you were going to purchase a
8  pen for a dollar and the supplier delivers the pen and
9  also hands you an invoice for $5, would you contend
10  that the supplier breached the previous agreement or
11  does the invoice govern?
12      A.  I -- I wouldn't look at those as two distinct
13  agreements.  I would --
14      Q.  You --
15      A.  I would look at -- I would look at the
16  e-mail -- I would look at the e-mail and the invoice
17  as one agreement and I would state that there is a
18  irregularity in the invoice because the offer to
19  purchase the pen was for a dollar, not for $5.  And so
20  I would either in that case reject the invoice, send
21  the product back, or have the supplier correct the
22  invoice to a dollar, and that way the e-mail and the
23  invoice, the offer and the, I guess, acceptance kind
24  of match up.
25      Q.  And that's because the initial agreement you

Amar Ali - January 7, 2021

**169**

1   Q. It says, Imperial and A-Z entered into a
2 Modified Oral Agreement to extend terms on delinquent
3 invoices.
4       Did I read that correctly?
5   A. Yes.
6   Q. So at this point, A-Z had terminated its
7 relationship with Harrison, correct?
8   A. Yes.
9   Q. And had not yet placed its orders with
10 Imperial, right?  You were still negotiating the
11 initial terms?
12   A. No.
13   Q. You had already placed an order with Imperial
14 before agreeing to the payment terms; is that what
15 you're saying?
16   A. No.  What I'm -- what I'm saying is -- if
17 you're asking me on which day did the modified oral
18 agreement take place, right, I can't point you to the
19 exact date without maybe looking at some e-mails that
20 might refresh my memory, but the modified oral
21 agreement took place at a time when Imperial and A-Z
22 were doing business and no longer doing business with
23 Harrison, or at least in preparation of that, because
24 the goal was Imperial would start selling us product,
25 our payments would be made to Harrison for the open

**170**

1 invoices that remained.  Once those open invoices were
2 fully paid off to Harrison, probably sometime in June,
3 early July of 2015, then the payments would resume or
4 would start for Imperial.
5       At that point, Imperial's invoices were
6 probably eight, ten weeks out, and so we were to pay
7 those invoices last -- first invoice -- the first
8 invoice from April 1st, pay that one first, and then
9 pay the next subsequent invoice, so on and so forth,
10 and at the same time continue to reduce the credit
11 amount that had accrued during that first eight to ten
12 weeks of doing business with Imperial and reduce that
13 amount on a weekly basis, and in exchange, Imperial
14 would continue to serve and deliver goods to A-Z
15 Wholesale.
16   Q. Looking again at this specific interrogatory,
17 why is this oral agreement not distinguished from the
18 other oral agreement you were referring to earlier
19 with Imperial?
20   A. It may not be another oral agreement.  Like
21 you were saying, it's a capital -- it's capitalized,
22 right, so it refers to a specific modified oral
23 agreement.
24   Q. So in March 2015 or sometime in that time
25 frame then is your testimony when the oral agreement

**171**

1 took place that we were referring to earlier where A-Z
2 would pay more than the amount it was purchasing?
3   A. Again, I can't pinpoint you on whether or not
4 that occurred in March, whether that occurred in
5 April, whether that -- that modified oral agreement
6 occurred in June, but it did occur because Imperial
7 started shipping product, delivering product, and A-Z
8 started purchasing product from Imperial in April of
9 2015, that first week; however, our first payment to
10 Imperial for that -- for those invoices for the
11 product that was purchased and delivered by Imperial
12 to A-Z Wholesale probably did not occur until sometime
13 in June or July.  And at that point, you would have
14 had eight weeks' or ten weeks' worth of business,
15 let's say even at 2 mill -- at $200,000 a week, you're
16 at $2 million that now A-Z owes Imperial for invoices,
17 you know, minus credits and offsets and rebates and
18 all that other stuff, right, just on invoice, right,
19 you're at $2 million and you're -- you're at payment
20 terms that are at two months, so the agreement was
21 that let's take that $2 million number and let's just
22 reduce that every week, which means, if you buy X, if
23 you buy $300,000, pay more than $300,000 that
24 following week so that number goes down, buy $200,000,
25 pay more than $200,000 so the overall number goes

**172**

1 down.
2       Now, that occurred and every once in a
3 while if it -- if it moved, we'd jump on the phone
4 with Wayne and Brad, I would jump on the phone with
5 Wayne and Brad and say, hey, this was a short week or
6 we got a holiday or we're only ordering once or we're
7 going to do this, so the extra $20,000 that the --
8 that the amount went up with Imperial this week, we'll
9 make that up next week.
10       And so, right, we had those agreements,
11 also, but this modified oral agreement I believe
12 specifically relates to the -- the initial agreement
13 that we had with Imperial and how it was modified so
14 that Harrison could get completely paid off and we
15 would have the extended terms for the delinquent
16 invoices or the past term invoices that we had with
17 Imperial, because I think if you pull up an Imperial
18 invoice, it'll say one month, but we started off with
19 terms of nearly two months or two and a half months.
20   Q. If you can turn back to page 2 of this
21 exhibit, Mr. Ali, and look at Request for Admission
22 No. 155; do you see that?
23   A. I mean, this -- this Request for Admission
24 says a little more succinctly what I was trying to say
25 over the last two or three minutes.

Amar Ali - January 7, 2021

225

1    Q. And what is your basis for that allegation?
2    A. Because the products purchased and the
3  invoices that are outstanding are due to Imperial
4  minus any offsets, credits, returns, expired goods
5  that we still have, and any other counterclaims for
6  them breaching the contract with -- that Imperial
7  breached with us, but that exists with Imperial, not
8  with Harrison. Harrison --
9    Q. I'm talking only to the dollar amount. Do
10  you dispute Harrison's accounting of the balance that
11  remains regardless of whether it was owed to Harrison
12  or Imperial?
13    A. I can't answer that question because it's not
14  owed to Harrison, so I am disputing that amount, yes.
15    Q. If Imperial filed this lawsuit, would you
16  contest the dollar amount that Harrison calculated as
17  outstanding from A-Z?
18    A. Absolutely.
19    Q. Why?
20    A. Because it doesn't count the offsets, the
21  rebates, the credits, the returns, and any
22  counterclaims that we have against Imperial, so I -- I
23  would certainly contest that amount.
24    Q. Is it your position that A-Z owes any amount
25  to Imperial?

226

1    A. I don't know. Until there's a proper
2  accounting done, I couldn't tell you who owes who, but
3  we've got significant damages at this point that have
4  accrued against Imperial.
5    MR. HOLMAN: I believe Imperial has
6  repudiated the debt and said the debt is owed to
7  Harrison in an affidavit.
8    MS. FINGER: Objection. Mr. Holman, I --
9  I haven't asked a question to the witness.
10    A. Objection sustained. I just sustained your
11  objection, by the way.
12    Q. (By Ms. Finger) Appreciate it.
13    A. You're welcome.
14    (Exhibit No. 32 marked.)
15    Q. (By Ms. Finger) Okay. I'm going to show you
16  what has been marked as Exhibit 32.
17    Do you see Exhibit 32 in front of you,
18  Mr. Ali?
19    A. I do. I just rotated it and trying to blow
20  it up so I can see it. Okay.
21    Q. I want to look at the individual totals for
22  each Dallas and Waco.
23    Let me back up. Have you ever seen this
24  document before, Mr. Ali?
25    A. I don't know if I recall seeing it or not.

