# EXHIBIT A

Barkat G. Ali - January 5, 2021

## Page 1

```
      IN THE UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF TEXAS
              DALLAS DIVISION
HARRISON COMPANY LLC,      )
                           )
     Plaintiff,            )
                           )
VS.                        )  NO. 3:19-CV-1057-B
                           )
A-Z WHOLESALERS INC. and   )
BARKAT G. ALI,             )
                           )
     Defendants.           )


         ORAL AND VIDEOTAPED DEPOSITION OF
                   BARKAT G. ALI
                  JANUARY 5, 2021
               (Reported Remotely)

         ORAL AND VIDEOTAPED DEPOSITION of BARKAT
G. ALI, produced as a witness at the instance of the
Plaintiffs, and duly sworn, was taken in the
above-styled and numbered cause on the 5th of January,
2021, from 10:59 a.m. to 5:07 p.m., before Audra B.
Paty, CSR in and for the State of Texas, reported by
machine shorthand, at 616 Clariden Ranch Road, in the
City of Southlake, County of Tarrant, State of Texas,
pursuant to Notice and the Federal Rules of Civil
Procedure.
```

## Page 2

```
               A P P E A R A N C E S
   FOR THE PLAINTIFF:
        Mr. Joseph Anthony Unis, Jr.
        Mr. David L. Swanson
        Ms. Anna K. Finger
        LOCKE LORD LLP
        2200 Ross Avenue
        Suite 2800
        Dallas, Texas 75201
        214.740.8000
        junis@lockelord.com
        dswanson@lockelord.com
        anna.k.finger@lockelord.com

   FOR THE DEFENDANTS:
        Ms. Joyce W. Lindauer
        Ms. Kerry S. Alleyne
        JOYCE W. LINDAUER, PLLC
        1412 Main Street
        Suite 500
        Dallas, Texas 75202
        972.503.4033
        joyce@joycelindauer.com
        kerry@joycelindauer.com

   ALSO PRESENT:
        Mr. Amar Ali
        Mr. Guy Tubbs, Videographer
```

## Page 3

```
                    I N D E X
WITNESS                                       PAGE
BARKAT G. ALI
  EXAMINATION BY MR. UNIS                        7

  CORRECTIONS MADE BY WITNESS                  177

  SIGNATURE OF WITNESS                         178

  REPORTER'S CERTIFICATION                     179

EXHIBITS                                   IDENTIFIED
Exhibit  2 - Harrison Credit Application        52
Exhibit  3 - Harrison Company, LLC Terms
             and Conditions                     58
Exhibit  7 - Defendant Barkat G. Ali's
             Responses and Objections to
             Plaintiff's First Set of
             Discovery Requests                 91
Exhibit  9 - Defendant Barkat Ali's Response
             to Plaintiff's Second Set of
             Discovery Requests                101
Exhibit 10 - 9-10-18 Baquet letter to A-Z
             Wholesalers and A. Ali and B.
             Ali                               108
Exhibit 13 - 4-10-14 Baquet e-mail to Baquet   119
Exhibit 15 - Declaration of Barkat G. Ali      119
Exhibit 16 - Declaration of Amar B. Ali         XX
Exhibit 17 - E-mail string top e-mail 11-24-14
             Barkat e-mail Albritton           131
Exhibit 18 - E-mail string top e-mail 12-22-14
             Barkat e-mail to Thomas           133
```

## Page 4

```
EXHIBITS                                   IDENTIFIED
Exhibit 19 - E-mail string top e-mail 2-27-15
             A. Ali e-mail to B. Ali           135

Exhibit 20 - E-mail string top e-mail 3-5-15
             Albritton e-mail to Barkat and Ali   138
Exhibit 23 - E-mail string top e-mail
             3-26-15 Albritton e-mail to Barkat   139

Exhibit 29 - 10-30-15 Prendergrast to A. Ali    142

Exhibit 34 - Declaration of Sandy Zazulak      152

Exhibit 35 - Spreadsheet                       158

Exhibit 38 - Defendant's First Amended Answer
             to Plaintiff's Original Complaint   159
```

