```
          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
                   DALLAS DIVISION

HARRISON COMPANY, LLC,        )
                              )
          Plaintiff,          )
                              )
vs.                           )  3:19-CV-01057-B
                              )
A-Z WHOLESALERS INC. and      )
BARKAT G. ALI,                )
                              )
          Defendants.         )
```

PRETRIAL CONFERENCE
BEFORE THE HONORABLE JANE J. BOYLE
UNITED STATES DISTRICT JUDGE
MARCH 26, 2021
A P P E A R A N C E S

For the Plaintiff:

```
     LOCKE LORD, LLP
     2200 Ross Avenue - Suite 2800
     Dallas, TX  75201
     214/740-8514
     Email: dswanson@lockelord.com
     BY:  DAVID L. SWANSON
     Email: junis@lockelord.com
          JOSEPH A. UNIS, JR.
     Email:  haley.owen@lockelord.com
          HALEY MOWDY OWEN
```

For the Defendants:

```
     JOYCE W. LINDAUER ATTORNEY, PLLC
     1412 Main Street - Suite 500
     Dallas, TX  75202
     972/503-4033
     Email: joyce@joycelindauer.com
     BY:  JOYCE W. LINDAUER
     Email:  guy@joycelindauer.com
          GUY HOLMAN
and
     LAW OFFICES OF FRANK J. WRIGHT, PLLC
     2323 Ross Avenue - Suite 730
     Dallas, TX  75201
     214/238-4153
     Email: jeff@fjwright.law
     BY:  JEFFREY MICHAEL VETETO
```

```
COURT REPORTER:    SHAWNIE ARCHULETA, TX CCR No. 7533
                   1100 Commerce Street
                   Dallas, Texas  75242

proceedings reported by mechanical stenography,
transcript produced by computer.
```

```
 1                    (In open court at 9:08 a.m.)
 2                    THE COURT:  Good morning.
 3                    For the record, this is Civil Action
 4      3:19-CV-1057.
 5                    We're at the pretrial conference for
 6      Harrison, LLC, versus A to Z Wholesalers, et al.
 7                    Who is here for the plaintiff?  Lead
 8      counsel first.
 9                    MR. SWANSON:  Good morning, Your Honor,
10      David Swanson.
11                    THE COURT:  You can take your mask off as
12      long as you are immune.
13                    Did you take your shots?
14                    MR. SWANSON:  I've had both my shots.
15                    THE COURT:  Okay.  Good.
16                    MR. SWANSON:  David Swanson for the
17      Plaintiff, Harrison Company, along with --
18                    THE COURT:  Stand up and announce yourself
19      and take your mask off.
20                    MR. UNIS:  Joe Unis, Your Honor, for the
21      Plaintiff, Harrison Company, LLC.
22                    THE COURT:  Mr. Unis, yes, nice to see
23      you.
24                    MR. UNIS:  Nice to see you.
25                    MS. OWEN:  Haley Owen, also for the
```

```
1    Plaintiff, Harrison Company, LLC.

2              THE COURT:  Thank you very much.  And for

3    the Defense?

4              MS. LINDAUER:  And Joyce Lindauer for the

5    Defendants, A to Z and Mr. Barkat.

6              THE COURT:  Mr. Barkat is who?

7              MS. LINDAUER:  I'm sorry, he's one of the

8    defendants, Ali Barkat.  We represent both of them.

9              THE COURT:  Okay.  I see.  I see.

10             Go ahead and sit down.

11             I came up with the idea that I think this

12   case has very little jury appeal, but it's up to

13   you, if you would maybe try this as a bench trial.

14             You know, it's not going to make any

15   difference to me -- I mean, I will make sure it

16   doesn't make any difference to me, but I would love

17   for you to try this as a bench trial, because I

18   think these are just legal issues.

19             Yes, Mr. Swanson.

20             MR. SWANSON:  Yes, Your Honor.  We have no

21   objection.  As a matter of fact, we even suggested

22   right before we got the Court's email that we could

23   try this case on stipulated exhibits and facts,

24   because we think there is no fact issue, and it's

25   just a legal issue or legal issues.
```

```
 1              THE COURT:  I think so, too.

 2              Ms. Lindauer.

 3              MS. LINDAUER:  Your Honor, we discussed it

 4   with our clients, and they are just adamant that if

 5   we are going to have a trial, they would like a

 6   jury, so. . .

 7              THE COURT:  I mean -- okay.  But you do

 8   understand, don't you, that this is just

 9   hypertechnical stuff that they're really going to be

10   confused about.  And I hope you can make it simple.

11   I know, Ms. Lindauer, you've done that, and I'm sure

12   you've counseled them, but it's much better as a

13   bench trial.

14              Do you want to talk to them some more?

15              MS. LINDAUER:  Can I be real candid with

16   the Court?

17              THE COURT:  Yes.

18              MS. LINDAUER:  They're scared to death of

19   you.

20              THE COURT:  Why?  Come up to the lecturn,

