# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

HARRISON COMPANY LLC,     §
    §
    Plaintiff,     §
    §
v.     §     CIVIL ACTION NO. 3:19-CV-1057-B
    §
A-Z WHOLESALERS, INC. and     §
BARKAT G. ALI,     §
    §
    Defendants.     §

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiff Harrison Company LLC ("Harrison")'s Second Motion for Summary Judgment (Doc. 133) and Defendants A-Z Wholesalers, Inc. and Barkat G. Ali's Second Motion for Summary Judgment (Doc. 136). Harrison's Second Motion for Summary Judgment (Doc. 133) is **GRANTED**, and Defendants' Second Motion for Summary Judgment (Doc. 136) is **DENIED**. Next, Harrison's objections and motions to strike (Docs. 140 & 144) are **MOOT**. Finally, Defendants' objections, as set forth in their response (Doc. 141), are **OVERRULED IN PART** and are otherwise **MOOT**. The Court explains its reasoning below.

## I.

## BACKGROUND[1]

### A.   *Factual Background*

This is a breach-of-contract and breach-of-guaranty action by Harrison against Defendant

---

[1] All facts are taken from the briefing, which cites to the parties' appendices. *See generally* Doc. 134, Pl.'s Mot. Br.; Doc. 137, Defs.' Mot. Br.; Doc. 139, Pl.'s Resp.; Doc. 141, Defs.' Resp.

A-Z Wholesalers, Inc. ("A-Z") and A-Z's president and CEO, Defendant Barkat Ali ("Ali"). Harrison is a regional food distributor that fills orders and "distributes products to its customers from its warehouse located [in] Bossier City," Louisiana. Doc. 134, Pl.'s Mot. Br., 5. In March 2011, Harrison executed a Credit Agreement with A-Z to supply A-Z with various goods, particularly cigarettes. *Id.* at 5–6. As "Harrison . . . generally require[s] customers to provide one or more personal guaranties," Ali guaranteed A-Z's payment by a separate agreement ("the Guaranty"). *Id.* at 5. In relevant part, the Guaranty states that Ali "personally guarantee[s] to [Harrison] payment of any obligation of [A-Z]" and that Ali will "pay [Harrison] on demand any sum which may become due to [Harrison] by [A-Z] whenever [A-Z] shall fail to pay the same." *See* Doc. 138, Pl.'s Mot. App., 24. After the Credit Agreement and Guaranty were executed, "Harrison began to sell products to A-Z." Doc. 134, Pl.'s Mot. Br., 5. Harrison assigned A-Z two customer account numbers—one for A-Z's Waco location and one for its Dallas location. *Id.* at 6; Doc. 141, Defs.' Resp., ¶ 24. Whenever A-Z would order from Harrison, Harrison would send A-Z an invoice. Doc. 134, Pl.'s Mot. Br., 6; Doc. 141, Defs.' Resp., ¶ 6; *see* Doc. 138, Defs.' App., 183–97. At least since 2014, "every A-Z order was filled by Harrison from its inventory in its Bossier City warehouse." Doc. 139, Pl.'s Resp., 4; *see* Doc. 135, Pl.'s Mot. App., 55.

In 2014, Harrison's parent entity, Noble Feldman, Inc. ("Noble Feldman"), merged with Imperial Trading Company LLC ("Imperial"). Doc. 134, Pl.'s Mot. Br., 6. Imperial then became Harrison's sole member, sharing "common upstream ownership" with Harrison, yet remaining "separate entities." *Id.* The events giving rise to the current dispute between Harrison and Defendants arose after Noble Feldman's merger with Imperial. In general, the parties do not dispute

the facts of the events but rather the significance of them.

Following the merger, A-Z began receiving invoices that were different from the invoices it received from Harrison before the merger. *See* Doc. 141, Defs.' Resp., ¶ 2; *see also, e.g.*, Doc. 138, Defs.' App., 27. These new documents did not show "Harrison" but rather bore "the Imperial logo and name in large font[.]" Doc. 141, Defs.' Resp., ¶ 2; *see, e.g.*, Doc. 138, Defs.' App., 27. The invoices also used customer account numbers for A-Z's Dallas and Waco locations that differed from the customer account numbers that Harrison previously assigned to A-Z. Doc. 141, Defs.' Resp., ¶ 2. And "as instructed by the invoices," A-Z would remit checks to Imperial, rather than Harrison. *Id.* In addition, after the merger, the delivery trucks stated "Imperial" on the side as well as "Harrison." *Id.* Finally, Defendants claim that "[w]hen a customer dials the main phone number allegedly assigned to Harrison . . . , the recording says 'Thank you for calling Imperial Trading[.]'" *Id.*

This evidence, Defendants argue, demonstrates that after the merger, "all subsequent sales were conducted through Imperial" instead of Harrison. Doc. 137, Defs.' Mot. Br., ¶ 31. They claim that the merger thus "marked the clear end of A-Z's business relationship with Harrison, and the beginning of a new relationship with Imperial." *Id.* ¶ 28. While Defendants concede that "A-Z never entered into a similar credit agreement with Imperial," Defendants allege that their business with Imperial was conducted via "a separate oral agreement (i.e. open invoice contract) with Imperial for Imperial to supply A-Z as required." *Id.* ¶ 34.