227

1    Q. Did you from time to time receive trial
2  balances from Harrison or Imperial?
3    A. I don't recall if I did or did not.
4    Q. If we can take a look at the first total for
5  A-Z Wholesale Dallas, it says 1 million 363 --
6    A. Excuse me, sorry, I want to correct my
7  testimony.
8    Q. Sure.
9    A. I do recall receiving balances from Imperial.
10  I don't know if they were these trial balances, but
11  they're balances that I would receive on a weekly
12  basis that wasn't that sloppy spreadsheet that we were
13  talking about earlier.
14    Q. This one is dated May 31st, 2018; do you see
15  that?
16    A. Yes, ma'am.
17    Q. And the total for A-Z Dallas as of May 31st,
18  2018 here says 1,368,925.67; do you see that?
19    A. Yes, ma'am.
20    Q. And for Waco it says 1,038,500.42; do you see
21  that?
22    A. Yes, ma'am.
23    (Exhibit No. 31 marked.)
24    Q. (By Ms. Finger) I'm going to show you now
25  what's been marked as Exhibit 31. Do you see Exhibit

228

1  31 in front of you?
2    A. Yes, I do.
3    Q. And have you ever seen this document before?
4    A. Yes, I have.
5    Q. And this is a letter that A-Z received dated
6  June 15th, 2018; is that right?
7    A. Yes, ma'am.
8    Q. This was signed by Brad Prendergast at
9  Imperial; is that right?
10    A. Yes, ma'am.
11    Q. And it says, the balance due of 1,368,925.67
12  as of May 31st, 2018 is correct without the following
13  exceptions.
14    Did I read that correctly?
15    A. Yes, you did.
16    Q. And there are no exceptions written below,
17  right?
18    A. There are no exceptions written below, no.
19    Q. And that's your signature at the bottom of
20  this page, correct?
21    A. Yes.
22    Q. And by signing this, you agreed that the
23  balance owed as of May 31st, 2018 was 1,368,925.67; is
24  that right?
25    A. Well, not technically right. So the balance

Amar Ali - January 7, 2021

241

1  that right?
2      A. Yeah.
3      Q. This was the last time that Imperial sent one
4  of these spreadsheets to A-Z, isn't it?
5      A. I'd have to check. I don't know if there was
6  another spreadsheet that was sent after this.
7      Q. Sandy says in her e-mail that the balance
8  increased to 2,574,930.73; is that right?
9      A. That's correct.
10     Q. Did you ever contact anyone at Imperial or
11 Harrison to dispute this balance that Sandy sent on
12 March 15th, 2019?
13     A. I don't know if I did or not because I think
14 your firm was probably engaged soon after, and if they
15 were represented by attorneys, it's probably not the
16 best thing to be talking to the client without your
17 permission, so I don't know if I did or didn't. Also
18 I know that I was traveling, I was overseas during
19 this time period.
20     Q. You don't recall ever reaching out to Sandy
21 and asking why she sent you an incorrect balance, do
22 you?
23     A. I don't recall reaching out to Sandy around
24 this time frame and talking about this balance, but
25 I'm sure I've reached out to Sandy or Wayne or Brad at

242

1  other points to talk about the balance being
2  incorrect.
3      Q. I'm talking about this balance specifically.
4  You also did not respond to either Wayne or Brad
5  asking why this balance is incorrect, did you?
6      A. Did they ask me if the balance was incorrect?
7      Q. I want to know if you ever disputed this
8  balance to Wayne or Brad when you received this
9  e-mail?
10     A. Rephrase your question because I'm a -- I'm a
11 little confused. Again, just want to make sure.
12 Around March 15th, 2019, I was overseas or I was -- I
13 was on vacation. So did I respond back to Sandy
14 saying this balance is incorrect at that time? I
15 don't know. I'd have to go back and look. If you're
16 asking me do I contest that balance today, that A-Z
17 owes Imperial 2,574,930.37, it's a yes.
18     Q. Do you agree that that was the outstanding
19 balance on March 15th, 2019?
20     A. No, I don't agree.
21     Q. Why?
22     A. Because it probably does not include all the
23 rebates, the credits, the offsets, the returned
24 products, expired products, the discounts, that would
25 include --

243

1      Q. You said probably. How do you know that?
2      A. I'm sorry?
3      Q. You said probably does not include. How do
4  you know whether or not it includes those?
5      A. Because the balance -- because the balance
6  they sent every week doesn't -- didn't always include
7  all that stuff.
8      Q. Have you done the accounting to figure out
9  what the accurate balance was that was owed to
10 Imperial before this lawsuit?
11     A. Did I do that before this lawsuit?
12     Q. The outstanding balance owed to Imperial,
13 we'll say as of today, have you calculated that
14 number?
15     A. I have not.
16     Q. So how do you know that this number is
17 incorrect?
18     A. Because I know because I was doing business
19 with them and I know that that number is incorrect.
20     Q. How?
21     A. Well, for several reasons: Number one, it
22 doesn't include all of the offsets and credits and
23 damaged products and expired products that we have
24 that they're responsible for crediting us.
25     Q. But how do you know that? How do you know --

244

1      A. Because we know --
2      Q. -- that this number didn't include it?
3      A. Because they haven't picked up the product
4  yet. It's still sitting in my warehouse in shrink
5  wrap on pallets, you know, black shrink wrap, and
6  they're responsible for picking that up, and that's
7  hundreds of thousands of dollars' worth of stuff. It
8  doesn't -- not to mention the fact that they breached
9  the contract, stopped shipping us that caused damage
10 to our company, not to mention the fact that they
11 didn't give me the discount per carton that I was
12 promised to get. So if you take all of that, yeah, I
13 do contest that amount with Imperial.
14     Q. How much do you claim A-Z is entitled to in
15 offsets?
16     A. I don't know. I can't give you that number
17 right now.
18     Q. You understand that that number should have
19 been already included in discovery responses as well
20 as in your answer and should definitely be testified
21 to at this time?
22     A. No, because Harrison is the plaintiff in this
23 case and we -- I can tell you for sure Harrison is
24 owed zero dollars. If Imperial was the plaintiff, I
25 certainly believe we would have done the accounting by

Amar Ali - January 7, 2021

245

1  now and this case would have probably already settled
2  a long time ago.
3      Q.  What evidence --
4      A.  Because --
5      Q.  -- do you have this number is correct?
6      A.  Because we -- we would have just sat down and
7  done the accounting and talked to the principals over
8  there and said, hey, this is what we believe is owed
9  by you guys or this is what we believe is owed by us,
10  let's settle this thing and walk our separate ways.
11  Nobody said --
12          MS. FINGER:  Objection, nonresponsive.
13      Q.  (By Ms. Finger)  Mr. Ali, what evidence do
14  you have to support that this number calculated as of
15  March 2019 is inaccurate?
16          MR. HOLMAN:  Asked -- objection, asked
17  and answered.
18          MS. FINGER:  I haven't asked that
19  question yet, Mr. Holman.
20      Q.  (By Ms. Finger)  Mr. Ali, what evidence do
21  you have that you can present to me in this lawsuit
22  that this number is incorrect, evidence, not
23  allegations, that offsets have not been credited?
24      A.  The pal --
25      Q.  What evidence do you have?