**61**

1  Amar was running -- operating the place.
2    Q. Same goes for the Waco warehouse, correct?
3  You have no reason to dispute that Harrison delivered
4  product to the A-Z warehouse in Waco, right?
5    A. I don't know. I don't know.
6    Q. You don't know because you weren't involved,
7  correct?
8    A. Yes.
9    Q. You don't have any personal knowledge of that
10 process, do you, sir?
11   A. Yes, I don't have personal knowledge.
12   Q. Would anyone other than Amar have knowledge
13 of that process?
14   A. You can ask Amar.
15   Q. Okay. I'm asking you, sir. Are you aware of
16 anyone other than Amar having knowledge of that
17 process?
18   A. No.
19   Q. And you don't have any personal knowledge
20 about the account numbers that Harrison set up for A-Z
21 under the credit agreement, do you, sir?
22   A. No, I don't.
23   Q. And you don't have any personal knowledge of
24 A-Z's ordering process when it would order product
25 from Harrison, do you, sir?

**62**

1    A. No, I don't.
2    Q. You don't know how A-Z placed those orders,
3  do you?
4    A. I don't know that.
5    Q. And you don't know how Harrison filled those
6  orders, correct?
7    A. I don't know.
8    Q. You're totally uninvolved, right, that's what
9  you told me?
10   A. Yes.
11   Q. So you don't know who anyone at A-Z spoke to
12 at Harrison, right?
13   A. No.
14   Q. And you don't know how often A-Z was ordering
15 product from Harrison, do you, sir?
16   A. I don't know that.
17   Q. You don't know how often Harrison was
18 delivering product, correct?
19   A. I don't know.
20   Q. And you don't know how much product A-Z was
21 ordering; is that right?
22   A. I don't know.
23   Q. You don't know what it was paying for the
24 product it was ordering?
25   A. No, I don't know.

**63**

1    Q. And you don't know how much product Harrison
2  was delivering; is that correct?
3    A. No, I don't know.
4    Q. Is there anything you know about the ordering
5  or the delivery process under this Exhibit 4 credit
6  agreement?
7    A. I don't know.
8    Q. I'm sorry. This is actually Exhibit 3. I
9  misspoke. So you don't know anything about the
10 ordering process, correct?
11   A. No.
12   Q. And you don't know anything about the
13 delivery process, right?
14   A. No.
15   Q. Were you ever at the warehouse in Dallas when
16 Harrison delivered product to A-Z?
17   A. No, I'm not there. I was never -- I just
18 went some time and that's it.
19   Q. So you never observed a Harrison truck
20 unloading product at the warehouse in Dallas?
21   A. Not really.
22   Q. Not really?
23   A. Don't remember.
24   Q. You don't recall ever seeing a Harrison truck
25 unload product at the warehouse in Dallas?

**64**

1    A. Not really. Really don't remember.
2    Q. And do you recall ever seeing a Harrison
3  truck unload product at the warehouse in Waco?
4    A. Yeah, it was far away. I don't know.
5    Q. How often would you go to the Waco warehouse?
6    A. I think I have been only two, three times all
7  these years. That's it.
8    Q. Do you recall the last time you were at the
9  warehouse in Waco?
10   A. Maybe a few years ago.
11   Q. Do you recall why you went to the warehouse
12 in Waco a few years ago?
13   A. Just was passing by, just stopped by.
14   Q. So you have no idea what the Harrison trucks
15 look like; is that correct?
16   A. I really don't, no. I don't remember.
17   Q. And do you know who at A-Z would be
18 responsible for receiving any delivery from Harrison?
19   A. I don't know.
20   Q. And you have no idea what type of
21 documentation was involved either on the Harrison side
22 or the A-Z side when ordering and delivering product,
23 do you, sir?
24   A. No, I don't know.
25   Q. Other than Amar, do you know who would be

**77**

1  Prendergrast doesn't work for Harrison?
2      A. I met him when -- I think later on. He came
3  and introduced himself I think at the warehouse one
4  day and said he's chief financial officer or chief
5  operating officer. I don't know. He was coming from
6  Imperial. Imperial.
7      Q. And you would agree it's possible for one
8  person to be associated with two entities, correct?
9      A. No, he wasn't presenting as Imperial officer.
10     Q. Sir, you yourself are affiliated with three
11 entities at least, right?
12     A. So what. I can be ten.
13     Q. Exactly.
14     A. But he was from Imperial.
15     Q. And what is the basis for that understanding,
16 sir?
17     A. I vaguely remember he gave me a business card
18 which said Imperial and he was chief operating officer
19 or chief financing officer, something. He gave me a
20 card, business card, that said Imperial.
21     Q. Okay Who is Brad Albritton? Do you know?
22     A. No, I don't remember.
23     Q. Is that name familiar to you?
24     A. No, I don't remember.
25     Q. What about Wayne Baquet?