21   please.

22              MS. LINDAUER:  Okay.  Well, I think

23   they've read a number of your rulings, and they

24   are -- they are hypertechnical rulings, obviously,

25   but I think it scared them.
```

```
 1              And you have to realize, one of our
 2    defendants, Mr. Barkat, is like 78 years old.  He's
 3    a cancer survivor.  He's an elderly gentleman.  And
 4    he is just very concerned that -- he feels like he
 5    should have a jury trial.  So that's the reason that
 6    they are so insistent on having a jury trial.
 7              THE COURT:  All right.  They're going to
 8    get one.
 9              MS. LINDAUER:  No fault on yours.
10              THE COURT:  I know.
11              MS. LINDAUER:  You're doing your job, but
12    you understand the perception of clients can
13    sometimes be different perhaps, so. . .
14              THE COURT:  That's fine, Ms. Lindauer.  I
15    appreciate you making the effort.
16              So, Mr. Holman, who are you?  Is he an
17    officer?  Director?
18              MS. LINDAUER:  No, he's an associate with
19    our law firm.
20              THE COURT:  Okay?  No one is here for the
21    parties.
22              MS. LINDAUER:  No, we didn't bring
23    parties.
24              THE COURT:  I'm sorry.  I didn't know.
25              MS. LINDAUER:  No.  And then the other
```

```
 1   gentleman is actually a clerk that works at our
 2   firm.
 3              THE COURT:  I have Larry Boyd, Clerk, but
 4   you didn't identify Mr. Holman.
 5              Thank you, Mr. Holman.
 6              MR. HOLMAN:  Thank you, Your Honor.
 7              THE COURT:  Let's get started, then.
 8              All right.  Let's start with the
 9   Plaintiff's Motions in Limine.
10              Okay.  I think -- I'm hoping you-all have
11   agreed to all of these.  But Defense, will you tell
12   me which of those you have agreed to so we don't
13   have to go through them?
14              Would you come up here, please?
15              MS. LINDAUER:  Sure.  Yes, ma'am.
16              We actually filed a response.
17              THE COURT:  No, this is your motions in
18   limine.  I want to hear from the defense.
19              MS. LINDAUER:  We are the defense.
20              You want to hear from the Plaintiff?
21              THE COURT:  Yes.
22              MS. LINDAUER:  All right.  Thank you.
23              MR. UNIS:  May it please the Court.
24              Your Honor, our motions in limine address
25   seven specific topics, one of which has two
```

```
 1   subtopics.

 2           Defendants did file a response this

 3   morning that I have had an opportunity to review.  I

 4   don't know if we've agreed to anything.  It seems as

 5   if they are willing to limit certain testimony, and

 6   they agreed to some of the factual bases pursuant to

 7   which we filed our limines.

 8           So in the interest of judicial economy and

 9   efficiency, I don't want to have to go 1 through 7.

10   But if that's what the Court prefers, I certainly

11   will.

12           THE COURT:  Well, if they haven't agreed

13   to them for sure on the record, then let's go

14   through them.

15           MR. UNIS:  Yes, Your Honor.

16           THE COURT:  I'm going to have you do it

17   one by one.  Okay?

18           MR. UNIS:  Understood.

19           The first motion in limine, Your Honor, is

20   any argument regarding alleged payment and/or offset

21   that the Defendants did not plead; payment is an

22   affirmative defense.

23           We cite to authority in our brief.  This

24   gets to the amount of the debt, if there is any fact

25   question.
```

```
 1              THE COURT:  You only have one affirmative
 2   defense.
 3              MR. UNIS:  We're the plaintiffs.
 4              THE COURT:  I'm sorry, I'm confused.
 5              MR. UNIS:  I understand there's a lot to
 6   follow.
 7              The only affirmative defense -- or I guess
 8   there's two that are still at issue --
 9              THE COURT:  Standing.
10              MR. UNIS:  -- is really standing.
11              And so throughout this litigation, Your
12   Honor, if you recall our summary judgment motions,
13   we put on extensive proof from our client's
14   controller, Ms. Sandy Zazulak, that established the
15   amount of the debt three or four different ways.
16   And they all led to the same conclusion, which is
17   also addressed in the Court's most recent ruling,
18   ECF-110, on our Motion for Reconsideration.
19              So we don't think there's any dispute as
20   to the amount owed.  We would like to stipulate to
21   that.
22              THE COURT:  Let me hear from Ms. Lindauer.
23              Come on up here.
24              MS. LINDAUER:  Thank you.
25              THE COURT:  What's your beef with the
```