Harrison, unsurprisingly, tells a different story. Harrison does not dispute the underlying facts concerning the use of Imperial's name on the invoices, payments, trucks, and phone number, but does dispute Defendants' assertion that these changes indicate the termination of Harrison and A-Z's

business relationship or the existence of an oral contract between A-Z and Imperial. *See* Doc. 139, Pl.'s Resp., 2. Harrison explains that these changes were an intentional response to Noble Feldman's merger with Imperial. *See id.* at 12. Indeed, Harrison claims that after the merger, "[f]or efficiency and economy, Imperial and Harrison began sharing certain executive level management and accounting services functions[.]" *Id.* Harrison offers additional evidence to show the changes cited by Defendants were the product of internal changes rather than changes in the identity of the party that sold goods to A-Z.

First, in October 2014, Harrison's president sent a letter ("October Letter") to Harrison's customers, stating that "[t]he acquisition of . . . Harrison . . . and now its official name change to Imperial – Bossier City further strengthens [Harrison's] ability to service [customers'] stores now and into the future." Doc. 135, Pl.'s Mot. App., 20. As Harrison explains, the use of Imperial's name, therefore, does not mean that Imperial—a separate entity—became the seller of A-Z's goods. *See* Doc. 134, Pl.'s Mot. Br., 6–7. Instead, A-Z's orders were still being filled by Harrison, under a new name, and the sales were thus still subject to the Credit Agreement. *See id.*

Second, while A-Z claims that "[a]ll Harrison-labeled statements and invoices . . . bear different account numbers from those on the Imperial labeled invoices," Doc. 137, Defs.' Mot. Br., ¶ 7, Harrison explains that beginning in 2015, "Harrison and Imperial integrated the two companies' accounting systems[.]" Doc. 134, Pl.'s Mot. Br., 7. And "because Imperial is the more prominent brand," Harrison changed "the formatting of [its] invoices" to match Imperial's. Doc. 139, Pl.'s Resp., 10. Thus, as part of the integration process, "Harrison replaced its customers' old, 6-digit numbers with new, 5-digit numbers[.]" Doc. 134, Pl.'s Mot. Br., 7. And Harrison provides evidence of its

transition to the new accounting system. Harrison shows that, from May 2015 to August 2016, the invoices sent to A-Z—bearing the Imperial name and logo—contained both the old and new account numbers and showed "Bossier" on them as well. *Id.* at 8; *see* Doc. 135, Pl.'s Mot. App., 30–38. The term "Bossier," Harrison explains, "is how Imperial knows, internally for accounting purposes, that the sales and revenue are attributed to Harrison." Doc. 139, Pl.'s Resp., 12. After August 1, 2016, the invoices still showed "Imperial" and "Bossier," but showed only the new customer account numbers. Doc. 134, Pl.'s Mot. Br., 8. The changes in invoices and customer numbers, Harrison explains, is therefore not evidence of a new agreement between A-Z and Imperial, but rather an internal change in Harrison's accounting system. Doc. 139, Pl.'s Resp., 12.

Finally, every order by A-Z after the merger "was filled by Harrison from Harrison's warehouse in Bossier City," Louisiana. Doc. 139, Pl.'s Resp., 4; *see* Doc. 135, Pl.'s Mot. App., 55. And though "A-Z, and other Harrison customers, would remit payment to Imperial for those 'Bossier' invoices, . . . Imperial and Harrison's shared accounting people would apply those payments to the customer's accounts with Harrison." Doc. 139, Pl.'s Resp., 12. Thus, while "Imperial deposited payments . . . into one or more Imperial accounts, those receipts were all credited on Harrison's books." *Id.* Accordingly, Harrison argues that the sales made after the merger between Imperial and Noble Feldman were still subject to the Credit Agreement— not some oral contract between A-Z and Imperial. *See id.*

Regardless of who the seller was, the parties do not dispute that at some point, A-Z failed to make payments for the goods that it was receiving. Doc. 134, Pl.'s Mot. Br., 12; *see* Doc. 141, Defs.' Resp., ¶ 35. As of the date of this Order, A-Z's outstanding debt amounts to $2,575,335.73 ("the

Debt"). Doc. 134, Pl.'s Mot. Br., 10; *see* Doc. 132, Tr., 10:11–13 (Defendants' counsel stating that "there's really not a dispute over how much is owed."); *see also* Doc. 135, Pl.'s Mot. App., 47 (showing a past-due balance of $1,298,633.64 for A-Z's Dallas location), 48 (showing a past-due balance of $1,276,702.09 for A-Z's Waco location).