246

1      A.  I've got pallets of product that is -- that
2  Imperial has to take back --
3      Q.  Why?
4      A.  -- that's entire product.
5      Q.  Why?
6      A.  Because that was our agreement.
7      Q.  When did you make that agreement?
8      A.  That was our agreement from the very
9  beginning, that if we have any expired product, either
10  snuff, cigarettes don't sell, they credit us back 100
11  percent.  We bought -- we bought 50 million dollars'
12  worth of stuff from Imperial and 50 million dollars'
13  worth of stuff from Harrison.  After doing 100 million
14  dollars' worth of business, they're going to give me
15  credit for my 2 to 300,000 dollars' worth stuff that's
16  expired, right, that's just what they do because they
17  get 100 percent credit back from the manufacturer.
18          They go to Philip Morris and they say,
19  hey, these are old cigarettes, take them back.  They
20  all get their tax money back.  Philip Morris throws it
21  away, they all get their credit, and it's done.  So it
22  doesn't cost Harrison or Imperial any money.
23      Q.  What amount do you contend A-Z is owed in
24  offsets?
25      A.  I don't know that number because Imperial

247

1  Trading isn't the one suing me or A-Z.
2      Q.  What amount do you contend A-Z is owed by
3  Imperial for offsets?
4      A.  I don't have that exact number.
5      Q.  How much do you contend A-Z is owed in
6  credits?
7      A.  I don't have that exact number.
8      Q.  What other credits are you referring to that
9  A-Z is supposedly owed?
10      A.  Credits for the discount --
11          MR. HOLMAN:  Objection, form, asked and
12  answered.
13          MS. FINGER:  I haven't asked that
14  question yet, Mr. Holman.
15      Q.  (By Ms. Finger)  You can answer, Mr. Ali.
16      A.  Credits for the expired products?
17      Q.  How are those different from offsets?
18      A.  Offsets are something that is like we get
19  damaged goods right away, right, so that should be
20  offset off our invoice.  Those are those smaller ones
21  that you see in that statement, the 50 bucks here, the
22  10 bucks here, whatever that is, right, those are the
23  smaller ones.
24          The credits are for expired goods and
25  then the credits are also for the discounts on the

248

1  price that Imperial was charging us that was a higher
2  rate, right, which some people refer to as rebate,
3  some people refer to as credit, but either way,
4  it's -- if they're charging me 60 bucks, but they
5  should be charging me 59.50, that credit is accruing,
6  right, and I'm supposed to get that credit at some
7  point.
8      Q.  You can't tell me any of the amounts you
9  contend A-Z is owed in offsets or credits, can you?
10      A.  Not sitting here right now, no.
11          (Exhibit No. 34 marked.)
12      Q.  (By Ms. Finger)  Let me show you what's been
13  marked as Exhibit 34.  I'll represent to you that this
14  was a declaration of Sandy Zazulak filed in support of
15  summary judgment briefing by Harrison.  Do you see
16  this document?
17      A.  I do.
18      Q.  Do you have any reason to believe that this
19  is not a true and accurate copy of the document that
20  Harrison filed with the court?
21      A.  I have no reason to believe that that's not a
22  true and accurate copy of what was filed with the
23  court.
24      Q.  If you can, please turn to paragraph 6 on
25  page 2.

Amar Ali - January 7, 2021

249

1    A. Yep.
2    Q. Actually, we're going to skip ahead to --
3    A. We should talk about paragraph 6 because it's
4    inaccurate, but --
5    Q. How so?
6    A. Product Harrison sold and delivered to A-Z
7    Wholesalers, Inc. are identified by customer number
8    95750, and for those sold and delivered to Waco --
9    its -- its Waco warehouse by customer number 95751,
10   those are not the customer numbers from Harrison.
11   Q. That's because you believe those are the
12   customer numbers for Imperial; is that right?
13   A. It's not that I believe. Facts are a
14   stubborn thing and the invoices are the best evidence.
15   Pull up a Harrison invoice, pull up an Imperial
16   invoice, and you will see that there are two separate
17   customer numbers for each respective warehouse;
18   further, the reason why I agree -- disagree is because
19   it says that product -- for products that were sold
20   and delivered to its Waco warehouse. Well, neither
21   Harrison nor Imperial actually ever delivered anything
22   to the Waco warehouse, so that is also inaccurate. It
23   was all delivered to Dallas.
24        The Harrison customer number that Dallas
25   had is 17501. The Harrison customer number that A-Z

250

1    Waco had was 17502. The customer number that A-Z had
2    with Imperial was 95750 and the Waco warehouse with
3    Imperial at 95751. So when Mister -- or when Sandy
4    testifies in an affidavit that Harrison sold this
5    product and delivered it by customer number 95750,
6    that should say product sold by Imperial, not by
7    Harrison.
8    Q. And your statement just now is based on the
9    invoices you received, correct?
10   A. Oh, it's based on more than just invoices,
11   but the invoices are just the best evidence. You
12   could throw those up and anybody can see that that's
13   completely false, that would just stop it.
14   Q. Mr. Ali, you never worked for Harrison, did
15   you?
16   A. No.
17   Q. How long did you work for Harrison's
18   accounting department?
19   A. I never worked for Harrison's accounting
20   department.
21   Q. If you can turn to Exhibit D of this
22   exhibit -- of this exhibit, please, yeah. So Exhibit
23   D of Sandy's declaration which is on page --
24   A. D, I'm there.
25   Q. The label page is on 11 and then Exhibit 12

251

1    is the first page?
2    A. I am there.
3    Q. Have you reviewed this document before?
4    A. The only time I've looked at this document
5    from what I recall was just a few days ago or a couple
6    days ago when my father was being deposed.
7    Q. Okay. You'll start at the top --
8    A. Stop. You can ask me questions about this
9    all day long. This is an in-house made spreadsheet.
10   It's not a report, and so when it says warehouse, they
11   could write Bossier City, they could write Imperial
12   Bossier City, they could write Harrison. I mean, this
13   is just --
14        MS. FINGER: Mr. Ali, I have not asked a
15   question. Objection, nonresponsive. There is no
16   question pending.
17   A. I understand that -- I understand that
18   you're, but --
19   Q. (By Ms. Finger) Answer according to my
20   questions, Mr. Ali.
21        THE REPORTER: Wait, wait, wait. We've
22   got to go one at a time. We've got to go one at a
23   time.
24   A. No, I -- I get it. I get it, but it's
25   getting late in the day and this is --