**78**

1      A. I know I met Wayne Baquet, but I know he's
2  the president of Imperial.
3      Q. How do you know that?
4      A. Amar. I was told by Amar.
5      Q. Amar told you?
6      A. Yes.
7      Q. You never met Wayne?
8      A. I never met Wayne.
9      Q. Did you meet Brad Prendergrast?
10     A. I met him one time.
11     Q. When was that?
12     A. I don't remember. I don't remember really.
13 Met him maybe four years ago, three years ago.
14     Q. Do you remember where you met him?
15     A. At A-Z.
16     Q. In Dallas?
17     A. Yes.
18     Q. And you made reference to Imperial. That's
19 Imperial Trading Company, LLC, correct?
20     A. No, I don't know exact name.
21     Q. What do you know about Imperial?
22     A. I don't know. Imperial was -- is a company
23 that was sending us goods, and I was signing the
24 checks. I remember -- that's all I remember.
25     Q. And your opinion that Imperial was sending

**79**

1  you goods is based on what, sir?
2      A. Question repeat again.
3          MR. UNIS: Madam Court Reporter, could
4  you please read back the question?
5          (Record read.)
6      A. Yeah, based on writing checks. I was signing
7  the checks. Not writing, but signing the checks.
8      Q. (BY MR. UNIS) Okay. Anything other than how
9  you would make out checks to support your opinion?
10     A. That's all. I was signing the checks.
11     Q. So nothing other than the checks, correct?
12     A. Yes.
13     Q. You weren't there receiving deliveries,
14 right, at A-Z?
15     A. No.
16     Q. And you weren't placing the orders, were you,
17 sir?
18     A. No.
19     Q. And you told me earlier you don't know how
20 those orders were being filled, correct?
21     A. Uh-huh.
22     Q. Who was filling those orders?
23     A. I don't know.
24     Q. What those trucks looked like, correct?
25     A. Yes.

**80**

1      Q. Who owned the trucks? You didn't know that,
2  did you?
3      A. No.
4      Q. You didn't know who was driving the trucks,
5  right?
6      A. No.
7      Q. You didn't know who employed the employees
8  who were loading the trucks at the warehouse, did you?
9      A. I don't know.
10     Q. And you didn't even know where the warehouse
11 was located correct, sir?
12     A. No.
13     Q. And you have no idea after you signed those
14 checks who was receiving them, do you?
15     A. No.
16     Q. Or how those checks were being applied,
17 right?
18     A. No.
19     Q. And you don't even know what entity was
20 reporting the monies received pursuant to those checks
21 as income on their taxes, do you?
22     A. Well, all I remember there was once upon a
23 time Harrison checks were made, I signed it. Later on
24 it was Imperial checks on my desk, I signed it, and
25 mailed it.

### 85

1  Q. You know nothing about the relationship,
2  correct?
3  A. No.
4  Q. How did you first learn of Imperial?
5  A. I don't remember. I think three years back
6  when Brad came. I don't know.
7  Q. So you had never heard of Imperial until you
8  met with Mr. Prendergrast three years ago?
9  A. Well, I start remembering when I was signing
10 checks to Imperial. So that's all. I did Harrison
11 and then Imperial.
12 Q. Okay. So you first learned of Imperial when
13 someone put a check in front of you to sign that was
14 addressed to Imperial; is that right?
15 A. Yes.
16 Q. And did you ask why is this check addressed
17 to Imperial at that time?
18 A. No, I don't ask.
19 Q. You just signed it?
20 A. I signed it.
21 Q. So it didn't matter to you who the check was
22 addressed to, did it?
23 A. No.
24 Q. Do you know anything about A-Z's account
25 numbers with Harrison?