10

```
 1    Motion in Limine Number 1?
 2              MS. LINDAUER:  Motion in Limine Number 1,
 3    I would agree with them that we would not be using
 4    documents to prove the amount due and owing.  That
 5    would be their documents.
 6              But the documents that reflect the amount
 7    due and owing also reflect who was actually charging
 8    the amounts due and owing.  So that's the snaggy
 9    part of that.
10              So while they may not be offered to
11    actually prove up the total amount due -- and I
12    would agree, there's really not a dispute over how
13    much is owed.  But the actual payment invoices and
14    shipping manifests and all of that stuff goes to the
15    question of who was the actual party.
16              THE COURT:  I agree.
17              MS. LINDAUER:  So you understand the
18    issue.
19              So we're not using it for the purpose they
20    are suggesting, and we put that in our response.
21              Really, we think it goes to the question
22    of standing.
23              THE COURT:  Mr. Unis, come on up.  You can
24    just --
25              MS. LINDAUER:  Stay here.
```

```
 1              THE COURT:  Fine.
 2              MS. LINDAUER:  Have you had any shots?
 3              MR. UNIS:  I've had my first dose.
 4              MS. LINDAUER:  I've had two, so I just
 5    wanted to be sure.
 6              MR. UNIS:  Your Honor, I think with the
 7    stipulation it's not confusing, and I have no issue
 8    with the exhibits.
 9              We're not disputing the fact that they say
10    "Imperial-Bossier."  I think it becomes potentially
11    confusing and prejudicial for the jury if you are
12    putting in all this evidence of payment, and then
13    they're asked to somehow determine what the amount
14    is.
15              THE COURT:  Ms. Lindauer, what can you
16    agree to?
17              MS. LINDAUER:  Your Honor, I think we can
18    agree to the amount.
19              THE COURT:  Okay.
20              MS. LINDAUER:  To the extent that they
21    establish -- the real question here is who is
22    liable, or who is responsible.
23              THE COURT:  Right.
24              MS. LINDAUER:  That's the question.  Yeah,
25    I don't think there's really a dispute as to the
```

1    amount.  If we're off for a few dollars, we're not

2    going to argue about that.

3              THE COURT:  So you're going to stipulate

4    to the amount owed, but you want those other

5    documents, then, to show the people transacting.

6              What about that?

7              MR. UNIS:  I think I'm agreeable to that.

8    I would like to confer with my co-counsel --

9              THE COURT:  Sure.

10             MR. UNIS:  -- Your Honor.  But I really do

11   believe it's a binary issue.  It's either zero or

12   the amount we have pled.

13             THE COURT:  Okay.  I'm going to grant in

14   part and deny in part -- assuming your partner

15   agrees -- with the amount stipulated to.  You-all

16   put together a stipulation, and the other -- yes,

17   sir.  Mr. Swanson?

18             MR. SWANSON:  I just wanted to clarify

19   before I agreed or disagreed.  I agree with the

20   stipulation to the amount sought.  I got a little

21   sidetracked on the second part of that, which is the

22   manifests and the statements.  Was that -- was that

23   the part --

24             THE COURT:  Ms. Lindauer, why don't you

25   explain.

```
 1              MS. LINDAUER:  Understood.  So as I
 2    understood it, the limine that was filed addressed
 3    certain exhibits that would go to the actual amount
 4    being claimed, as well as perhaps delivery of the
 5    goods that make up that amount.
 6              I don't think we're disputing -- because
 7    we don't have a defense on it -- the amount that
 8    you're claiming.  The dispute is who was the
 9    contract with or who was the agreement with with
10    regard to those particular amounts.
11              So I think the documents come in under
12    that theory, but not to prove the actual amount due.
13    I think we can agree that the amount due --
14              THE COURT:  I will give them a limiting
15    instruction.
16              MS. LINDAUER:  Right.  Right.  So I think
17    we can agree on the amount due.
18              MR. SWANSON:  Right.  And the only
19    clarification -- and I proposed this yesterday when
20    we were conferring -- is Ms. Lindauer can argue
21    whatever she wants about what she thinks the
22    documents mean or say.
23              We would ask her to identify, because the
24    Court's scheduling order, 9C, said a specific
25    description.
```

14

```
 1            THE COURT:  All of the exhibits should be
 2   described and numbered by now.
 3            MS. LINDAUER:  They are.
 4            MR. SWANSON:  But this goes to those
 5   exhibits.  Because Imperial Trading Company-Bossier
 6   is critical to the description of the manifests, the
 7   statements, the invoices.  It's on every one of
 8   them.
 9            And that's critical because -- one more
10   thing.
11            THE COURT:  No, no, I'm just going to tell
12   her to be quiet.
13            MS. LINDAUER:  I'm being quiet.
14            MR. SWANSON:  One more thing.  Plaintiff's
15   Exhibit 6 -- and I don't think you objected to it,
16   because you produced it -- is a letter to all the
17   Harrison customers dated October 1st, 2014, that
18   says, "We're going to call Harrison Imperial Trading
19   Company-Bossier."  Tells every customer that.
20   They've got a copy and have produced it back to us.
21            So I just don't want the confusion for the
22   jury, because they're going to say, "Oh, I'm doing
23   business with Imperial Trading."  Well, it says
24   "Imperial Trading Company-Bossier."  That's what the
25   letter said you're going to get.
```

15

```
 1              THE COURT:  Well, I think this is just the
 2   dispute.
 3              MR. SWANSON:  It's not a fact question,
 4   it's a legal question.  We admit, we stipulate, that
 5   those invoices say "Imperial Trading
 6   Company-Bossier."  We stipulate that the statements
 7   say that.  We stipulate that the Bills of Lading
 8   that are not even left with the customer, they are
 9   signed when the truck driver brings them back to
10   Bossier City.
11              We stipulate -- we sent over 40
12   stipulations, a couple that say all that's true.
13              We think the question is for the Court,
14   taking that landscape, is the remaining fact
15   question.  Because I don't think we ask the jury,
16   "Do you find from a preponderance of the evidence
17   that Harrison Company has standing."
18              THE COURT:  Well, I looked that up this
19   morning, and I can't tell yet.  I thought it was a
20   question for the Court.  Yeah.
21              MR. SWANSON:  We both agree -- actually,
22   the one thing the parties agreed on back last --
23   when we filed our cross-motions was that we admit
24   that they say "Imperial."  We explain why they say
25   "Imperial."  We're not going to ask the jury -- it's
```

1   not whether the light was green or red, it's on

2   there.  And we don't want people talking about

3   the -- the limiting instruction is, "This means

4   this," the Court gets to decide what a document is.