B.    *Procedural Background*

On January 19, 2018, Imperial filed a "UCC Financing Statement" which lists A-Z as the debtor, and lists "all equipment and inventory furnished or sold by Imperial" as the collateral. *See* Doc. 138, Defs.' App., 380 (changed to lower case). The financing statement does not indicate the amount owed and contains no mention of any agreement between the Imperial and A-Z. *See id.* On March 18, 2019, Imperial, through its counsel, delivered a demand letter to A-Z to recover the Debt. *See* Doc. 138, Defs.' App., 366. And on March 25, 2019, Imperial filed suit against Defendants in Texas state court, seeking to recover the Debt. *See generally id.* at 1–14. However, as Harrison explains, given the shared managing and accounting functions between Imperial and Harrison, "Imperial's assertion that A-Z owed it money was simply a mistake." Doc. 139, Pl.'s Resp., 6.

Thus, on May 2, 2019, Imperial "corrected [the] mistake" by moving to nonsuit its state-court case against Defendants. *Id.* That same day, Harrison, through the same counsel as Imperial, filed suit against Defendants in this Court, alleging claims for breach of contract against A-Z and breach of guaranty against Ali. Doc. 1, Compl., 3–4. Harrison also seeks attorneys' fees and interest. *Id.* at 4–5.

The Court previously denied the parties' cross-motions for summary judgment on Harrison's claims, but struck a wide array of affirmative defenses asserted by Defendants. *See* Doc. 76, Mem. Op.

& Order, 13; Doc. 110, Mem. Op. & Order, 13–14. On April 26, 2021, pursuant to the Court's Order (Doc. 131), both sides filed new motions for summary judgment. *See generally* Doc. 133, Pl.'s Mot.; Doc. 136, Defs.' Mot. The motions have been fully briefed and are ripe for review.

## II.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law governing a matter determines which facts are material to a case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The summary-judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Lab'ys*, 919 F.2d 301, 303 (5th Cir. 1990). Usually, this requires the movant to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted).

Once the summary-judgment movant has met this burden, the burden shifts to the non-movant to "go beyond the pleadings and designate specific facts" showing that a genuine issue exists. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (citing *Celotex*, 477 U.S. at 325). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* (citations omitted). Instead, the non-moving party must "come forward with specific facts showing

that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis and quotation marks omitted).

"[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary[-]judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations incorporated) (quotations marks omitted). But the Court need not "sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citation and quotation marks omitted). If the non-movant is unable to make the required showing, the Court must grant summary judgment. *Little*, 37 F.3d at 1076.

## III.

## ANALYSIS

Both parties seek summary judgment on Harrison's breach-of-contract and breach-of-guaranty claims. *See generally* Doc. 133, Pl.'s Mot. Br., 2; Doc. 137, Defs.' Mot. Br., 2. The Court first addresses Defendants' motion for summary judgment and the singular contention upon which it is premised. Rejecting this argument, the Court denies Defendants' motion. Next, the Court turns to Harrison's breach-of-contract claim and then to Harrison's breach-of-guaranty claim. Finding that no genuine issue of material fact exists as to those claims, the Court grants Harrison's motion for summary judgment. Then, the Court addresses Harrison's request for damages, followed by its request for attorneys' fees and interest. And finally, the Court addresses the parties' evidentiary objections.

A.    *Defendants' Motion for Summary Judgment Is Denied.*

Defendants seek summary judgment dismissing Harrison's breach-of-contract and breach-of-guaranty claims on the grounds that Harrison lacks contractual standing, constitutional standing, and "is not able to demonstrate that it can meet each of the required elements" for its claims. Doc. 137, Defs.' Mot. Br., ¶ 23. Defendants' arguments are entirely premised on its assertion that "Imperial, not Harrison[,] is the proper party to any claim against A-Z" regarding the debt at issue in this case. *Id.* ¶ 15. Indeed, Defendants claim that "[a]fter Imperial acquired the parent company of Harrison, all subsequent sales were conducted through Imperial" and thus not subject to the Credit Agreement or Guaranty. *See id.* ¶ 31. Instead, Defendants assert that the sales were made pursuant to "a separate oral agreement . . . with Imperial[.]" *See id.* ¶ 34. Upon review, the Court finds that not only are Defendants' positions unsupported by the evidence, but that the evidence—even when viewed in the light most favorable to Defendants—proves Harrison's position that the sales related to this case were made pursuant to the Credit Agreement.