252

1    Q. (By Ms. Finger) I understand. If you want
2    to wrap this up quickly, Mr. Ali, if you want to wrap
3    this up quickly, I need you to answer my questions and
4    not testify as to a monologue that is nonresponsive to
5    any question that I have pending. Can we do that?
6    A. Yes, absolutely.
7    Q. At trial, your lawyer can ask you whatever
8    questions he wants so that you can give whatever
9    testimony you want, but right now it's my turn to ask
10   the questions that I need answers to, okay?
11   A. No, I -- I get it and I'm sure you have lots
12   of questions about this document because it's very
13   unusual.
14   Q. As you stated, this is an internal document
15   produced by Harrison or Imperial; is that correct?
16   A. Yeah, this is -- this is -- I wouldn't
17   even -- I wouldn't even classify it as an internal
18   document. I would classify this as a document
19   prepared to fit the conclusion that they're looking
20   for in this case. I didn't --
21   Q. Is it your allegation that this document is
22   fabricated, Mr. Ali?
23   A. I -- I -- I would -- I would probably argue
24   it is because I guarantee you the other thousands of
25   customers that they have, they don't have Warehouse

Amar Ali - January 7, 2021

257

1    Q. I'm not talking about your damages, Mr. Ali.
2 Let's look at the top of this document. It's dated
3 June 1st, 2018. Do you see that in the center of the
4 first line?
5    A. No, I don't see that.
6    Q. The very top line of the first page of
7 Exhibit D, it says Month, Day, Century, and Year and
8 it's dated June 1st, 2018. Do you agree with that?
9    A. No, I don't.
10    Q. What are you looking at? We're on page 12 of
11 this exhibit which is page 1 of Exhibit D to Exhibit
12 34. We're still looking at the same spreadsheet and
13 in the center, it says Month, Day, Century, and Year,
14 and beneath it says 6-1-20 and 18. Do you see that?
15    A. I see that.
16    Q. Do you understand that that means the month
17 is 6, which is June, the day is 1, which is the 1st,
18 the century is 20, meaning the 2000s, and the year is
19 18, meaning June 1st, 2018? Do you understand that?
20    A. I understand that that's what this
21 spreadsheet says.
22    Q. That's what I asked. That's what it says,
23 correct?
24    A. That's what this spreadsheet says.
25    Q. And that's the date immediately after May

258

1 31st, 2018, which is the date you signed the audit
2 letter agreeing to the balance at that time, correct?
3    A. Again, that's not what I testified to. I
4 agree -- I agreed that those invoices were accurate
5 and if you total up those invoices and you total up
6 the credits on those invoices that they -- you were
7 showing in that statement, that that total is
8 accurate.
9    Q. You didn't do that and total up those amounts
10 before you signed the document that said you agreed to
11 the balance?
12    A. I didn't have to because it was on the
13 statement.
14    Q. So you just signed the letter and agreed to
15 the outstanding balance as of May 31st, 2018; isn't
16 that right?
17    A. No. What we do is we go back and make sure
18 that those invoices are the actual invoices.
19    Q. And you did that, right?
20    A. Yeah, we check actual every invoice and say,
21 okay, did we get this invoice? Yes. Did we get this
22 invoice? Yes, yes, yes. Are these the credits that
23 have already been processed? Yes, yes, yes. Does
24 that end up being the total amount that's according to
25 this statement? Yes. That's what I'm signing off on.

259

1    Q. So from that date when you signed off on the
2 balance that you reviewed the invoices for and
3 confirmed with accuracy, this spreadsheet now goes
4 from the next day, June 2018, all the way through to
5 April 1st, 2019, and as you're scrolling through to
6 confirm my dates, I'll ask that you look in the column
7 on the right-hand side and see that, generally
8 speaking, this spreadsheet incorporates payments,
9 sales invoices, credit memos, nonsufficient fund
10 checks, et cetera. Do you see all that?
11    A. I see all that.
12    Q. Do you have any reason to dispute the line
13 items that are included in this spreadsheet?
14    A. Yes.
15    Q. Why?
16    A. Because these are -- these are not reflective
17 of all the credits and offsets.
18    Q. How do you know that those aren't in here?
19    A. Because I'm still sitting on a hundred or
20 200,000 dollars' worth of product that -- that still
21 needs to be credited.
22    Q. And you don't see any of that in here and you
23 claim that you're entitled to it?
24    A. No, because I'm still -- I'm still sitting on
25 it. The only stuff that's reflected in here is the

260

1 ones that they physically already picked up.
2    Q. But you can't tell me approximately how much
3 that offset would change these numbers, can you?
4    A. I can tell you it would probably be a couple
5 hundred thousand dollars just the expired goods, and
6 that's not including the rebates and the discounts, I
7 mean...
8    Q. In your answer --
9    A. What --
10    Q. -- and counterclaims, Mr. Ali --
11    A. Ma'am, hang on. Can you tell me what exhibit
12 this is again?
13    Q. 34.
14    A. Plaintiff's 34?
15    Q. Correct.
16    A. Okay. Thanks.
17    Q. In A-Z's answer and counterclaims filed in
18 this case, to the extent there are any, how much do
19 you claim A-Z is owed in offsets?
20    A. Against Harrison, zero. Harrison doesn't owe
21 us any credits, offsets, anything. Imperial does. I
22 can't --
23    Q. So you don't include any contest of the
24 amount that Harrison claims other than to say it's not
25 owed to Harrison, only to Imperial in your pleadings;

Amar Ali - January 7, 2021

261

1 is that true?
2      A. We don't have any counterclaims against
3 Harrison because we don't owe Harrison any money in
4 counterclaims.
5          MR. BARKAT ALI: We don't owe.
6      A. We don't owe them and they don't owe us.
7 Harrison doesn't owe us anything. We don't owe
8 Harrison anything. Like Harrison and A-Z are zero.
9 It's Imperial and A-Z. Imperial owes us money and we
10 potentially owe Imperial money, but if you count the
11 damages, I don't know where we go.
12     Q. If a jury disagrees with you, Mr. Ali, and
13 finds that the balance is owed to Harrison, what
14 amount do you claim is owed?
15         MR. HOLMAN: Objection, calls for a
16 hypothetical.
17     Q. (By Ms. Finger) You can answer, Mr. Ali.
18     A. Zero dollars.
19     Q. How so?
20     A. Because we don't owe Harrison any money.
21     Q. If a jury disagrees with you and finds that
22 the outstanding balance that A-Z was left with as of
23 March 2019 or later and finds that the balance was
24 owed to Harrison, what dollar amount do you contest
25 A-Z owes?