### 86

1  A. No, I don't know.
2  Q. Do you know if those account numbers ever
3  changed?
4  A. I don't know really.
5  Q. So you don't know if the account numbers ever
6  changed?
7  A. I don't know.
8  Q. So you wouldn't know if they changed why they
9  changed, would you, sir?
10 A. I don't know.
11 Q. And I asked you earlier about Harrison's
12 internal operations. You said you had no knowledge of
13 those operations, right?
14 A. Yeah, I don't know.
15 Q. And so you don't know anything about
16 Imperial's operations either, do you, sir?
17 A. No.
18 Q. You don't know anything about its accounting
19 procedures, correct?
20 A. No.
21 Q. Nothing about its employees, correct?
22 A. No.
23 Q. And nothing about its relationship with
24 Harrison, right?
25 A. No.

### 87

1  Q. Other than the fact that you were addressing
2  checks to Imperial, what do you know about Imperial?
3  A. Nothing. I don't know. All I was signing
4  checks.
5  Q. You never placed an order yourself with
6  Imperial, did you?
7  A. Repeat the question.
8  Q. You personally never placed any order with
9  Imperial, correct?
10 A. No.
11 Q. And you never spoke with anyone at Imperial,
12 did you, sir?
13 A. No.
14 Q. Do you even know where Imperial is located?
15 A. No.
16 Q. I believe you testified earlier once you sent
17 a check off, you have no idea how it was applied,
18 correct?
19 A. Correct.
20 Q. Doesn't matter if you made it payable to
21 Harrison or if you made it payable to Imperial, you
22 don't know what happened to that check, right?
23 A. No.
24 Q. And you don't know who reported those sales
25 on their taxes?

### 88

1  A. No.
2  Q. Because you have no personal knowledge of
3  Harrison or Imperial's internal accounting practices,
4  correct, sir?
5  A. I don't need to know.
6  Q. I didn't ask you if you need to know. I
7  asked if you do know.
8  A. No.
9  Q. What do you know about A-Z's payment terms
10 with Harrison, sir?
11 A. I don't know.
12 Q. You know nothing about the payment terms?
13 A. No.
14 Q. Okay. And you testified earlier you
15 believed you were -- or you believed A-Z at some point
16 started purchasing from Imperial, correct?
17 A. I can recognize only with the checks, when I
18 was signing the checks.
19 Q. Okay. So you know nothing about any alleged
20 payments terms between A-Z and Imperial, do you, sir?
21 A. No.
22 Q. How much do you believe A-Z owes Imperial?
23 A. I don't know.
24 Q. Do you believe that A-Z owes Imperial money?
25 A. I don't know.

121

1    A. Yeah, I signed it, yes.
2    Q. I want to take a look at paragraph 3 on page
3  2, please.
4    A. Okay.
5    Q. And that first sentence of paragraph 3
6  states, on September 1st, 2018, Imperial Trading
7  Company, LLC, Imperial, acquired Harrison and took
8  over the process of fulfilling all orders. Did I read
9  that correctly?
10   A. Okay.
11   Q. I read that correctly?
12   A. Yes.
13   Q. And, sir, what is the basis, the factual
14  basis, for that statement?
15   A. I don't remember.
16   Q. Is that statement accurate in your opinion
17  sitting here today?
18   A. Yes.
19   Q. Based on what?
20   A. Based on signing the checks.
21   Q. Okay. But you told me that you stopped
22  making payment to Harrison in 2015, did you not?
23   A. No, I was signing checks, not stop payment.
24  I was signing checks to Harrison in 2014, '15, and
25  then I was signing checks to Imperial later on. Why

122

1  you confusing the language?
2    Q. And the date in this paragraph 3 is September
3  1, 2018. Do you see that, sir?
4    A. Yeah.
5    Q. What is that date based on?
6    A. I don't know.
7    Q. And you testified earlier you don't know
8  anything about the relationship between Harrison and
9  Imperial; is that right?
10   A. Yeah.
11   Q. And then beginning midway of line 3 through
12  paragraph 3 of your declaration you state, all orders
13  were submitted to representatives of Imperial and all
14  invoices were sent from Imperial. Did I read that
15  correctly?
16   A. Uh-huh, yes.
17   Q. You weren't involved in submitting orders,
18  were you, sir, on behalf of A-Z?
19   A. No.
20   Q. So what is the factual basis for your
21  statement that all orders were submitted to
22  representatives of Imperial?
23   A. Signing checks.
24   Q. That's payment.
25   A. Yeah, that's all I know from this time to