5            THE COURT:  How do you think this plays

6   out in your scenario?

7            MR. SWANSON:  I think we stipulate to the

8   admissibility and description of all those exhibits,

9   and they stipulate to the amount.  And then we all

10  come to you and say, "Do you think there's a fact

11  question?  And, if so, what is it?"  Because I don't

12  want to waste the Court's time or these people's

13  time or her time or her clients'.

14           THE COURT:  Ms. Lindauer.

15           MS. LINDAUER:  I think I heard some sort

16  of motion.

17           THE COURT:  Excuse me.  One at a time.

18  Slowly.

19           MS. LINDAUER:  So let me just address the

20  actual dispute that came up.

21           So we have a stack of invoices that say,

22  "Imperial Trading."  And they have a little notation

23  on there that says, "Bossier."  All right?

24           So what they want is, when we refer to

25  those exhibits with the jury, we call them the

17

```
1   "Imperial Trading-Bossier invoices."
2           And I said, "Well, why do we have to do
3   that?  You can call them whatever you want to call
4   them, and I will call them whatever I want to call
5   them.  They are Imperial Trading invoices.  Now, you
6   might want to point out to the jury that they say
7   'Bossier' on there and that that has some sort of
8   meaning in the greater context.  But I don't think I
9   should be limited to have to say all of these are
10  Imperial Trading-Bossier, they are just Imperial
11  Trading invoices."
12          That was the argument we were having
13  yesterday afternoon.
14          And he said, "Well, the judge said we both
15  have to agree on what we call these documents."
16          THE COURT:  No, you don't.
17          MS. LINDAUER:  I don't think we need to.
18  You can call them soup to nuts, and I can call them
19  candy.  It's just whatever we want to call them.  So
20  saying they are Imperial Trading-Bossier, that's
21  fine, that can be his position.
22          So do you understand what the issue is?
23          THE COURT:  Yes.
24          MS. LINDAUER:  Okay.  Got it.
25          MR. SWANSON:  Which goes back to if
```

```
 1    there's no dispute as to the amount due and owing,
 2    it goes to the relevance or admissibility of any of
 3    those underlying statements.
 4              THE COURT:  I see the relevance, though.
 5    Because they're trying to say that it was you and
 6    them, right?
 7              MS. LINDAUER:  Right.
 8              MR. SWANSON:  Well, Imperial is not in the
 9    courtroom.  So you, Harrison, is here, not you,
10    Imperial.
11              THE COURT:  Doesn't matter.  Imperial is
12    very much in the case.
13              MR. SWANSON:  Yeah, right.  It doesn't
14    have a claim in the case.
15              THE COURT:  No, no, no.  But Imperial is
16    part of the fabric of this case.
17              MR. SWANSON:  Right.  And we've explained
18    that.  And I don't think there's a fact dispute as
19    to where Imperial sits in this case.
20              That's where I was going.
21              THE COURT:  Ms. Lindauer, where is the
22    fact dispute?
23              MS. LINDAUER:  The fact dispute is -- and
24    I think you did a good job of outlining it in the
25    last order that you entered.  So I grabbed it, your
```

```
 1   memorandum opinion and order -- which is now, by the
 2   way on Westlaw.  So you made some law there --
 3   Document 110.  I think you pointed out that there
 4   are competing factual elements over the question of
 5   who, in fact, were we doing business with and who
 6   did we have a responsibility to pay.
 7              THE COURT:  Yeah.
 8              MS. LINDAUER:  Let me give you an example.
 9              We thought about this a lot.
10              So Verizon and AT&T, these telephone
11   companies, are all the time changing and merging.
12   So you've got --
13              THE COURT:  Slow down.
14              MS. LINDAUER:  Okay.  So you've got your
15   cell phone with Verizon, right?  And you deal with
16   Verizon for three or four years.  All of a sudden
17   you get a bill from AT&T.
18              AT&T says, "Now pay us on your cell phone
19   bill."  And you go and you look and you say, "Oh,
20   there was some kind of transaction between AT&T and
21   Verizon."  So you start paying AT&T, and you pay
22   them for a couple years.
23              And then all of a sudden, maybe you quit
24   paying, you can't afford to pay, whatever, and then
25   you get a lawsuit from Verizon, not AT&T.
```

```
 1              And you say, "Wait a minute.  I thought I
 2    owed AT&T.  I didn't think I had Verizon anymore.
 3    You told me I owed AT&T."
 4              That's essentially the dispute here is,
 5    who is responsible as far as who -- are we
 6    responsible to pay?  And when you tell us that this
 7    is the responsible party, Imperial.  We write you
 8    checks.  We order goods from you.  We do all these
 9    things for a couple of years, not just for a moment,
10    for a couple of years.  And then you come back and
11    say, "Well, now you're in default.  Don't pay
12    Imperial, who you have been dealing with, pay
13    Harrison."
14              THE COURT:  Describe for me the fact
15    issues.  What's at issue?
16              MS. LINDAUER:  So the fact issue, I think,
17    is, when did the relationship -- if it ever ended,
18    when did the relationship between Harrison and A-Z
19    actually end?  Did it end when Imperial started
20    sending their invoices and goods?  Or did that
21    relationship with Harrison continue even though we
22    were getting documents from Imperial?  So I think
23    there's a question about the relationships of these
24    various parties.
25              Our position is, Your Honor, very simple,
```

```
1   that the credit agreement that forms the basis of
2   their claims was between A-Z and Harrison.  I don't
3   think there's any dispute about that.  We agreed to
4   that exhibit.
5           But at some point, the relationship
6   between A-Z and Harrison stopped, and then A-Z
7   started doing business with Imperial, and there was
8   no subsequent credit agreement.
9           Now, there was an offer of a credit
10  agreement, and that will be some of the testimony.
11  But there was never a signed credit agreement
12  between Imperial and A-Z.  So all we have, then, are
13  the invoices.
14          THE COURT:  Okay.
15          MS. LINDAUER:  So the invoices, in
16  essence, become the contract, if you will, between
17  Imperial and A-Z.
18          THE COURT:  This is why I told you this is
19  going to be confusing for the jury.
20          MS. LINDAUER:  But I think it's a little
21  common sense, if you think about it.  Because,
22  again, go back to my analogy, which is people deal
23  with these issues -- okay, another one.  You have a
24  mortgage.  Your mortgage is with --
25          THE COURT:  I know all this.
```

```
 1              MS. LINDAUER:  But you see what I'm
 2    saying?  These companies do this, but at some point
 3    that relationship is defined for a period of time,
 4    and then this relationship is defined for a period
 5    of time --
 6              THE COURT:  Okay.
 7              MS. LINDAUER:  -- so. . .
 8              THE COURT:  Mister -- I'm sorry.
 9              MR. SWANSON:  Swanson.
10              THE COURT:  Mr. Swanson.  I'll get used to
11    this.
12              MR. SWANSON:  No problem, Your Honor.
13              The problem, if I might point out, with
14    the AT&T/Verizon analogy is it ends with, "I
15    thought."  I thought.
16              We're not going to ask, "What did Amar Ali
17    or Barkat Ali or A-Z Wholesalers do for you to find
18    that they thought that?"  It's not a predicate
19    element of any claim.
20              THE COURT:  Yeah, yeah.
21              MR. SWANSON:  So we're not going to ask
22    the thought police on what that thought was.
23              On the credit agreement, we get to choose
24    which contract we're suing on, and we either win or
25    lose on our contract.
```