In support of their motion, Defendants point to the changes in Harrison's internal processes after the merger between Noble Feldman and Imperial, and to A-Z's belief that it was operating under an oral agreement with Imperial. *Id.* They also point to Imperial's actions to recover the Debt in support of their claims of such an agreement. *Id.* ¶ 13. However, Defendants fail to demonstrate a genuine issue of material fact that any oral contract existed between A-Z and Imperial or regarding whether the sales were made pursuant to the Credit Agreement.

First, Defendants make much ado about the use of Imperial's name after the merger between it and Noble Feldman. For example, Defendants point out that the invoices issued to A-Z after the

merger stated "Imperial" on them, and the trucks delivering the goods "ha[d] 'Harrison' written on one side, and 'Imperial' on the other." Doc. 141, Defs.' Resp., ¶ 2. They also claim that "[w]hen a customer dials the main phone number allegedly assigned to Harrison . . . the recording says '[t]hank you for calling Imperial Trading[.]'" *Id.* However, the use of Imperial's name does not prove the existence of an oral contract between A-Z and Imperial. Indeed, Harrison points to the October Letter, which notified Harrison's customers in 2014 that as part of the merger, Harrison would undergo an "official name change to Imperial – Bossier City[.]" Doc. 134, Pl.'s Mot. Br., 7; *see* Doc. 135, Pl.'s Mot. App., 20. Harrison also points out that the invoices cited by Defendants show "Bossier." Doc. 139, Pl.'s Resp., 9; *see, e.g.*, Doc. 135, Pl.'s Mot. App., 40. So while the invoices and trucks said "Imperial," this fact does not evince the existence of any oral contract between A-Z and Imperial or that Harrison was not the seller of the goods. Rather, this evidence shows that Harrison was indeed the seller of the goods, simply operating under a new name.

Next, Defendants point out that the customer account numbers on the invoices changed after 2015, Doc. 137, Defs.' Mot. Br., ¶ 38; Doc. 141, Defs.' Resp. ¶¶ 23–26, and Defendants provide evidence that A-Z would tender payments to Imperial rather than Harrison. Doc. 137, Defs.' Mot. Br., ¶ 31 (citing Doc. 138, Defs.' App., 370–77). But these facts are easily explained by the integration of Imperial and Harrison's accounting systems that began in 2015. As Harrison describes, the account numbers shown on the invoices changed from Harrison's "old, 6-digit numbers" to the "new, 5-digit numbers" in order "to integrate the system." Doc. 134, Pl.'s Mot. Br., 7. Further, the evidence shows Harrison's gradual transition to using the new account numbers, as the invoices sent to A-Z from May 2015 to August 2016 contained both the old and new account numbers before only

showing the new numbers on invoices issued after August 2016. *See* Doc. 135, Pl.'s Mot. App., 30–38. Moreover, Harrison explains that even though "A-Z, and other Harrison customers, would remit payment to Imperial for th[e] 'Bossier' invoices, . . . Imperial and Harrison's shared accounting people would apply those payments to the customer's accounts with Harrison." Doc. 139, Pl.'s Resp., 12 (citing Doc. 53, Pl.'s First Mot. App., 3). And "[a]lthough Imperial deposited payments from A-Z and other Harrison customers into one or more Imperial accounts, those receipts were all credited on Harrison's books." *Id.* (citing Doc. 53, Pl.'s First Mot. App., 3). Thus, this evidence does not give rise to an issue of material fact concerning the termination of A-Z and Harrison's relationship or the existence of any oral agreement between Imperial and A-Z.

Further, Defendants suggest various actions taken by Imperial show that "Imperial holds itself out to the public as the [s]eller" of the goods for which A-Z failed to pay and that the sales were thus made subject to an oral agreement between A-Z and Imperial. Doc. 141, Defs.' Resp., ¶ 13; *see* Doc. 137, Defs.' Mot. Br. ¶ 34. For example, Defendants show that "Imperial retained counsel and issued a demand for payment on the same invoices for which Harrison now alleges a right to payment." Doc. 137, Defs.' Mot. Br., ¶ 30. They then show that Imperial filed a lawsuit against Defendants in state court and that "Imperial hold[s] a lien on the assets of A-Z for" the unpaid-for goods, "evinced by [Imperial's] UCC Financing Statement." *Id.* ¶¶ 32–33. However, Imperial's acts do not demonstrate the existence of an oral contract between A-Z and Imperial. To start, Harrison and Imperial's integrated accounting systems and management give weight to Harrison's explanations that "Imperial's assertion that A-Z owed it money was simply a mistake." Doc. 139, Pl.'s Resp., 6. Indeed, Harrison explains that "Brad Prendergast, Imperial's CFO, . . . and Wayne Baquet, president