262

1      A. To Harrison? The entire amount.
2      Q. Which would be what?
3      A. Whatever the jury found was owed by A-Z to
4 Harrison. I would -- with all due respect to the
5 jury, I have to say that the jury verdict is
6 completely wrong because A-Z Wholesalers, Inc., and
7 I'll -- you know, I'll die, I'll go to my grave
8 knowing this, doesn't owe Harrison a penny, and
9 Harrison doesn't owe A-Z Wholesale a penny. The
10 fight, the dispute is between Imperial and A-Z
11 Wholesale.
12     Q. And how much does A-Z owe Imperial?
13     A. I can't tell you sitting here right now what
14 that amount is.
15     Q. Can you guess?
16     A. No, I don't want to guess. Why would I --
17         MR. HOLMAN: Objection, asked and
18 answered about 20 different ways. We need to move on.
19         MS. FINGER: Mr. Holman, respectfully, I
20 would ask that you to keep your objections according
21 to the rules.
22     Q. (By Ms. Finger) And, Mr. Ali, I will ask you
23 how much you contend A-Z owes to Imperial.
24     A. I -- I can't give you that amount.
25     Q. Is it more than $1 million?

263

1      A. I can't answer that and I wouldn't try to
2 answer that until we calculate all the offsets,
3 credits, expired goods, send it all back, get all that
4 stuff done, and then the damages that A-Z Wholesalers
5 has incurred as a result of Imperial's breach of
6 contract with A-Z Wholesalers, which is substantial.
7      Q. And the only reason you haven't tried to
8 calculate that amount is because you think Imperial
9 should be a party to this lawsuit; is that right?
10         MR. HOLMAN: Objection, form.
11     Q. (By Ms. Finger) You can answer.
12     A. Imperial -- Imperial should be the only
13 plaintiff in this case.
14     Q. And because they're not a plaintiff, is that
15 why you haven't made any effort to calculate the
16 amount that A-Z is owed or that Imperial is owed?
17     A. It's not that I haven't made any effort.
18 It's that that hasn't been something that we've been
19 asked to do.
20     Q. Who would ask you to do that?
21     A. The plaintiff in this case and the
22 plaintiff --
23     Q. You don't have --
24     A. -- is Imperial.
25     Q. You don't have any internal accounting at A-Z

264

1 that reflects how much you owe to another company?
2      A. I'm fairly certain that we could very quickly
3 put together a spreadsheet that would account for all
4 the payment, credits, offsets, rebates, discounts, and
5 then I could give you a ballpark number on the damages
6 that we've incurred as a result of Imperial's breach
7 of contract with A-Z Wholesalers, Inc.
8      Q. You haven't produced any documents in this
9 case that reflect any calculation by A-Z of the
10 amounts owed, right?
11     A. I don't know if I have or have not. If it
12 wasn't a production request, which it couldn't have
13 been because Imperial hasn't asked for any, but I can
14 tell you with Harrison, since they're the plaintiff,
15 it's zero. Doesn't take much to calculate that. It's
16 zero dollars.
17         MS. FINGER: Objection, nonresponsive.
18     Q. (By Ms. Finger) Have you produced any
19 document in this litigation that reflects an
20 accounting of the amount that A-Z owes to Harrison or
21 Imperial?
22     A. Yes. Well, to Harrison, yes, it's zero.
23     Q. What document have you produced that shows
24 that?
25     A. I mean, just the -- just the payment

Amar Ali - January 7, 2021

265

1 documents that you have up here show that. I don't
2 know -- I don't know exactly what we've produced. I
3 think we've produced all our checks and everything
4 that we've made, payments that we've made, those show
5 that.
6     Q. It's your position that the spreadsheet in
7 front of you reflects that A-Z doesn't owe Harrison
8 anything even though it reflects an outstanding
9 balance?
10     A. Okay. So the spreadsheet in front of me
11 definitely says that I don't owe Harrison anything
12 because this is not a Harrison spreadsheet. This is
13 Imperial. This money is owed to Imperial is what this
14 spreadsheet says. I don't agree with that amount, but
15 that's an Imperial spreadsheet, not a Harrison
16 spreadsheet. The Harrison spreadsheet should say zero
17 because Harrison was paid off in 2015 around June or
18 July. Whatever that $2.1 million balance was that was
19 started on March 2015 was paid off seven or eight
20 weeks later.
21         So it doesn't take a spreadsheet to
22 figure that one out. It's zero dollars.
23         (Exhibit No. 38 marked.)
24     Q. (By Ms. Finger) I'm going to show you what's
25 been marked as Exhibit 38. Can you confirm that this

266

1 is a copy of Defendants' First Amended Answer to
2 Plaintiff's Original Complaint filed in this case?
3     A. Yeah, it looks like a file marked copy, so
4 I'm assuming that this is defendants' answer.
5     Q. If you can turn to page 4, I want to look at
6 paragraph 27 that runs into page 5.
7     A. Okay.
8     Q. And on page 5, this paragraph states,
9 "Harrison was not a party to any transaction involving
10 any of the claims it has asserted."
11         Did I read that correctly?
12     A. Yes, you did.
13     Q. You understand Harrison is filing for breach
14 of the credit agreement between Harrison and A-Z,
15 correct?
16     A. No, I don't agree with that.
17     Q. What is your personal knowledge of Harrison's
18 theory of this case? Do you represent Harrison,
19 Mr. Ali?
20     A. No, I don't.
21     Q. Do you work for Harrison, Mr. Ali?
22     A. No, ma'am.
23     Q. Do you agree that Harrison is a party to the
24 credit agreement dated March 11th, 2011?
25     A. Yes.

267

1     Q. I want to go down now to paragraph 32. It
2 says, "Plaintiff's claims are barred, in whole or in
3 part, due to accord and satisfaction because the
4 parties modified their payment terms as to arrearages
5 and Defendant A-Z was performing in satisfaction of
6 the modified terms."
7         Do you see that?
8     A. I do.
9     Q. Who are the parties that the defendants refer
10 to in this sentence?
11     A. I don't know, but I'm assuming it would be
12 plaintiff and defendant.
13     Q. When did Harrison and A-Z modify their
14 payment terms as to arrearages?
15     A. At several points during the four-year
16 relationship that we had with Harrison beginning in
17 March of 2011 to March of 2015.
18     Q. How many times were those payment terms
19 modified?
20     A. I don't know.
21     Q. How were they modified?
22     A. Same way that we've modified other terms of
23 our agreement, through conversation, through e-mails,
24 through other means of communication and
25 correspondence, through our actions.

268

1     Q. Mr. Ali, as a lawyer, isn't it your
2 understanding that best practice would be to put any
3 agreement into writing?
4     A. Not really when you're -- not in -- I mean,
5 in this situation, that's not a best practice.
6     Q. You're a lawyer, though, right?
7     A. Yeah, sure, but it's not a best practice
8 because every time -- I mean, every time -- every time
9 a price changes, we don't put it in writing and say,
10 hey, this is going to be the price change, we're going
11 to buy it for this much, we're going to do that. I
12 mean, this is a -- this -- this is a relationship and
13 so it's like any other relationship where, you know,
14 if I tell my wife, hey, we're going to go have Chinese
15 food for dinner and we -- I say, we're going to Jeng
16 Chi in Richardson, I don't put that in writing with my
17 wife.
18     Q. That is not a hundreds of thousands of
19 dollars' worth of an agreement, though, right?
20     A. No, we're talking millions of dollars and
21 that's why the relationship here is -- was like a
22 marriage, right? It was such a close relationship
23 that we could pick up the phone and say, hey, I need
24 20 cents off on Marlboros for the next six weeks
25 because I'm going to be selling it in my marketing