123

1  time I was just signing the checks.
2    Q. Okay. So you know nothing about the
3  submission of orders from A-Z to Imperial, do you?
4    A. Why don't you show me the invoices?
5    Q. I'm asking you about your declaration, sir.
6  We can talk about invoices next.
7    A. Yeah, I was signing the checks based on that.
8    Q. And to generate an invoice, you first have to
9  have an order, right? You order the goods, you get
10  invoiced for the goods, you pay the invoice. That's
11  how the process works, right?
12   A. Yeah, but I was signing the checks. The last
13  number is mine.
14   Q. So you were involved in part 3 of that
15  chronology. We're talking about part 1, orders
16  submitted to representatives of Imperial. You have no
17  personal knowledge of that, do you, sir?
18   A. Every company have people to work on those
19  processes. My job was to sign the checks.
20   Q. So my question to you, sir, is what is the
21  factual basis for your statement in your declaration
22  that all orders were submitted to representatives of
23  Imperial?
24   A. Sign the check.
25   Q. So you have no personal knowledge of the

124

1  order process, the order form and the payment?
2    A. I was signing checks. That's all.
3    Q. Okay. And so then step 2 in that chronology
4  is the invoice. You state all invoices were sent from
5  Imperial. What is the basis for your statement that
6  invoices were sent from Imperial?
7    A. It says from period October 18 and March 19.
8  I mean, those invoices I was not looking at the
9  invoices. All I was signing the checks.
10   Q. Right. So you have no personal knowledge as
11  to whether Imperial or Harrison was sending invoices
12  to A-Z, do you, sir?
13   A. No, at that time, Harrison was stopped
14  because Harrison was paid off. Harrison was done.
15  You are in 2021. You're not in 2015. 2015 Harrison
16  was paid off zero dollars. My guaranties null and
17  void. I'm done with Harrison. Imperial start
18  sending. I was signing the checks to Imperial at that
19  time.
20   Q. Okay. So you don't know who was receiving
21  orders from A-Z or who was sending invoices to A-Z, do
22  you, sir?
23   A. No.
24   Q. And you don't know if either person was
25  employed by Harrison or Imperial, do you, sir?

### 125

1   A. What is that question?
2   Q. You don't know if the person receiving the
3   order from A-Z was employed by Harrison or Imperial,
4   do you, sir?
5   A. The question is kind of funny, no.
6       MR. UNIS: Madam Court Reporter, can you
7   read it back, please?
8       (Record read.)
9   A. I'm not running Harrison, sure. Imperial,
10  sure. Who was getting the orders I don't know.
11  That's kind of a funny question.
12  Q. (BY MR. UNIS) You don't know who is
13  receiving the order in Bossier City, Louisiana, do
14  you, sir?
15  A. I don't want to talk something to you that
16  it's a dumb question, man.
17  Q. Well, but the dumb question --
18  A. I don't know, man. I don't know who was
19  getting the order, Imperial or Harrison. How do I
20  know? Does Joe got it or John got it or Sam got it?
21  I don't know. You're asking some dumb question.
22  That's why I'm kind of confused. What are you asking?
23  Q. I'm just trying to understand your
24  declaration because you state that A-Z was submitting
25  the orders to representatives of Imperial. I'm asking

### 126

1   you how you know they were representatives of
2   Imperial?
3   A. Because I was signing the checks. My job was
4   to sign the checks and based on signing the checks
5   long time ago I used to sign it and then later on
6   Imperial I have been telling you a hundred times.
7   Whoever read --
8   Q. So you were not involved --
9   A. -- this deposition get bored.
10  Q. Thank you, sir. You were not involved in
11  placing orders, right?
12      MR. AMAR ALI: We've gone over this how
13  many times today. He did not place the orders. He
14  did not receive the orders. He did not look at the
15  invoices. He signed the checks. The orders were
16  placed by A-Z to Harrison and at some point later they
17  were placed to Imperial. A-Z paid Harrison. After
18  Harrison wasn't owed any money, then Imperial was
19  paid.
20      MR. UNIS: I'm objecting whatever, this
21  testimony, sidebar, narrative.
22      MR. AMAR ALI: You keep asking him over
23  and over again if he placed the order. Let's go back
24  and look at the deposition transcript and see how many
25  times you've asked that same question. He did not