23

```
 1              What Ms. Lindauer wants to say is, "I
 2      don't like that contract.  I like to say that the
 3      invoices you sent me are my only contract," which
 4      then goes to our trial brief we submitted back in
 5      January --
 6              THE COURT:  I've got it.  I've got it.
 7              MR. SWANSON:  -- on that choice of law,
 8      where Louisiana says -- and it may or may not
 9      matter.  But in Louisiana law it really matters,
10      because you can't have an oral credit agreement in
11      Louisiana.
12              I think it's in our reply brief to their
13      response to the motion for summary judgment.  I
14      didn't look this morning, but we addressed the Texas
15      version of that, which would be the Statute of
16      Frauds.
17              And I know that -- so I'm not trying to
18      get too deep, but it does matter, because the
19      ultimate issue is not really who they thought they
20      were doing business with.  The only reason we're
21      here is to get the guarantor off the liability.
22      That's what the fight's about.  Because A-Z's
23      argument is, "We have an oral agreement with
24      Imperial.  And, by the way, your guarantor, Mr. Ali,
25      he's not part of that oral agreement, that's just
```

```
 1    A-Z."

 2              That's what this case is about, is trying

 3    to get Mr. Ali off his guarantee.  It's not really

 4    about all this, "What name is on the truck?  What

 5    name is on the invoice?"  It is, "Do I still -- does

 6    my client, Harrison Company, still have a creditor?"

 7              THE COURT:  What are the fact issues?

 8              MR. SWANSON:  I don't think there are any.

 9    I can't find one.  I have scoured.

10              THE COURT:  So you are suing on which

11    contract?

12              MR. SWANSON:  We are suing on the credit

13    agreement, the March 11, 2011, agreement.

14              THE COURT:  2011.

15              MR. SWANSON:  2011.  It says, "Credit

16    Application, Credit Agreement or Agreement Terms and

17    Guarantee."  And it's a credit agreement that was in

18    place, and we don't think it's been terminated.  The

19    word was used in the response filed this morning to

20    our motion in limine that it lapsed.  And once

21    again, I go, "What's the lapse question?"  I'm going

22    to ask, "Do you find from a preponderance of the

23    evidence that it lapsed?"  I think that would be a

24    question for Your Honor.

25              THE COURT:  Okay.
```

```
 1               MS. LINDAUER:  Can I go back?
 2               THE COURT:  Go ahead.
 3               MS. LINDAUER:  So here's -- based on your
 4     opinion.  So here's the facts.
 5               THE COURT:  Which one?  Which one?
 6               MS. LINDAUER:  The order that you entered.
 7               THE COURT:  I entered several orders.
 8               MS. LINDAUER:  The most recent one.
 9               THE COURT:  110.
10               MS. LINDAUER:  Yeah, 110.
11               So you talk about standing, right?  And
12     there's questions about contractual standing, those
13     issues.  But the law is, when you have a dispute
14     over standing, the fact question is, which principal
15     was, in fact, the contracting party?  That is the
16     fact question.  Which principal is the one that
17     actually had the contract for this particular
18     situation?
19               And that's where you said you thought
20     there were competing facts on both sides of that
21     issue, which -- because if you look at your standing
22     issue, I think it's on page 6.
23               THE COURT:  Yeah.
24               MS. LINDAUER:  "Genuine dispute of
25     materials whether Harrison has contractual standing.
```