of both Harrison and Imperial, 'hired and relied on outside counsel' to 'make demand on and, if no response, sue'" Defendants for the outstanding debt. *Id.* (quoting Doc. 53, Pl.'s First Mot. App., 17). Once realizing its mistake, "counsel nonsuited the State Court Case, and filed this lawsuit on Harrison's behalf[.]" *Id.* Given the relationship between Imperial and Harrison, and their shared accounting systems and management, such a mistake is entirely plausible.

Nonetheless, Imperial's acts, as described by Defendants, hardly constitute evidence of any oral agreement between Imperial and A-Z. In various contexts, courts are reluctant to give weight to a party's assertions made in pleadings that have been withdrawn. *See, e.g., Adams v. Rios*, 1996 WL 337108, at *2 (Tex. App.—Hous. [14th Dist.], June 20, 1996, no pet.) (explaining that when determining whether to judicially estop a party from taking an inconsistent position from a prior position, the estopped party "must have successfully maintained the prior position"); *Portillo v. Cunningham*, 872 F.3d 728, 737 (5th Cir. 2017) (stating that when determining whether to apply *res judicata* to a nonsuited case, courts will only bar claims "where a plaintiff suffers an adverse judgment"); *Blankenship v. Buenger*, 653 F. App'x 330, 335–36 (5th Cir. 2016) (stating that when determining whether to accept a prior pleading as a judicial admission, "withdrawn . . . pleadings are no longer judicial admissions" (quotation marks and citation omitted)); *see also Sinclair Refining Co. v. Thompkins*, 117 F.2d 596, 598 (5th Cir. 1941) ("Pleadings are for the purpose of accurately stating the pleader's version of the case, and they bind *unless withdrawn* or altered by amendment." (emphasis added)). Thus, the Court does not find that Imperial's filing of the state-court lawsuit constitutes evidence of any oral agreement between it and A-Z.

Similarly, the lien is not evidence of any oral contract because "a UCC-1 financing statement

in and of itself, which does not contain any evidence of an agreement, does not create a security interest or security agreement." *United States v. Greenstreet*, 912 F. Supp. 224, 228 (N.D. Tex. 1996). And the UCC statement filed by Imperial only describes the collateral, stating nothing of any agreement with A-Z. *See* Doc. 138, Defs.' App., 380. Thus, the UCC statement does not demonstrate the existence of an oral agreement.

In the absence of evidence of an oral agreement, and in light of the relationship between Harrison and Imperial, the Court does not find that Imperial's attempts to collect on the Debt raise a genuine issue of material fact as to the existence of an oral contract.

Finally, the evidence proves not only that there was no oral contract between A-Z and Imperial, but also that the goods were sold pursuant to the Credit Agreement between A-Z and Harrison. As Imperial's Chief Financial Officer, Brad Prendergast states in a sworn declaration that "[n]either Harrison nor Imperial will sell to a customer without a signed and approved credit application and agreement." Doc. 135, Pl.'s Mot. App., 22. And with the "limited exception" for "very large, well-capitalized corporate customers," "Harrison and Imperial generally require . . . one or more personal guaranties." *Id.* After operating with Harrison under the formal, written Credit Agreement since 2011, it seems farfetched that A-Z would simply assume the existence of "a separate oral agreement . . . with Imperial for Imperial to supply A-Z as required." *See* Doc. 137, Defs.' Mot. Br., ¶ 34. Such an assumption seems even more unlikely considering the only changes that A-Z experienced after the merger of Imperial and Noble Feldman appear to be the use of Imperial's name—of which Harrison forewarned its customers—and the use of new customer account numbers. These changes had little-to-no effect on A-Z, and the Court finds no other reason for A-Z to

reasonably believe that an oral contract with Imperial existed. Indeed, Defendants do not allege that A-Z experienced any changes in ordering procedures, pricing, delivery schedules, type or brand of goods, inventory availability, or any other indicia that might lead A-Z to reasonably believe that it was no longer doing business with Harrison. *See generally* Doc. 137, Defs.' Mot. Br.