Amar Ali - January 7, 2021

281

1  lawyer entered those -- that agreement with new
2  terms?
3      A.  Well, so there's -- there's parties, so there
4  could be A-Z Wholesalers, Inc., there could be
5  Harrison Company, there could be Imperial, there could
6  be Barkat Ali.  I mean, there's -- you could have
7  certain parties, if that's what it said.
8          Specifically as to the doctrine of
9  unconscionability, which parties are being referenced,
10 I'm not really sure, but I can tell you it's certainly
11 unconscionable what Harrison is doing by suing in this
12 lawsuit, and as far as I'm concerned --
13         MS. FINGER:  Mr. Ali --
14     A.  -- I'm concerned --
15         MS. FINGER:  Objection, nonresponsive.
16     A.  -- Imperial is also -- Imperial is also being
17 unconscionable if they're trying to use Harrison to
18 keep that -- that personal guaranty in place, and
19 that's the reason why Harrison is suing is because
20 there's a personal guaranty with Harrison, but there's
21 no money owed with Harrison.
22         MS. FINGER:  Objection, nonresponsive.
23     Q.  (By Ms. Finger)  Mr. Ali, there is no
24 agreement that you can point to --
25         THE REPORTER:  Wait, wait, wait --

282

1      A.  There is not --
2          THE REPORTER:  -- we have to go one at a
3  time.
4      Q.  Mr. Ali --
5      A.  -- did a personal guaranty because we did --
6  we refused to give a personal guaranty to Imperial.
7  They tried several times, including the last document
8  that you threw up there which --
9      Q.  Mr. Ali --
10     A.  -- and we refused to do that.  And so the --
11 the end around -- the end around is, hey, let's just
12 use Harrison and say this is Harrison's debt when it's
13 not.  We all know that.  You even know that.  You're a
14 good lawyer.  You get it.
15         MS. FINGER:  Mr. Ali, objection,
16 nonresponsive.
17         The court reporter cannot take down what
18 we're all saying when we talk over each other.  I will
19 ask that you keep your testimony in response to my
20 question so that I do not have to file a motion with
21 this court requesting more time to further this
22 deposition to remedy the obstruction that you're
23 causing to my deposition.
24     A.  I -- look, I'm --
25     Q.  Mr. Ali, I have not asked a question.

283

1      A.  I know, but I'm just saying you can't say --
2  you can't go to the court and be like I've been
3  obstructing.  I've been answering all your questions
4  throughout --
5      Q.  Mr. Ali --
6      A.  -- the seven hours.
7          MS. FINGER:  Objection, nonresponsive,
8  and I have not gotten my full seven hours because I
9  cannot get answers to my questions this way.
10     A.  In the last 15 minutes, I disagree with your
11 question over here because I can't tell you who the
12 parties are and I don't know the doctrine of
13 unconscionability by heart, but by Monday we'll all
14 have the answer, so let's just wait until Monday.
15     Q.  (By Ms. Finger)  I understand that you intend
16 to file a motion -- file your response with the court
17 on Monday.  Sitting here today, in your affirmative
18 defenses, you cannot tell me who the parties are that
19 you are referring to in each of these; is that true?
20     A.  I can't answer that question right now,
21 that's correct.
22     Q.  Thank you.
23         MS. FINGER:  Let's go off the record
24 right now.  Wayne, I don't know if I have any time
25 left, but to the extent I do, let me just make sure I

284

1  don't have anything else to throw on the record to the
2  extent I can before we wrap up.
3          THE VIDEOGRAPHER:  Sure.
4          Mr. Holman, you agree?
5          MR. HOLMAN:  I -- yeah, I do have a brief
6  redirect.
7          THE VIDEOGRAPHER:  Off the -- well, do
8  you agree to go off the record?
9          MR. HOLMAN:  Yes.
10         THE VIDEOGRAPHER:  Off the record; the
11 time is 6:28 p.m.
12         (Recess 6:28-6:39.)
13         THE VIDEOGRAPHER:  Back on the record;
14 the time is 6:39 p.m.
15         MS. FINGER:  I will pass the witness.
16         THE WITNESS:  I know I'm still under
17 oath.
18         MR. HOLMAN:  I'm sorry, Anna, did you
19 pass?
20         MS. FINGER:  Yes, sir.
21         MR. HOLMAN:  Okay.  Thank you.
22             EXAMINATION
23 BY MR. HOLMAN:
24     Q.  Mr. Ali, you were asked earlier about your
25 understanding of Harrison's theory of the case, do you

Amar Ali - January 7, 2021

285

1  recall that?
2      A. Yes.
3      Q. And it was brought up that there were two
4  causes of action, one for breach of contract and the
5  other one for suit on Ali's guaranty; do you recall
6  that?
7      A. Yes.
8      Q. All right. I want to represent this -- this
9  is the actual language from the complaint filed where
10  it says that the credit agreement is a valid and
11  enforceable contract. Harrison has performed all
12  conditions precedent, covenants and promises required
13  of it pursuant to the credit agreement.
14      Then it goes on to state in paragraph 18
15  that A-Z breached a credit agreement by failing to pay
16  the amounts due and owing.
17      Is it your understanding that when we
18  mentioned that there was no invoices that were due,
19  that there was no breach of contract, that those
20  relate to the actual invoices that they are
21  referencing in paragraph 18?
22      MS. FINGER: Objection, form.
23      A. That is --
24      Q. (By Mr. Holman) Would you agree that when it
25  says A-Z breached the credit agreement by failing to

286

1  pay the amounts due and owing, if any, what amounts
2  would be due and owing?
3      A. Zero dollars.
4      Q. And if there were any, they would be
5  represented by invoices; is that correct?
6      MS. FINGER: Objection, form.
7      A. That is correct.
8      MR. HOLMAN: All right. Let's go on
9  to -- and, Anna, I'm going to ask your help with this,
10  this was in -- you pulled up RFA No. 3? I don't have
11  the exhibit number, but it was the response to RFA No.
12  3.
13      MS. FINGER: Exhibit 6.
14      MR. HOLMAN: Okay.
15      THE WITNESS: Hey, can you guys hang on?
16  I think I just got a family emergency. I just got a
17  text message from my cousin and it said 911, so we've
18  got to stop for a second, please.
19      MR. HOLMAN: Okay.
20      THE VIDEOGRAPHER: Off the record; the
21  time is approximately 6:42 p.m.
22      (Recess 6:42-6:45.)
23      THE VIDEOGRAPHER: Back on the record;
24  the time is 6:45 p.m.
25      Q. (By Mr. Holman) Mr. Ali, we -- we have