### 127

1   place the orders between A-Z and Imperial. He did not
2   place the order between A-Z and Harrison.
3       MR. UNIS: In his signed declaration he
4   has personal knowledge. I'm just trying to run these
5   facts to the ground.
6       MR. AMAR ALI: You've asked the question
7   at least 20 times. At least. That's a conservative
8   number.
9       MR. UNIS: Well, I'm just trying to
10  figure out why it's in the declaration if he doesn't
11  know.
12      MR. AMAR ALI: It's in the declaration
13  because A-Z was placing those orders. A-Z informed
14  him that they were placing the orders to Imperial.
15      MR. UNIS: So he has no personal
16  knowledge.
17  Q. (BY MR. UNIS) You have no personal
18  knowledge, sir? If you just answer that question, we
19  can move on.
20      MR. AMAR ALI: We've moved on. We've
21  moved on. You haven't moved on.
22      MR. UNIS: You would like to move on and
23  you'll have your opportunity on Thursday, sir. I'm
24  asking the fact witness --
25  A. I'm telling you you are asking dumb

### 128

1   questions. I think you are just killing your time.
2   You are actually wasting my time. You are making
3   money. I'm not making money. You billing your
4   client. Who am I going to bill for wasting my time
5   for asking same question for 120 times? Come on, man.
6       MR. AMAR ALI: I mean, why don't you just
7   put the invoices up from October 22nd, 2018 to March
8   4th, 2019. Put the invoices up and go through those.
9       MR. UNIS: I appreciate you wanting to
10  coach the deposition, sir.
11      MR. AMAR ALI: I'm not coaching the
12  deposition. I'm just sitting here. I know he's
13  tired. It's getting late. You said you're going to
14  go until 5:00, but you keep asking the same question.
15  We are going to be here until 8:00.
16  A. Hey, God bless you, man. Keep on billing
17  your client, but don't waste my time, buddy.
18  Q. (BY MR. UNIS) I would like to look at
19  paragraph 6 of your declaration, sir, if you and your
20  son are done with your rant. Can we agree to go to
21  paragraph 6 at page 3?
22  A. Page 3 is it?
23      MR. AMAR ALI: No, it's paragraph 6.
24      THE WITNESS: Paragraph 6.
25  Q. (BY MR. UNIS) Are you there?

**177**

1     CHANGES AND SIGNATURE
2  **WITNESS NAME:** BARKAT G. ALI   JANUARY 5, 2021
3  PAGE  LINE  CHANGE       REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

**178**

1        I, BARKAT G. ALI, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5        _____
         BARKAT G. ALI
6
7
8
9
10 THE STATE OF _____)
11 COUNTY OF _____)
12       Before me, _____, on this
13 day personally appeared BARKAT G. ALI, known to me (or
14 proved to me under oath or through _____)
15 (description of identity card or other document) to be
16 the person whose name is subscribed to the foregoing
17 instrument and acknowledged to me that they executed
18 the same for the purposes and consideration therein
19 expressed.
20       Given under my hand and seal of office this
21 _____ day of _____, 2021.
22
23       _____
         NOTARY PUBLIC IN AND FOR
24       THE STATE OF _____
   My commission expires: _____
25

**179**

1  STATE OF TEXAS )
2  COUNTY OF DALLAS )
3       I, Audra B. Paty, Certified Shorthand
4  Reporter, in and for the State of Texas, certify that
5  the foregoing deposition of BARKAT G. ALI was reported
6  stenographically by me at the time and place
7  indicated, said witness having been placed under oath
8  by me; that review was requested pursuant to Federal
9  Rule of Civil Procedure 30(e)(1); and that the
10 deposition is a true record of the testimony given by
11 the witness.
12      I further certify that I am neither counsel
13 for nor related to any party in this cause and am not
14 financially interested in its outcome.
15      Given under my hand on this the 11th day of
16 January, 2021. *Audra B. Paty*
17      _____
         Audra B. Paty, Certified
18       Shorthand Reporter No. 5987
         Dickman Davenport, Inc.
19       Firm Registration #312
         4228 North Central Expressway
20       Suite 101
         Dallas, Texas 75206
21       214.855.5100   800.445.9548
         e-mail: abp@dickmandavenport.com
22       My commission expires 10-31-22
23
   Time used by each party:
24 Mr. Joseph Anthony Unis, Jr. - 5:13
   Ms. Joyce W. Lindauer - 0:00
25