1   And therefore you --" so the factual question is,

2   which principal was the contracting party?

3              And based on the law, that actually is a

4   question for the Plaintiff, not the Defendant.  The

5   Defendant has to prove it is the party that had the

6   contractual standing.  Okay?

7              And so of course our position is, is that

8   when they changed all of their invoices and

9   everything, they took away the Harrison, and they

10  accepted payments under Imperial.  So those are the

11  actual facts is -- is, which principal was the

12  contracting party at the very beginning, we know

13  that.

14             THE COURT:  The 3/11/11, or something,

15  whatever the contract is?

16             MS. LINDAUER:  Right, at the very

17  beginning.  And then of course it's our position

18  that that contract -- or testimony would show that

19  that contract was actually paid off.

20             THE COURT:  That was Harrison and A-Z,

21  right?

22             MS. LINDAUER:  Right.  That contract was

23  paid off, and then a relationship existed between

24  Wholesale, A-Z and Imperial.  So he's right in a

25  way.  I'm not going to disagree with him.  Okay?

 1              We think that the original lawsuit they

 2     filed in State Court, which was Imperial versus A-Z,

 3     was really the correct lawsuit because Imperial --

 4     so here's the question.  Imperial clearly could have

 5     sued on those invoices, right?  They nonsuited that

 6     action, okay?  And then they filed this action in

 7     Federal Court involving Harrison, okay?

 8              And we brought up to them several times,

 9     the reason they don't like the Imperial lawsuit is

10     because there is a question about whether the

11     guarantor -- I will agree with him -- whether the

12     guarantor agreed to guarantee the Imperial invoices

13     or did he simply guarantee the Harrison debt that

14     was then paid off.

15              So that's the fundamental question here

16     really.  He's right.  I mean, I'm not going to

17     dispute that.  I think if they had maintained their

18     Imperial lawsuit in State Court, that would have

19     been probably the right thing to do.  But we don't

20     have that, but we do have those exhibits which they

21     have objected to.

22              THE COURT:  Mr. Swanson.  Go ahead and

23     talk into the microphone.

24              MR. SWANSON:  In reverse order, I guess,

25     the nonsuit, the State Court deal, I got involved

28

```
 1   after that case was filed.  I looked at it.  I asked
 2   the question and said, "Explain to me the nature of
 3   the business."  I said, "What's your agreement with
 4   them?"  It was the March 11, 2011, agreement.  I
 5   said, "Does Harrison still exist?"
 6              He said, "yes."
 7              I said, "Then Imperial has no claim --
 8   it's on the books of Harrison, it's a receivable of
 9   Harrison, Harrison pays its own taxes, Harrison has
10   its own Web."
11              I said, "Well, how did you get to
12   Imperial?"
13              So the bottom line is -- even though I
14   don't think anything about the State Court lawsuit
15   should come in, the bottom line is a mistake was
16   found -- let's just call it a mistake, whether it's
17   the client or the lawyer, it's a mistake.  So what
18   do you do to fix the mistake?  You nonsuit it,
19   because it's wrong.  And you file the legally
20   correct lawsuit, and because it's diversity we filed
21   it in Federal Court.  That's the history.
22              And now we're trying to use it as a cudgel
23   to say, "See, it really belongs to Imperial."  We
24   corrected the mistake.  So that's that part of it.
25              I want to address the Court briefly, if I
```

```
 1   may, on 110, and I cross-reference it to --
 2              THE COURT:  Yeah, what page are you on?
 3              MR. SWANSON:  I'm on the same page she's
 4   on, page 6.
 5              On page 3 of our Joint Pretrial Order,
 6   they have a contention -- which goes to a lot of
 7   stipulations and motions in limine -- which is,
 8   "Harrison ceased to exist."  For a while they said,
 9   "We merged," Harrison merged.  And then they dropped
10   that because we didn't merge, and there's no proof
11   we merged.  But they still have a contention that
12   Harrison ceases to exist.
13              So then I go to page 6, and I wrote them
14   out and cut them out, and they were:  Standing;
15   Capacity; Authority; and Privity.  And I worked
16   backwards from our stipulations and objections.
17   Privity of the contract.  The parties have agreed to
18   Stipulation Number 6 in the joint pretrial order,
19   which is the contract I'm suing on.
20              The parties have offered a copy of
21   Plaintiff's Exhibit 1 and --
22              THE COURT:  Slow down.  Start again.
23   Plaintiff's offered a copy --
24              MR. SWANSON:  So we stipulated to the
25   contract.  They just say that's not the right one,
```

```
 1    but they have stipulated to it.  It's in my exhibits
 2    and theirs, and neither have objected to it.  So if
 3    we have privity, which is a question for the Court
 4    based on the undisputed facts that that's the
 5    agreement, I'm Harrison --
 6              THE COURT:  A-Z.
 7              MR. SWANSON:  So we have privity.  So then
 8    the next question becomes standing versus
 9    performance or standard versus capacity.
10              THE COURT:  You can sit down, Mr. Unis,
11    it's fine.
12              MR. SWANSON:  I didn't see him.
13              And so when I was trying to merry
14    harmonize the rulings with the stipulations with the
15    exhibits, I got down to, we have -- each have one
16    contested issue that is close to being the same
17    thing that could, I suppose, be a fact question.
18    Who performed?  Who delivered the goods?  Who
19    performed?  Because we have a contract.  It's offer,
20    acceptance, consideration, performance.  They
21    admit -- they stipulate --
22              THE COURT:  You were the offerer.
23              MR. SWANSON:  Yeah, well, they came and
24    asked for credit.  And we said, "We will give you
25    credit."
```