And regardless of A-Z's alleged subjective beliefs, "[e]very A-Z order was filled by Harrison from its inventory in its Bossier City Warehouse." Doc. 134, Pl.'s Mot. Br., 9. And Harrison, rather than Imperial, "owns all of the inventory in its Bossier City Warehouse" and "employs everyone who works at its Bossier City Warehouse." *Id.* at 8–9. Among Harrison's employees are "the account manager . . . , the director of warehouse operations . . . , and the transportation manager . . . that oversaw all sales and deliveries to A-Z in 2018 and 2019." *Id.* at 9. Each of these employees submitted declarations and W-2 forms affirming that they were indeed Harrison's, not Imperial's, employees during this time and that Harrison was indeed the supplier of the goods to A-Z. Doc. 135, Pl.'s Mot. App., 49–63. As Harrison's transportation manager attests in a sworn declaration, "[e]very delivery to A-Z's warehouse in Dallas was made by Harrison in a Harrison truck." *Id.* at 60. The truck drivers that delivered the goods to A-Z were employed by Harrison as well. *Id.* at 59–60. Finally, the Debt "remain[s] as 'accounts receivable' on Harrison's books and records," rather than on Imperial's. Doc. 134, Pl.'s Mot. Br., 10. Defendants offer no evidence to the contrary. *See generally* Doc. 137, Defs.' Mot. Br.; Doc. 141, Defs.' Resp.; Doc. 148, Defs.' Reply.

Accordingly, the evidence not only disproves that the goods were sold pursuant to an oral contract between A-Z and Imperial, but proves that the goods were sold to A-Z by Harrison and therefore sold pursuant to the Credit Agreement. The Court thus concludes that Defendants have

failed to raise a genuine issue of material fact that "Imperial, not Harrison[,] is the proper party to any claim against A-Z." Doc. 137, Defs.' Mot. Br., ¶ 15. Because Defendants' motion for summary judgment is entirely dependent upon that argument, Defendants' motion for summary judgment is **DENIED**.

B.    *Harrison Is Entitled to Summary Judgment on its Breach-of-Contract Claim.*

The elements of a breach-of-contract claim are "(1) the existence of a valid contract between plaintiff and defendant; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of the contract; and (4) the plaintiff's damage as a result of the breach." *In re Staley*, 320 S.W.3d 490, 499 (Tex. App.—Dallas 2010, no pet.) (citation omitted). In Louisiana, the breach-of-contract elements are virtually the same for a contract such as the Credit Agreement. *See, e.g.*, *Denham Homes, L.L.C. v. Teche Fed. Bank*, 182 So.3d 108, 119 (La. App. 2015) ("The essential elements of a breach of contract claim are (1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee." (citations omitted)); *Harter v. Harter*, 208 So.3d 971, 980 (La. App. 2016) ("A contract is commutative when the performance of the obligation of each party is correlative to the performance of the other. . . . As a general rule, a party suing to recover on a commutative contract must allege and prove performance of his agreement." (citations omitted)).

Harrison claims that it satisfied every element of its claim that A-Z breached the Credit Agreement. Doc. 134, Pl.'s Mot. Br., 1. Defendants do not dispute the validity of the Credit Agreement. *See* Doc. 137, Defs.' Mot. Br., ¶ 14. Nor do they dispute that A-Z failed to pay for the goods it received. *See id.* ¶ 15; Doc. 141, Defs.' Resp., ¶ 35. Finally, Defendants "readily admit[] that

[A-Z] has an arrearage" in regard to those unpaid-for goods and, therefore, that the seller of those goods has been damaged. *Id.* Thus, only one question is before the Court: Did Harrison perform under the Credit Agreement? If that question is answered in the affirmative, Harrison will succeed on its breach-of-contract claim. If not, Harrison's claim will fail. After reviewing the parties' briefing and evidence, the Court finds this question is answered in the affirmative.

While Defendants repeatedly point to the use of Imperial's name and the changes in customer account numbers, Defendants' reliance on these facts misses the point. To reiterate, the only question before the Court is whether Harrison performed under the Credit Agreement. Defendants do not argue that the Credit Agreement requires the invoices and delivery trucks to say "Harrison" or that it requires Harrison to use the old, six-digit customer account numbers.

The only requirement relevant to this case is that Harrison supply and deliver goods to A-Z. And, as discussed, the evidence proves that it did. Indeed, A-Z's alleged belief as to the identity of the seller is inconsequential. Rather, Harrison performed under the Credit Agreement because, as discussed, "[e]very A-Z order was filled by Harrison from its inventory in its Bossier City Warehouse." Doc. 134, Pl.'s Mot. Br., 9. Harrison's, not Imperial's, employees worked to fill A-Z's orders, and Harrison maintains A-Z's debt on its books and records. *Id.*

In viewing the evidence in the light most favorable to Defendants, the Court finds that there is no genuine issue of material fact as to whether Harrison performed under the Credit Agreement, and therefore whether Harrison has proven its breach-of-contract claim against A-Z. Accordingly the Court **GRANTS** Harrison's motion for summary judgment on its breach-of-contract claim.