287

1  pulled up what was Plaintiff's Exhibit Number 6. This
2  was your RFA response to question number 3, and there
3  was some discussion regarding the second sentence
4  where it says that "Deny that any of the products
5  forming the basis of Harrison's lawsuit were ordered
6  from Harrison," and then you went on to say it was
7  contested, that there were no products that are being
8  sued on. But is -- is it your understanding that
9  there are certain invoices that would relate back to
10  any products that would have been sold by Harrison or
11  Imperial; is that correct?
12      MS. FINGER: Objection, leading.
13      Q. (By Mr. Holman) Let me -- let me restate.
14      Where it says here products, are there
15  any associated invoices that if there were products,
16  there would be invoices associated with that?
17      MS. FINGER: Objection, form.
18      Q. (By Mr. Holman) You can answer.
19      A. Yes, there would -- there would be invoices.
20      Q. Is it -- is it your understanding that there
21  are no Harrison invoices for the relevant period that
22  are the basis of this suit?
23      A. That's correct.
24      Q. Okay.
25      MR. HOLMAN: Anna, if you could you pull

288

1  up your Exhibit 14, I believe that was the affidavit
2  of Mr. Ali.
3      THE WITNESS: He's putting you to work,
4  huh, Ms. Finger?
5      Q. (By Mr. Holman) Thank you. And let's go
6  down to paragraph 3.
7      A. Yes.
8      Q. And you previously testified that that was a
9  typo where it says September 1, 2008?
10      A. That's correct.
11      MS. FINGER: Objection.
12      Q. (By Mr. Holman) Is that correct?
13      A. That's correct.
14      MS. FINGER: Objection, mischaracterizes
15  prior testimony.
16      Q. (By Mr. Holman) Okay. Mr. Ali, does
17  September 1, 2018 have any relevance to you?
18      A. No.
19      Q. Does September 1, 2014 have any relevance?
20      A. Yes.
21      Q. And what would that date be?
22      A. That date would be the date that Imperial
23  acquired Harrison.
24      Q. Okay. Thank you.
25      MR. HOLMAN: Anna, can you bring up

Amar Ali - January 7, 2021

289

1  your -- I have the Bates number.  It's Harrison
2  005748.
3         MS. FINGER:  It's plaintiff's Exhibit 18.
4         MR. HOLMAN:  I believe there was a
5  subsequent attachment.
6         MS. FINGER:  Not to this exhibit, no.
7         MR. HOLMAN:  Hold on just one second.
8  Here we go.  I -- I see it.
9      Q.  (By Mr. Holman)  If you look down at the one,
10  two, three, four, five, six, the sixth paragraph where
11  it says "I think."  Do you see that?
12     A.  Yes.
13     Q.  Can you read that sentence?
14     A.  It says, "I think this system will help the
15  accounting method A to Z needs per Barkat and will
16  suffice the needs of Imperial to continue supplying
17  our customer."
18     Q.  And so from that, who -- from your
19  perspective, who was supplying you?
20     A.  Imperial.
21     Q.  Okay.
22         MR. HOLMAN:  Can you bring up Exhibit 31,
23  please?
24     Q.  (By Mr. Holman)  This was the audit letter
25  and whose letterhead is the audit letter on?

290

1      A.  Imperial.
2      Q.  And who signed the audit letter?
3      A.  Brad Prendergast as -- for -- on behalf of
4  Imperial Trading Company, LLC.
5      Q.  So when you signed that, was it your
6  understanding that you were acknowledging invoices
7  owed to Imperial?
8      A.  Yes.
9      Q.  At that time when you acknowledged the -- the
10  audit letter, had you contemplated any offsets,
11  setoffs, rebates?  Is that included in that figure?
12     A.  No.
13     Q.  Mr. Ali, your prior testimony was that also
14  that none of the modifications were in writing, is
15  that correct?
16     A.  Well --
17     Q.  You know that -- that many of the
18  modifications were not in writing?
19     A.  That's correct, but what I -- what I meant
20  with that, and I'm glad you bring that up and I think
21  Ms. Finger and I talked about that early in my
22  deposition, when she was stating writing -- I was
23  trying to clarify if it was writing and executed,
24  right, where it was actually physically signed or in
25  writing, i.e., like an e-mail or some other

291

1  correspondence.
2      Q.  So are -- are you aware of any e-mails that
3  would constitute a writing that would form the basis
4  of a modification that -- that had been discussed?
5      A.  Sure, there's -- there's several of those.
6      Q.  Okay.  So when we say modification by a
7  writing, it not only references promissory notes that
8  have an execution, but also the e-mail and text
9  message correspondence; is that correct?
10     A.  That's correct.
11         MS. FINGER:  Objection, form.
12     A.  That's correct.
13         MR. HOLMAN:  I'll pass.
14             EXAMINATION
15  BY MS. FINGER:
16     Q.  I just want to take one more look, Mr. Ali,
17  at your declaration, which was Exhibit 14.  Again,
18  we're talking about paragraph 3 on page 2; do you see
19  that?
20     A.  Yes, ma'am.
21     Q.  And is it your testimony that this first
22  sentence should say on September 1st, 2014 instead of
23  2018?
24     A.  Yes.
25     Q.  In September of 2014, A-Z was still receiving

292

1  invoices from Harrison; is that right?
2      A.  Yes.
3      Q.  A-Z was also still placing orders with
4  Harrison at that time, right?
5      A.  Yes.
6      Q.  You just testified in response to
7  Mr. Holman's question that there are e-mails and text
8  messages that comprise an agreement between A-Z and
9  Imperial; is that right?
10     A.  That's not exactly what I testified to.
11     Q.  Can you clarify?
12     A.  I said that there would be e-mails and text
13  messages, other correspondence that's in writing that
14  would make up, you know, a modification of our
15  agreement.
16     Q.  If you had to tell a stranger what your
17  agreement was with Imperial, how would you do that?
18     A.  With Imperial?
19     Q.  Yes.
20     A.  I would say that our agreement with Imperial
21  was that we continue to buy product from them, they
22  continue to ship product to us, they continue to
23  accept all returns, expired goods, give us credits and
24  offsets.  We continue to pay and reduce our overall
25  balance with Imperial, no personal guaranties, either

Amar Ali - January 7, 2021

293

1  from Barkat or from Amar, as long as they continue to
2  ship and we continue to pay, the relationship would
3  continue and that we would continue to be good, strong
4  partners.  That's sort of the -- that's sort of the
5  summary after seven hours of doing this.  I'm sure I
6  could be more succinct when I'm bright-eyed and bushy
7  tailed in the morning.
8      Q.  What documents would you show just for a
9  description of A-Z's agreement with Imperial?
10     A.  I'd probably show e-mails, text messages, the
11 invoices from Imperial, the statements that we
12 received on a weekly basis, not that spreadsheet, but
13 the actual statements from Imperial, other
14 correspondence, and then I -- I would probably also
15 show other documents that were not executed
16 intentionally like that agreement that Mr. Baquet said
17 in September of 2018 that we refused to sign or a
18 credit agreement that Imperial tried to get us to sign
19 that we refused to sign.
20     Q.  So just to describe the terms that govern the
21 relationship between A-Z and Imperial, how many
22 documents would you show?
23     A.  I mean, it depends on how many invoices we
24 have because each one of those is a contract in my
25 opinion because we're -- we're buying and if they