1          And they said, "Okay, I'm going to buy

2    about a hundred to $200,000 worth of a cigarettes a

3    week," which they did.

4          THE COURT:  Ms. Lindauer, your papers are

5    making noise.

6          MS. LINDAUER:  Oh, I'm sorry.  I was just

7    trying to flip ahead a little bit.

8          MR. SWANSON:  So that's our agreement.  "I

9    give you credit.  You guarantee that credit.  You

10   buy on credit, cigarettes.  I deliver those

11   cigarettes.  You sell those cigarettes to others,

12   and you pay me."  But at some point they stopped.

13         So we have an unpaid balance under that

14   contract, the balance of which we just stipulated

15   to.  We've already stipulated to the contract.  So

16   if I were to find a fact question, which I don't

17   really think there is one, is did we perform -- do

18   you find from a preponderance of the evidence that

19   Harrison Company delivered the cigarettes?

20         THE COURT:  Yeah, yeah.

21         MR. SWANSON:  And I don't think the

22   subjective belief that -- it says "Imperial" on the

23   side of the truck.  Sure did.  It said "Harrison,"

24   too.

25         It said "Imperial" on the Bills of Lading.

```
 1    Sure did.  It said "Bossier," too.
 2              So we still lead back to what's the legal
 3    import of those things?
 4              THE COURT:  Ms. Lindauer, anything?
 5              I'm going to take a break right now,
 6    because I'm going to talk to my clerk a little bit.
 7              Anything else?
 8              MS. LINDAUER:  I think if you look at the
 9    First Amended Proposed Jury Questions that we filed
10    this morning, I think that those questions are the
11    right questions, which is:  "Was A-Z obligated under
12    the credit agreement to pay Harrison Company, LLC?"
13              Then, "Was A-Z to obligated under the
14    creditor --"
15              THE COURT:  Wait, wait, wait.  To pay
16    Harrison Company, right?
17              MS. LINDAUER:  Right.  These are page 9
18    and 10 of our proposed jury questions.
19              THE COURT:  I can't find those right now.
20              What was the second question?
21              MS. LINDAUER:  The second question is:
22    "Was A-Z obligated under the credit agreement to pay
23    Imperial Trading Company?"
24              Those are very simple questions.  I think
25    a jury can understand that.  Were they obligated to
```

1   pay Harrison, or were they obligated to pay

2   Imperial?

3           And then, if you say, "Yes, they're

4   obligated to pay Harrison," okay.  Then, "Did that

5   relationship at some point end?"  And that's going

6   to be the testimony.  And of course they're going to

7   say, "No, it didn't," and we're going to say, "Yes,

8   it did."  So, again, that's the question for the

9   jury.  And then, "How much do you find for damages?"

10  We've agreed on a damage amount.

11          And same thing for the guarantor.  "Was he

12  obligated under the Harrison agreement?"

13          "Yes or No?"

14          "And was he obligated under some agreement

15  with Imperial?"

16          "Yes or no?"

17          And if he still -- so the question is --

18  it's really a timing question, which is, "Did this

19  relationship ever stop?"