C.    *Harrison Is Entitled to Summary Judgment on its Breach-of-Guaranty Claim.*

Similarly, Harrison has proven its breach-of-guaranty claim against Ali. Both Texas and Louisiana law treat a breach-of-guaranty claim like a breach-of-contract claim: the plaintiff must show the existence of the guaranty and a breach of the guaranty. *United Cent. Bank v. Yoon*, 2015 WL 11120516, at *3 (N.D. Tex. Mar. 4, 2015) (citing *Byrd v. Est. of Nelms*, 154 S.W.3d 149, 157 (Tex. App.—Waco 2004, pet. denied)); *Ferrell v. S. Cent. Bell Tel. Co.*, 403 So.2d 698, 700–01 (La. 1981) (citations omitted).

Defendants concede that "Ali tender[ed] a personal guarant[y] in favor of Harrison under" the Credit Agreement. Doc. 137, Defs.' Mot. Br., ¶ 14. And "what triggers a default under the Credit Agreement"—and thus Ali's liability under the Guaranty—"is failure to pay Harrison[.]" Doc. 141, Defs.' Resp., ¶ 9. Indeed, under the Guaranty, Ali promised to "pay [Harrison] on demand any sum which may become due to [Harrison] by [A-Z] whenever [A-Z] shall fail to pay the same." Doc. 138, Defs.' App., 24.

Again, Defendants dispute Harrison's claim by asserting that "Harrison is not the proper party to sue . . . for A-Z's alleged failure to pay Imperial." Doc. 137, Defs.' Mot. Br. ¶ 14. Thus, they argue that "the parties never bargained for or contemplated that an alleged non-payment to Imperial could trigger a right to recovery by Harrison." *Id.* ¶ 27. In other words, Defendants' only defense to Harrison's breach-of-guaranty claim against Ali is that A-Z did not breach the Credit Agreement, but instead breached an oral agreement with Imperial. Thus, Defendants assert that Ali's liability under the Guaranty was never triggered. *See id.*

As discussed, however, there is no evidence of an oral agreement between Imperial and A-Z,

and A-Z did in fact fail to pay under the Credit Agreement. *See supra* Section III.A–B. Accordingly, the Guaranty requires Ali to pay the Debt to Harrison because A-Z "fail[ed] to pay the same." Doc. 138, Defs.' App., 24. And Defendants do not dispute that Ali failed to make any payment to Harrison for the Debt. *See generally* Doc. 137, Defs.' Mot. Br.

Viewing the evidence in the light most favorable to Defendants, the Court finds that there is no genuine issue of material fact as to whether Ali breached the Guaranty. Thus, the Court **GRANTS** Harrison's request for summary judgment on its breach-of-guaranty claim against Ali.

D.    *The Court Awards Harrison Damages.*

Given that there is no genuine issue of material fact regarding whether A-Z breached the Credit Agreement or whether Ali breached the Guaranty, the Court turns to damages.

Harrison claims that "A-Z owes $2,575,335.73, exclusive of interest and attorneys' fees, for cigarettes and other goods[.]" Doc. 134, Pl.'s Mot. Br., 12. In support, Harrison provides evidence including invoices, sworn declarations, and other documents that indicate the amount of the Debt is $2,575,335.73. *See* Doc. 138, Pl.'s Mot. App., 26–48; Doc. 53, Pl.'s First Mot. App., 40–74. Indeed, Harrison's evidence shows that A-Z owes past-due balances of $1,298,633.64 for goods shipped to its Dallas location and $1,276,702.09 for goods shipped to its Waco location. *See* Doc. 135, Pl.'s Mot. App., 47–48.

Defendants "readily admit[] that [A-Z] has an arrearage." Doc. 141, Defs.' Resp., ¶ 35. And while their briefing does not necessarily concede the amount of damages claimed by Harrison, Defendants do not dispute that amount. *See generally* Doc. 137, Defs.' Mot. Br.; Doc. 141, Defs.' Resp.; Doc. 148, Defs.' Reply. Indeed, Defendants conceded at a hearing that "there's really not a

dispute over how much is owed" and that they "don't have a defense" to "the amount that [Harrison is] claiming." *See* Doc. 132, Tr., 10:11–13, 13:6–8.

Thus, considering the evidence presented, "there is no genuine dispute as to any material fact" regarding the amount of damages. *See* Fed. R. Civ. P. 56(a). Accordingly, the Court awards Harrison $2,575.335.73 in damages, not including an award of attorneys' fees and interest.