294

1  deliver, then we pay, but there would be other
2  documents, and, again, it's a -- it's a very good
3  question.  I would probably need to give it some more
4  thought and get my head around it and jot down all the
5  points of what I believe the agreement was with
6  Imperial, but those are just some of the highlights.
7      Q.  You didn't prepare any of that in preparation
8  for your deposition testimony today on the topics that
9  were listed in your Notice of Deposition as the
10 corporate representative; is that right?
11     A.  Did I prepare any what?
12     Q.  Did you pull together any of these e-mails or
13 text messages or other written documents that you just
14 said you would show to prove the agreement between A-Z
15 and Imperial?
16     MR. HOLMAN:  Objection.  They've been
17 produced.
18     MS. FINGER:  That's not what my question
19 was.
20     Q.  (By Ms. Finger)  Go ahead.
21     A.  Yeah, did I -- did I revisit the items that
22 were produced and kind of put them together in a
23 succinct and chronological manner to potentially
24 respond to a question that may come up in seven hours
25 with all the production, no.  I did -- you know, I

295

1  did -- like I said, I made some preparation.  I did a
2  little bit of preparation.  I know the case well
3  enough to where I felt I could accurately respond,
4  but, you know, in any -- in any context, there were
5  some questions that you raised that I would like to
6  revisit and look at and make sure that I've got a very
7  succinct answer so that we can get beyond that and
8  narrow the issues for trial even better.
9      Q.  When will you get these succinct answers?
10     A.  Certainly before trial.
11     Q.  You understand that the purpose of this
12 deposition is so that we don't have any surprises at
13 trial as to the questions that I'm asking, right?
14     A.  I mean, I don't think there's going to be any
15 surprises from our side.  We produced everything we
16 could possibly produce.  I think -- I think you have a
17 very clear understanding of what our legal position
18 is.  I've tried to make it very clear.
19     MS. FINGER:  Objection, nonresponsive.
20     Q.  (By Ms. Finger)  You haven't told me, though,
21 which e-mails and exhibits you contest comprise the
22 agreement between A-Z and Imperial, right?  You can't
23 connect them for me sitting here today, can you?
24     A.  I -- I can't tell you that right now.  I can
25 tell you what -- I mean, I can -- I can tell you that

296

1  my focus obviously in preparation for this deposition
2  is to -- to look at Harrison and so I spent a little
3  more time with Harrison than I did with Imperial since
4  Harrison is the plaintiff in this case.
5      Q.  You also haven't pointed me today to any
6  document, e-mail, or text that shows in writing how
7  any terms were modified were terminated with Harrison;
8  is that true?
9      A.  I have not pointed you to any specific
10 e-mails, but you have all my e-mails that I was able
11 to produce and I am confident that those e-mails are
12 reflective of the written modifications -- or some of
13 the written modifications in relation to the plaintiff
14 or in relation to Imperial, for that matter.
15     Q.  And at trial, do you plan to connect those
16 dots and testify as to which e-mails and texts
17 comprise any modification to the agreement between A-Z
18 and Harrison?
19     A.  I anticipate I will be more prepared for
20 trial than I was for the deposition, and since you've
21 asked me these questions, I actually kind of took some
22 notes and so my job would be to specifically look into
23 those and -- and get more succinct answers that I
24 think a jury or a judge, fact finder could understand.
25     MS. FINGER:  I have no further questions.

**Amar Ali - January 7, 2021**

**297**

1    Mr. Holman, are we good to go off the
2 record?
3    **MR. HOLMAN:**  We're good to go.
4    THE VIDEOGRAPHER:  All Right.  Counsel,
5 pursuant to the Federal Rules, are there any other
6 agreements or stipulations pertaining to the
7 transcript, exhibits, or other pertinent matters?
8    **MS. FINGER:**  Actually, while we're still
9 on the record, I would like to request that any notes
10 Mr. Ali has taken during this deposition be produced
11 in this litigation.
12    **MR. HOLMAN:**  We would object.
13    **MS. FINGER:**  On what grounds?
14    **MR. HOLMAN:**  They're his private notes.
15 We haven't had a chance to review it.  Potentially
16 there might be some privileged note taking.  It's his
17 personal recollection -- his personal notes.  It might
18 be privileged.
19    **MS. FINGER:**  Were any of the notes
20 derived from communications with his attorney?
21    **MR. HOLMAN:**  May be.  We -- I don't know.
22 I haven't been able to review his notes.
23    **MS. FINGER:**  Let me clarify that we are
24 asking for unprivileged notes that Mr. Ali has taken
25 during his deposition which he just mentioned in

**298**

1 response to his last question that relate to the
2 succinct answers he will be able to provide in the
3 response to the questions that I asked today that he
4 could not answer.
5    **MR. HOLMAN:**  We'll take that under
6 advisement.
7    THE VIDEOGRAPHER:  This marks the
8 conclusion of the videoconference deposition.  We're
9 going off the record at 7:02 p.m.
10    (Deposition concluded at 7:02 p.m.)

**299**

1    CHANGES AND SIGNATURE.
2 **WITNESS NAME:** AMAR ALI    JANUARY 7, 2021
3 PAGE LINE CHANGE    REASON

**300**

1    I, AMAR ALI, have read the foregoing
2 deposition and hereby affix my signature that same is
3 true and correct, except as noted above.
5    _____
     AMAR ALI
10 THE STATE OF _____)
11 COUNTY OF _____)
12    Before me, _____, on this
13 day personally appeared AMAR ALI known to me (or
14 proved to me under oath or through _____)
15 (description of identity card or other document) to be
16 the person whose name is subscribed to the foregoing
17 instrument and acknowledged to me that they executed
18 the same for the purposes and consideration therein
19 expressed.
20    Given under my hand and seal of office this
21 _____ day of _____, 2021.
22    _____
     NOTARY PUBLIC IN AND FOR
     THE STATE OF _____
24 My commission expires: _____

76 (Page 301)

Amar Ali - January 7, 2021

301

1  STATE OF TEXAS )
2  COUNTY OF DALLAS )
3         I, Kim M. Dickman, Certified Shorthand
4  Reporter, in and for the State of Texas, certify that
5  the foregoing deposition of AMAR ALI was reported
6  stenographically by me at the time and place
7  indicated, said witness having been placed under oath
8  by me; that review was requested pursuant to Federal
9  Rules of Civil Procedure 30(e)(1); and that the
10 deposition is a true record of the testimony given by
11 the witness.
12        I further certify that I am neither counsel
13 for nor related to any party in this cause and am not
14 financially interested in its outcome.
15        Given under my hand on this the 11th day of
16 January, 2021.
17
18               Kim M. Dickman, Certified
                 Shorthand Reporter No. 2181
19               in and for the State of Texas
                 Dickman Davenport, Inc.
20               Firm Certification No. 312
                 4228 North Central Expressway
21               Suite 101, Dallas, Texas 75206
                 (214) 855-5100  (800) 445-9548
22               www.dickmandavenport.com
                 e-mail: kd@dickmandavenport.com
23               My commission expires 4-30-21
24 TIME USED BY THE PARTIES:
   Ms. Anna K. Finger:  7 hours, 3 minutes
25 Mr. Guy Harvey Holman:  9 minutes