20          They're saying "No," and we say, "Yes."

21          THE COURT:  Mr. Swanson.

22          MR. SWANSON:  Both examples she gave

23  you -- because I got this this morning, too -- she

24  just asked you to construe the terms of an

25  unambiguous writing.  That's a question of law,

```
 1   that's not a question you ask the jury.
 2             THE COURT:  Okay.  All right.  Let's take
 3   a short break, and I will be right back.
 4             MS. LINDAUER:  Thank you, Your Honor.
 5             (Recess taken.(
 6             THE COURT:  I think that Mr. Swanson has
 7   the better argument.  And I think what I'm going to
 8   do is this:  I'm going to have them file another
 9   summary judgment motion on these issues, because
10   this is really confusing.  You respond to it.  And
11   if there's anything left, we will have a jury trial.
12   Okay?
13             MS. LINDAUER:  Who's filing summary
14   judgment, us or them?
15             THE COURT:  Them.
16             MS. LINDAUER:  Okay.  All right.
17             THE COURT:  Right, Mr. Swanson?
18             MR. SWANSON:  Yes, Your Honor.
19             By when?  When would the Court --
20             THE COURT:  Well, I would like it within
21   two weeks or 30 days.  Which would you prefer?
22             MR. SWANSON:  I'd prefer the 30 days, just
23   because there are other things --
24             THE COURT:  All right.  Thirty days.  The
25   response 21 days after, and then the reply.
```

```
 1            MR. SWANSON:  Understood, Your Honor.
 2            THE COURT:  And, you know, I don't want to
 3   do this, but I think this is so confusing, and a
 4   jury is going to just die when they hear it.
 5            And, you know, I think that -- I think we
 6   need to just test his legal issues out and see if I
 7   think at the end there's a fact issue, because I
 8   just don't think there is.
 9            Go ahead, Ms. Lindauer.
10            MS. LINDAUER:  Couple of things:  One,
11   you're not as scary in person as you are in your
12   writings.  So I was actually going to go back and
13   report to my clients that I thought there was a good
14   possibility we should let you try the case.  Because
15   I do think you would be fair, from what I'm seeing
16   here in court.
17            THE COURT:  I would be very fair.
18            MS. LINDAUER:  Yeah, right.  I just
19   haven't had any experience with you as a judge other
20   than just reading what you write.
21            THE COURT:  I thought we had something a
22   long time ago.
23            MS. LINDAUER:  Maybe 10 or 15 years ago.
24   Normally, I'm in the Bankruptcy Court, so this is a
25   little different experience.
```

```
 1              THE COURT:  It was a bleed-off of some
 2    bankruptcy matter, I think.
 3              MS. LINDAUER:  Probably.  But
 4    irrespective, I was going to go back and report
 5    that.  So I will let you know an answer today on
 6    that, because if you try it, then you could ferret
 7    all this out very quickly, I think, and it would
 8    literally take a day.
 9              THE COURT:  Mr. Swanson?
10              MR. SWANSON:  We've been out
11    two-and-a-half-million dollars for two years.  We're
12    trying to save money.  Our witnesses are from New
13    Orleans and Bossier City.
14              Please let us file the motion for summary
15    judgment.
16              MS. LINDAUER:  That's fine.  That's fine.
17              THE COURT:  Thirty days.  We will send a
18    schedule out.  But, again, I think this case is so
19    confusing with legal issues and fact issues.
20              MS. LINDAUER:  Can we have 30 days to also
21    file --
22              THE COURT:  You can have 30 days.
23              MS. LINDAUER:  -- to also file a summary
24    judgment?
25              THE COURT:  Thirty days together, and you
```

1  will file them separate.  And you respond and you

2  respond.

3          MS. LINDAUER:  Okay.  And I will let you

4  know probably by Monday, to the extent that you

5  ultimately determine that you find a fact question,

6  whether we would be okay with you handling that.  So

7  I'll let you know that, too.

8          THE COURT:  Okay.

9          MS. LINDAUER:  Because I do think if you

10  heard it, it would be one day, at the most a day and

11  a half.  If you do a jury, you're right that could

12  take a week, because they have to have breaks, and

13  they have to have lunch.

14          THE COURT:  And COVID stuff.

15          MS. LINDAUER:  COVID stuff, too.

16          THE COURT:  Mr. Swanson.

17          MR. SWANSON:  Nothing further, unless you

18  want me to reaffirm that we will try the case to

19  Your Honor, we would be happy to do that, too, if

20  there's a fact issue.

21          THE COURT:  If there's a fact issue.  I

22  can't ferret it all out right now.  I will ferret it

23  out, and you file the motions, and I will decide

24  from there, and I'm hoping it will be very soon.

25          Thank you very much.  We will be in

1    recess.

2                (Court in recess at 9:46 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

39

1                    C E R T I F I C A T E

2            I, Shawnie Archuleta, CCR/CRR, certify

3     that the foregoing is a transcript from the record

4     of the proceedings in the foregoing entitled matter.

5            I further certify that the transcript fees

6     format comply with those prescribed by the Court and

7     the Judicial Conference of the United States.

8            This 7th day of April 2021.

9

10

11                        s/Shawnie Archuleta
                          Shawnie Archuleta CCR No. 7533
12                        Official Court Reporter
                          The Northern District of Texas
13                        Dallas Division

14

15

16    My CSR license expires:  December 31, 2021

17    Business address:  1100 Commerce Street
                         Dallas, TX  75242
18    Telephone Number:  214.753.2747

19

20

21

22

23

24

25

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**