E.      *Harrison Is Entitled to Attorneys' Fees, Pre-Judgment Interest, and Post-Judgment Interest.*

Harrison also seeks summary judgment on its request for attorneys' fees, pre-judgment interest, and post-judgment interest. Doc.134, Pl.'s Mot. Br., 14. Because the Court finds that A-Z breached the Credit Agreement and Ali breached the Guaranty, Harrison is entitled to an award of attorneys' fees and interest.

First, the Credit Agreement provides that A-Z "agrees to pay, in the event the account becomes delinquent and is turned over to an attorney or agency for collection, a reasonable fee." Doc. 138, Defs.' App., 24. And the Guaranty provides that Ali "agree[s] to pay, in the event the account becomes delinquent and is turned over to any attorney or collection agency for collection, a reasonable fee[.]" *Id.* When provided for by contract, both Texas and Louisiana law permit a party to recover attorneys' fees. *See, e.g.*, *Rivet v. State, Dept. of Transp., & Dev.*, 680 So.2d 1154, 1161 (La. 1996); *Peterson Grp., Inc. v. PLTQ Lotus Grp., L.P.*, 417 S.W.3d 46, 60 (Tex. App.—Hous.[1st Dist.] 2013). So, Harrison is entitled to attorneys' fees from both A-Z and Ali.

Second, the Credit Agreement provides that A-Z "agrees to any interest on all-past due sums at the rate of 22 percent per annum." Doc. 138, Defs.' App., 24. As Ali promised to "pay [Harrison] on demand any sum which may become due to [Harrison] by [A-Z] whenever [A-Z] shall fail to pay

the same," Ali is required to pay interest where A-Z fails to do so. *Id.* Accordingly, Harrison is entitled to pre-judgment interest from A-Z and Ali.

Finally, "[p]ost-judgment interest is awarded as a matter of course." *Meaux Surface Protection, Inc. v. Fogleman*, 607 F.3d 161, 173 (5th Cir. 2010) (citing 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court.")). Thus, Harrison is entitled to post-judgment interest from A-Z and Ali.

Therefore, the Court **GRANTS** Harrison's request for attorneys' fees and interest. Harrison must file supplemental documentation, within **TWENTY-ONE (21)** days of this Order, clarifying the amount of attorneys' fees and interest that Harrison seeks and providing its basis for calculating said amount. Defendant may respond to Harrison's request within **FOURTEEN (14)** days of Harrison's filing.

F.   *The Court Addresses the Parties' Objections to Evidence.*

Defendants object to portions of the sworn declarations of Wayne Baquet, Jr., Brad Prendergast, Daniel Burgos, Christopher McClure, and Scott Faley. *See* Doc. 141, Defs.' Resp., ¶¶ 38–52. Particularly, Defendants object to various statements as hearsay, improper legal conclusions, irrelevant, or a combination thereof. *See id.* The Court has reviewed all of Defendants' objections and arguments and finds them unavailing. Rather than address each objected-to line of each paragraph of each declaration, the Court holds as follows: Insofar as the Court relies upon any objected-to statements in this Order, those objections are **OVERRULED**. The Court has carefully reviewed the statements and determines that it has not relied upon hearsay, impermissible legal conclusions, or irrelevant evidence in reaching its decision. Insofar as the Court does not rely on

objected-to statements in this Order, Defendants' remaining objections are **MOOT**.

Similarly, because the Court does not rely on Amar B. Ali's deposition transcript in its Order, Harrison's Objections to and Motion to Strike (Doc. 140) are **MOOT**. And because the Court does not rely on the evidence in Defendants' Response Appendix (Doc. 142), Harrison's additional Objections to Defendants' Evidence (Doc. 144) are **MOOT**.

## IV.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Harrison's Second Motion for Summary Judgment (Doc. 133) and **DENIES** Defendants' Second Motion for Summary Judgment (Doc. 136). In doing so, the Court awards Harrison damages totaling $2,575,335.73 plus reasonable attorneys' fees and interest to be determined at a future time. Further, Harrison's Objections to and Motion to Strike (Doc. 140) and Objections to Evidence in Support of Defendants Response (Doc. 144) are **MOOT**. Finally, Defendants' objections, as set forth in their Response (Doc. 141), are **OVERRULED IN PART** and are otherwise **MOOT**. Finally, Harrison must file supplemental documentation, within **TWENTY-ONE (21)** days of the date of this Order, demonstrating the amount of attorneys' fees and interest that Harrison seeks, as well as its basis for calculating its request. Defendant may respond to Harrison's request within **FOURTEEN (14)** days of Harrison's filing.

SO ORDERED.

SIGNED: July 8, 2021.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE